**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) ) |
| *Plaintiff,* | ) **Non-Confidential Version** ) |
| v. | ) ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00246 ) |
| *Defendant,* | ) Business Proprietary Information ) Deleted from Pages: 36 & 39. |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, et al., | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ARENT FOX LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@ArentFox.com

November 22, 2021

# TABLE OF CONTENTS

Page

I.    STATEMENT PURSUANT TO RULE 56.2(C)(1) ...........................................................1

    A.    Administrative Record To Be Reviewed ...............................................................1

    B.    Issues Presented And Summary Of Argument .......................................................2

II.   STATEMENT OF FACTS ...................................................................................................4

III.  STANDARD OF REVIEW .................................................................................................8

IV.   ARGUMENT .......................................................................................................................9

    A.    Commerce's Duty Drawback Methodology Unlawfully Limited The
        Adjustment To U.S. Price ......................................................................................9

        1.    Commerce's Duty Drawback Methodology Conflicts With Its
               Historic and More Recent Practice Involving the Turkish IPR ...............10

        2.    Commerce's Duty Drawback Methodology Is Inconsistent With
               The Plain Language, Intent, and Purpose Of The Statute .......................12

        3.    Commerce's Duty Drawback Methodology Is Inconsistent With
               Recent Court Precedent ...........................................................................15

    B.    Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted
        From Export Price ................................................................................................17

        1.    The Statute Does Not Contemplate Adjustments For "Special"
               Tariffs .....................................................................................................18

        2.    The Section 232 Tariffs On Steel and Aluminum Imports Are
               "Special" Tariffs .....................................................................................22

            a.    Section 232 Tariffs Are Remedial .................................................22

            b.    Section 232 Tariffs Are Temporary ...............................................27

            c.    Section 232 Tariffs Were Implemented Under Congress's
                  Specific Delegation of Authority to the Executive ........................29

        3.    There Is A Clear Interplay Between Section 232 Tariffs and
               Antidumping Duties Such That Deducting Section 232 Tariffs
               Imposes A Double Remedy .....................................................................32

    C.    Commerce's Decision to Deny Assan the Home Market Rebate
        Adjustment to Which it is Entitled is Contrary to Law and Unsupported by
        Substantial Evidence on the Record ....................................................................35

         1.    Commerce's Decision to Deny Assan's Post-Sale Price
               Adjustments without Adequate Explanation or Analysis Was Not
               Support by Substantial Evidence and was Otherwise Not in
               Accordance with Law ..............................................................................35

AFDOCS/24889026.5

## TABLE OF CONTENTS
(continued)

**Page**

2.    Commerce's Failure to Issue a Supplemental Questionnaire and Allow Assan to Cure Any Deficiencies in its Response was Contrary to Law ........................................................................38

V.    PRAYER FOR RELIEF ....................................................................41

AFDOCS/24889026.5

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*AK Steel Corp. v. United States,*
988 F.Supp.584 (Ct. of Int'l Trade 1997) ..............................................................32

*Allied Tube & Conduit Corp. v. United States,*
374 F. Supp. 2d 1257 (Ct. Int'l Trade 2005) ......................................................10

*Am. Inst. for Int'l Steel, Inc. v. United States,*
376 F.Supp.3d 1335 (Ct. Int'l Trade 2019), *aff'd,* 806 F. App'x 982 (Fed. Cir.
2020), *cert denied,* 139 S. Ct. 2748 (2020) ..............................................26

*Apex Frozen Foods Priv. Ltd. v. United States,*
862 F.3d 1337 (Fed. Cir. 2017) ..............................................................38

*Asociacion Colombiana de Exportadores de Flores v. United States,*
6 F.Supp.2d 865 (1998) ..............................................................9

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
494 F.Supp.3d 1365 (Ct. Int'l Trade 2021) ..........................................*passim*

*Böwe-Passat v. United States,*
17 CIT 335 (1993) ..............................................................40

*Camp v. Pitts,*
411 U.S. 138 (1973) ..............................................................37

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ..............................................................9

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938) ..............................................................8

*CS Wind Viet. Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) ..............................................................38

*DuPont Teijin Films USA, LP v. United States,*
407 F.3d 1211 (Fed. Cir. 2005) ..............................................................8

*Eregli Demir ve Celik Fabrikalari T.A.S v. United States,*
357 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ..........................................15, 16

*Forest Lab'ys, Inc. v. United States,*
403 F. Supp. 2d 1348 (Ct. Int'l Trade 2005), *aff'd,* 476 F.3d 877 (Fed. Cir.
2007) ..............................................................30

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
   361 F. Supp. 3d 1314, 1320 (Ct. Int'l Trade 2019) .......................................................... 14, 16

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
   415 F. Supp. 3d 1195 (Ct. Int'l Trade 2019) ................................................................... 13

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*,
   429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ........................................................ 10, 15, 16

*Jacobi Carbons AB v. United States*,
   313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018 ................................................................... 38

*Jindal Poly Films Ltd. of India v. United States*,
   365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) .........................................................38, 40, 41

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ................................................................................... 8

*Maverick Tube Corp. v. United States*,
   861 F.3d 1269 (Fed. Cir. 2017) ................................................................................... 13

*NMB Sing. Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) ................................................................................21, 37

*Queen's Flowers de Colombia v. United States*,
   981 F. Supp. 617 (Ct. Int'l Trade 1997) ....................................................................... 41

*Rebar Trade Action Coal. ("RTAC") v. United States*,
   No. 14-268, 2016 WL 5122639 (Ct. Int'l Trade Sept. 21, 2016) ........................................ 15

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ................................................................................... 34

*Rhone-Poulenc, Inc. v. United States*,
   927 F.Supp. 451 (1996) ............................................................................................. 9

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
   635 F.3d 1335 (Fed. Cir. 2011) ................................................................................10, 14

*Ta Chen Stainless Steel Pipe v. United States*,
   No. 97–08–01344, 1999 WL 1001194 (Ct. Int'l Trade 1999) .........................................40, 41

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005) ................................................................................... 37

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
   321 F. Supp. 3d 1270 (Ct. Int'l Trade 2018) ......................................................14, 15, 16, 37

AFDOCS/24889026.5

*Transpacific Steel LLC v. United States*,
  4 F.4th 1306 (Fed. Cir. 2021) ............................................................... 27

*Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013) .............................................................. 9

*Uttam Galva Steels Ltd.("UGSL") v. United States*,
  311 F. Supp. 3d 1345 (Ct. Int'l Trade 2018), *aff'd* 997 F.3d 1192 (Fed. Cir.
  2021)........................................................................................ 15, 16, 17

*Wheatland Tube Co. v. United States*,
  495 F.3d 1355 (Fed. Cir. 2007) .................................................... *passim*

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................. 8

19 U.S.C. § 1671 ................................................................................ 23, 24

19 U.S.C. § 1673 ....................................................................... 18, 21, 25

19 U.S.C. § 1673a ................................................................................... 4

19 U.S.C. § 1677(7)(C) ......................................................................... 24

19 U.S.C. § 1677a(a) ............................................................................. 18

19 U.S.C. § 1677a(b) ............................................................................. 18

19 U.S.C. §1677a(c) .............................................................................. 14

19 U.S.C. § 1677a(c)(1)(B) ........................................................... *passim.*

19 U.S.C. § 1677a(c)(2)(A) ...................................................... 19, 20, 21

19 U.S.C. § 1677b ................................................................................... 3

19 U.S.C. § 1677b(a)(1)(B)(i) ............................................................... 35

19 U.S.C. § 1677m(d) ...................................................................... 38, 40

19 U.S.C. § 1862 ............................................................................. 23, 30

19 U.S.C. § 1862(b)(3)(A) .............................................................. 30, 31

19 U.S.C. § 1862(c) .............................................................................. 31

19 U.S.C. § 1862(c)(1)(A)(ii) ......................................................... 27, 31

AFDOCS/24889026.5

19 U.S.C. § 1862(d) ................................................................................................ 23, 24, 31

19 U.S.C. § 2251 ...................................................................................................... 23, 24

19 U.S.C. § 2251(a) ............................................................................................................ 24

19 U.S.C. § 2252 ................................................................................................................ 24

Trade Expansion Act of 1962 § 232 .............................................................................. *passim*

**Constitutional Provisions**

U.S. Const. Article I, § 8 ................................................................................................ 30

**Regulations**

19 C.F.R. § 351.102(b) .................................................................................................. 3, 35

19 C.F.R. § 351.401(c) ...................................................................................................... 35

**Administrative Determinations**

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From
    Korea: Final Results of Antidumping Duty Administrative Reviews*, 62 Fed.
    Reg. 18404 (Dep't Commerce Apr. 15, 1997) ...................................................... 19

*Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany,
    Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia,
    Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation
    of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19444 (Dep't
    Commerce April 7, 2020) ...................................................................................... 4

*Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany,
    Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia,
    South Africa, Spain, Taiwan, and Turkey*, 85 Fed. Reg. 23842 (Int'l Trade
    Comm'n April 29, 2020) (preliminary determ.) .................................................. 4

*Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany,
    India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa,
    Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*,
    86 Fed. Reg. 22139 (Apr. 27, 2021) ...................................................................... 2

*Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany,
    India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa,
    Spain, Taiwan, and Turkey*, 86 Fed. Reg. 22068 (Int'l Trade Comm'n Apr. 26,
    2021) (final determ.) .............................................................................................. 8

*Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative*
*Determination of Sales at Less Than Fair Value, Preliminary Negative*
*Determination of Critical Circumstances, Postponement of Final*
*Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346
(Oct. 15, 2020) ("Preliminary Determination"), and accompanying Issues &
Decision Memorandum .................................................................................6, 39

*Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of*
*Sales at Less Than Fair Value*, 86 Fed. Reg. 13326 (Dep't Commerce March
8, 2021, and accompanying Issues & Decision Memorandum ........................*passim*

*Light-Walled Rectangular Pipe and Tube from Turkey*, 69 Fed. Reg. 53675 (Dep't
Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues &
Decision Memorandum ..................................................................................11

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review*, 69 Fed. Reg. 19153
(Dep't Commerce Apr. 12, 2004) .......................................................19, 20, 22, 32

*Steel Concrete Reinforcing Bar From the Republic of Turkey,* 86 Fed. Reg. 28574
(Dep't Commerce May 27, 2021) (final AD results & determ. no shipments;
2018-2019), and accompanying Issues & Decision Memorandum.....................12, 17, 23, 32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 43181
(Dep't Commerce Aug. 6, 2021) (prelim. AD results & determ. no shipments;
2019-2020), and accompanying Issues & Decision Memorandum................................*passim*

**Other Authorities**

*Conversion of the Tariff Schedules of the United States Annotated Into the*
*Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC
Pub. 1400 (June 1983) ...................................................................................29

*Duty Drawback Practice in Antidumping Proceedings*, 70 Fed. Reg. 37764,
(Dep't Commerce June 30, 2005) (request for cmts.) .......................................10, 11

HTSUS, ch. 99...............................................................................................31

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty*
*Proceedings*, 81 Fed. Reg. 15641 (Dep't Commerce Mar. 24, 2016) (final
rule)................................................................................................................36

*Procedures To Consider Additional Requests for Exclusion of Particular Products*
*From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670
(USTR Feb. 14, 2018) ....................................................................................28

*Proclamation 9704 of March 8, 2018, Adjusting Imports of Aluminum Into the*
*United States*, 83 Fed. Reg. 11619 (Mar. 15, 2018)......................................26, 28

*Proclamation 9710 of March 22, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 13355 (Mar. 28, 2018) ...............................................28

*Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 20677 (May 7, 2018) .................................................28

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018) ...............................................29, 31, 34

*Proclamation 9758 of May 31, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 25849 (June 5, 2018) .............................................28

*Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019) ..............................................28

*Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020).................................................................28

*Publication of a Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508 (Dep't Commerce Jul. 6, 2020) .................................................................................17, 25

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ........................25, 33

*Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106 (Dep't Commerce Mar. 19, 2018) .......................................26

S. Rep. No. 16, 67th Cong., 1st Sess. (1921) ...............................................20

S. Rep. No. 90-1385, pt. 2 (1968) ...............................................................30

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103–316, Vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040.................................................................................14

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026 (Dep't Commerce Sept. 11, 2018)..........................26, 28

*Uruguay Round Agreements Act*, Pub. L. No. 103–465, 108 Stat. 4809 (1994)..........................14

-viii-

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., ) | |
| ) | |
| *Plaintiff*, ) | <u>**Non-Confidential Version**</u> |
| ) | |
| v. ) | |
| THE UNITED STATES, ) | Consol. Court No. 21-00246 |
| ) | |
| *Defendant*, ) | Business Proprietary Information |
| ) | Deleted from Pages: 36 & 39. |
| ALUMINUM ASSOCIATION COMMON ) | |
| ALLOY ALUMINUM SHEET TRADE ) | |
| ENFORCEMENT WORKING GROUP, et al., ) | |
| ) | |
| *Defendant-Intervenors*. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to the Court's Order dated August 16, 2021, ECF No. 24, Plaintiff Assan

Aluminyum Sanayi ve Ticaret A.S. ("Assan" or "Plaintiff"), a foreign manufacturer and exporter

of Common Alloy Aluminum Sheet ("CAAS") from Turkey, hereby submits this memorandum

of points and authorities in support of its motion for judgment on the agency record challenging

the final affirmative determination as set forth below.

**I.    STATEMENT PURSUANT TO RULE 56.2(C)(1)**

**A.    Administrative Record To Be Reviewed**

This is an appeal from the final affirmative determination in the sales at less-than-fair-

value ("LTFV") investigation of Common Alloy Aluminum Sheet From Turkey ("CAAS from

Turkey"). The period of investigation ("POI") is January 1, 2019 through December 31, 2019.

1

On March 8, 2021, the U.S. Department of Commerce, International Trade Administration, Enforcement and Compliance ("Commerce") published its final antidumping ("AD") duty determination finding that CAAS from Turkey is being or is likely being sold at less than fair value ("LTFV"). *Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13326 (Dep't Commerce March 8, 2021) ("*Final AD Determination*"), P.R. 358, ECF No. 15-1. Commerce's factual and legal conclusions underlying the *Final AD Determination* are set forth in its Issues and Decision Memorandum. Memorandum from J. Maeder to C. Marsh, Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey, and Final Negative Determination of Critical Circumstances (Mar. 1, 2021) ("*Final I&D Memo*"), P.R. 330, ECF No. 15-2.

On April 27, 2021, Commerce published the AD duty order. *Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22139 (Apr. 27, 2021) ("AD Orders"), P.R. 347.[1]

**B.    Issues Presented And Summary Of Argument**

Plaintiff raises the following three issues in this brief:

1.    Whether Commerce's decision to limit Plaintiff's claimed duty drawback adjustment by allocating the amount of import duties rebated or not collected by reason of exportation over all of Assan's production, including production for domestic sales, is contrary to law and unsupported by substantial evidence on the record. Consistent with the plain language

---

[1]In the *AD Order*, it was noted that the final determination for Turkey was published with an incorrect investigation number. *Id*., 86 Fed. Reg. at 22140 n.1, P.R. 347. Specifically, The final affirmative determination for Turkey was inadvertently published under the case number for Italy (A–475–842). The correct case number for Turkey is A–489–839. *Id.*

of the statute, and Commerce's longstanding two-prong test for determining whether a drawback adjustment may be granted, Assan was entitled to a full drawback adjustment to U.S. price for the entire amount of the import duty rebated or not collected on its export sales.  By allocating Assan's exempted import duties over total production, rather than exports as required by the statute, Commerce significantly limited the amount of per-unit duty drawback being added to U.S. price. As this Court has repeatedly held, Commerce's "duty neutral" methodology applied in the *Final AD Determination* is unsupported by substantial evidence and is otherwise not in accordance with law

      2.     Whether Commerce should not deduct Section 232 tariffs paid by Assan from the export price of its U.S. sales because the Section 232 tariffs are "special" tariffs imposed pursuant to a specific congressional delegation of tariff making authority to the executive branch, rather than ordinary U.S. import duties within the meaning of the antidumping statute. The Section 232 tariffs are remedial, temporary, and treated differently than normal customs duties in the Harmonized Tariff Schedule, and their deduction from U.S. price in the *Final AD Determination* imposes a double-remedy that is contrary to the statute. Commerce's determination to treat the special Section 232 tariffs as ordinary customs duties and deduct the full amount of tariffs paid from Assan's export price is thus unsupported by substantial evidence and is otherwise not in accordance with law.

      3.     Whether Commerce's decision to deny Assan the home market rebate adjustment to which it is entitled is contrary to law and unsupported by substantial evidence on the record. The statute (19 U.S.C. § 1677b) provides for various adjustments to normal value to determine the prices to be used in U.S. price comparisons. Commerce's regulation (19 C.F.R. § 351.102(b)(38)) lists permitted price adjustments, which include "any change in the price

3

charged for subject merchandise or the foreign like product, such as discounts, rebates, and post-sale price adjustments that are reflected in the purchaser's net outlay." Assan claimed a home market rebate adjustment for certain sales where customers received rebates tied to the volume of purchases made in a given period. Record evidence identified the affected customers, sales contracts, and specific rebates issued. Proof of payment was provided and reconciled to both the per unit rebate calculations and company accounting. Assan was thus entitled to claim these reported rebates as a downward adjustment to normal value and Commerce's denial of the claimed adjustment in the *Final AD Determination* is thus unsupported by substantial evidence and is otherwise not in accordance with law

## II.   <u>STATEMENT OF FACTS</u>

Commerce initiated the antidumping duty investigation of CAAS from Turkey pursuant to Section 732 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673a. *See Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19444 (Dep't Commerce April 7, 2020), P.R. 34. On April 22, 2020, the United States International Trade Commission ("ITC") preliminarily determined that there is a reasonable indication that imports of CAAS from Turkey are materially injuring the U.S. industry. *See Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey*, 85 Fed. Reg. 23842 (Int'l Trade Comm'n April 29, 2020) (preliminary determ.).

Assan was one of the two mandatory respondents in Commerce's investigation and participated throughout the proceeding through the filing of questionnaire responses, verification

4

of the data submitted, and submission of legal arguments.  On June 3, 2020, Assan submitted its

response to Section A of Commerce's antidumping duty questionnaire. *See* Section A

Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S. (June 3, 2020) ("Section A

QR"), C.R. 21-24, P.R. 117-119. On June 29, 2020, Assan submitted its responses to sections B

and C of the questionnaire.  *See* Section B Questionnaire Response of Assan Aluminyum Sanayi

ve Ticaret A.S. (June 29, 2020) ("Section B QR"), C.R. 28-51, P.R. 141; Section C Questionnaire

Response of Assan Aluminyum Sanayi ve Ticaret A.S. (June 29, 2020) ("Section C QR"), C.R.

52-63, P.R. 142-143. On July 2, 2020, Assan submitted its response to Section D of the

questionnaire. *See* Section D Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret

A.S. (July 2, 2020) ("Section D QR"), C.R. 70-88, P.R. 148.  Assan also filed numerous

supplemental questionnaire responses.  *See e.g.*, Supplemental Section A Questionnaire Response

of Assan Aluminyum Sanayi ve Ticaret A.S. (July 24, 2020) ("Supp. A QR"), C.R. 111-121, P.R.

164-165; Supplemental Section D Questionnaire Response of Assan Aluminyum Sanayi ve

Ticaret A.S. (Aug. 18, 2020) ("Supp. D QR"), C.R. 181-216, P.R. 195-196; Supplemental

Section D Questionnaire Response – Question 23, Subparts b, d, and f of Assan Aluminyum

Sanayi ve Ticaret A.S. (Aug. 21, 2020) ("Supp. D, Qu. 23, Subparts b, d & F QR"), C.R. 217-

219, P.R. 200; Supplemental Section B Questionnaire Response of Assan Aluminyum Sanayi ve

Ticaret A.S. (Sept. 3, 2020) ("Supp. B QR"), C.R. 253-281, P.R. 217-218; Supplemental Section

C Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S. (Sept. 10, 2020) ("Supp.

C QR"), C.R. 283-291, P.R. 227; Second Supplemental Section D Questionnaire Response of

Assan Aluminyum Sanayi ve Ticaret A.S. (Sept. 15, 2020) ("2nd Supp. D QR"), C.R. 305-313,

P.R. 235.  In addition, Assan provided quantity and value information. *See e.g.* Quantity & Value

Shipment Data (Sept. 15, 2020), C.R. 303-304, P.R. 234; Quantity & Value Shipment Data (Oct.

15, 2020), C.R.350-351, P.R. 263; Quantity & Value Shipment Data (Nov. 16, 2020), C.R.362-363, P.R. 282.

Commerce issued the preliminary determination calculating a preliminary dumping margin for Assan of 12.65 percent.  *Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346, 65347 (Oct. 15, 2020) ("Preliminary Determination"), P.R. 264. Commerce's factual and legal conclusions underlying its preliminary determination are set forth in the Preliminary Decision Memorandum.  Memorandum from J. Maeder to J. Kessler, re: Decision Memorandum for the Preliminary Affirmative Determination in the Less Than Fair Value Investigation of Common Alloy Aluminum Sheet from Turkey (Oct. 6, 2020) ("Preliminary Decision Memo"), P.R. 247.

On December 18, 2020, Assan submitted its response to Commerce's request for documents in lieu of verification. Response to Request for Documents in Lieu of Verification of Assan Aluminyum Sanayi ve Ticaret A.S. (Dec. 18, 2020) ("Verification Response"), C.R. 373-398, P.R. 305.

On January 6, 2021, Assan filed a case brief.  In its case brief, Assan commented on the calculation of a full duty drawback adjustment to U.S. price, Assan's eligibility for a home market ("HM") rebate adjustment, and the treatment of additional Section 232 duties in the margin calculation. Case Brief of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 6, 2021) ("Assan Case Br."), C.R. 400, P.R. 309  With regard to the duty drawback adjustment, Assan claimed that Commerce incorrectly calculated the statutory duty drawback adjustment to which Assan was entitled by applying a purportedly "duty neutral" methodology allocating the amount

6

of duties rebated or not collected "to all production," rather than to total exports as required by the plain language of the statue and the reviewing courts. *Id.* at 6-11. Next, Assan argued that Commerce incorrectly rejected Assan's HM rebate adjustment methodology based on a misunderstanding of the record and available evidence confirming that the adjustment should be accepted. *Id.* at 11-12. Finally, Assan challenged Commerce's treatment of the additional Section 232 tariffs levied on Kibar Americas as ordinary customs duties, rather than "special" tariffs that should not be deducted from Assan's U.S. price. *Id.* at 16-24.

On January 19, 2021, Assan filed a rebuttal brief. Rebuttal Brief of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 19, 2021) ("Rebuttal Br."), C.R. 404, P.R. 317. In its rebuttal brief, Assan maintained, amongst other things, that Commerce should continue to grant Assan a duty drawback adjustment in the final determination, consistent with its longstanding practice in Turkish cases, because it met the requirements under Turkey's Inward Processing Regime ("IPR") and thus satisfied Commerce's two-prong test to qualify for the full statutory adjustment. Rebuttal Br. at 2-7.

On March 8, 2021, Commerce published its *Final AD Determination* finding that CAAS from Turkey was being sold at less-than-fair-value and calculating a final rate for Assan of 2.02 percent. 86 Fed. Reg. at 13327, P.R. 358. Commerce's calculations underlying its *Final AD Determination* are set forth in the Memorandum from S. Carey to The File, re Final Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S. (Mar. 1, 2021) ("Final Calculation Memo"), C.R. 407, P.R.333.

In the *Final AD Determination*, Commerce determined that Assan met its two-prong test for a duty drawback adjustment, but granted only a partial adjustment to Assan's U.S. sales price using a methodology that was not limited to export sales as required by the statute, 19 U.S.C.

7

§ 1677a(c)(1)(B), but rather allocated the adjustment over Assan's total production during the POI, including production for domestic sales. *Final I&D Memo* at 8-11 (Cmt. 1), P.R. 330, ECF No. 15-2. Commerce also treated the Section 232 tariffs paid by Assan as ordinary customs duties, distinct from antidumping, section 201 safeguards, and other "special" tariffs, and thus deducted them from U.S. price. *Id.* at 14-15 (Cmt. 2). Finally, with regards to Assan's reported HM rebate adjustment, Commerce continued to find that Assan was not entitled to an adjustment because the company did not demonstrate that the customer reached the sales volume target specified in the rebate agreement or that the full amount of the rebate was actually paid. *Id.* at 22 (Cmt. 6). The U.S. International Trade Commission made an affirmative final injury determination, published as *Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey*, 86 Fed. Reg. 22068 (Int'l Trade Comm'n Apr. 26, 2021) (final determ.). Commerce published the *AD Orders* on April 27, 2021.  86 Fed. Reg. at 22139, P.R. 347.

## III.   <u>STANDARD OF REVIEW</u>

This Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotations omitted)).

AFDOCS/24889026.5

When reviewing Commerce's statutory interpretations, the Court applies the two-part framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–43, (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the court conducts a two-part test. Under the first prong of this test, the court determines whether Congress has spoken directly to the question at issue, and if it has, the court and the agency must give effect to the unambiguously expressed intent of Congress. *See id.* Where the statute is vague or silent on an issue, the court upholds Commerce's interpretation only if the interpretation is reasonable. *See id.* at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865, 880 (1998).

## IV.   <u>ARGUMENT</u>

### A.   Commerce's Duty Drawback Methodology Unlawfully Limited The Adjustment To U.S. Price

In the *Final AD Determination*, Commerce found that Assan was eligible for a duty drawback adjustment and granted such an adjustment to Assan. *Final I&D Memo* at 8, P.R. 330, ECF No. 15-2. However, Commerce's calculation of the drawback adjustment was improperly based on an allocation "to all *production* for the relevant period based on the cost of inputs during the POI." *Id.* (emphasis added). Though Commerce claims this "duty neutral" calculation was "consistent with {its} practice," its methodology conflicts with both Court precedent and Commerce's more recent determinations involving the Turkish drawback system, *i.e.* the Import

9

Processing Regime ("IPR"). *Id.* The reviewing courts have consistently found Commerce's drawback calculations to be unlawful, confirming that the adjustment Assan is entitled to should be recalculated based on total exports covered by the drawback, rather than total production, consistent with Commerce's practice and the plain language of the statute. *See, e.g.*, *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1364 (Ct. Int'l Trade 2020).

### 1. Commerce's Duty Drawback Methodology Conflicts With Its Historic and More Recent Practice Involving the Turkish IPR

In determining whether to grant a duty drawback adjustment to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test in which the party requesting the adjustment must demonstrate:

(1) that the exemption is linked to the exportation of the subject merchandise; and (2) there are sufficient imports of the raw material to account for the duty drawback on the export of subject merchandise.

*See Final I&D Memo* at 8, P.R. 330, ECF No. 15-2; *see also Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011); *Allied Tube & Conduit Corp. v. United States*, 374 F. Supp. 2d 1257, 1261 (Ct. Int'l Trade 2005).

It has been Commerce's longstanding policy that, where an importer satisfies both criteria, Commerce grants a drawback adjustment to EP and constructed export price ("CEP") for the amount of the duty foregone.  Historically, Commerce has calculated this adjustment by allocating exempted and rebated duties over exports to the U.S. *See Duty Drawback Practice in Antidumping Proceedings*, 70 Fed. Reg. 37764, 37764-66 (Dep't Commerce June 30, 2005) (request for cmts.) ("*Duty Drawback Notice*") (requesting comments on its "long-standing" duty drawback practice in antidumping proceedings). This methodology has been applied by Commerce in determinations addressing the Turkish drawback system for more than 17 years

10

and Turkey's IPR system has not changed. *See, e.g., Light-Walled Rectangular Pipe and Tube from Turkey*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 9 (cmt. 1) ("The only limitation placed on the duty drawback adjustment is that the adjustment to the U.S. price may not exceed the amount of import duty actually paid.").

In this case, Commerce determined that Assan met its two-prong test for a duty drawback adjustment to U.S. price for the IPR. *Final I&D Memo* at 8-9, P.R. 330, ECF No. 15-2. Specifically, Commerce found that "Assan's import duty costs, based on the consumption of imported inputs during the POI, including imputed duty costs for imported inputs, properly account for the amount of duties imposed." *Id.* at 9. Having found that Assan satisfied its requirements for a duty drawback adjustment, Commerce should have simply granted Assan a full duty drawback adjustment to U.S. price by dividing the amount of the uncollected duty by Assan's total exports covered by drawback, in accordance with its usual practice. *See Duty Drawback Notice*, 70 Fed. Reg. at 37764-66. Instead, in contravention of its long-standing practice, Commerce used production, rather than exports, as the denominator in its calculation of the duty drawback ratio, rejecting the *full* amount of the duty drawback adjustment to U.S. price accurately reported by Assan in favor of an *imputed* amount. *Final I&D Memo* at 8-9, P.R. 330, ECF No. 15-2.  In adjusting U.S. price by the per-unit duty cost, as reflected in the *cost of production*, Commerce effectively granted Assan only a fraction of actual duty exemptions earned on U.S. sales. *Id.*

As detailed below, this purportedly "duty neutral" methodology has been rejected on multiple occasions by the reviewing courts and abandoned by Commerce in more recent proceedings involving the Turkish IPR. For example, in the 2018-2019 administrative reviews of

the antidumping duty order on *Steel Concrete Reinforcing Bar ("Rebar") From Turkey*, Commerce acknowledged that "use of the 'duty neutral' methodology has not been affirmed by the CIT and the Federal Circuit," and instead calculated the duty drawback adjustment "by allocating the allowable amount of exempted duties (*i.e.*, the amount attributable to IPCs determined to be closed by the {Government of Turkey}) over the total quantity of exports under the closed IPCs listing exports to the U.S. during the POR." 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021) (final AD results & determ. no shipments; 2018-2019), and accompanying Issues & Decision Memorandum at 12. Similarly, in the in the 2019-2020 review of the same order, Commerce abandoned its "duty neutral" methodology and instead allocated the adjustment "over the total quantity of exports{.}" *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 43181 (Dep't Commerce Aug. 6, 2021) (prelim. AD results & determ. no shipments; 2019-2020), and accompanying Issues & Decision Memorandum at 18.

Like respondents in *Rebar from Turkey*, Assan qualifies for, and should have received, a full duty drawback adjustment based on its exports of subject merchandise, in accordance with Commerce's statutory mandate and the facts of this case.

> ### 2. Commerce's Duty Drawback Methodology Is Inconsistent With The Plain Language, Intent, and Purpose Of The Statute

Commerce's calculation of the duty drawback adjustment to U.S. price in the *Final AD Determination* was designed to reduce the adjustment by allocating the exempted duties over total production, rather than total exports of subject merchandise, in contravention of the plain language, intent, and underlying purpose of the statute. *Final I&D Memo* at 8, P.R. 330, ECF No. 15-2.

12

First, the plain language of the drawback statute (19 U.S.C. § 1677a(c)(1)(B)) requires a full upward adjustment to U.S. price related to exportation, not production. Specifically, in making a duty drawback adjustment, the statute directs Commerce to increase EP or CEP by:

> the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, ***by reason of the exportation*** of the subject merchandise to the United States{.}

19 U.S.C. § 1677a(c)(1)(B) (emphasis added).The statute thus tells Commerce all it needs to know about adjusting U.S. price for duty drawback and clearly contemplates an adjustment directly related to the act of exporting rather than producing subject merchandise. *Id*. As such, this Court has found Commerce's methodology to unlawfully ignore the "statutory linkage" between the exempted duties and the products exported to the United States. *See, e.g.*, *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 415 F. Supp. 3d 1195, 1203 (Ct. Int'l Trade 2019). The allocation of drawback over production in this case likewise violates the statute's linkage of the drawback adjustment in § 1677a(c)(1)(B) to the act of exporting ("by reason of"). Consistent with the plain language of 19 U.S.C. § 1677a(c)(1)(B), Assan is entitled to a full duty drawback adjustment based on the allocation of the duty exemption to exports, not production.

Second, Commerce's methodology contradicts the intent of the statute and the Court's long-standing recognition that duty drawback adjustments should be granted "*only when there is some kind of connection* between the nonpayment of import duties and the exportation of the subject merchandise to the United States," *i.e.* where "but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty." *Maverick Tube Corp. v. United States*, 861 F.3d 1269, 1273 (Fed. Cir. 2017) (emphasis added).  Indeed, the connection between the drawback adjustment and total exports is clearly

13

articulated in the Statement of Administrative Action ("SAA") accompanying the Uruguay

Round Agreements Act ("URAA"), which enacted the duty drawback statute, 19 U.S.C.

§1677a(c), in its current form. *See Uruguay Round Agreements Act*, Pub. L. No. 103–465, § 223,

108 Stat. 4809, 4876 (1994). Specifically, the SAA explained that, under the statute, "Commerce

will calculate export price and constructed export price by adding to the starting prices . . .

import duties that are rebated or not collected *due to the exportation* of the merchandise (duty

drawback){.}" *Statement of Administrative Action accompanying the Uruguay Round*

*Agreements Act*, H.R. Rep. No. 103–316, Vol. 1, at 822–23 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4163 (emphasis added).

Finally, Commerce's allocation of the drawback adjustment over total production is

contrary to the statute's explicit purpose, as articulated by Commerce and the reviewing courts.

The duty drawback adjustment is intended to "prevent a dumping margin from being created, or

artificially inflated, because the exporting country exempts from import duties (or

refunds/rebates import duties paid on) material inputs or components that are imported into the

country and used to produce a product that is subsequently exported." *Borusan Mannesmann*

*Boru Sanayi ve Ticaret A.S. v. United States*, 222 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2017);

*see also Wheatland Tube*, 414 F. Supp. 2d 1271, 1286 (Ct. Int'l Trade 2006), *rev'd on other*

*grounds*, 495 F.3d 1355 (Fed. Cir. 2007). The duty drawback adjustment compensates for the fact

that import duty costs reflected in home market price or normal value are not reflected in export

price. *Saha Thai*, 635 F.3d at 1338. By design, the duty drawback adjustment is therefore an

*upward* adjustment to U.S. price. *See Borusan Mannesmann*, 222 F. Supp. 2d at 1261 (describing

duty drawback as "the upward adjustment made to the export price pursuant to 19 U.S.C.

§ 1677a(c)(1)(B)"); *see also Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 321 F. Supp.

14

3d 1270, 1278 (Ct. Int'l Trade 2018) ("The statute allows for an upward adjustment to EP{.}"). Because total production is normally a larger figure than total exports, use of total production rather than total exports as the denominator in the drawback calculation improperly reduces the adjustment to U.S. sales by improperly "attribut{ing} some of the drawback to domestic sales, which do not earn drawback." *Eregli Demir ve Celik Fabrikalari T.A.S v. United States*, 357 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018). This allocation, in part, to Turkish sales that cannot qualify for drawback under the IPR program, which only provides duty exemptions for exported product, violates the statute's linkage of the drawback adjustment in § 1677a(c)(1)(B) to the act of exporting ("by reason of"). Because Assan did not receive any exemptions on products sold domestically, those costs should not be included in the duty drawback adjustment *to U.S. price*.

### 3. Commerce's Duty Drawback Methodology Is Inconsistent With Recent Court Precedent

The courts have repeatedly considered Commerce's "duty neutral" methodology and found that there is no legal or factual basis for computing a per unit drawback adjustment to U.S. price over any other denominator than the exports to which it is linked.  Indeed, this Court has specifically remanded the exact methodology which Commerce used here on numerous occasions in the last five years, finding that it unlawfully reduced the duty drawback adjustment respondents are entitled to receive under the statute. *See, e.g.*, *Icdas Celik*, 429 F. Supp. 3d at 1364 (emphasis added) ("The {statute} *provides no indication that the duty drawback should instead be tied to overall production*.")*; Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1314, 1320 (Ct. Int'l Trade 2019); *Eregli Demir*, 357 F. Supp. 3d at 1333; *Toscelik Profil*, 321 F. Supp. 3d at 1278; *Uttam Galva Steels Ltd.("UGSL") v. United States*, 311 F. Supp. 3d 1345, 1355 (Ct. Int'l Trade 2018), *aff'd* 997 F.3d 1192 (Fed. Cir. 2021); *Rebar Trade Action Coal. ("RTAC") v. United States*, No. 14-268, 2016 WL 5122639, at *6 (Ct.

15

Int'l Trade Sept. 21, 2016).  In the majority of those instances, the Court analyzed the exact same duty drawback program (IPR) and the same methodology (allocation over production) used to calculate the drawback adjustment as that applied by Commerce in this case. *See Icdas Celik*, 429 F. Supp. 3d at 1364; *Habas Sinai*, 361 F. Supp. 3d at 1320; *Eregli Demir*, 357 F. Supp. 3d at 1333; *Toscelik Profil*, 321 F. Supp. 3d at 1278; *RTAC*, 2016 WL 5122639, at *6.

Most recently, in *Icdas Celik*, the Court considered Commerce's duty neutral methodology as applied to Turkish producers of rebar, finding that the statute "explicitly states that the export price should be increased by the amount of import duties rebated or not collected because of exportation of the merchandise" and that Commerce's methodology is thus "inconsistent with the plain language of 19 U.S.C. § 1677a(c)(1)(B)." 429 F. Supp. 3d at 1364. Because "{t}he plain language of the statute, persuasive case law from this court, and the legislative history all support the proposition that the duty drawback must be tied to exported merchandise," the Court declared Commerce's "duty neutral methodology {to be} contrary to law" and remanded the case with instructions for Commerce to "recalculate the duty drawback adjustment." *Id.* at 1365.

This year, the Court of Appeals for the Federal Circuit ("CAFC") also considered Commerce's drawback methodology and affirmed Commerce's remand redetermination based on an allocation over total exports, rather than total production. *UGSL*, 997 F.3d at 1197. The CAFC affirmed that an allocation of the "duty drawback adjustment between exported goods and home-market goods, which lessen{s the} overall duty drawback adjustment to export price" has no basis in the statute, instead finding that the "statute requires an adjustment to 'export price' based on the full extent of the duty drawback." *Id.* at 1197. The more recent CAFC precedent highlights that Commerce's citation to the CAFC decision in *Saha Thai* in support of its duty

16

drawback adjustment in this case is misplaced. *Final I&D Memo* at 9-10, P.R. 330, ECF No. 15-2 (citing 635 F.3d at 1342-43).As the CAFC has now confirmed, Commerce's reading of *Saha Thai* erroneously conflates the duty drawback adjustment to U.S. price with the *Saha Thai* cost side adjustment and ignores that duty drawback is causally related to *exportation*, not home market sales. *UGSL*, 997 F.3d at 1198 (citation omitted) ("The entire drawback was allowed 'by reason of the exportation.'").

As detailed above, Assan's comprehensive reporting in this case was sufficient to satisfy Commerce's two-prong test and there is thus no reason to set aside the actual exports reported by Assan on which the duty exemptions were earned and instead to allocate the duty exemptions over total production. Commerce's methodology in this case is inconsistent with the statute and should be rejected, consistent with the precedent of this Court and the CAFC.

**B.   Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price**

Certain CAAS imported by Turkish Respondents during the POR were subject to additional tariffs imposed pursuant Section 232 of the Trade Expansion Act of 1962. Section C QR at Appendix V, C.R. 52, P.R. 142. Section 232 tariffs are special tariffs imposed to remedy threats to national security – in this case a threat to the viability of the U.S. steel and aluminum industries. *See Publication of a Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Aluminum Report*").

In its *Final AD Determination*, Commerce concluded that "section 232 duties should be treated as U.S. import duties" and "thereby customs duties which are deducted from U.S. price." *Final I&D Memo* at 14-15, P.R. 330, ECF No. 15-2. However, Commerce's treatment of the Section 232 tariffs as regular U.S. import duties, rather than special tariffs is unsupported by

17

substantial evidence. Commerce's deduction of the Section 232 tariffs from U.S. price, which

effectively increases antidumping margins solely on the basis of the special tariffs imposed, is

contrary to Commerce's longstanding policy of excluding adjustments for special tariffs, such as

safeguards, antidumping, and countervailing ("CVD") duties, which has been consistently

upheld by the reviewing courts, and unlawfully results in a double remedy. *See, e.g.*, *Wheatland*,

495 F.3d at 1363.

The Court previously considered treatment of Section 232 tariffs in *Borusan*

*Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, and found that, "{w}hile Section 232

duties are 'special' in some sense . . . they are still import duties" and the "the reasoning provided

by Commerce differentiating its treatment of Section 232 and Section 201 duties is {not} so

lacking in merit that the court must say it is arbitrary." 494 F. Supp. 3d 1365, 1375-76 (Ct. Int'l

Trade 2021), *appeal docketed*, Fed. Cir. No. 2021-2240. For the reasons that follow, the Court

should reconsider its ruling and find that the special Section 232 tariffs are distinguishable from

ordinary U.S. import duties and may not be deducted from EP and CEP.

### 1.    The Statute Does Not Contemplate Adjustments For "Special" Tariffs

Commerce calculates a margin of dumping based on a comparison between the price of

the merchandise sold in the home market, *i.e.* the "normal value," and the price of merchandise

sold in the United States. 19 U.S.C. § 1673. The export ("EP") or constructed export ("CEP")

price in this comparison refers to ex-factory prices, which are adjusted based on specific factors

outlined in the statute. 19 U.S.C. §§ 1677a(a)-(b). Specifically, Commerce is statutorily

mandated to, amongst other things, reduce the price used to establish both EP and CEP by:

> {T}he amount, if any, included in such price, attributable to any additional costs,
> charges, or expenses, and *United States import duties*, which are incident to
> bringing the subject merchandise from the original place of shipment in the
> exporting country to the place of delivery in the United States."

*Id.* § 1677a(c)(2)(A) (emphasis added). The statute does not define "United States import duties" and the reviewing courts have found that it is an "ambiguous phrase in the statute." *Borusan*, 494 F. Supp. 3d at 1372 (citing *Wheatland Tube*, 495 F.3d at 1359–60). Relying on the legislative history, Commerce has determined that the phrase "United States import duties" does not cover all U.S. customs duties imposed on imported merchandise, but rather excludes special or remedial remedies, including safeguards (Section 201) and trade remedies (AD/CVD), which should not be treated as "United States import duties" for purposes of calculating gross U.S. price. *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153, 19159 (Dep't Commerce Apr. 12, 2004) (final AD review results) ("*SSWR Korea*"); *see also Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea*, 62 Fed. Reg. 18404, 18421 (Dep't Commerce Apr. 15, 1997) (final AD results) (distinguishing between "special" dumping duties and "ordinary" customs duties, and determining that "United States import duties" are limited to ordinary duties); *Borusan*, 494 F. Supp. 3d at 1372 ("Commerce relied on the legislative history of the Antidumping Act of 1921 to conclude there is a distinction between '*special* dumping duties' and '*normal* customs duties' (also referred to as 'United States import duties').").

For example, in *SSWR Korea*, Commerce specifically issued an interpretation of the statutory term "United States import duties" following formal notice and comment procedures. *SSWR Korea*, 69 Fed. Reg. at 19157-61. Upon examination of the legislative history of the Antidumping Act of 1921, from which section 1677a(c)(2)(A) derives, Commerce concluded that the term United Sates import duties was intended to apply only to regular customs duties and did not cover special tariffs such as antidumping duties. *Id*. at 19159; *see also Borusan*, 494 F. Supp. 3d at 1372 ("Congress intended that some duties implementing trade remedies, such as AD

AFDOCS/24889026.5

duties, are special duties to be distinguished from the normal duties that should be deducted from EP and CEP.").[2] Reasoning that Section 201 safeguards are remedial tariffs that are temporary in nature, the deduction of which would result in a double remedy by imposing the Section 201 tariffs a second time in the form of a dollar-for-dollar increase in antidumping duties, Commerce explicitly found that safeguards were special tariffs not to be deducted from U.S. price under section 1677a(c)(2)(A). *SSWR Korea*, 69 Fed. Reg. at 19159-61.

This Court has recognized Commerce's distinction between special dumping tariffs and ordinary customs duties, and the U.S. Court of Appeals for the Federal Circuit has affirmed that this interpretation of "United States import duties" as not including special tariffs is reasonable. *Wheatland Tube*, 495 F.3d at 1365-66; *see, e.g., Borusan*, 494 F.Supp.3d at 1372. In *Wheatland Tube*, the CAFC concluded that Congress did not intend all duties to be considered "United States import duties" and that Section 201 safeguards were properly considered special tariffs that should not be deducted from EP and CEP. 495 F.3d at 1361. Specifically, the CAFC found that:

> Like antidumping duties, Commerce found that § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports. Antidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. Similarly, § 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports. Normal customs duties, in contrast, have no remedial purpose. They are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

*Id.* at 1362 (citations omitted). The court noted with approval Commerce's observation that "antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed

---

[2]Further support for the distinction is found in the Senate report regarding the Antidumping Act of 1921, which consistently refers to antidumping duties as "special dumping duties," while referring to ordinary customs duties as "United States import duties." *See* S. Rep. No. 16, at 4 (1921).

based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise." *Id.* "Given the similarities between antidumping duties and § 201 safeguard duties," the CAFC held:

> {I}t was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties." Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as antidumping duties and not deduct them from the EP when calculating dumping margin.

*Id.* (citations omitted). Finally, the court affirmed as reasonable Commerce's finding that "if § 201 safeguard duties were included as 'United States import duties' for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice." *Id.*

Consistent with CAFC precedent, Commerce has interpreted 19 U.S.C. § 1677a(c)(2)(A) to provide for the deduction only of regular customs duties and not special remedial tariffs. Because special tariffs are distinct from ordinary customs duties, their deduction from U.S. price in calculating antidumping margins is not contemplated by the statute. 19 U.S.C. § 1677a(c)(2)(A). Where, as here, Commerce has "establishe{d} a course of action . . . {it} is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). In finding the Section 232 tariffs to be ordinary customs duties, Commerce has departed from its consistent interpretation of the statute without adequately explaining its reasons for diverging from it. As Commerce has repeatedly found, and the CAFC has affirmed, 19 U.S.C. § 1677a(c)(2)(A) provides for the deduction only of regular customs duties and not special tariffs. Section 232 tariffs are remedial, temporary, and indistinguishable from the antidumping

21

and Section 201 safeguards that Commerce and the reviewing courts have consistently found to be non-deductible United States import duties.

### 2. The Section 232 Tariffs On Steel and Aluminum Imports Are "Special" Tariffs

In the *Final AD Determination*, Commerce found that "{s}ection 232 duties are not akin to antidumping or section 201 duties" and should be treated "as 'ordinary' customs duties." *Final I&D Memo* at 14-15 (citation omitted), P.R. 330, ECF No. 15-2. However, Commerce has itself "acknowledge{d} the extraordinary nature of 232 duties," in the absence of which the U.S. "industry will continue to decline{.}" *See* Memorandum from C. Showers to P. Lee Smith, re: Issues and Decision Memorandum for the Final Normal Value Calculations to be Effective from Release of the Final Normal Values through June 30, 2019, under the Agreement Suspending the Antidumping Duty Investigation on Certain Oil Country Tubular Goods from Ukraine (A-823-815), at 7 (Feb. 15, 2019), ACCESS Barcode 3793809-01. It is clear that Commerce and the Administration contemplated the Section 232 tariffs as an alternate means to remedy injury and/or threat of injury to a domestic industry, consistent with the underlying purpose of other special tariffs. Moreover, similar to Section 201 safeguards and antidumping duties, the Section 232 tariffs are remedial, temporary, and were implemented under Congress's delegation of authority, providing additional support for their treatment as special tariffs in dumping calculations.

### a. Section 232 Tariffs Are Remedial

In finding that Section 201 safeguards are properly characterized as special tariffs, Commerce and the CAFC found it significant that Section 201 safeguards, like antidumping duties, are remedial in nature. *SSWR Korea*, 69 Fed. Reg. at 19159; *Wheatland Tube*, 495 F.3d at 1362. By contrast, ordinary customs duties, which are imposed "regardless of whether the U.S.

22

industry is suffering adverse effects as a result of imports," have "no remedial purpose." *Wheatland Tube*, 495 F.3d at 1362.

In the *Final AD Determination*, Commerce found that the Section 232 tariffs "have no remedial purpose" because they are "focused on addressing imports that threaten to impair national security, separate and apart from any function performed by antidumping and 201 safeguard duties to remedy injury to a domestic industry." *Final I&D Memo* at 14-15, P.R. 330. This is a distinction without a difference. Contrary to Commerce's claims, Section 232 tariffs, as well as Section 201 and antidumping duties, "are all directed at the same overarching purposes – protecting the bottom line of domestic producers." *Wheatland Tube*, 495 F.3d at 1364. Though Commerce reasons that the 232 tariffs are specifically tailored towards national security, its conclusion ignores the text and operation of the Section 232 statute, as well as the articulated rationale of Commerce and the President in implementing the tariffs.

Like other special tariffs, the Section 232 tariffs are imposed "in response to trade practices in specific instances in which the welfare of key domestic industries is impacted by foreign trade." *Borusan*, 494 F.Supp.3d at 1374. Unlike import duties imposed in the normal course of trade, Section 201, antidumping and countervailing, and Section 232 tariffs may only be imposed following investigations establishing the existence of particular conditions. *See* 19 U.S.C. §§ 2251, 1671, 1673, 1862. Factors considered by the ITC in antidumping and Section 201 cases are similar to those considered pursuant to the Section 232 statute, which directs Commerce and the President to consider, amongst other things, "the impact of foreign competition on the economic welfare of individual domestic industries;" "any substantial unemployment . . . loss of skills or investment;" and "other serious effects resulting from the displacement of any domestic products by excessive imports." 19 U.S.C. § 1862(d). In assessing

23

material injury in antidumping investigations, the ITC likewise looks to conditions of

competition in the U.S. market, U.S. producers' financial experience and employment levels, and

other effects related to displacement from imports, including U.S. production, shipments,

apparent consumption, market shares, and pricing data. 19 U.S.C. § 1677(7)(C). In Section 201

proceedings, the Commission considers whether "an article is being imported into the United

States in such increased quantities as to be a substantial cause of serious injury, or the threat

thereof, to the domestic industry." 19 U.S.C. § 2251(a). Under each provision, the amount of

tariffs imposed is related directly to the extent of the particular conditions determined to exist

with regards to the domestic industry. *See* 19 U.S.C. §§ 1862(d), 1677(7)(C), 2251(a). In other

words, the remedy provided by these measures "is the same—the imposition of duties on foreign

exports, which is intended to raise the United States market price for the subject merchandise and

thereby increase sales and profits of domestic producers." *Wheatland Tube*, 495 F.3d at 1364.

While, as Commerce notes, the Section 232 tariffs address threats to national security,

*Final I&D Memo* at 14-15, P.R. 330, ECF No. 15-2, the remedial purpose of adjusting imports to

safeguard national security does not make the Section 232 tariffs more like ordinary customs

duties than other special tariffs. To the contrary, comparing the Section 232 tariffs with special

tariffs like Section 201 and AD/CVD duties reveals a nearly identical underlying purpose—

protection of the domestic industry via adjustment of imports. Indeed, like Section 232, each of

the special tariff provisions require an additional finding beyond injury to domestic producers,

*i.e.* a surge in imports (Section 201), that imports are sold at below fair value (AD), or that

imports causing injury benefit from government subsidies (CVD). These additional factors do

not obscure the same primary focus of each special measure to protect the economic welfare of

U.S. domestic industries. *See* 19 U.S.C. §§ 2251-2252, 1673, 1671; *see also Wheatland Tube*,

24

495 F.3d at 1363-64 ("While all of these three types of duties remedy 'distinct harms' they are all directed at the same overarching purpose—protecting the bottom line of domestic producers.").

The Section 232 statue is likewise broadly focused on the economic impact of imports on domestic producers and industries, as evidenced by Commerce's investigation, which considered, amongst other things, the "poor financial status" of and the "threat of impairment" to the domestic industry necessitating "reduc{tion of} imports to a level that will provide the opportunity for U.S. primary aluminum producers{.}" *Section 232 Aluminum Report*, 85 Fed. Reg. at 40560, 40566. Commerce's analysis included many of the same factors weighed by the ITC in determining injury in Section 201 and antidumping cases, including the profitability, net income, loss of revenue, capacity utilization rates, and capital expenditures of the domestic industry. *Id.* at 40519, 40530, 40561, 40563 As in those cases, Commerce's recommendation "that the President take immediate action by adjusting the level of . . . imports" was based on its conclusion that "present quantities and circumstance of aluminum imports are 'weakening our internal economy,'" including the "financial health and viability" of domestic producers. *Id.* at 40509-10, 40522.

Commerce's *Section 232 Aluminum Report* to the President highlights not only the special nature of the tariffs, but also their connection to antidumping and countervailing duty orders, which are referenced in the aluminum report, as well as the accompanying report on steel imports. *See id.* at 40543; *see also Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202, 40204, 40210-11, and 40216 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Steel Report*"). In implementing the 10 percent tariffs, the President emphasized that, as with other special tariffs, the Section 232 tariffs were being imposed "in

25

response to specific requests from affected domestic parties" for the explicit purpose of protecting "domestic aluminum producers" and helping them to "achieve long-term economic viability through increased production." *Proclamation 9704 of March 8, 2018*, *Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11619 (Mar. 15, 2018) ("*Proclamation 9704*"). *Proclamation 9704*, which implemented the tariffs, explained that the tariff is "necessary and appropriate to adjust imports of aluminum articles" due to Commerce's findings that those imports are "'weakening our internal economy,' leaving the United States 'almost totally reliant on foreign producers of primary aluminum.'" *Id.* at 11619-20. In other words, the Section 232 tariffs were recommended and implemented to serve the remedial purpose of providing relief to the domestic aluminum industry from the adverse effects of imports.

As the Court recently noted, "the purpose of Section 232 duties is . . . remedial in a broad sense." *Borusan*, 494 F.Supp3d at 1374. That is especially true, where, as here, Commerce and the President viewed the Section 232 tariffs as an alternate means to remedy injury to a domestic industry, equivalent to special tariffs like antidumping and Section 201 tariffs. Indeed, both the Court and Commerce have recognized the Section 232 tariffs as "remedial" outside the context of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied*, 139 S. Ct. 133 (2020); *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) (interim final rule) ("*Submission of Exclusion Requests & Objections*") (noting that "the President is implementing these remedial actions" and that "any delay in implementing these remedial actions (as described Proclamations 9704 and 9705 of March 8, 2018) would further undermine U.S. national security interests"); *Requirements for Submissions Requesting Exclusions From the Remedies Instituted*

26

*in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106, 12109 (Dep't Commerce Mar. 19, 2018) (interim final rule). Given this reality, Commerce's claim that that the Section 232 tariffs are now "separate and apart" from other special, remedial safeguard provisions is disingenuous. *Final I&D Memo* at 15, P.R. 330, ECF No. 15-2.

Because remedying the impact of the imports on the economic welfare of U.S. domestic industries is the primary focus of the Section 232 statute, as with both antidumping and Section 201 safeguards, the Court should find that the Section 232 tariffs have a remedial purpose.

**b.    Section 232 Tariffs Are Temporary**

In *Wheatland Tube*, the CAFC agreed with Commerce that Section 201 tariffs, which are temporary in nature, are distinguishable from ordinary custom duties, which have no termination provision and are permanent unless modified by Congress. *Wheatland Tube*, 495 F.3d at 1362. Like other special tariffs, the Section 232 tariffs are temporary in nature and do not require congressional action to be modified.

The Section 232 statute provides authority for the President to determine the "nature and duration of the action" taken to adjust imports, 19 U.S.C. § 1862(c)(1)(A)(ii), which the CAFC has found to include "coverage of a plan implemented over time, including options for contingency-dependent choices." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1321 (Fed. Cir. 2021), *petition for cert. filed*, Nov. 16, 2021. Even though Section 232 tariffs do not have a fixed termination date, this broad "authority to pursue a continuing course of action, with adjustments (including additional impositions) adopted over time," highlights the temporary nature of the tariffs, which can be modified or suspended by the President at any time. *Id.* at

27

1324; *see also Borusan*, 494 F. Supp. 3d at 1374-75 ("Section 232 duties may be terminated any

time the President believes their purpose has ended.").

Here, the Section 232 tariffs were only found to be "necessary and appropriate" under the

"current circumstances." *Proclamation 9704*, 83 Fed. Reg. at 11620. The proclamation

implementing the Section 232 tariffs expressly directs the Secretary of Commerce to continue to

monitor imports of aluminum articles and to periodically review the status to inform the

President of any circumstances that might require modifications or circumstances that might

indicate that the tariffs would no longer be necessary. *Id.* at 11621-22. Indeed, since the

publication of *Proclamation 9704*, the President has modified the Section 232 tariffs on steel and

aluminum articles on multiple occasions, including by changing the number of countries

covered, by raising and then lowering the applicable duty rates, and by expanding the scope to

include certain downstream derivative products. *See Proclamation 9710 of March 22, 2018:

Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 13355 (Mar. 28, 2018);

*Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the United States*, 83

Fed. Reg. 20677 (May 7, 2018); *Proclamation 9758 of May 31, 2018: Adjusting Imports of

Aluminum Into the United States*, 83 Fed. Reg. 25849 (June 5, 2018); *Proclamation 9894 of May

19, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019);

*Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and

Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020). As with

Section 201 safeguards, specific products can also be excluded from the Section 232 tariffs for a

one-year period of time. Compare *Submissions of Exclusion Requests & Objections,* 83 Fed.

Reg. at 46026 (exclusion request procedures for Section 232 tariffs), with *Procedures To

Consider Additional Requests for Exclusion of Particular Products From the Solar Products*

28

*Safeguard Measure*, 83 Fed. Reg. 6670 (USTR Feb. 14, 2018) (notice & request for cmts.) (exclusion request procedures for Section 201 tariffs).

      Finally, as detailed below, the fact that the Section 232 tariffs are temporary is further evidenced by their placement in Chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS"). *See Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 88 Fed. Reg. 20683, 20687 (May 7, 2018) ("To Modify Certain Provisions of Chapter 99") ("*Proclamation 9740*"). When Chapter 99 was created, the ITC issued a report explaining that "Chapter 99 is designed for the incorporation of legislation, proclamations, and administrative actions, which, because of their *temporary* or collateral nature, are not assimilated into the main body of the tariff schedule." *Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC Pub. 1400, at 16 n.1, 28 (June 1983) (emphasis added). Thus, from the outset, Congress and the ITC envisioned Chapter 99 as a location for temporary tariffs, separate and distinguishable from the ordinary Customs duties included in Chapters 1-97 of the HTSUS.

      This Court has previously found Section 232 tariffs to be "temporary in that no Congressional action is needed to end them," which is "a clear difference from normal customs duties, which are enacted by Congress." *Borusan*, 494 F.Supp.3d at 1374. This "lack of permanenc{y}" aligns the Section 232 tariffs more closely with other special tariffs than with ordinary customs duties. *Id.* at 1375. The Court should thus continue to find that Section 232 tariffs, like antidumping and Section 201 safeguards, are temporary in nature.

### c. Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive

      The special nature of Section 232 tariffs is further emphasized by constitutional principles, which "vests in Congress the sole authority to impose tariffs" but allows the President

to impose special tariffs such as under the Trade Expansion Act of 1962. S. Rep. No. 90-1385, pt. 2, at 13 (1968). Specifically, the U.S. Constitution provides that Congress is responsible for levying and collecting taxes and duties. U.S. Const. art. I, § 8. The reviewing courts have interpreted this authority such that "{t}he general power to modify the HTSUS belongs exclusively to Congress," with the President given by Congress "limited authority to make modifications to the HTSUS based solely within the framework of statutorily defined objectives." *Forest Lab'ys, Inc. v. United States*, 403 F. Supp. 2d 1348, 1352 (Ct. Int'l Trade 2005), *aff'd,* 476 F.3d 877 (Fed. Cir. 2007).

The ability of the Executive Branch to impose tariffs pursuant to Section 232 thus flows directly from an express delegation of authority through legislation from Congress. U.S. Const. art. I, § 8. This delegation of limited authority, which authorizes the President to apply special tariffs only where certain conditions are found to exist, is consistent with antidumping and Section 201 tariffs. *See* 19 U.S.C. § 1862. In each case, the Executive Branch may implement special tariffs for the remedial purposes specified in the statute. This is in stark contrast to ordinary U.S. import duties, which are determined and imposed by Congress pursuant to the United States' World Trade Organization ("WTO") obligations. While Congress has delegated to the Executive Branch the limited authority to apply special tariffs in certain circumstances, Congress has never delegated to the President any general or blanket authority to modify duty rates or to set ordinary customs duties. This power lies solely with Congress. Any authority delegated by Congress to the President to impose tariffs, as it has done here, is by definition a special duty implemented to fulfill specific statutory objectives.[3]

---

[3]Pursuant to 19 U.S.C. §§ 1862(c)(1)(A)(ii) and (b)(3)(A) Congress delegated its authority to the President to "determine the nature and duration of the action that . . . must be taken to adjust the imports of the {imported} article and its derivatives" if the Secretary of Commerce finds that an

Here, Congress delegated its exclusive authority to the Executive Branch, allowing it to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). Congress's delegation is limited to "safeguarding national security," including the "economic welfare of individual domestic industries." 19 U.S.C. § 1862(d). This delegation is distinguishable from ordinary customs duties set by Congress, and indicates that these special tariffs imposed by the Executive Branch should not be "treated as any other duties." *Final I&D Memo* at 14 (citation omitted), P.R. 330, ECF No. 15-2. Indeed, the antidumping, Section 201, and Section 232 laws each involve a delegation of legislative authority to the Executive Branch to investigate the consequences of increased imports and the resulting economic harm. *Wheatland Tube*, 495 F.3d at 1363-64.

This legal distinction is carried through to the classification of duties in the HTSUS. Though Commerce cites absence of an "express exception" in the Annex to *Proclamation 9740*, as evidence of the President's intent that the 232 tariffs be treated as U.S. import duties, *Final I&D Memo* at 14 (citation omitted), P.R. 330, ECF No. 15-2, the placement of the modification in HTSUS Chapter 99 further highlights its special nature. *See Proclamation 9740*, 88 Fed. Reg. at 20687. Chapters 1 to 97 of the HTSUS are used for ordinary customs duties, whereas Chapter 99 is specifically reserved for special tariffs imposed under "Temporary Legislation, Temporary Modifications Established Pursuant to Trade Legislation, {and} Additional Import Restrictions{.}" HTSUS, ch. 99.

---

"article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."

The HTSUS designation is not simply a matter of organization or nomenclature, but rather, reflects the critical legal distinction between regular customs duties imposed by Congress, and special duties imposed by the Executive Branch. Even Commerce has acknowledged that Chapter 99 "is reserved for special or temporary duties" and regarded the designation of Section 201 tariffs in Chapter 99 as significant to its distinction of those tariffs from ordinary customs duties. *SSWR Korea*, 69 Fed. Reg. at 19160. Having previously recognized placement in Chapter 99 as a signifier that tariffs are special, it is unreasonable for Commerce to take a different position with respect to the Section 232 tariffs in this case without further explanation.

Consistent with both Congress's delegated authority and the history of Chapter 99 of the HTSUS, the Court should find the Section 232 tariffs to be special tariffs.

      **3.**      **There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy**

The reviewing courts have found that the deduction of special tariffs from U.S. price in the calculation of dumping margins results in double-counting. *See, e.g.*, *AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. of Int'l Trade 1997) (treating remedial tariffs as costs "would create the same double-counting issue Commerce is seeking to avoid in its refusal to consider countervailing and antidumping duties to be U.S. import duties." *Id.* at 608 n.12). As the CAFC confirmed, because safeguards "may reduce or eliminate the injury that is required for an antidumping duty to continue and because deducting . . . safeguard duties from the EP may create an artificial dumping margin," their deduction from the calculation of dumping margins would result in the punitive collection of additional duties in contravention of the statute. *Wheatland Tube*, 495 F.3d at 1365. Indeed, "{t}o assess both a safeguard duty and an

antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice." *Id*.

In its prior review of the Section 232 tariffs, the Court's decision turned on the extent of the "statutory interplay" between Section 232 and antidumping duties, *i.e.* whether Section 232 tariffs are "related to and complimentary to antidumping duties." *Borusan*, 494 F .Supp. 3d at 1375. In its *Final AD Determination*, Commerce claimed that there was no such "overla{p}" because the Section 232 and antidumping duties do not provide multiple remedies for the same situation." *Final I&D Memo* at 14-15, P.R. 330. Contrary to Commerce's claims, the President and Commerce have frequently indicated that the Section 232 tariffs were contemplated as an alternative to other special trade remedies, most notably antidumping duties. For example, in its Report to the President, Commerce noted that "{d}espite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. . . . producers being unable to fairly compete with foreign suppliers." *Section 232 Steel Report*, 85 Fed. Reg. at 40216. Commerce clearly viewed the Section 232 tariffs as commensurate with other special provisions, stating that "{s}maller . . . manufacturers are financially unable to afford {AD/CVD} cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets{.}" *Id.* at 40211.

The CAFC's finding in *Wheatland Tube* that "deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin," *Wheatland Tube*, 495 F.3d at 1363 (citation omitted), thus applies with equal force to Commerce's deduction of Section 232 tariffs in this proceeding. To the extent that there is any preexisting dumping margin, Commerce's methodology results in a dollar-for-dollar increase in that margin equal to the amount of the Section 232 duty; if there is

33

no preexisting dumping margin, Commerce's methodology would create one. This result is contrary both to the remedial purpose of the antidumping statue, as well as Commerce's obligation to calculate dumping margins "as accurately as possible." *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce's attempts to mask the double remedy inherent in its methodology by citing to a statement in the Annex to *Proclamation 9740* that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein" is unavailing. *Final I&D Memo* at 14 (citation omitted), P.R. 330, ECF No. 15-2. The issue is not whether antidumping duties should continue to apply to aluminum imports like CAAS, but rather whether Commerce should be permitted to collect Section 232 tariffs a second time in the form of an increased antidumping margin based on their collection. Commerce's rationale does not confirm that Section 232 tariffs are to be treated as regular customs duties, nor resolve the direct conflict between its methodology and the CAFC's determination in *Wheatland Tube*. Contrary to the Court's finding in *Borusan*, there are no "crucial differences" between Section 201 and Section 232 justifying disparate treatment by Commerce. *Borusan*, 494 F.Supp.3d at 1376. Both Section 201 and Section 232 tariffs are special tariffs, more akin to antidumping duties than to ordinary customs duties. *See Wheatland Tube*, 495 F.3d at 1362 (finding Section 201 duties to be special duties because they "are more like antidumping duties in purpose and function than they are like ordinary customs duties" (citation omitted)).

Because the purpose and function of both Section 232 tariffs and antidumping duties is to remedy injury to a domestic industry, deduction of the Section 232 tariffs in the dumping

34

calculation presents the same "unique circularity issue," *Borusan*, 494 F.Supp.3d at 1373,

identified by the CAFC in *Wheatland Tube*.

### C. Commerce's Decision to Deny Assan the Home Market Rebate Adjustment to Which it is Entitled is Contrary to Law and Unsupported by Substantial Evidence on the Record

In the final determination, Commerce denied Assan's home market rebate adjustment

based on the finding that Assan's questionnaire response was inadequate, i.e. "for one customer,

Assan did not demonstrate that the customer reached the sales volume target specified in the

rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the

rebate was actually paid." *Final I&D Memo*, at 22, P.R. 330, ECF No. 15-2. Commerce failed to

provide a full and reasoned explanation for its decision to deny Assan's home market rebate

adjustment as required by the statute and case law. Further, if there was any issue with respect to

the information submitted by Assan, Commerce was required to issue a supplemental

questionnaire and allow Assan an opportunity to cure and deficiencies in its response.

### 1. Commerce's Decision to Deny Assan's Post-Sale Price Adjustments without Adequate Explanation or Analysis Was Not Support by Substantial Evidence and was Otherwise Not in Accordance with Law

The statute requires Commerce to calculate normal value using the "price at which the

foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C.

§ 1677b(a)(1)(B)(i). Commerce's regulation further requires that it uses a price for normal value

that is "net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to

the . . . foreign like product." 19 C.F.R. § 351.401(c). In determining a respondent's entitlement

to its claimed adjustment, Commerce considers a non-exhaustive list of factors as follows:

> "(1) Whether the terms and conditions of the adjustment were established and/or
> known to the customer at the time of sale, and whether this can be demonstrated
> through documentation; (2) how common such post-sale price adjustments are for
> the company and/or industry; (3) the timing of the adjustment; (4) the number of

35

such adjustments in the proceeding; and (5) any other factors tending to reflect on the legitimacy of the claimed adjustment."

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15641, 15644-45 (Dep't Commerce Mar. 24, 2016) (final rule) ("*Modification of Regulations*"). Commerce weights these factors singly or in combination. *Id.* at 15644-45.

   In its response to the Section B questionnaire, Assan claimed a home market rebate price adjustments. Section B QR at 31-32, and Exhs. B-10.1 and B-10.2, C.R. 28-29, P.R. 141. In claiming the rebate adjustments, Assan recognized and addressed the requirements of the *Modification of Regulations*, explaining that, "Assan follows an annual volume target based rebate program with certain customers. The rebates are calculated on an annual basis by the sales department. Assan reports per unit rebated . . . based {on} actual approved and paid amounts on a customer specific basis." Section B QR at 31, C.R. 28, P.R. 141 . Assan included a worksheet that listed [     ] customers who have received a rebate during the POI, the net sales quantity sold, the net rebate amount paid, and the unit rebate amount that tied to the home market sales database. *Id.* at Exh. B-10.1. For each customer, Assan provided the rebate invoice that shows the rebate payment both inclusive and exclusive of VAT. *Id.* at Exh. B-10.2, C.R. 28-29, P.R. 141.

   In its Supplemental Section B questionnaire, Commerce asked Assan to "provid{ing} documentation, including sample agreements, showing how the 'annual volume target' was calculated for [                                        ]." Supp. B QR at 11, C.R. 253, P.R. 217. In response, Assan provided the supply contracts for the [     ] customers (which include the annual volume target agreements), the rebate invoices, and the bank receipt evidencing proof of payment. *Id.* at Exh. S3-19, C.R. 255, P.R. 218.

   At no point during the investigation did Commerce address or explain how any of the five factors of the *Modification of Regulation* were not satisfied, nor did it explain how it

AFDOCS/24889026.5

weighed any of the factors in deciding not to grant the adjustment. Instead, Commerce simply

denied the adjustment based on the conclusory finding that the response was inadequate.

Specifically, in the preliminary determination, Commerce denied Assan's home market price

adjustment  because "{f}or certain reported home market price adjustments, no sample

supporting documentation was provided or the sample supporting documentation could not be

tied to the respective per unit amount reported in the home market database." Memorandum from

S. Carey to The File, re: Preliminary Determination Margin Calculation for Assan Aluminyum

Sanayi ve Ticaret A.S. at 3 (Oct. 6, 2020), C.R. 329 ("Preliminary Analysis Memo"). In the final

determination, Commerce continued to deny Assan's rebate adjustment citing to its preliminary

finding that the information provided by Assan was inadequate. *Final I&D Memo*, at 22, P.R.

330, ECF No. 15-2.

Without further explanation or analysis, Commerce's final determination cannot be

considered supported by substantial evidence and is contrary to law. The statute explicitly

requires that commerce to "include in a final determination . . . an explanation of the basis for its

determination." 19 U.S.C. § 1677f(i)(3)(A). The Court has also held that "{t}he law clearly

requires Commerce to explain the basis for its decisions." *Toscelik Profil*, 321 F. Supp. 3d at

1280, *citing NMB Sing.*, 557 F.3d at 1319-20 ("{W}hile its explanations do not have to be

perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

*See also Timken U.S. Corp. v. United States,* 421 F.3d 1350, 1355 (Fed. Cir. 2005) (explaining

that "it is well settled that an agency must explain its action with sufficient clarity to permit

'effective judicial review,' " and that "{f}ailure to provide the necessary clarity requires the

agency action be vacated") (*quoting Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)).

AFDOCS/24889026.5

Further, in a case such as this, "{w}ithout some basis for reviewing Commerce's conclusions, the court is unable to ensure that the agency's interpretation is not 'arbitrary, capricious, or manifestly contrary to statute.'" *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1325 (Ct. Int'l Trade 2018), *citing Apex Frozen Foods Priv. Ltd. v. United States,* 862 F.3d 1337, 1346 (Fed. Cir. 2017). *See also CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (the agency's experience and expertise are not a substitute for the required explanation).

Therefore, the Court should remand the case to Commerce with instructions to provide an adequate explanation for its determination, to reopen the record if necessary, and to give Assan the opportunity to offer comments and arguments based on a well-reasoned determination.

### 2. Commerce's Failure to Issue a Supplemental Questionnaire and Allow Assan to Cure Any Deficiencies in its Response was Contrary to Law

If the factual information submitted by Assan regarding the home market rebate adjustments was not adequate, Commerce was required to issue a supplemental questionnaire seeking additional information. 19 U.S.C. § 1677m(d) specifically provides that

> {i}f the administering authority . . . determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of . . . reviews under this subtitle."

This Court has previously held that the statute obligates Commerce to issue a supplemental questionnaire if Commerce determined that respondent's questionnaire response was deficient or need clarification. *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1387 (Ct. Int'l Trade 2019). Nevertheless, Commerce never issued a supplemental questionnaire on this issue.

38

Nor can Commerce claim that it had insufficient time to provide Assan with an opportunity to remedy any deficiencies in its response. Assan submitted its response to the Section B Questionnaire and first requested the home market rebate adjustment on June 29, 2020. Section B QR at 31-32, Exhs. B-10.1 and B-10.2, C.R. 28-29, P.R. 141. Assan submitted its response to Commerce supplemental Section B Questionnaire on September 3, 2020, in which Commerce requested Assan to provide supporting documentation for [          ] customers Assan claimed a rebate adjustment. Supp. B QR at 11 and Exh. S3-19, C.R. 255, P.R. 218. The preliminary determination was issued on October 15, 2020. *Preliminary Determination*, 85 Fed. Reg. at 65346, P.R. 264. After the preliminary determination, Commerce issued an in lieu of verification questionnaire on December 10, 2020, in which it did not seek any additional information pertaining to the claimed rebate adjustment. *See* Verification Response, C.R. 373-398, P.R.305. The final determination was not issued until March 3, 2021. *Final AD Determination*, 86 Fed. Reg. at 13326, P.R. 358, ECF No. 15-1. Therefore, Commerce had at least six month before the final determination to request the additional information after it determined that the information submitted by Assan was inadequate.

Further, the supplemental section B questionnaire cannot be construed as to what factual information Commerce required to grant a rebate adjustment under the *Modification of Regulations*. The supplemental section B questionnaire only selected [              ] customers that Assan claimed a rebate adjustment and requested Assan to provide supporting documentation, including sample agreements. Supp. B QR at 11, C.R. 255, P.R. 218. Assan provided the requested information and, in addition, addressed the terms and conditions of the annual volume target, provided the relevant rebate invoices, and attached the bank receipts

39

evidencing proof of payment. *Id.* at Exh. S3-19. However, the question did not ask for specific

information for all of the factors considered under the *Modification of Regulations*.

As a result, Assan was never given adequate notice of the information Commerce was

seeking. *Ta Chen Stainless Steel Pipe v. United States*, No. 97–08–01344, 1999 WL 1001194, at

*12 (Ct. Int'l Trade 1999) (finding that, where Commerce had failed to request information

"specifically," it had failed to provide plaintiff with sufficient notice under 19 U.S.C.

§ 1677m(d)). The failure by Commerce to provide respondents with sufficient notice renders its

decision "unsupported by substantial evidence and otherwise contrary to law." *Id.* at *13 (citation

omitted). The Court will not endorse "an investigation where {Commerce} sent out a general

questionnaire and a brief deficiency letter, then effectively retreated into its bureaucratic shell,

poised to penalize {respondent} for deficiencies not specified in the letter that {Commerce}

would only disclose after it was too late, *i.e.*, after the preliminary determination." *Böwe-Passat*

*v. United States*, 17 CIT 335, 343 (1993). *See also Jindal Poly Films*, 365 F. Supp. 3d at 1388.

(Commerce is obligated to issue a supplemental questionnaire seeking clarification of the

information respondent provided, because "Commerce was the only party that could have been

aware of the deficiency in the questionnaire response because it was the only participant in the

review that knew what would satisfy its unarticulated criteria.")

Similar to the respondent in *Jindal Poly Films*, in this case, Commerce was the only party

who knew what information would satisfy its criteria in granting the rebate adjustment, however,

Assan did not receive the deficiency determination until the Preliminary Determination, by

which point it was too late to submit new factual information. Preliminary Analysis Memo at 3,

C.R. 329. Nevertheless, Commerce issued a post-preliminary questionnaire on other issues, but

did not afford Assan any opportunity to cure the deficiency with respect to the claimed rebate

40

adjustment. *See* Verification Response, C.R. 373-398, P.R.305. In the final determination, Commerce justified its decision by citing to the truism that the deficiency finding in the preliminary determination is dispositive. *Final I&D Memo* at 22, P.R. 330, ECF No. 15-2. As the Court has held "{t}his truism, however, cannot obviate Commerce's obligation to let the respondent know what information it really wants." *Ta Chen,* 1999 WL 1001194, at *13, *citing Queen's Flowers de Colombia v. United States*, 981 F. Supp. 617, 628 (Ct. Int'l Trade 1997).

Therefore, the Court should remand the case to Commerce with instructions to provide Assan an opportunity to clarify or supplement its responses to address Commerce's application of the factors set forth in the *Modification of Regulations*. *See Jindal Poly Films*, F. Supp. 3d at 1388-89 ("By declining to issue a supplemental questionnaire seeking clarification of the information Jindal provided to support its claims for the post-sale price adjustments, Commerce unreasonably declined a downward adjustment to normal value when a simple clarification may have cured Commerce's lack of understanding.")

## V.   <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Turkish Respondents respectfully requests that this Court:

(a)    Hold that Commerce's *Final AD Determination* was not in accordance with law or unsupported by substantial record evidence with respect to the claims advanced by Plaintiff in this appeal;

(b)    Remand the *Final AD Determination* to Commerce for determination consistent with the opinion of this Court; and

41

(c)      Grant such additional relief as the Court may deem just and proper.


Respectfully submitted,


**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*

November 22, 2021

42

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's 56.2 Motion for Judgment on the Agency Record filed on November 15, 2021 complies with the word limitation requirement. The word count for Plaintiff's 56.2 Brief, as computed by Arent Fox LLP's word processing system is 12,710.

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*