NON-CONFIDENTIAL

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br> Defendant-Intervenors. | Consol. Court No. 21-00246 |

JOHN M. HERRMANN
PAUL C. ROSENTHAL
R. ALAN LUBERDA
JOSHUA R. MOREY
JULIA A. KUELZOW

KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members, et al.

November 22, 2021

NON-CONFIDENTIAL

## <u>Table of Contents</u>

<u>Page</u>

ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................................... 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ................................................... 2

STANDARD REVIEW ........................................................................................................... 4

STATEMENT OF FACTS ....................................................................................................... 4

I.     THE DEPARTMENT'S DETERMINATION TO GRANT ASSAN A
DUTY DRAWBACK ADJUSTMENT IS UNLAWFUL ....................................... 8

     A.    Background on Duty Drawback Adjustments ............................................ 8

     B.    The Turkish Drawback System Allows for Duty Drawback on
Imported Materials That Cannot Be Used in the Production of
Exported Merchandise .................................................................................. 9

     C.    The Conditions Under Which the Department Will Grant a Duty
Drawback Adjustment Are More Stringent Than the Conditions
Under Which the Turkish Government Will Pay Duty Drawback
Claims .......................................................................................................... 10

     D.    Like in *Maverick Tube II*, the Scope of the CAAS Order is Unique
In That Turkish Law Can Be Satisfied By Imports That Cannot Be
Used in the Production of Subject Merchandise....................................... 12

     E.    The Imported Materials Underlying Assan's Duty Drawback
Claims Were Not Capable of Being Used to Produce CAAS ................. 13

          1.    Assan Failed to Establish Its Imported [               ]
Were Capable of Being Used to Produce CAAS In
Advance of The Department's Preliminary Determination ......... 13

          2.    The Department Inappropriately Granted Assan's Request
for a Duty Drawback Adjustment in the Preliminary
Determination ............................................................................... 15

          3.    Additional Information Gathered After the Preliminary
Determination Confirmed that Imported [
        ] Could Not Be Used to Produce CAAS ............................ 16

NON-CONFIDENTIAL

### Table of Contents
### (continued)

| | | | Page |
|---|---|---|---|

F.   The Department's Contention That *Maverick Tube II* Is Not Applicable Is Not Supported by Substantial Evidence and the Agency's Determination Is Otherwise Unlawful .................................... 17

II.   THE DEPARTMENT'S ACCEPTANCE OF ASSAN'S AFFILIATED FREIGHT CHARGES IS UNLAWFUL ............................................................ 20

    A.   Legal Background ....................................................................... 20

        1.   Constructed Export Price ............................................. 20

        2.   Reliance on Adverse Facts Available ........................... 21

    B.   The Department Unlawfully Determined Assan Demonstrated Its Affiliated Freight Charges Were Made at Arm's-Length Prices ............. 22

        1.   Assan Withheld Information, Impeded the Department's Investigation, and Did Not Provide All Information and Documentation Requested by the Department ............................ 23

        2.   The Department's Acceptance of Assan's Reported Affiliated Freight Charges as Made at Arm's Length Is Otherwise Unlawful .................................................. 26

III.   THE DEPARTMENT'S RELIANCE ON ASSAN'S REPORTED BILLING ADJUSTMENTS IS UNLAWFUL .................................................. 27

    A.   Legal Background ....................................................................... 28

        1.   Billing Adjustment ..................................................... 28

        2.   Adverse Facts Available .............................................. 29

    B.   Assan Failed to Cooperate to the Best of Its Ability In Supplying Information Concerning Billing Adjustments ........................... 29

IV.   CONCLUSION ................................................................................ 32

NON-CONFIDENTIAL

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Fla. Citrus Mut. v. United States,
  550 F.3d 1105 (Fed. Cir. 2008)...............................................................................21

F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
  216 F.3d 1027 (Fed. Cir. 2000).............................................................................31

Hyundai Steel Co. v. United States,
  319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ........................................................21

Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.,
  861 F.3d 1269 (Fed. Cir. 2017) ("Maverick Tube II") ..................................*passim*

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,
  463 U.S. 29 (1983)...........................................................................................4, 30

NEXTEEL Co. v. United States,
  392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) .........................................................25

Nippon Steel Corp. v. United States,
  337 F.3d 1373 (Fed. Cir. 2003)........................................................................22, 31

Nippon Steel Corp. v. United States,
  458 F.3d 1345 (Fed. Cir. 2006)...............................................................................4

Saha Thai Steel Pipe (Public) Co. v. United States,
  635 F.3d 1335 (Fed. Cir. 2011)...........................................................................8-9

SeAH Steel Corp. v. United States,
  Ct. No. 20-00150, Slip Op. 21-146, 2021 WL 4859194
  (Ct. Int'l Trade Oct. 9, 2021) ...............................................................................21

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,
  222 F. Supp. 3d 1255 (Ct. Int'l Trade 2017) ..........................................................9

Universal Camera Corp. v. NLRB,
  340 U.S. 474 (1951)................................................................................................4

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................4

NON-CONFIDENTIAL

19 U.S.C. § 1673 ......................................................................................................8

19 U.S.C. § 1677(35)(A) .........................................................................................20

19 U.S.C. § 1677a(a) ...............................................................................................8

19 U.S.C. § 1677a(a)-(b) .........................................................................................20

19 U.S.C. § 1677a(c) ...............................................................................................8

19 U.S.C. § 1677a(c)(1)(B) .....................................................................................5

19 U.S.C. § 1677a(c)(2) ...........................................................................................21

19 U.S.C. § 1677a(c)(2)(A) .....................................................................................6

19 U.S.C. § 1677e(a) ...................................................................................4, 21, 22, 29

19 U.S.C. § 1677e(b) ...........................................................................................4, 29

19 U.S.C. § 1677m(g) ..............................................................................................25

19 C.F.R. § 351.102(b)(38) ......................................................................................28

19 C.F.R. § 351.301(c) .............................................................................................25

19 C.F.R. § 351.401(b)(1) ........................................................................................9

19 C.F.R. § 351.401(c) .............................................................................................28

### Administrative Determinations

Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany,
      Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia,
      Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey:
      Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 19,444
      (Dep't Commerce Apr. 7, 2020) (PR 34) ............................................................ 4-5

Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany,
      India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa,
      Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders,
      86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (PR 347) ("the Order") ............ *passim*

NON-CONFIDENTIAL

Common Alloy Aluminum Sheet From Turkey:
   Final Affirmative Determination of Sales at Less Than Fair Value,
   86 Fed. Reg. 13,326 (Dep't Commerce Mar. 8, 2021) (PR 358)
   ("Final Determination") ......................................................................................... *passim*

Common Alloy Aluminum Sheet From Turkey:
   Preliminary Affirmative Determination of Sales at Less Than Fair Value,
   Preliminary Negative Determination of Critical Circumstances, Postponement
   of Final Determination, and Extension of Provisional Measures,
   85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020)
   ("Preliminary Determination") (PR 264) ......................................................... *passim*

Decision Memorandum for the Preliminary Affirmative Determination in the
   Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from
   Turkey (Oct. 6, 2020) ("Prelim. Decision Memo") (PR 247) ......................... *passim*

Issues and Decision Memorandum for the Final Affirmative Determination in the
   Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from
   Turkey, and Final Negative Determination of Critical Circumstances
   (Dep't Commerce Mar. 1, 2021) (PR 330) ("I&D Memo") ........................... *passim*

Issues and Decision Memorandum for the Final Determination of Sales at Less
   Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Brazil,
   (Dep't Commerce Sept. 23, 2002), ref'd in 67 Fed. Reg. 62,134 (Oct. 3, 2002)
   (final results) .............................................................................................................21

**Miscellaneous**

Modification of Regulations Regarding Price Adjustments in Antidumping Duty
   Proceedings, 81 Fed. Reg. 15,641 (Dep't of Commerce Mar. 2016) ................................ 28-29

NON-CONFIDENTIAL

On behalf of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Aleris Rolled Products, Inc.; Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc., (collectively, "Petitioners"), we submit this Memorandum of Law in support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record.  As set forth below, Petitioners urge this Court to determine that certain aspects of the U.S. Department of Commerce's (hereinafter, the "Department") final affirmative determination of sales at less-than-fair-value are not supported by substantial evidence and are not otherwise in accordance with law and to remand the agency's determination for further proceedings.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Petitioners challenge certain aspects of the Department's affirmative determination in the less-than-fair value investigation of common alloy aluminum sheet ("CAAS") from the Republic of Turkey.  See Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 13,326 (Dep't Commerce Mar. 8, 2021) (PR 358)[1] (hereinafter, "Final Determination") and the accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey, and Final Negative Determination of Critical Circumstances (Dep't Commerce Mar. 1, 2021) (PR 330) (hereinafter, "I&D Memo"); see also Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, India,

---

[1]    Documents in the administrative record are cited using the descriptions provided in the Index to the Administrative Record, filed with this Court on June 30, 2021 (ECF No. 15). Documents are cited by their confidential record number ("CR __") and/or their public record number ("PR__"), as appropriate.

NON-CONFIDENTIAL

<u>Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the</u> <u>Republic of Turkey: Antidumping Duty Orders</u>, 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (PR 347) (hereinafter "the Order").

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The Department's <u>Final Determination</u> is not supported by substantial evidence and is not otherwise in accordance with law because the Department improperly:

1. Granted Assan a duty drawback adjustment;

2. Relied on Assan's affiliated freight charges in calculating constructed export price ("CEP");

3. Accepted Assan's reported billing adjustments despite the company's failure to cooperate in supplying the agency with information requested relating to the claimed adjustments.

<u>First</u>, a respondent is not eligible for a duty drawback adjustment where the record establishes that the relevant imports associated with the duty drawback claimed are not suitable for use in producing the subject merchandise. <u>See</u> <u>Maverick Tube Corp. v. Toscelik Profil ve</u> <u>Sac Endustrisi A.S.</u>, 861 F.3d 1269 (Fed. Cir. 2017) (hereinafter, "<u>Maverick Tube II</u>"). This is true irrespective of whether the foreign country permits drawback on the imported and exported materials that are identified by a respondent claiming a drawback adjustment. <u>See</u> <u>id.</u>

The Department improperly granted Assan's duty drawback adjustment because the record does not establish that Assan imported input materials that were suitable for use in producing subject merchandise (<u>i.e.</u>, common alloy aluminum sheet). The Department's explicit finding that the conditions of <u>Maverick Tube II</u> are not met is unsupported by substantial evidence, and the agency's justification for its decision to grant Assan's duty drawback adjustment is otherwise unlawful.

NON-CONFIDENTIAL

Second, the Department's acceptance of Assan's representation that affiliated freight charges it incurred were made at arm's length is unlawful.  The Department found that Assan provided the agency with all of the information requested concerning these affiliated freight charges and, therefore, that Assan acted to the best of its ability in responding to the agency's requests for information concerning these charges.  This finding is not supported by substantial evidence, as the record demonstrates that Assan withheld information requested by the Department – namely the average price Assan's affiliated freight provider charged to unaffiliated customers.  Assan's untimely effort to correct the record in its rebuttal case brief – submitted after the opportunity to place new factual information on the record had closed – should not have been accepted by the agency.  Moreover, the record otherwise indicates that the affiliated freight charges were not made at arm's length.  Because the Department failed to address detracting evidence, the agency's reliance on Assan's reported freight charges is not supported by substantial evidence.

Third, the Department's determination that Assan cooperated to the best of its ability in supplying the Department with information concerning its reported billing adjustments is wrong.  Assan did not respond to the Department's requests for information and, as a result, a gap remained in the record regarding the appropriate amount of the adjustment.  The Department requested this information in a supplemental questionnaire, but Assan failed to provide it.  In addition, the Department's reason for not filling this gap with an adverse inference in its Final Determination – that the downward adjustment did not benefit Assan – is unsupported by substantial evidence.  Due to Assan's failure to cooperate, it is unclear if the downward adjustment should have been greater than the one applied by the Department.  As a result, the

NON-CONFIDENTIAL

Department's failure to rely on an adverse inference is contrary to the purpose of the statute (19 U.S.C. § 1677e(b)).

## STANDARD REVIEW

In reviewing a challenge to a final determination by the Department, this Court will sustain a determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)). Substantial evidence has also been determined to mean "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). When reviewing agency determinations, the court will evaluate whether the agency action is reasonable given the record as a whole. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp., 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

## STATEMENT OF FACTS

On March 30, 2020, the Department initiated a less-than-fair value investigation of common alloy aluminum sheet from Turkey. See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea,

NON-CONFIDENTIAL

Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 19,444 (Dep't Commerce Apr. 7, 2020) (PR 34).

On April 20, 2020, the Department selected Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan") and Teknik Aluminyum Sanayi A.S. as mandatory respondents. See Memo to DAS for Operations Pertaining to Interested Parties Respondent Selection (CR 15) (PR 49).

Following the submission of responses to the Department's questionnaires, the Department issued its Preliminary Determination on October 6, 2020. See Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020) (hereinafter, "Preliminary Determination") (PR 264), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey (Oct. 6, 2020) (hereinafter, "Prelim. Decision Memo") (PR 247).

In its Preliminary Determination, the Department reached several preliminary conclusions relevant to this appeal. First, the Department granted Assan's request for a duty drawback adjustment pursuant to 19 U.S.C. § 1677a(c)(1)(B). See Prelim. Decision Memo at 10-11 (PR 247). The Department found that Assan satisfied the agency's two-part test to determine eligibility for such an adjustment. Specifically, the Department determined that Assan met the first prong – "the import duty and its rebate or exemption be directly linked to, and dependent upon, one another" – based on Assan's submission of documentation of projected quantities of imported inputs and projected quantities of exported merchandise when Assan

NON-CONFIDENTIAL

opened inward processing certificates ("IPCs") with the Government of Turkey ("GOT"). Id. (PR 247). The Department also determined that Assan satisfied the second prong – "sufficient imports of materials to account for the duty drawback or exemption granted for the export of the manufactured product" – based on Assan's submission of yield/loss ratios that, when applied to Assan's import quantities, demonstrated that Assan had sufficient imports to account for its exports. Id. at 11 (PR 247). As discussed below, however, the Department failed to evaluate a threshold question – whether the imported inputs on which the GOT granted duty exemptions to Assan were capable of being used to produce subject CAAS.

Second, in calculating constructed export price ("CEP"), the Department applied a reduction in CEP for freight charges pursuant to 19 U.S.C. § 1677a(c)(2)(A). See id. at 9 (PR 247). The Department preliminarily concluded that Assan demonstrated the arm's-length nature of the reported freight charge required to make the deduction, even though Assan failed to respond to the Department's request for data related to the average price charged by its affiliate to unaffiliated customers, as well as record evidence demonstrating that Assan's affiliate did not charge arm's length prices. See id. (PR 247). The Department also declined to apply adverse facts available, notwithstanding Assan's disregard of the Department's request for information on the average price charged to Assan's affiliate to unrelated customers for freight services. See id. (PR 247).

Third, the Department rejected Assan's claimed billing adjustments, based on a determination that Assan failed to submit required documentary support to substantiate the claimed adjustments. See Memo from USDOC to File Pertaining to Assan Cost Memo at 5-6 (PR 249) (CR 324) (hereinafter, "Prelim. Calc. Memo"); Prelim. Decision Memo at 9 (PR 247). As a result, in the Preliminary Determination, the Department set an upward price adjustment to

zero and used Assan's lowest reported value for the relevant U.S. variables being deducted from the U.S. gross unit price for the downward adjustments.  See Prelim. Calc. Memo at 5-6 (PR 249) (CR 324).

In its case brief addressing the Preliminary Determination, Assan challenged the Department's rejection of both adjustments and the "adverse impact" of the Department's adjustments.  See Brief of Mayer Brown LLP to Sec. of Commerce Pertaining to Assan Case Brief at 15 (CR 400) (PR 309) ("Assan Case Br.").  In response, Petitioners highlighted the absence of information on the record substantiating Assan's claimed adjustments and its uncooperative behavior in failing to respond to the Department's requests for relevant information.  See Brief from Kelley Drye & Warren LLP to Sec. of Commerce Pertaining to Petitioners Rebuttal Brief at 16-22 (CR 401) (PR 318).

On March 8, 2021, the Department issued its Final Determination and left unchanged its conclusions regarding duty drawback and affiliated freight charges.  With respect to billing adjustments, however, the Department stated that it had "incorrectly set" the downward adjustment (i.e., BILLADJU2) to the lowest reported value in the Preliminary Determination, and it instead used Assan's reported information on the record for that downward adjustment in the Final Determination.  See I&D Memo at 4-11, 17-18, 22-24 (PR 330). In so doing, the Department declined to apply an adverse inference, even though Assan did not provide requested documents and failed to respond comprehensively and accurately to the Department's requests for information regarding the claimed billing adjustments.

Petitioners subsequently and timely filed the instant appeal.[2]

---

[2]   Additional facts relevant to each issue are set forth in the relevant sections below.

NON-CONFIDENTIAL

I. **THE DEPARTMENT'S DETERMINATION TO GRANT ASSAN A DUTY DRAWBACK ADJUSTMENT IS UNLAWFUL**

    A. **Background on Duty Drawback Adjustments**

If the Commerce Department determines that a class or kind of foreign merchandise is being sold in the United States at less-than-fair-value, and the U.S. International Trade Commission determines that an industry in the United States is materially injured by reason of imports of the foreign merchandise, an antidumping duty is imposed on such merchandise "in an amount equal to the amount by which the normal value exceeds the export price (or constructed export price) for the merchandise." 19 U.S.C. § 1673.

The statute defines "export price" as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," taking into account certain adjustments. 19 U.S.C. § 1677a(a). For example, the Department shall increase export price (or constructed export price) by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c). This adjustment is known as a "duty drawback adjustment." See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S., 861 F.3d 1269, 1271 (Fed. Cir. 2017) (hereinafter, "Maverick Tube II").

The statute does not specify the method the Department should use to determine whether a duty drawback adjustment is warranted. In evaluating whether or not to make a duty drawback adjustment, the Department employs a two-pronged test which requires:

NON-CONFIDENTIAL

(1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

Saha Thai Steel Pipe (Public) Co. v. United States, 635 F.3d 1335, 1340-41 (Fed. Cir. 2011) (citation omitted) (hereinafter, "Saha Thai"); see also I&D Memo at 10 (PR 330).

A respondent claiming an adjustment bears the burden of establishing the adjustment is warranted. See 19 C.F.R. § 351.401(b)(1) (stating that "{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment"); see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 222 F. Supp. 3d 1255, 1261 n.7 (Ct. Int'l Trade 2017) (citing Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed. Cir. 1996)); Saha Thai, 635 F.3d at 1340 (stating that "the respondent is required to demonstrate" the prongs in the Department's test are satisfied).

## B. The Turkish Drawback System Allows for Duty Drawback on Imported Materials That Cannot Be Used in the Production of Exported Merchandise

Under Turkish law, exporters of merchandise that has been processed in Turkey may have their duty liability on imports forgiven if the exporter satisfies certain requirements. See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Sec. C QR at Exhibit C-8 (CR 52-62) (PR 142-43).[3] Turkish law – specifically the Inward Processing Regime

---

[3]    Turkish law allows for importers to: (1) first pay duties, and then have the duties refunded upon satisfaction of the law; or (2) conditionally import material duty free, and have the duty liability applicable to those imports forgiven after satisfaction of the drawback system. See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Sec. C QR at 42, Exhibit C-8 (CR 52-62) (PR 142-43). Assan availed itself of the latter option only during the period of investigation. See id. at 42 ("Under the suspension system that Assan uses, an Inward

(cont'd on next page)

NON-CONFIDENTIAL

("IPR") – authorizes "drawback of duties" (i.e., the extinguishing of liability for import duties), even when no input used in the production of exported merchandise has been imported and no duties paid. In particular, the IPR allows for drawback based on the use of "equivalent goods" in the production of merchandise that is exported. Id. (CR 52-62) (PR 142-43). "Equivalent goods" are goods that "have the same Customs Tariff Position with at least (eight)-bases as import goods and bear the same commercial qualities and technical characteristics." Id. (CR 52-62) (PR 142-43). In other words, if a Turkish exporter imports materials that are classified under the Turkish Harmonized Tariff Schedule based on the same eight-digit classification as the materials it uses to produce merchandise for export, the Turkish government will forgive import duty liability on the "equivalent goods" even if those imported equivalent goods cannot be used to produce the exported merchandise. Id.

### C. The Conditions Under Which the Department Will Grant a Duty Drawback Adjustment Are More Stringent Than the Conditions Under Which the Turkish Government Will Pay Duty Drawback Claims

The standard applied by the Department in determining eligibility for a drawback adjustment under U.S. law is more stringent than Turkish law's grant of duty drawback to Turkish exporters. In particular, where the imported input *cannot* be used to produce the exported merchandise (albeit satisfying the "equivalent goods" standard under Turkish law), no duty drawback adjustment to export price (or constructed export price) is appropriate.

In Maverick Tube II, for example, the U.S. Court of Appeals for the Federal Circuit ("CAFC") sustained the Department's rejection of a respondent's claim for a duty drawback

---

Processing Certificate ("IPC") holder is conditionally exempt from the payment of customs duties, charges and value added tax ("VAT") otherwise payable on the import entries at the time of import.") (CR 52-62) (PR 142-43).

NON-CONFIDENTIAL

adjustment because the respondent did not import the particular grade of hot-rolled steel required to produce oil country tubular goods ("OCTG") (i.e., the subject merchandise in that case). See id., 861 F.3d at 1272-74. The respondent's hot-rolled steel imports satisfied the Turkish drawback system's "equivalent goods" standard, because they were classifiable under the same eight-digit tariff heading as the particular grade of hot-rolled steel required to produce OCTG. In that proceeding, however, the respondent did not import the particular grade of hot-rolled steel required for the production of OCTG. See id. Although the OCTG respondent's duty liability on imports of hot-rolled steel was forgiven by the Turkish government, the imported hot-rolled steel could not be used to manufacture the merchandise that was exported (i.e., OCTG).

The CAFC explained that the statute is silent with respect to the question of whether the imported inputs must be capable of being used in the production of subject merchandise. See id., 861 F.3d at 1274. As a result, the CAFC examined the context of the duty drawback adjustment relative to the relevant statutory language and the statute's purpose. See id. The CAFC concluded the Department's interpretation of the statute (i.e., restricting a respondent's eligibility for a duty drawback adjustment to instances where the imported merchandise on which drawback was received was capable of being used in producing subject merchandise) was "entirely reasonable" because "allowing for duty drawbacks for goods unrelated to the subject merchandise contravenes the statutory goal of making apples-to-apples comparisons between foreign and United States prices." Id. Thus, in the case of OCTG exports from Turkey, to the extent the Turkish drawback system is satisfied by matching imports of hot-rolled steel that is classifiable under the same eight-digit heading – irrespective of whether it is capable of being used to produce OCTG, in order to be eligible for a duty drawback adjustment under U.S. law, a

NON-CONFIDENTIAL

different standard must be met – i.e., that the hot-rolled steel imports are capable of being used to produce OCTG.

The OCTG fact pattern is particularly relevant with respect to an antidumping duty order that covers subject merchandise produced by a *specific grade or type* of an imported input that is narrower than the eight-digit Turkish HTS category for such input. This circumstance is present with respect to the scope of the Order on CAAS from Turkey.

**D.** **Like in *Maverick Tube II*, the Scope of the CAAS Order is Unique In That Turkish Law Can Be Satisfied By Imports That Cannot Be Used in the Production of Subject Merchandise**

In relevant part, the Order's scope provides that:

> {t}he products covered by these orders are common alloy aluminum sheet, which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of these orders includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. **With respect to not clad aluminum sheet, common alloy sheet is manufactured from a *1XXX-, 3XXX-, or 5XXX-series alloy* as designated by the Aluminum Association**.

Order, 86 Fed. Reg. at 22,143 (emphasis added).

Thus, CAAS is produced from only three different alloy-series, 1xxx-, 3xxx-, and 5xxx – and CAAS *cannot* be produced from aluminum in the 2xxx-, 4xxx-, 6xxx-, 7xxx-, and 8xxx-series alloy families. Id. Nevertheless, the Harmonized Tariff Schedule does not define aluminum by grade or alloy. Instead, it is largely defined by the thickness of the coil – 0.2 mm or less defined as "foil," greater than 0.2 mm defined as "plates, sheets and strips" – and whether the coil is manufactured from an aluminum alloy or is made from commercially pure aluminum. See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Suppl. Sec. C QR at Exhibit S4-4 (CR 283-85) (PR 227). As a result, like in Maverick Tube II, to the extent a

Turkish exporter satisfies the drawback system by exporting CAAS (i.e., aluminum sheet manufactured from a 1xxx-, 3xxx-, or 5xxx-series alloy), but imports only a semi-finished aluminum product manufactured from an alloy other than a 1xxx-, 3xxx-, or 5xxx-series alloy, the conditions of <u>Maverick Tube II</u> apply and a drawback adjustment to U.S. price is not appropriate.

### E.   The Imported Materials Underlying Assan's Duty Drawback Claims Were Not Capable of Being Used to Produce CAAS

#### 1.   Assan Failed to Establish Its Imported [            ] Were Capable of Being Used to Produce CAAS In Advance of The Department's Preliminary Determination

The Department's practice, which is not at issue or relevant to this case, is to grant duty drawback provided under the Turkish system only where Inward Processing Certificates ("IPC") have closed, meaning the Turkish government has approved the IPC and duty liability is extinguished.   In order to close an IPC, Turkish exporters must declare the import and export of a sufficient amount of materials for the established IPC and then apply to the Turkish government for closure.  <u>See</u> Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Sec. C QR at 42-43, Exhibit C-8 (CR 52-62) (PR 142-43).

During the period of investigation, Assan imported materials under [      ] IPCs, only one of which – IPC [      ] – was closed.  <u>Id.</u> at 43 (CR 52-62) (PR 142-43).  Assan imported what it referred to as [            ] under IPC [      ] <u>Id.</u> at 44, Exhibit C-11 (combined imports) (CR 52-62) (PR 142-43).

As discussed above, CAAS is produced from only three alloy series – specifically, 1xxx-, 3xxx-, and 5xxx-series alloys.  Assan's description of the material inputs [            ], therefore, was insufficient to meet its burden of establishing eligibility for a duty drawback

NON-CONFIDENTIAL

adjustment under <u>Maverick Tube II</u>, because [                    ] could be produced from [

                    ] that could – or could not – be used to produce CAAS.

Moreover, the combined *export* summary sheet prepared by Assan showed that of the

[                    ] kilograms of merchandise *exported* under IPC [          ], [                    ] kilograms

or [          ] percent [

                                        ] Response from Mayer Brown, LLP to Sec. of

Commerce Pertaining to Assan Sec. C QR at Exhibit 11 (CR 52-62) (PR 142-43).   In other

words, *at least* [          ] percent of the *exports* under IPC [          ] were non-subject merchandise.

This indicates that there is a possibility that the *imported* materials at issue in IPC [          ] were

not, and potentially could not be, used to produce in-scope CAAS (as opposed to [

            ]

Additionally, Assan described its production process for CAAS as beginning with the

"re-melting of unwrought aluminum, aluminum scrap, and {other} alloying elements" (<u>i.e.</u>, not

with an [                    ], the imported materials upon which Assan's duty drawback claim

was based).   <u>See</u> Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan

Questionnaire Response at 4 (CR 70) (PR 148).   Assan also notified the Department that it

produces other flat-rolled aluminum products including "foil (flat rolled products below 0.2 mm

thickness)" and "sells small quantities of thicker gauge sheet/plate in the home market that is

sourced from unaffiliated {foreign} suppliers."   Response from Mayer Brown, LLP to Sec. of

Commerce Pertaining to Assan Sec. A QR at 29, 33 (CR 21-23) (PR 117-19).   Aluminum foil

[

            ]   <u>See</u> Response from Mayer Brown, LLP to Sec. of Commerce

NON-CONFIDENTIAL

Pertaining to Assan Sec. C QR at Exhibit 11 (CR 52-62) (PR 142-43).   Thus, there was no basis for the Department to conclude that the *imported* [                    ] could be used in the production of subject merchandise and, indeed, record evidence indicated [

] could not be used to produce CAAS [

]

### 2.    The Department Inappropriately Granted Assan's Request for a Duty Drawback Adjustment in the Preliminary Determination

Despite Assan's failure to submit information to demonstrate that the *imported* inputs on which it received duty drawback from the Turkish government could be used in the production of CAAS, in the Preliminary Determination, the Department granted Assan's request for a duty drawback adjustment.   See Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020) (hereinafter, "Preliminary Determination") (PR 264) and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey (Oct. 6, 2020) at 10 (hereinafter, "Prelim. Decision Memo") (PR 247).   In particular, the Department explained that "Commerce has found that Turkish companies that meet the requirements under Turkey's Inward Processing Regime (IPR), which issues Inward Processing Certificates (IPCs), have satisfied the statute and two-prong test for duty drawback adjustments."   Prelim. Decision Memo at 10 (PR 247).   Further, because Assan submitted evidence that it had satisfied the IPR, the Department granted Assan's requested adjustment.   Id.

NON-CONFIDENTIAL

The Department applied the incorrect standard in its Preliminary Determination. Meeting the requirements under Turkey's IPR can satisfy the Department's two-pronged test in certain circumstances, but as demonstrated in Maverick Tube II, that is not the case where imported inputs cannot be used to produce the subject merchandise. Here, the Department erred in applying the two-pronged test without first assessing the record facts specific to Assan to determine if the test applied.

### 3. Additional Information Gathered After the Preliminary Determination Confirmed that Imported [          ] Could Not Be Used to Produce CAAS

In a post-preliminary submission, Petitioners notified the Department that Assan had failed to meet its burden of establishing eligibility for a duty drawback adjustment under Maverick Tube II, and urged the Department to issue a post-preliminary questionnaire to gather additional information that would allow the Department to undertake the appropriate inquiry. See Letter from Kelley Drye & Warren LLP to Sec. of Commerce Pertaining to Petitioners Post-Prelim. Cmts. at 3-6 (CR 359) (PR 279).

Due to complications in conducting onsite verification resulting from the COVID-19 pandemic, the Department issued a questionnaire in lieu of verification to Assan. See Preliminary Determination, 85 Fed. Reg. at 65,348 (PR 264); Letter from USDOC to Mayer Brown Pertaining to Assan Request Documentation in Lieu of Verification (CR 372) (PR 301). Therein, the Department instructed Assan to provide documentation regarding whether a sampling of the imports upon which Assan's duty drawback claim was based "could have been used in the production of the subject merchandise." Letter from USDOC to Mayer Brown Pertaining to Assan Request Documentation in Lieu of Verification at 7 (CR 372) (PR 301).

NON-CONFIDENTIAL

Assan responded that none of the *import* transactions identified by the Department involved inputs suitable for the production of CAAS, but claimed that other imported inputs could be used without providing any documentation regarding such other imported inputs. Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Verification QR at 14 (CR 373-82) (PR 305).  The documentation Assan did provide with respect to the specific import transactions identified in the Department's questionnaire confirmed that none of the imports could be used in the production of CAAS because they were all [

                    ] Id. at Exhibit V-21 (CR 373-82) (PR 305).

Instead of providing the Department with documentation to support its claim that certain other unidentified imports could be used in the production of CAAS, Assan submitted a table breaking down its *exports* under IPR [        ] by Turkish HTS.  Id. at Exhibit V-20 (CR 373-82) (PR 305).  As discussed in sections I.E.1, however, Assan's *exportation of subject merchandise* does not support its assertion that the *imported* materials at issue under IPR [        ] can be used to produce CAAS.

Despite the lack of record support for its claim and, thus, Assan's failure to carry its regulatory burden to establish its eligibility for a duty drawback adjustment, the Department unreasonably determined that Assan was eligible for a duty drawback adjustment.   See I&D Memo at 4-11 (PR 330).

F.   **The Department's Contention That *Maverick Tube II* Is Not Applicable Is Not Supported by Substantial Evidence and the Agency's Determination Is Otherwise Unlawful**

The Department's explanation for granting Assan's duty drawback adjustment is not supported by substantial record evidence.  First, the Department explained that "{c}ontrary to the petitioners' argument, the duty drawback provision, Commerce's regulations, and Commerce's

NON-CONFIDENTIAL

current practice do not require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment." I&D Memo at 9 (PR 330). Petitioners, however, did not argue that the duty drawback provision or Commerce's practice require "actual use" of the imported input. Rather, Petitioners argued that, pursuant to Maverick Tube II, a respondent claiming a duty drawback adjustment is required to demonstrate that the imported inputs are *capable* of being used in the production of subject merchandise. For the reasons discussed above, the record does not support such a finding.

Second, the Department stated that "{t}he purpose of the duty drawback adjustment to EP or CEP is to ensure that the results of participating in a duty drawback program do not affect the dumping calculation to either create or eliminate dumping margins, i.e., to make the dumping calculations duty drawback neutral" and that "it is unnecessary to trace specific inputs into the production of specific exports, as claimed by the petitioners" to accomplish this purpose. I&D Memo at 9 (PR 330). Again, Petitioners did not argue that the Department is required to trace the consumption of specific inputs in connection with the production of specific exports of subject merchandise. Further, the statutory purpose identified by the Department is not satisfied here. In Maverick Tube II, the CAFC explained that:

> The antidumping statutes generally "seek to produce a fair 'apples-to-apples' comparison between foreign market value and United States price." Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995). "{T}o achieve that end, the statutes and Commerce Department regulations call for adjustments to the base value of both foreign market value and United States price to permit comparison of the two prices at a similar point in the chain of commerce." Id. In Saha Thai, we explained that to produce this apples-to-apples comparison, "if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase {the export price} to account for the rebated or unpaid

NON-CONFIDENTIAL

> import duty (the 'duty drawback')." 635 F.3d at 1338 (emphases added). We thus explicitly endorsed Commerce's interpretation that duty drawbacks are only available for potential inputs of the subject merchandise.

Id., 861 F.3d at 1274.

Because Assan did not satisfy its burden of establishing that the imported inputs *could* be used in the production of subject merchandise, granting Assan a duty drawback adjustment inappropriately eliminates dumping by increasing EP and/or CEP based on duty liability forgiven for imported inputs that Assan itself has conceded (with respect to at least certain imports) cannot be used in the production of subject merchandise. To the extent even a portion of the drawback adjustment is based on imported inputs that cannot be used in the production of subject merchandise, granting Assan a duty drawback adjustment undermines the statutory intent of "produc{ing} a fair apples-to-apples comparison." Id.

Third, the Department stated the "the conditions noted by the petitioners in *Maverick Tube II* are not met in this case," because "the record evidence does not demonstrate that none of the inputs imported under the closed IPC are suitable for the production of subject merchandise." I&D Memo at 11 (PR 330) (emphasis in original). In support of this finding, the Department cited Assan's verification questionnaire response, which for the reasons explained above in section I.E.3, *does not* support a finding that *any* of the imported input materials can be used in the production of subject merchandise. Specifically, Assan's claim that other imported inputs (not identified in the Department's verification questionnaire) could be used in the subject merchandise is based on a table breaking down Assan's *exports* under IPR [     ] by Turkish HTS. See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Verification QR at 14, Exhibit V-20 (CR 373-82) (PR 305). Because the Turkish IPR allows for

NON-CONFIDENTIAL

drawback based on the importation of "equivalent goods," however, Assan's *exportation of subject merchandise* does not support its assertion that *imported* materials under IPR [      ] can be used to produce CAAS.  Because the only documentation Assan placed on the record confirmed that its imports at issue in IPR [       ] could not be used in the production of CAAS – because they were all [                                        ] – the Department's determination is not supported by substantial record evidence.

## II.   THE DEPARTMENT'S ACCEPTANCE OF ASSAN'S AFFILIATED FREIGHT CHARGES IS UNLAWFUL

### A.   Legal Background

#### 1.   Constructed Export Price

The Department calculates a dumping margin as the amount by which normal value exceeds the export price or constructed export price.  See 19 U.S.C. § 1677(35)(A).  Where a respondent reports no sales of subject merchandise into the United States to an unaffiliated purchaser, as in this case, the Department will calculate a constructed export price.  See 19 U.S.C. § 1677a(a)-(b).  The constructed export price is

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or <u>by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter</u> . . .

Id. at § 1677a(b) (emphasis added).  Accordingly, the Department uses the transaction price of an affiliated seller's first sale to an unaffiliated purchaser in the United States.  Id.

The statute further requires the Department to make several adjustments to CEP, including a reduction for an amount "attributable to any additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of shipment in

NON-CONFIDENTIAL

the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2). The Department makes such an adjustment "to achieve 'a fair, apples-to-apples comparison' between U.S. price and foreign market value . . ." Fla. Citrus Mut. v. United States, 550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  Reducing CEP for charges related to bringing subject merchandise to the place of delivery, like freight, prevents the improper inflation of CEP of subject merchandise by exporters charging a cost for freight higher than the actual freight expenses to their customers. See SeAH Steel Corp. v. United States, Ct. No. 20-00150, Slip Op. 21-146 at 49, 2021 WL 4859194, at *16 (Ct. Int'l Trade Oct. 9, 2021) (citing Dongguan Sunrise Furniture Co. v. United States, 865 F. Supp. 2d 1216, 1248-50 (2012)).

Where a company uses an affiliated provider of a service, however, the Department requires a respondent to demonstrate the prices paid to the provider are made at arm's length, in order to prevent any distortions to the dumping calculation caused by reducing the constructed export price by too much or too little.  See, e.g., Hyundai Steel Co. v. United States, 319 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2018); see also Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Brazil, at Comment 11 (Dep't Commerce Sept. 23, 2002), ref'd in 67 Fed. Reg. 62,134 (Oct. 3, 2002) (final results).

### 2.    Reliance on Adverse Facts Available

In order for the Department to rely on adverse facts available in determining an antidumping margin, it must first find that its reliance on "facts available" is warranted.  See 19 U.S.C. § 1677e(a).  To do so, the agency must find that "necessary information is not available on the record," or that a respondent: (1) "with{held} information" requested by the Department;

NON-CONFIDENTIAL

(2) "fail{ed} to provide such information by the deadlines for submission of the information or in the form and manner requested"; (3) "significantly impede{d} a proceeding"; or (4) "provide{d} such information but the information {could not} be verified." <u>Id.</u>

Moreover, if that interested party also "failed to cooperate by not acting to the best of its ability to comply with a request for information," the Department is required to apply an adverse inference in selecting among facts available.   <u>See id.</u> at § 1677e(b).   This standard for cooperation requires that a respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."   <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

**B.** **<u>The Department Unlawfully Determined Assan Demonstrated Its Affiliated Freight Charges Were Made at Arm's-Length Prices</u>**

In the <u>Final Determination</u>, the Department relied on Assan's reported affiliated freight charges in calculating CEP, despite Assan's failure to demonstrate that those charges were made at arm's length.   The Department specifically determined that "Assan has fully cooperated and provided all the information and documentation requested by Commerce in order to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length." <u>I&D Memo</u> at 18 (PR 330).   This determination, however, is contradicted by the record.   In particular, because record evidence indicates these affiliated charges were not made at arm's length, and the Department failed to address this detracting evidence, the agency's reliance on Assan's reported freight charges is not supported by substantial evidence.

NON-CONFIDENTIAL

1. **Assan Withheld Information, Impeded the Department's Investigation, and Did Not Provide All Information and Documentation Requested by the Department**

In its initial questionnaire responses, Assan reported that foreign inland freight "is arranged and invoiced by" an affiliated logistics company, [                    ]  See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Sec. B QR at 35 (hereinafter "CQR") (CR 52) (PR 142-43).  Because freight was arranged and invoiced by an affiliate of Assan, Petitioners urged the Department to collect the following additional information from Assan to ensure the charges were made at arm's length and to allow the Department to make any necessary adjustments:

- Provide data on the average prices the affiliate [                    ] charged from unaffiliated customers during the POI for the same logistical services it provided for Assan for U.S. subject merchandise shipments. Provide similar data regarding prices charged by the affiliate from Assan. Tie the reported data to Assan's books and records.

- Provide audited, or if unavailable, unaudited financial statements for [                    ] for FY 2019.

- Provide copies of any contracts and/or agreements Assan has with [                    ] applicable to the POI that involve freight services performed for subject merchandise.

See Letter from Kelley Drye & Warren LLP to Sec. of Commerce Pertaining to Petitioners Deficiency Cmts. on Assan's Section B-C QR at 32 (CR 103) (PR 154).

The Department did not request that Assan submit all of the above-noted information, but the agency did issue a supplemental questionnaire addressing this issue and instructing Assan to provide the following:

- A worksheet calculating the average price that the affiliated company [                    ] charged to unaffiliated customers for the same logistical services related to transporting subject merchandise to the port for export. Provide a price comparison of this average price to the average price

reported for foreign inland freight, noting the discount or premium between the two average prices.

- Sample documentation related to [                    ]'s charge to Assan (identify the sale observation), and the charge to unaffiliated companies using [                    ]'s same logistical services.

See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Suppl. Sec. C QR at 9 (CR 283-85) (PR 227).

Assan failed to provide a narrative response to these requests for information.  See id. (CR 283-85) (PR 227).  Instead, Assan submitted a worksheet showing: (1) the average price for inland freight to port between Assan and its affiliate; and (2) [

]  Id. at Exhibit S4-15 (CR 283-85) (PR 227).  The

[                    ] was both of limited probative value of whether the freight charges were at arm's length and of questionable accuracy in light of detracting record evidence (see infra section II.B.2).

Despite failing to provide the Department with the specifically requested information – i.e., "the average price that the affiliated company [                    ] charged to unaffiliated customers for the same logistical services related to transporting subject merchandise to the port for export" – and instead submitting only [                    ], the Department concluded that Assan "fully cooperated and *provided all the information and documentation requested by Commerce* in order to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length."  I&D Memo at 18 (PR 330) (emphasis added).  This determination, however, is wrong and is contrary to the record, as Assan *did not* provide the information explicitly requested by the Department (i.e., "the average price that the affiliated company [                    ] charged to unaffiliated customers for the same logistical services

related to transporting subject merchandise to the port for export"). Because this subsidiary determination is not supported by substantial evidence, the Court should remand this matter to the Department for the agency to revise its determination.

Even though Assan had an opportunity to explain the relevance of the [

] in response to the Department's questionnaires, Assan did not do so until its rebuttal case brief, following the Department's issuance of questionnaires and a questionnaire in lieu of verification. Assan claimed, for the first time in the investigation, that the [

] was the [                                                                 ] and an unaffiliated customer during the period of investigation. See Brief from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Rebuttal Brief at 17 (CR 404) (PR 317). The Department appears to have adopted this late-stage explanation in its Final Determination. See I&D Memo at 18 ("Commerce finds no evidence of broader use of the affiliated freight service provider for subject merchandise that would suggest that the information reported by Assan is incomplete.") (PR 330). The Department should not have relied on Assan's untimely and unsupported assertion in its case brief as the factual record in the investigation was closed. See 19 U.S.C. § 1677m(g) (providing that, before making a final determination, Commerce "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information . . . Comments containing new factual information shall be disregarded."); 19 C.F.R. § 351.301(c) (specifying deadlines for submitting factual information); cf. NEXTEEL Co. v. United States, 392 F. Supp. 3d 1276, 1291 (Ct. Int'l Trade 2019) (upholding the Department's rejection of respondent's proposed calculation of general and administrative expenses in its rebuttal case brief that incorporated information on the record as untimely filed new factual information). Indeed, in its supplemental questionnaire response, Assan gave *no* indication that the [                    ] was

NON-CONFIDENTIAL

the [                                        ] and an unaffiliated customer.  See Response from

Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Suppl. Sec. C QR at 9, Exhibit S4-

15 (CR 283-85) (PR 227).

Moreover, record evidence suggests that the affiliated logistics company [


]  In particular, the tax returns and other

financial information of that company indicated that [

]  See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to

Assan Suppl. Sec. A QR at Exh. A-18 (CR 111-18) (PR 164).  Given this record evidence, the

Department's determination that Assan has "fully cooperated and *provided all the information*

*and documentation requested by Commerce* in order to determine whether the price paid by

Assan to the affiliated freight service provider was at arms-length" is not supported by

substantial evidence.  I&D Memo at 18 (PR 330) (emphasis added).

### 2. The Department's Acceptance of Assan's Reported Affiliated Freight Charges as Made at Arm's Length Is Otherwise Unlawful

Even assuming that the Department's determination that Assan acted to the best of its

ability in responding to the Department's inquiries concerning freight services obtained from an

affiliate is supported by substantial evidence, the record does not support the agency's

determination that the affiliate's freight charges were made at arm's length.  The [

] and an unaffiliated customer specified a freight charge for an

[                                        ] See Response from

Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Suppl. Sec. C QR at Exhibit S4-15

(CR 283-85) (PR 227).  In contrast, the invoice issued by [            ] to Assan is [

] See id.  As a result, the fact that the

[                                                    ] and an unaffiliated customer was for a [                    ]

than the average price between Assan and the affiliated freight provider, does not demonstrate

Assan's reported freight charges were at arm's length.

Further, [                        ] tax returns and other financial information showed  that the

company [                                                    ] See Response from Mayer Brown, LLP to

Sec. of Commerce Pertaining to Assan Suppl. Sec. A QR at Exh. A-18 (CR 111-18) (PR 164).

This indicates that the company was not charging Assan arm's length prices, as it should have

been [            ] if it was charging Assan prices that [                            ] Even

though Petitioners raised these concerns, the Department did not address any detracting evidence

and, instead, summarily concluded that there was "no indication that the evidence on the record

concerning the accuracy and completeness of the freight costs provided by Assan's affiliated

freight service provider is insufficient." I&D Memo at 18.  As such, the Department's reliance

on Assan's affiliated freight charges and conclusory analysis is unsupported by substantial

evidence, and demonstrates that Assan failed to carry its burden of demonstrating its unaffiliated

freight charges were made at arm's length. Cf. Nippon Steel Corp., 458 F.3d at 1350–51.

## III. THE DEPARTMENT'S RELIANCE ON ASSAN'S REPORTED BILLING ADJUSTMENTS IS UNLAWFUL

The Department's decision not to apply an adverse inference in selecting facts available

for certain billing adjustments is unsupported by substantial evidence and contrary to law.  In

particular, the Department found, absent any explanation, that Assan cooperated in responding to

the agency's requests for information, even though the Department acknowledged Assan's

NON-CONFIDENTIAL

failure to provide requested documentation and information supporting reported billing adjustments.  See I&D Memo at 24 (PR 330).

### A.     Legal Background

#### 1.     Billing Adjustment

In determining the constructed export price, the Department's regulations instruct the agency to use a price that is "net of price adjustments," or a "change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment." 19 C.F.R. §§ 351.401(c), 351.102(b)(38).  Further, the burden of demonstrating entitlement to, and the amount of, a particular adjustment lies with the "interested party that is in possession of the relevant information."  Id. at § 351.401(b)(1); see also 19 C.F.R. § 351.401(c) (the Department "will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment").

When determining a party's entitlement to a claimed adjustment, the Department will consider a variety of factors, including:

> (1) Whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation; (2) how common such post-sale price adjustments are for the company and/or industry; (3) the timing of the adjustment; (4) the number of such adjustments in the proceeding; and (5) any other factors tending to reflect on the legitimacy of the claimed adjustment. The Department may consider any one or a combination of these factors in making its determination, which will be made on a case-by-case basis and in light of the evidence and arguments on each record.

Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,644-45 (Dep't of Commerce Mar. 2016).  Any one of these factors, either

NON-CONFIDENTIAL

taken alone or in combination, may weigh in favor of granting an adjustment.  Id., 81 Fed. Reg. at 15,645.

**2.**      **Adverse Facts Available**

As explained above in section II.A.2., the Department will apply AFA when "necessary information is not available on the record" or an interested party "withholds information that has been requested," and the interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. §§ 1677e(a), 1677e(b).

**B.**      **Assan Failed to Cooperate to the Best of Its Ability In Supplying Information Concerning Billing Adjustments**

The Department preliminarily found that Assan failed to demonstrate its entitlement to billing adjustments to U.S. price, based on the absence of customer-specific documentation.  See Prelim. Calc. Memo. at 5-6 (CR 253) (PR 249); see also Prelim. Decision Memo at 9  (PR 247). Consequently, the Department set Assan's reported upward adjustment to zero and the downward adjustment to the lowest reported value for such adjustments.  See Prelim. Calc. Memo. at 5-6 (CR 253) (PR 249).  Although the Department did not state that it was applying an adverse inference, the Department's selection of the billing adjustments values, in fact, resulted in a lower U.S. price and, thus, higher dumping margin for Assan.[4]  In the Final Determination, however, the Department changed course with respect to Assan's downward adjustment, relying on Assan's reported information on the record, rather than the lowest reported value, in the Final Determination.  See I&D Memo at 22-24 (PR 330).  The Department explained that it declined to apply an adverse inference in selecting facts otherwise available, noting that reliance on Assan's

---

[4]    Assan observed and contested the "adverse impact" of the Department's billing adjustments in its case brief.  See Assan's Case Br. at 15 (CR 400) (PR 309).

NON-CONFIDENTIAL

reported downward billing adjustments "does not benefit Assan" and "results in a lower U.S. price." I&D Memo at 24 (PR 330). The Department's conclusion in the Final Determination is unreasonable and contrary to law.

First, the Department concluded, without explanation, that "{a}s discussed above, we disagree that use of an adverse inference under section 776(b) of the Act is warranted," referring to its discussion of AFA in regard to an unrelated issue. See I&D Memo at 20, 24 (PR 330). As the application of AFA normally relates to specific gaps in the record (not the agency's total disregard of submitted information), the path of the Department's reasoning is impossible to discern, and its finding rests on entirely unknown evidence. Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) ("{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").

Second, in declining to apply AFA, the Department rewarded Assan's repeated failures to provide requested information and to explain its claimed billing adjustments. In particular, the Department instructed Assan to correct and clarify aspects of its billing adjustments reported for U.S. sales in a supplemental questionnaire with sample documentation for each type of billing adjustment. See Response from Mayer Brown, LLP to Sec. of Commerce Pertaining to Assan Suppl. Sec. C QR at 5-6 (CR 283-85) (PR 227). Assan did not explain its billing adjustments, nor did it provide the documentation requested by the Department, even though Assan stated it provided the requested information in an exhibit. Id. Without this documentation, there was no information on the record to support Assan's reported billing adjustments, and the Department applied facts available. See Prelim. Calc. Memo. at 5-6. In so doing, however, the Department

failed to address Assan's uncooperative behavior and condoned Assan's "inattentiveness, carelessness, or inadequate record keeping" contrary to the statute. See Nippon Steel Corp. v United States, 337 F.3d at 1382-83; cf. Issues and Decision Memorandum for the Antidumping Duty (AD) Investigation of Certain Cold-Rolled Carbon Steel Flat Products (Cold-Rolled Steel) from Belgium, at Comment 9 (Dep't of Commerce Sept. 23, 2002), ref'd in 67 Fed. Reg. 62,130 (Oct. 3, 2002) (final results) (applying partial AFA to respondent's billing adjustments and setting billing adjustments to zero, where respondent failed to cooperate to the best of its ability by providing requested information).

Moreover, the Department's conclusion that reliance on Assan's reported downward billing adjustment "does not benefit" Assan is meritless. I&D Memo at 24 (PR 330). While it is true that the reported adjustment decreases U.S. price and, therefore, increases Assan's dumping margin, it is not the case that Assan's withholding of information – and lack of cooperation – does not benefit Assan. Because the Department does not have the necessary information on the record to conclude the downward adjustment is accurate, and because Assan failed to cooperate in providing the Department with such information, the agency should have filled the gap in the record with an adverse inference by reducing Assan's U.S. price as it did in its Preliminary Determination. Failing to do so is inconsistent with the policy behind 19 U.S.C. § 1677e – i.e., that uncooperative parties should not benefit from their lack of cooperation and are encouraged to comply in future proceedings. See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

In sum, the Department's decision is not reasonable, and its decision allows Assan to benefit from its repeated failures to provide information requested and its uncooperative behavior.

IV.   **CONCLUSION**

For the reasons set forth above, Petitioners respectfully urge this Court to determine that the Department's Final Determination is not supported by substantial evidence and is otherwise not in accordance with law.  Petitioners urge this Court to remand the Final Determination to the Department with instructions to correct the errors set forth above.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Petitioners

Dated:  November 22, 2021

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's September 2, 2021 Order (ECF No. 20) setting the word limitation to Plaintiffs Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Aleris Rolled Products, Inc.; Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc.'s ("Petitioners") Rule 56.2 Brief to 14,000 words, counsel to Petitioners certifies that this Brief contains 9,413 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400

Counsel to Petitioners

Dated: November 22, 2021