## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) |
| | ) |
| *Plaintiff,* | ) **Non-Confidential Version** |
| | ) |
| v. | ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00246 |
| | ) |
| *Defendant,* | ) Confidential Business Proprietary |
| | ) Information Deleted from Pages: 5-7, 9- |
| ALUMINUM ASSOCIATION COMMON | ) 20. |
| ALLOY ALUMINUM SHEET TRADE | ) |
| ENFORCEMENT WORKING GROUP, et al., | ) |
| | ) |
| *Defendant-Intervenors.* | ) |

## RESPONSE BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S TO PETITIONERS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ARENT FOX LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@ArentFox.com

February 22, 2022

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     ISSUES PRESENTED.......................................................................................... 2

III.    STANDARD OF REVIEW ................................................................................... 2

IV.     ARGUMENT ....................................................................................................... 3

    A.    Commerce's Finding That Assan Was Entitled To A Duty Drawback
        Adjustment Is Supported By Substantial Evidence ................................ 4

        1.    The Turkish IPR Satisfies Commerce's Longstanding "Two-
             Prong" Test for Drawback Eligibility ........................................ 4

        2.    The Record Establishes That Inputs Under Assan's IPC Are
             Capable of Producing CAAS ..................................................... 6

        3.    Commerce Fully Considered Petitioners' Arguments in the *Final
             AD Determination* ................................................................... 12

    B.    Commerce Properly Relied on Assan's Affiliated Freight Charges ................... 15

    C.    There Is No Basis for Commerce To Apply AFA In Connection With The
        Billing Adjustments Reported By Assan ........................................................ 20

V.      PRAYER FOR RELIEF ...................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Akzo N.V. v. U.S. Int'l Trade Comm'n,*
   808 F.2d 1471 (Fed. Cir. 1986)........................................................................................3

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
   222 F. Supp. 3d 1255 (Ct. Int'l Trade 2017) ...................................................................14

*Changzhou Trina Solar Energy Co. v. United States,*
   359 F. Supp. 3d 1329 (Ct. Int'l Trade 2019), *aff'd* 975 F.3d 1318 (Fed. Cir.
   2020) ................................................................................................................................21

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984)..........................................................................................................3

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938)..........................................................................................................2

*DuPont Teijin Films USA, LP v. United States,*
   407 F.3d 1211 (Fed. Cir. 2005).........................................................................................2

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,*
   357 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ...................................................................8

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,*
   361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ...................................................................8

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States,*
   429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ...............................................................4, 8

*Laclede Steel Co. v. United States,*
   18 CIT 965 (1994) ..........................................................................................................11

*Lasko Metal Prods., Inc. v. United States,*
   43 F.3d 1442 (Fed. Cir. 1994).........................................................................................14

*Marmen Inc. v. United States*
   545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) .................................................................17

*Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi,*
   861 F.3d 1269 (Fed. Cir. 2017)...........................................................................7, 8, 9, 13

*Mittal Steel USA, Inc. v. United States,*
   31 CIT 1395 (2007) ........................................................................................................11

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)..................................................................22

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)....................................................................3

*In re NuVasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016)....................................................................3

*Pro-Team Coil Nail Enter., Inc. v. United States*,
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ...........................................17

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
   635 F.3d 1335 (Fed. Cir. 2011).................................................................14

*Tianjin Magnesium Int'l, Co. v. United States*,
   844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...........................................22

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013)....................................................................3

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................2, 3

19 U.S.C. § 1677a(c)(1)(B).........................................................................4, 6

19 U.S.C. § 1677b(f)(2) and (3)....................................................................19

28 U.S.C. § 2640(b) ........................................................................................2

**Regulations**

19 C.F.R. § 351.401 ......................................................................................21

19 C.F.R. § 351.401(b)(1)..............................................................................21

19 C.F.R. § 351.407(b) ..................................................................................19

**Administrative Determinations**

*Common Alloy Aluminum Sheet From Bahrain, Croatia, Egypt, Germany, India,
   Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain,
   Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg.
   22139 (Dep't Commerce Apr. 27, 2021) ....................................................9

*Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of
   Sales at Less Than Fair Value*, 86 Fed. Reg. 13326 (Dep't Commerce Mar. 8,
   2021), and accompanying Issues and Decision Memorandum ...................... *passim*

*Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative
Determination of Sales at Less Than Fair Value, Preliminary Negative
Determination of Critical Circumstances, Postponement of Final
Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346
(Oct. 15, 2020), and accompanying Decision Memorandum .................................................12

*Light-Walled Rectangular Pipe and Tube from Turkey*, 69 Fed. Reg. 53675 (Dep't
Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues &
Decision Memorandum ...........................................................................................................5

*Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't
Commerce Oct. 13, 2015) (final LTFV determ.), and accompanying Issues &
Decision Memorandum .........................................................................................................5, 6

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., )<br><br>*Plaintiff*, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>*Defendant*, )<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, et al., )<br><br>*Defendant-Intervenors*. ) | <u>**Non-Confidential Version**</u><br><br>Consol. Court No. 21-00246<br><br>Confidential Business Proprietary Information Deleted from Pages: 5-7, 9-20. |

**RESPONSE BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S. TO PETITIONERS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I.    <u>INTRODUCTION</u>

On behalf of Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan"), we respectfully submit this brief in response to the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group, et al.'s ("Petitioners") memorandum of points and authorities in support of its motion for judgment on the agency record filed on November 22, 2021, ECF Nos. 29 and 30 ("Pet. Br."), regarding the final affirmative determination of the Department of Commerce ("Commerce") in the antidumping duty ("AD") investigation of Common Alloy Aluminum Sheet ("CAAS") from Turkey. *Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13326 (Dep't Commerce Mar. 8, 2021) ("*Final AD Determination*"), P.R. 358, ECF No. 15-1, and the accompanying Issues and Decision Memorandum ("*Final I&D Memo*"), P.R. 330, ECF No. 15-2.

II.     **ISSUES PRESENTED**

Assan addresses the following three issues raised in Petitioners' Brief:

1.      Whether Commerce's determination to grant Assan a duty drawback adjustment is supported by substantial evidence and otherwise in accordance with law.

2.      Whether Commerce's acceptance of Assan's affiliated freight charges to calculate constructed export price ("CEP") is supported by substantial evidence and otherwise in accordance with law.

3.      Whether Commerce's determination not to apply adverse facts available in connection with Assan's reported billing adjustments is supported by substantial evidence and otherwise in accordance with law.

III.    **STANDARD OF REVIEW**

The authority and scope of the Court's power to review Commerce's determinations in AD cases is established by statute. 28 U.S.C. § 2640(b) provides that "{i}n any civil action commenced in the Court of International Trade under section 516A of the Tariff Act of 1930, the court shall review the matter as specified in subsection (b) of such section." 19 U.S.C. § 1516a(b)(1)(B)(i) provides that, with respect to a final determination by the Commerce, the Court "shall hold unlawful any determination, finding, or conclusion found . . . unsupported by substantial evidence on the record, or otherwise not in accordance with law." By statute, Commerce determinations shall thus be upheld if they are supported "by substantial evidence on the record" and are otherwise "in accordance with law." *Id.*

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). More specifically, when reviewing agency determinations, findings, or conclusions for

substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). To provide a reasoned explanation, Commerce "must make the necessary findings and have an adequate evidentiary basis for its findings," and "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal quotations omitted) (citations omitted); *see* 19 U.S.C. § 1516a(b)(1)(B)(i).

The Court of Appeals for the Federal Circuit ("Federal Circuit") has stated that the "substantial evidence standard does not allow a court to conduct a *de novo* investigation of the evidence on the record before it and reach an independent conclusion; rather, the court's review is limited to deciding whether there is sufficient evidence in the record considered as a whole to support the agency's findings." *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir. 1986). The "mere fact that a reasonable person might reach some other conclusion is insufficient for this court to overturn the agency's conclusion." *Id.* When reviewing Commerce's statutory interpretations, the Court specifically applies the framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984)).

## IV. **ARGUMENT**

Commerce's *Final AD Determination*, including its finding that Assan was entitled to a duty drawback adjustment, its use of affiliated freight charges reported by Assan to calculate CEP, and its refusal to apply adverse facts available in connection with the billing adjustments reported by Assan, was supported by substantial record evidence and otherwise in accordance with law.

3

**A.     Commerce's Finding That Assan Was Entitled To A Duty Drawback Adjustment Is Supported By Substantial Evidence**

In the *Final AD Determination*, Commerce found that Assan was eligible for a duty drawback adjustment and granted Assan such an adjustment. *Final I&D Memo* at 8, P.R. 330. Commerce's determination, which was based on its well-established two-prong test, is reasonable and supported by substantial record evidence provided by Assan.

**1.     The Turkish IPR Satisfies Commerce's Longstanding "Two-Prong" Test for Drawback Eligibility**

As detailed in Assan's opening brief, in determining whether to grant a duty drawback adjustment to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test in which the party requesting the adjustment must demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and

> (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

*See* Plaintiff's Memorandum of Law in Support of Motion for Judgement on the Agency Record Pursuant to Rule 56.2 at 10 (Nov. 22, 2021), ECF Nos. 27, 28; *Final I&D Memo* at 8, P.R. 330; *see also* Pet. Br. at 9. Where an importer satisfies both criteria, it has been Commerce's longstanding practice to grant a drawback adjustment for the amount of the duty foregone. *Final I&D Memo* at 8. Use of Commerce's two-prong test has been repeatedly acknowledged and upheld by the reviewing courts, with any deviations from this standard methodology categorically rejected. *See, e.g., Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1362-64 (Ct. Int'l Trade 2020).

During the POI, Assan utilized the same drawback program considered by Commerce in previous administrative reviews involving Turkey – the Inward Processing Regime ("IPR").

NON-CONFIDENTIAL

Section C Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S at 42 (Jun. 29, 2020), C.R. 52, P.R. 142 ("Section C QR"). Commerce has analyzed the Turkish IPR many times and consistently found it to satisfy Commerce's two-prong test for drawback eligibility. *See, e.g.*, *Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce Oct. 13, 2015) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 7 ("*Welded Line Pipe I&D Memo*"). Indeed, Commerce's methodology has been applied in determinations addressing the Turkish drawback system for nearly two-decades and Turkey's IPR system has not changed. *See, e.g., Light-Walled Rectangular Pipe and Tube from Turkey*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 9 (cmt. 1).

Consistent with its previous findings, Commerce analyzed Assan's use of the IPR system in this investigation and found that it satisfies the first prong of Commerce's two-prong test. The IPR specifies and restricts that only exports containing qualifying incorporated imported inputs may be used to claim drawback. *See* Section C QR at Exh. C-8 (Turkish Inward Processing Law at Articles 2, 8-9), C.R. 52, P.R. 143. It also explicitly requires that the exported product contain the imported raw material inputs to qualify for drawback, with the IPC number providing the necessary linkage for the imports and exports. *Id*.

Record evidence further demonstrates that Assan received drawback on its U.S. exports and that there were sufficient imports of the inputs, namely [                    ], to account for the duty drawback on the exports of CAAS, satisfying the statutory requirements of 19 U.S.C §1677a(c)(1)(B) and the second prong of Commerce's test. Section C QR at 42-46 & Exh. C-11, C.R. 52, P.R. 142-143. Specifically, Assan filed entry and exit declarations with Turkish Customs, which verified the accuracy of the relevant information and entered it into an "IPR e-

portal" database detailing import/ export movements and usage under the inward processing

certificate ("IPC"). For IPC No. [      ], Assan provided screenshots of realized consumption

tables from the IPR e-portal showing the quantities of raw materials purchased and the quantities

of finished goods exported, as well as yield/loss ratios. *Id.* at 44 and Exh. C-10, C.R. 52, P.R.

142-143. The combined import and export data Assan provided under IPC No. [      ] was

extracted directly from the IPR e-portal, which is a complete, detailed, and fully integrated

system maintained by Turkish Customs and designed to ensure "objective criteria to measure all

IPC transactions." *Id.* at 45-46 and Exh. C-11.

     Upon review of the extensive record evidence provided, Commerce found that Assan

satisfied both criteria of its two-prong test and "granted a duty drawback adjustment to Assan

consistent with {its} practice." *Final I&D Memo* at 8, P.R. 330. Despite this, Petitioners claim

that Commerce applied the "incorrect standard" and that Commerce's "standard . . . in

determining eligibility for a drawback adjustment under U.S. law is more stringent than Turkish

law's grant of duty drawback to Turkish exporters." Pet. Br. at 10, 16. Petitioners' argument

ignores decades of Commerce precedent finding that "the requirements under Turkey's duty

drawback program . . . if met by Turkish companies, satisf{y} the statute with respect to duty

drawback adjustments under U.S. law." *Welded Line Pipe I&D Memo* at 7.

    **2.**    **The Record Establishes That Inputs Under Assan's IPC Are Capable of Producing CAAS**

    As detailed above, the Turkish IPR system has been analyzed by Commerce for several

years and consistently found to satisfy Commerce's two-prong test for drawback eligibility. *See*

Section IV.A.1., *supra*. Nevertheless, Petitioners claim that Commerce must first assess record

facts to determine whether the two-prong test applies before applying it. Pet. Br. at 10, 16. Such a

"threshold test" is applicable only "when the exempted goods {can}not be used as inputs to

6

NON-CONFIDENTIAL

produce the subject merchandise." *Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi*, 861

F.3d 1269, 1272 (Fed. Cir. 2017) ("*Maverick II*"). Where, as here, imported inputs ([

          ]) are capable of being used to produce CAAS, the threshold test is inapplicable

and Commerce's well-established two-prong test applies.

Petitioners first take issue with provisions in the drawback statute regarding "equivalent

goods," which it misinterprets as meaning "the Turkish government will forgive import duty

liability . . . even if those imported equivalent goods cannot be used to produce the exported

merchandise." Pet. Br. at 10. In fact, the provisions related to equivalent goods, *i.e.* "{g}oods in

free movement," are only applicable in situations where exportation in advance occurs. Section

C QR at Exh. C-8, Art. 3 (emphasis added), C.R. 52, P.R. 143. In that circumstance, the

exportation of processed products produced from equivalent goods purchased in the home

market occurs prior to the importation. *Id.* Equivalent goods thus do not refer to imported raw

materials that may not be suitable for the production of subject merchandise, as Petitioners'

claim, but rather raw materials in free movement in Turkey's Customs Area. *Id.* at Art. 5. This

distinction is clear in the language of the Turkish IPR Regulation and Customs Law, which notes

that equivalent goods may be used "*instead of the imported goods* used in obtaining the

processed products." *Id.* (emphasis added).

Petitioners' attempts to reinterpret the Turkish IPR Regulation and Customs Law without

foundation or any evidentiary basis should be rejected by the Court. Petitioners not only read

provisions into the Turkish IPR that do not exist, but also introduce concepts that are inapplicable

in this investigation. Assan has not reported use of the equivalent goods under IPC [       ] and

record evidence demonstrates that Assan had sufficient imports to account for the duty drawback

on its exports of CAAS under IPC [       ] without the purchase of equivalent goods in the

domestic market. Section C QR at Exh. C-11, C.R. 52, P.R. 143. Again, Commerce and this Court have consistently found that the Turkish drawback system satisfies it two-prong test establishing eligibility for a drawback adjustment. *Icdas*, 429 F. Supp. 3d at 1362; *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1314, 1319 (Ct. Int'l Trade 2019) (appeal to the Federal Circuit Court of Appeals, No. 21-1066, dismissed voluntarily by Appellants on June 4, 2021); *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 357 F. Supp. 3d 1325, 1329 (Ct. Int'l Trade 2018). The Turkish IPR has not changed and Petitioners' reinterpretation would overturn years of precedent on the basis of speculation, incorrect legal interpretation, and facts wholly irrelevant here.

Petitioners next claim that "{t}o the extent *even a portion* of the drawback adjustment is based on imported inputs that cannot be used in the production of subject merchandise," Assan should not be granted a drawback adjustment. Pet. Br. at 19 (emphasis added). However, Petitioners again misinterpret the relevant standards governing drawback adjustment eligibility. Commerce does not require that *all* inputs under an IPC be used to produce subject merchandise, but rather that "*at least one imported input* under the closed IPC can be used in the production of subject merchandise." *Final I&D Memo* at 11 (emphasis added), P.R. 330. This clear standard was upheld by the Federal Circuit in *Maverick II*, the only case cited by Petitioners in support of their position that Commerce must impose such a "threshold test" analyzing the suitability of inputs for use in producing the subject merchandise. Pet. Br. at 10, 12-14. In *Maverick II*, the Federal Circuit's finding was premised on the fact that "*none* of the goods for which duties were exempted . . . were capable of being used to produce {subject merchandise}." 861 F.3d at 1272 (emphasis added). Specifically, the Federal Circuit found that the "{t}he particular pipes at issue

. . . may only be produced from a grade of coil known as J55" and the respondent "did not import any J55 coils." *Id*. at 1271.

Here, by contrast, record evidence clearly demonstrates that inputs under IPC [      ] were capable of being used to produce CAAS.  The scope of the order provides that CAAS is "a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width." *Final AD Determination*, 86 Fed. Reg. at 13327 (Appendix I), P.R. 358. In other words, any material with a thickness greater than 0.2 mm (and less than 6.3 mm) is within the scope of the *AD Order. Id.; see also Common Alloy Aluminum Sheet From Bahrain, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22139, 22143 (Appendix) (Dep't Commerce Apr. 27, 2021), P.R. 347.  Assan provided combined import and export data directly from the IPR e-portal maintained by Turkish Customs, which shows that all imports of [                    ] under IPC [      ] were classified under HTS subheading [      ]. Section C QR. at Exh. C-11, C.R. 52, P.R. 143; *see also* Response to Request for Documents in Lieu of Verification of Assan Aluminyum Sanayi ve Ticaret A.S. at Exh. V-6 (Dec. 18, 2020) ("Verification Response"), C.R. 374, P.R. 305. Pursuant to the Turkish Harmonized Tariff Schedule, aluminum classified under HTS [      ] necessarily [      ], meaning that it is capable of producing subject merchandise. Verification Response at Exh. V-7.

Petitioners ignore this point, instead highlighting the dimensions of certain *exports* under IPC [      ], which were [                    ]. Pet. Br. at 14. However, it does not follow, as Petitioners' speculate, that "there is a possibility that the *imported* materials at issue in IPC [      ] were not, and potentially could not be, used to produce in-scope CAAS." *Id.* Because

record evidence demonstrates that all imports under IPC [        ] had a thickness [

  ], each of those inputs was necessarily *capable* of ultimately producing CAAS. *See* Section

C QR at Exh. C-11, C.R. 52, P.R. 143; Verification Response at Exh. V-7, C.R. 374, P.R. 305.

 Like many manufacturers, Assan produces both subject (CAAS) and non-subject

merchandise (aluminum foil). As Assan explained, "{t}he fact that non-subject merchandise may

also have been exported under the same IPR number does not make Assan's {drawback}

calculation inaccurate {because it} takes into account denominator and numerator from the same

IPR{.}" Verification Response at 6, C.R. 373, P.R. 305. Even if the imported inputs under IPC

[     ] were ultimately used to produce non-subject merchandise, which they were not, it does

not follow that those inputs "could not be used to produce CAAS." Pet Br. at 15. Petitioners'

baseless argument ignores that both CAAS and aluminum foil are *capable* of being produced

from the same input – [                                    ]. In *Maverick II*, by contrast,

"the imported hot-rolled steel *could not* be used to manufacture the merchandise that was

exported." Pet. Br. at 11 (emphasis added).

 Petitioners' speculative arguments regarding the alloy-series of Assan's imports is

likewise unpersuasive. As Petitioners note, "the Harmonized Tariff Schedule does not define

aluminum by grade or alloy," and Commerce did not request such alloy information for imports

under IPC [     ]. *Id.* at 12-13. Though Petitioners now argue that Assan should have provided

alloy information "to meet its burden of establishing eligibility for a duty drawback adjustment

. . . because [               ] could be produced from [                    ]," *Id.* at 13-14,

this point ignores the record information provided by Assan establishing drawback eligibility,

which Commerce deemed to be sufficient. *Final I&D Memo* at 8, P.R. 330. Reporting of alloy-

specific information would amount to physical tracing of Assan's imports, a requirement

Commerce and this Court have consistently rejected. *See, e.g.*, *Laclede Steel Co. v. United States*, 18 CIT 965, 972 (1994) ("This court has consistently held that 'there is no requirement that {a} specific input be traced from importation through exportation before allowing drawback on duties paid{.}'" (citation omitted)). Instead, both "the statute and the two-prong test put the emphasis on proof of a direct link between the rebate of the import duty and on evidence of sufficient imports to account for the duty drawback and the exports of subject merchandise," which in present here. *Mittal Steel USA, Inc. v. United States*, 31 CIT 1395, 1412 (2007).

Indeed, as Commerce explicitly stated in the *Final AD Determination*, it "*do{es} not require that the imported material be traced directly from importation through exportation*," but rather only that a company meet its "two-pronged" test for qualify for the adjustment. *Final I&D Memo* at 8 (emphasis added), P.R. 330. Petitioners do not allege, nor can they, that Assan has not met Commerce's two-prong test. Petitioners acknowledge that Assan has "declare{d} the import and export of a sufficient amount of materials for the established IPC." Pet. Br. at 13. Despite Petitioners' claims, Assan also submitted information "demonstrat{ing} that the *imported* inputs on which it received duty drawback from the Turkish government could be used in the production of CAAS." *Id.* at 15; *see also* Section C QR at Exh. C-11, C.R. 52, P.R. 143; Verification Response at Exh. V-6, C.R. 374, P.R. 305.

Finally, Petitioners claim that "none of *import* transactions" reported by Assan "involved inputs suitable for the production of CAAS." Pet. Br. at 17. However, this is factually inaccurate. Though the two transactions identified by Commerce in its Verification Questionnaire involved "inputs suitable for production of [                    ]," imports under IPR [      ] were also "inputs suitable for the production of CAAS." Verification Response at 14, C.R. 373, P.R. 305. As detailed above, Petitioners' premise that inputs *suitable* for production of non-

subject merchandise are not *capable* of producing subject merchandise is unsupported by the record. Assan's drawback calculation accounts for the subject- and non-subject merchandise exported under IPR [    ], with "both the numerator and denominator of the duty drawback adjustment includ{ing} inputs for and exports of subject as well as non-subject goods," as well as a "breakdown of total exports as subject and non-subject goods." *Id.* at 14 and Exh. V-20, C.R. 373, 379, P.R. 305. Assan's comprehensive reporting was sufficient to satisfy Commerce's two-prong test and Commerce's determination to grant Assan the duty drawback adjustment to which is statutorily entitled was reasonable.

### 3. Commerce Fully Considered Petitioners' Arguments in the *Final AD Determination*

Petitioners argue that Commerce "applied the incorrect standard in its *Preliminary Determination*" and did not fully consider evidence submitted by Assan in its post-preliminary submission. Pet. Br. at 16 (citing *Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346 (Oct. 15, 2020) ("*Preliminary Determination*"), P.R. 264). As an initial matter, Commerce's *Preliminary Determination* is irrelevant at this stage; Commerce fully considered the arguments raised by Petitioners following the *Preliminary Determination* in its case and rebuttal briefs, and rejected those arguments in the *Final AD Determination*. *See Final I&D Memo* at 4-8, P.R. 330. Assan's drawback edibility, including its use of imported inputs under IPR [    ] in the production of CAAS, was fully vetted at the administrative level and Commerce's findings in the *Final AD Determination* were supported by record evidence. *Id.* at 9.

NON-CONFIDENTIAL

Specifically, in the *Final AD Determination*, Commerce fully considered Petitioners' arguments regarding Assan's drawback eligibility and properly applied its two-pronged test based on an assessment of record evidence. In response to Petitioners' argument, Commerce stated that its "current practice do{es} not require *actual use* of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment." *Id.* at 9 (emphasis added). This position is consistent with that articulated by the Court in *Maverick II*, which upheld as reasonable Commerce's threshold test that the exempted imports be only "*potential* inputs of the subject merchandise." 861 F.3d at 1274 (emphasis added). Following its analysis of record evidence, including its verification of imports and exports under IPC [      ]*,* Commerce determined that "Assan's import duty costs, based on the consumption of imported inputs during the {period of investigation}, including imputed duty costs for imported inputs, properly account for the amount of duties imposed." *Final I&D Memo* at 9, P.R. 330; *see also* Verification Response at Exh. V-6, C.R. 374, P.R. 305.

None of Petitioners' speculative arguments undermine Commerce's reasonable conclusion in the *Final AD Determination*. First, there is no record evidence to support Petitioners' contention that "granting Assan a duty drawback adjustment inappropriately eliminates dumping." Pet. Br. at 19. To the contrary, as Assan explained, because "non-subject goods included in the denominator dilute the reported drawback adjustment," the inclusion of inputs ultimately used in the production of non-subject merchandise in the drawback calculation does not discredit Assan's reported duty drawback adjustment. Verification Response at 15, C.R. 373, P.R. 305.

Second, the overarching purpose of the drawback statute is distinct from that of the antidumping statute more broadly; the goal is not to create an "apples-to-apples" comparison as

Petitioners claim, Pet. Br. at 19, but rather to "prevent a dumping margin from being created, or artificially inflated, because the exporting country exempts from import duties (or refunds/rebates import duties paid on) material inputs or components that are imported into the country and used to produce a product that is subsequently exported." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 222 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2017). Put more simply, the drawback adjustment compensates for the fact that import duty costs reflected in home market price or normal value are not reflected in export price. *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011); *see also Final I&D Memo* at 9, P.R. 330 ("The purpose of the duty drawback adjustment . . . is to ensure that the results of participating in a duty drawback program do not affect the dumping calculation to either create or eliminate dumping margins"). In this context, granting Assan's duty drawback adjustment does not "inappropriately eliminat{e} dumping," Pet. Br. at 19, but ensures that Commerce "determine{s} margins as accurately as possible, and {uses} the best information available to it in doing so." *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994).

Finally, Commerce fully considered the applicability of *Maverick Tube II* and found that "the conditions noted by the petitioners in *Maverick Tube II* are not met in this case." Pet. Br at 19-20; *Final I&D Memo* at 11, P.R. 330. Commerce's determination is supported by record evidence, including Assan's identification of [                    ], the imported input under IPC [        ],[1] as one of three major inputs used to produce CAAS,[2] and its establishment that

---

[1] *See* Section C QR at Exh. C-11 (describing the imported input under IPC [        ] as [                    ], C.R. 52, P.R. 143).

[2] *See* Section D Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S. at Exh. D-4 (Jul. 2, 2020) (listing inputs used to produce the merchandise under consideration, including [                        ], ("Section D QR"), C.R. 70, P.R. 148).

[                          ] was both purchased[3] and used in the production of CAAS during the period of investigation ("POI").[4]

Commerce properly determined that Assan was entitled to a duty drawback adjustment in the *Final AD Determination*. Its conclusion was reasonable, consistent with its longstanding application of the two-prong test, and fully supported by record evidence provided by Assan.

### B.    Commerce Properly Relied on Assan's Affiliated Freight Charges

In the *Final AD Determination*, Commerce properly relied on Assan's reported affiliated freight charges in calculating CEP. Commerce specifically determined that "Assan has fully cooperated and provided all the information and documentation requested by Commerce in order to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length." *Final I&D Memo* at 18, P.R. 330. Petitioners did not contest the veracity or accuracy of Assan's reported data. Rather, it claimed that the data reported by Assan was incomplete and deficient. Pet. Br. at 23-27. Petitioners' claim was baseless and not supported by substantial evidence.

### 1.    Assan Has Fully Cooperated and Provided All the Information Requested by Commerce

In its Section C Questionnaire Response, Assan explained that it relied on an affiliated freight supplier to transport merchandise from its plant to the port of export. Section C QR at 35, C.R. 52, P.R. 142. In its Supplemental Section C Questionnaire, the Department asked Assan to:

---

[3] *Id.* at Exh. D-5 (providing the quantity and value of the beginning inventory, purchases, consumption, other adjustments, and ending inventory for the three major inputs in the production of CAAS, including [                    ]).
[4] Supplemental Section D Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S., at 9 (Aug. 18, 2020) (detailing "that the raw material (aluminum) purchased to produce CAAS can come in three forms – primary aluminum, cast coil, or scrap."), C.R. 181, P.R. 195 ("Supp. D QR"); *see also id.* at Exh. S2-15 (providing the invoice for Assan's largest purchase of [            ], C.R. 184-185, P.R. 196).

Please provide a worksheet calculating the average price that the affiliated company [          ] charged to unaffiliated customers for the same logistical services related to transporting subject merchandise to the port for export. Provide a price comparison of this average price to the average price reported for foreign inland freight, noting the discount or premium between the two average prices.

Letter from M. Hoadley to Assan Aluminyum Sanayi ve Ticaret A.S., re: Section C

Supplemental Questionnaire at 5 (Question 6.a) (Aug. 24, 2020), C.R. 221, P.R. 203

Assan fully complied with this request, providing information on the price

charged to unaffiliated customers for transporting merchandise to the port for export –

indeed, as indicated in Exhibit S4-15, there was [          ] such transaction during the

POI and the [              ] was included in the submission. Supplemental Section C

Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S. at Exh. S4-15 (Sept.

10, 2020) ("Supp. C QR"), C.R. 283-284, P.R. 227. Assan also compared this price to the

average price reported for foreign inland freight to port, as reported in Field DINLFTPU.

*Id.* Commerce relied on Assan's reported expense in the *Preliminary Determination* and

did not request additional information or further verify this field in its post-preliminary

determination questionnaire in lieu of verification. *See generally* Verification Response,

C.R. 373-398, P.R. 305.

Petitioners alleged that Assan's reported affiliated freight expense was deficient

based on its speculation that Assan submitted "only [                    ]" in the

supplemental questionnaire response. Pet. Br. at 24-25.  Petitioners apparently did not

believe that [              ] only issued [                ] to an unaffiliated customer

on freight to port during the POI. Contrary to Petitioners' claim, in this case, Assan

submitted the information requested by Commerce, Commerce relied on that information

in the *Preliminary Determination*, and no further requests for information were made to

16

Assan. Petitioners did not identify the alleged deficiency until their case brief, in which

they claimed that Assan did not provide enough information to provide a comparison

between average prices of affiliated and unaffiliated companies that provide freight

services. Petitioners' Case Brief at 20 (Jan. 6, 2021), C.R. 401, P.R. 310. In response to

Petitioners' unfounded claim, Assan explained in its rebuttal brief that there was [

] such transaction during the POI. Rebuttal Brief of Assan Aluminyum Sanayi ve

Ticaret A.S. at 17 (Jan. 19, 2021) ("Rebuttal Br."), C.R. 404, P.R. 317. Ironically, in its

attempt to invalidate Assan's explanation in response to Petitioners' novel interpretation

of the records, Petitioners now argue that Assan's explanation in its rebuttal brief

constitutes untimely new factual information and should be rejected. Pet. Br. at 25-26.

The argument is absurd. Petitioners provided no factual or legal basis supporting its

purported interpretation that Assan's [                                          ].  Absent any

record evidence indicating a reason to question the veracity of Assan's submitted

information, concerns over the accuracy of the calculated dumping margin favor

accepting the submitted information. *Marmen Inc. v. United States* 545 F. Supp. 3d 1305,

1317 (Ct. Int'l Trade 2021) (citing *Pro-Team Coil Nail Enter., Inc. v. United States*, 419

F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2019), holding that "{a}bsent any reason to

question the veracity of the Q&V {quantity and value} figures, accuracy concerns favor

accepting the Q&V Schedule for the purpose of determining PT-Pro-Team's antidumping

duty rate.")

Further, Petitioners pointed to [                                          ] and alleged

that "the affiliated logistics company [

]," because "the tax returns and

17

other financial information of that company indicated that [

]. Pet. Br. at 26. Yet, Petitioners failed to explain why the

provision of Turkish domestic freight services to the port of export would be classified as

a "foreign sale" for accounting purposes. *Id.* Record evidence clearly demonstrated to the

contrary that "foreign sales" reflect revenue from the sale of foreign transportation

services. Supp. D QR, Exh. S2-22, at 37, C.R. 185-186, P.R. 196.

### 2. Commerce Properly Accepted Assan's Reported Affiliated Freight Charges as Made at Arm's Length

Petitioners also stated that the unaffiliated customer invoice was unreliable and

not representative because the distance between the customer and the destination is "an

[                                      ]" while the distance reflected in the invoice issued to Assan is

[                                      ]. Pet. Br. at 26-27. Yet, Petitioners failed to quantify [

] and [                    ] but simply insinuated a purported difference. *Id.* The

argument was baseless and not supported by substantial record evidence. In fact, the

invoice to Assan reflected that the merchandise was picked up at the [        ] plant,

which is located in [          ] at the following address: [                          ,

]. Supp.

C QR, Exh. S4-15, at 3, C.R. 283-284, P.R. 227. The unaffiliated invoice reflected a pick-

up in [            ]. *Id.*, Exh. S4-15, at 2. Both invoices showed that the destination is to

the port in [          ]. *Id.* [          ] port is approximately the same distance to both

[          ] and [        ]. Rebuttal Br. at 19, C.R. 404, P.R. 317. Absent record evidence

demonstrated to the contrary, Petitioners' characterization of the difference in distance

from Assan and the unaffiliated customer to the port was speculative and baseless.

Petitioners further stated that Assan's data is unreliable because [

] in the POI. Pet. Br. at 27. Petitioners did not cite to any precedent where such a requirement is necessary, particularly for a minor service such as the one at issue here. By way of example, for major inputs, the Department requires that the product specific per-unit cost of production of the major input should include movement costs incurred by the affiliated supplier for shipping the goods to the respondent and a portion of this affiliate's SG&A. *See* 19 U.S.C. §§ 1677b(f)(2) and (3) and 19 C.F.R. § 351.407(b). It does not state that the affiliate supplier must prove it is profitable. *Id.* In fact, the Department specifically stated in its questionnaire that an amount for the affiliated supplier's interest expenses should be added only if that affiliated supplier is not included in the consolidated financial statements being used to report financial expenses for the producer in the cost of production ("COP") buildup for the merchandise under consideration. Letter from M. Hoadley to Assan Aluminyum Sanayi ve Ticaret A.S., re: Request for Information, Section D at D-4 n.25 (Apr. 29, 2020), P.R. 60. [

] is in fact included in the consolidated financial statements of Kibar Holding which is used to compute the interest expense ratio. As such, even if the Department would have subjected the provision of a minor freight service to Assan to the same rigid test applied to major inputs, interest expense would not have been included in the COP of [                ]. Without the interest expense, [                ] financial statements would show an operating profit for the POI as shown in the tables below, Supp. D QR, Exh. S2-22, at 8 C.R. 186, P.R. 196:

| From Exh S2-22 – Audited Financial Statement | 2019 |
|---|---|
| Revenue | [          ] |
| Cost of Sales (-) | [          ] |
| General Administrative Expenses (-) | [          ] |
| Other Operating Income | [          ] |
| Other Operating Expense (-) | [          ] |
| | |
| Operating Profit | [          ] |

In sum, Assan has fully cooperated and provided all the information and documentation requested by Commerce in order to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length. Petitioners failed to demonstrate that Assan's submission contain a deficiency. Therefore, Commerce properly relied on Assan's reported data in the final dumping margin calculation. The Court should sustain Commerce's final determination with respect to this issue.

### C.    There Is No Basis for Commerce To Apply AFA In Connection With The Billing Adjustments Reported By Assan

In the *Final AD Determination*, Commerce found that Assan did not demonstrate its entitlement to two billing adjustments to U.S. price for billing errors (BILLADJ1U) and quality errors (BILLADJ2U). *Final I&D Memo* at 23, P.R. 330. Though Assan reported the aggregate totals for each adjustment and tied those figures to Kibar Americas' SAP accounts and trial balance, Commerce denied the claimed adjustments on the basis that "no customer-specific documentation was provided," such as credit notes.[5] *Id.* Because Assan failed to show that it was

---

[5] In its Case Brief, Assan argued that the record contains sufficient information to demonstrate that the reported voluntary billing adjustments are accurate, including accurately identified each of the billing adjustments at issue in its accounting record, tying that amount to its trial balance, and showing how each adjustment is applied on a customer specific basis. Case Brief of Assan Aluminyum Sanayi ve Ticaret A.S. at 13-15 (Jan. 6, 2021) ("Assan Case Br."), C.R. 400, P.R. 309.

entitled to BILLADJ1U, which would have benefited Assan's calculated dumping margin, Commerce denied the claimed adjustment. *Id.* For BILLADJ2U, which Commerce found "does not benefit Assan because it results in a lower U.S. price," Commerce used the reported information on the record. *Id.* at 24.

Despite this result, Petitioners argue that Commerce should have gone further and "appl{ied} an adverse inference in selecting facts available for {these} billing adjustments." Pet. Br. at 27. However, as Petitioners note, "the burden of demonstrating entitlement to, and the amount of, a particular adjustment lies with the 'interested party that is in possession of the relevant information.'" *Id.* at 28 (citing 19 C.F.R. § 351.401(b)(1)). Petitioners' arguments improperly characterize the billing adjustments at issue as *presumptive* adjustments Assan has the burden of rebutting, rather than *voluntary* adjustments Assan must demonstrate entitlement to. Such burden shifting is illogical and contrary to Commerce's regulations governing such "favorable adjustment{s}." 19 C.F.R. § 351.401; *Changzhou Trina Solar Energy Co. v. United States*, 359 F. Supp. 3d 1329, 1343 (Ct. Int'l Trade 2019), *aff'd* 975 F.3d 1318 (Fed. Cir. 2020).

Here, Assan voluntarily claimed certain billing adjustments, which were ultimately denied by Commerce in the *Final AD Determination*. *Final I&D Memo* at 23, P.R. 330. Though Petitioner repeatedly claims that Commerce "was applying an adverse inference" in denying those adjustments, Pet. Br. at 29, Commerce specifically "disagree{d} with the petitioners that Commerce applied facts available with an adverse inference (AFA) under section 776(b) of the Act in the *Preliminary Determination*, or that it is warranted for this final determination." *Final I&D Memo* at 20, C.R. 330.

Indeed, Commerce may apply AFA only where a respondent fails to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an

investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "It is well-established that Commerce enjoys broad discretion when considering whether to apply {AFA}," *Tianjin Magnesium Int'l, Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012), and there is no basis for it to do so where, as here, Assan has submitted complete and detailed information in response to the Commerce's questions. Upon a review of record evidence, Commerce found that Assan has cooperated with Commerce's requests for information throughout the investigation, including by "answer{ing} each request for {} information to the best of its ability." *Final I&D Memo* at 20, C.R. 330. Because there is no evidence to suggest that Assan has been uncooperative or failed to use its best efforts, Petitioners' claims that, "in declining to apply AFA, {Commerce} rewarded Assan's repeated failures to provide requested information," are without merit. Pet. Br. at 30.

Finally, while Petitioners' claim that Commerce's "reasoning is impossible to discern, and its finding rests on entirely unknown evidence," *id.*, Commerce's rationale is clearly detailed in the *Final AD Determination*. Concluding that "Assan failed to demonstrate that it is entitled to these two adjustments to U.S. price," Commerce denied the reported billing adjustment benefitting Assan (BILLADJ1U), and used the reported information on the record for the billing adjustment that did not benefit Assan (BILLADJ2U). *Final I&D Memo* at 23, C.R. 330. While Petitioners acknowledge that Commerce's treatment of BILLADJ2U "increases Assan's dumping margin," it also makes the speculative claim that "Assan's withholding of information – and lack of cooperation" may also benefit Assan. Pet. Br. at 31. Again, Assan fully cooperated with Commerce's requests for information and Commerce's determination that application of AFA is not appropriate is supported by record evidence. *Final I&D Memo* at 23-24, P.R. 330.

Commerce made the reasoned decision to deny Assan's claimed billing adjustment. There is no support for Petitioners' position that Commerce should have gone further and applied AFA in addition to the denial of these adjustments.

## V.   **PRAYER FOR RELIEF**

WHEREFORE, Turkish Respondents respectfully requests that this Court:

(a)     Hold that Commerce's *Final AD Determination* was based on substantial evidence and in accordance with the law with respect to the claims advanced by Petitioner in this appeal;

(b)     Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*

February 22, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Response to Petitioners' 56.2 Motion for Judgment on the Agency Record filed on February 22, 2022 complies with the word limitation requirement. The word count for Assan's Response Brief, as computed by Arent Fox LLP's word processing system is 6,812.

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*