**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

_____

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Consol. Court No. 21-00246 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.*, | ) ) ) |
| Defendant-Intervenors. | ) ) |

_____

**DEFENDANT'S CONSOLIDATED**
**RESPONSE TO PLAINTIFF'S AND CONSOLIDATED**
**PLAINTIFF'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

NATALIE MARIE ZINK
Attorney
Office of the Chief Counsel
   for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

KYLE S. BECKRICH
Trial Attorney
U.S. Dept. of Justice
Civil Division/National Courts
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

February 22, 2022

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................iii

STATEMENT PURSUANT TO RULE 56.2. ................................................... 2

    I.     The Administrative Determination Under Review ............................... 2

    II.    Issues Presented For Review ............................................................. 2

STATEMENT OF FACTS ............................................................................... 3

SUMMARY OF ARGUMENT ......................................................................... 7

ARGUMENT ..................................................................................................8

    I.     Standard Of Review ..........................................................................8

    II.    Commerce's Granting Assan A Duty Drawback Adjustment Is Supported By Substantial Evidence And Is In Accordance With Law .....................................10

        A.    Legal Standard For Duty Drawback.......................................10

        B.    Commerce Lawfully Granted Assan A Duty Drawback Adjustment .......12

        C.    Commerce's Duty Drawback Methodology Did Not Unlawfully Limit The Adjustment To U.S. Price.......................................................15

    III.    Commerce's Determination To Deny Assan A Home Market Rebate Adjustment Is Lawful And Supported By Substantial Evidence ...........................................18

    IV.    Commerce's Acceptance Of Assan's Affiliated Freight Charges Is Supported By Substantial Evidence And In Accordance With Law.........................................21

    V.    Commerce Lawfully Declined To Use An Adverse Inference With Respect To Assan's Reported Billing Adjustments ...............................................23

    VI.    Commerce Properly Deducted The Section 232 Duties From Assan's Constructed Export Price In Accordance With Law...............................................24

        A.    Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price ..........23

        B.    Commerce's Interpretation Is Consistent With Recent Court Precedent...26

        C.    Section 232 Duties Are Not Temporal Duties ........................................30

i

D.    Deducting 232 Duties From Export Price Does Not Result In A Double Remedy ................................................................................................ 31

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AK Steel Corp. v. United States,*
  988 F. Supp. 594 (Ct. Int'l Trade 1997) ..................................................26

*Allied Tube & Conduit Corp. v. United States,*
  374 F. Supp. 2d 1257 (Ct. In'tl Trade 2005) .......................................14

*Am. Inst. for Int'l Steel, Inc. v. United States,*
  806 F. App'x. 982 (Fed. Cir. 2020) ....................................................32

*Apex Exports v. United States,*
  777 F.3d 1373 (Fed. Cir. 2015) ....................................................24, 25

*Bethlehem Steel Corp. v. United States,*
  27 F. Supp. 2d 201 (Ct. Int'l Trade 1998) .........................................26

*Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States,*
  494 F. Supp. 3d 1374 (Ct. Int'l Trade 2021) ....................26, 27, 29, 33

*Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.,*
  467 U.S. 837 (1984) ....................................................................9, 15

*Chinsung Indus. Co. v. United States,*
  705 F. Supp. 598 (Ct. Int'l Trade 1989) ..........................21, 22, 23, 24

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ..........................................................................8

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ..........................................................................8

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ......................................................8, 10

*Goldlink Indus. Co. v. United States,*
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................8

*Hoogovens Staal BV v. United States,*
  4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) .........................................26

*JBF RAK LLC v. United States,*
  790 F.3d 1358 (Fed. Cir. 2015) ..........................................................9

*Jindal Poly Films Ltd. of India v. United States,*
  365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) .................................20, 21

*Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.,*
  861 F.3d 1269 (Fed. Cir. 2017) ....................................................12, 13

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ...........................................................10

*Ntn Bearing Corp. of America v. United States,*
  104 F. Supp. 2d 110 (Ct. Int'l Trade 2000) ............................ 18, 19, 20

*Saha Thai Steel Pipe (Public) Co. Ltd. v. United States,*
  635 F.3d 1335 (Fed. Cir. 2011) ....................................................passim

*Sugar Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ...........................................................10

*Timken Co. v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004) ...............................................9, 15, 25

*Torrington Co. v. United States,*
  82 F.3d 1039 (Fed. Cir. 1996) .............................................................15

*U.S. Steel Group, a Unit of USX Corp. v. United States,*
  15 F. Supp. 2d 892 (Ct. Int'l Trade 1998) ..........................................26

*U.S. Steel Grp. v. United States,*
  96 F.3d 1352 (Fed. Cir. 1996) .............................................................. 9

*Union Steel v. United States,*
  823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) ......................................15

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009) .........................................................................9, 16

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951) ............................................................................. 8

*Wheatland Tube Co. v. United States,*
  495 F.3d 1355 (Fed. Cir. 2007) ....................................................passim

*Zenith Electronics Corp. v. United States,*
  77 F.3d 426 (Fed. Cir. 1996) ..............................................................26

**Statutes**

19 U.S.C. § 1675 .......................................................................................30

19 U.S.C. § 1677 .......................................................................................10

19 U.S.C. § 1677a .................................................................................passim

19 U.S.C. § 1677b ..................................................................................................24

19 U.S.C. § 1677e ......................................................................................... 21, 23, 24

19 U.S.C. § 1677m ...............................................................................................21, 22

19 U.S.C. § 1862 ..........................................................................................passim

19 U.S.C. § 2251 .................................................................................................28, 30

19 U.S.C § 2132 ..................................................................................................30

## Regulations

19 C.F.R. § 351.401 ....................................................................................... 18, 19, 20

19 C.F.R. § 351.412 ............................................................................................17

## Other Authorities

*Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,326 (Dep't Commerce March 8, 2021) (final determ.) ........ 2

*Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 82 Fed. Reg. 47,477 (Dep't of Commerce, Oct. 12, 2017) ...................................................................................... 5

Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1 (1994) ............................32

*Proclamation 9740 of April 30, 2018*, 83 Fed. Reg. 20683 (Apr. 30, 2018) ............................25

*Proclamation 9705*, 83 Fed. Reg. 11625 (Mar. 8, 2018) .............................................. 28, 29, 32

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

_____
                                                              )
ASSAN ALUMINYUM SANAYI VE TICARET   )
A.S.,                                                          )
                                                              )
                                        *Plaintiff,*          )
                                                              )
            v.                                                )        Consol. Court No. 21-00246
                                                              )
UNITED STATES,                                               )
                                                              )
                                        *Defendant,*          )
                                                              )
            and                                              )
                                                              )
ALUMINUM ASSOCIATION COMMON            )
ALLOY ALUMINUM SHEET TRADE              )
ENFORCEMENT WORKING GROUP, *et al.,*    )
                                        *Defendant-Intervenors.*  )
_____)

## ORDER

Upon consideration of the motions for judgment upon the administrative record, responses thereto, replies, and all other papers, it is hereby

ORDERED that the motions are denied, and it is further

ORDERED that judgment shall enter in favor of the United States.


Dated: _____, 2022                    _____
        New York, NY                                          JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

_____

|  |  |  |
|---|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Consol. Court No. 21-00246 |
| UNITED STATES, | ) ) ) | |
| *Defendant,* | ) ) | |
| and | ) ) | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.,* | ) ) ) ) | |
| *Defendant-Intervenors.* | ) | |

_____)

**DEFENDANT'S CONSOLIDATED RESPONSE
TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFF'S
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motions for judgment upon the agency record submitted by plaintiff, Assan Aluminyum Sanayi Ve Ticaret A.S. (Assan), and consolidated plaintiff, Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group (Aluminum Association).[1] *See* "Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Agency Record Pursuant to Rule 56.2", ECF No. 27 (Assan Br.); *see also* ECF No. 29, docketed as "Confidential Final Brief in support of Rule 56.2 Motion for Judgment on

---

[1] In this brief, we refer to plaintiff as "Assan" and consolidated plaintiffs, named as defendant-intervenors in the case caption, as "the Aluminum Association."

the Agency Record" (Aluminum Assoc. Br.). Assan and the Aluminum Association challenge several aspects of the Department of Commerce's affirmative determination in the less-than-fair-value investigation of common alloy aluminum sheet ("CAAS") from the Republic of Turkey. As demonstrated below, Commerce's final determination is supported by substantial evidence and is otherwise in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's determination in its entirety and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I. The Administrative Determination Under Review

The administrative determination under review is *Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,326 (Dep't Commerce March 8, 2021) (*Final AD Determination*) (P.R. 358),[2] and the accompanying Issues and Decision Memorandum (IDM) (P.R. 330). The period of investigation is January 1, 2019, through December 31, 2019.

### II. Issues Presented for Review

1. Whether Commerce's decision to grant Assan a duty drawback adjustment is supported by substantial evidence and in accordance with law.

2. Whether Commerce's determination to limit Assan's claimed duty drawback adjustment by allocating the amount of import duties rebated or not collected by reason of exportation over Assan's total production is supported by substantial evidence and is otherwise in accordance with law.

---

[2] "P.R. ___" and "C.R. ___" refer to the documents in the public and confidential record, respectively. Citations are to item number, and not bar code, in the relevant index.

3.      Whether Commerce's decision to deny Assan a home market rebate adjustment is supported by substantial evidence and is in accordance with law.

4.      Whether Commerce's reliance on Assan's affiliated freight charges in calculating constructed export price is supported by substantial evidence and is otherwise in accordance with law.

5.      Whether Commerce's decision not to apply an adverse inference regarding the use of Assan's reported billing adjustments is supported by substantial evidence and is otherwise in accordance with law.

6.      Whether Commerce's determination to deduct Section 232 tariffs paid by Assan, because Section 232 tariffs are United States customs duties, is lawful and supported by substantial evidence.

## STATEMENT OF FACTS

On March 30, 2020, Commerce initiated a less-than-fair-value investigation of common alloy aluminum sheet from Turkey. *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19,444 (Dep't Commerce Apr. 7, 2020) (P.R. 34) (*Order*).

On April 20, 2020, Commerce selected Assan and Teknik Aluminyum Sanayi A.S. as mandatory respondents. *See* Memo to DAS for Operations Pertaining to Interested Parties Respondent Selection (C.R. 15) (P.R. 49). Between June and July 2020, Assan filed its sections A-D questionnaire responses. PDM at 35 (C.R. 21-24; 28-51; 52-63; 70-88, 111-21; 181-216;217-19; 253-281; 283-291; 52-63; 70-88, P.R. 117-119;141-43; 148; 164-65; 195-96; 20;

234-35; 237; 303-13). Despite responding to the sections A-D questionnaires and supplemental questionnaires, Assan failed to provide proof that it was entitled to a home market price adjustment.

Commerce issued its preliminary determination on October 6, 2020. *See Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020) (preliminary determination) (P.R. 264), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey (Oct. 6, 2020) (PDM) (P.R. 247).

Commerce reached several preliminary conclusions relevant to this appeal. First, Commerce granted Assan's request for a duty drawback adjustment pursuant to 19 U.S.C. § 1677a(c)(1)(B). *See* PDM at 10-11 (P.R. 247). Commerce's practice with respect to the Turkish duty drawback scheme is typically to determine that Turkish companies that meet the requirements under Turkey's Inward Processing Regime (IPR), which issues Inward Processing Certificates (IPCs), have satisfied the statute and two-prong test for duty drawback adjustments. *See* PDM at 10 (P.R. 247). Commerce found that Assan satisfied the agency's two-pronged test to determine eligibility for such an adjustment. *See* Aluminum Assoc. Br. at 8-13. Specifically, Commerce determined that Assan met the first prong–"the import duty and its rebate or exemption be directly linked to, and precedent upon, one another"–based on Assan's submission of documentation of projected quantities of imported inputs and projected quantities of exported merchandise when Assan opened inward processing certificates (IPCs) with the government of Turkey. *Id.* Commerce also determined that Assan satisfied the second prong–"sufficient

imports of materials to account for the duty drawback or exemption granted for the export of the manufactured product"–based on Assan's submission of yield/loss ratios that, when applied to Assan's import quantities, demonstrated that Assan had sufficient imports to account for its exports. *Id.* at 11. Moreover, consistent with practice, Commerce is considering only IPCs that the government of Turkey has closed for purposes of calculating a duty drawback adjustment.[3]

Second, Commerce reduced calculated export price for freight charges pursuant to 19 U.S.C. § 1677a(c)(2)(A). *See id.* at 9. Commerce preliminarily concluded that Assan demonstrated the arm's-length nature of the reported freight charge required to make the deduction based on record evidence provided by the parties. *See id.*

Third, Commerce rejected Assan's claimed billing adjustments, based on a determination that Assan failed to submit required documentary support to substantiate the claimed adjustments. *See* Memo from USDOC to File Pertaining to Assan Cost Memo at 5-6 (P.R. 249) (C.R. 324) (Prelim. Calc. Memo); PDM at 9 (P.R. 247). As a result, in the preliminary determination, Commerce set an upward price adjustment to zero and used Assan's lowest reported value for the relevant U.S. variables (billing errors and quality errors) being deducted from the United States gross unit price for the downward adjustments. *See* Prelim. Calc. Memo at 5-6 (P.R. 249) (C.R. 324).

---

[3] Commerce's practice with regard to the Turkish inward processing regime, which is the official mechanism for applying for exemption from import duties, is to consider only closed IPCs (*i.e.*, IPC's to which the company was no longer permitted by the government of Turkey to add import or export information) for purposes of calculating a duty drawback adjustment. PDM at 10 (P.R. 247), citing *Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 82 Fed. Reg. 47,477 (Dep't of Commerce, Oct. 12, 2017), and accompanying Issues and Decision Memorandum at Comment 5.

In January, 2021, Assan and the Aluminum Association filed their case brief. In Assan's case brief, it commented on the calculation of a full duty drawback adjustment to U.S. price, Assan's eligibility for a home market rebate adjustment, and the treatment of Section 232 duties in the margin calculation. Case Brief of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 6, 2021) (Assan Case Br.) (P.R. 309) (C.R. 400). On January 19, 2021, Assan filed a rebuttal brief to the Aluminum's Association case brief. Rebuttal Brief of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 19, 2021) (Rebuttal Br.) (P.R. 317) (C.R. 404). In its rebuttal brief, as it does now, Assan maintained that Commerce should continue to grant Assan a duty drawback adjustment in the final determination, consistent with its longstanding practice in Turkish cases, because it met the requirements under Turkey's Inward Processing Regime (IPR) and thus satisfied Commerce's two-pronged test to qualify for the full statutory adjustment. Rebuttal Br. at 2-7 (P.R. 317) (C.R. 404); Assan Br. at 17-29.

On March 8, 2021, Commerce issued its final determination. Commerce determined that Assan satisfied the two-pronged test for a duty drawback adjustment and granted a partial adjustment to Assan's U.S. sales price under 19 U.S.C. § 1677a(c)(1)(B). Commerce allocated the adjustment over Assan's total production during the period of investigation, including production for domestic sales, in accordance with Commerce practice. IDM at 8-11 (P.R. 330). Also in accord with its practice, Commerce treated the Section 232 tariffs paid by Assan as ordinary customs duties, distinct from antidumping, section 201 safeguards, and other "special" tariffs, and thus deducted them from U.S. price. *Id.* at 14-15. Finally, Commerce continued to find that Assan was not entitled to a home market rebate adjustment because Assan's provided supporting documentation did not satisfy the regulatory test. *Id.* at 22. Commerce left unchanged from the preliminary determination its determination regarding affiliated freight

charges. With respect to billing adjustments, however, Commerce recognized that in the Preliminary Determination it had "incorrectly set" the downward adjustment (*i.e.*, BILLADJU2) to the lowest reported value. Instead, in the Final Determination, Commerce used Assan's reported information on the record for that downward adjustment. *See id*. at 4-11, 17-18, 22-24.

Assan and the Aluminum Association subsequently and timely filed the instant appeals.

## SUMMARY OF ARGUMENT

Assan and the Aluminum Association's motions for judgment on the agency record challenging Commerce's Final Determination should be denied. Commerce's decision to grant Assan a duty drawback adjustment is in accordance with law. Commerce does not require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment. Instead, Commerce needs to determine only that a reasonable link exists between the duties imposed and those rebated or exempted, which the record supports in this case. Additionally, Commerce's method of adjusting Assan's price was lawful. Commerce's decision is consistent with the Federal Circuit's endorsement of a "matching principle," which requires equal adjustments to both the normal value and export price/constructed export price sides of the equation

Likewise, Commerce's decision to deny Assan a home market rebate adjustment is supported by substantial evidence and is in accordance with law. Based on the evidence provided by Assan, Assan failed to show the legitimacy of the claimed adjustment.

Commerce's determination to rely on Assan's affiliated freight charges is also supported by substantial evidence on the record. Notwithstanding the Aluminum Association's argument, Commerce did not determine that Assan failed to cooperate to the best of its ability with Commerce's requests for information regarding the affiliated freight charges, and thus an

adverse inference was not warranted. For the same reason, an adverse inference was also not warranted with respect to Assan's reported billing adjustments.

Finally, Commerce's decision to deduct Section 232 tariffs from Assan's U.S. price is lawful because these tariffs are not special tariffs but are U.S. customs duties that must be deducted from U.S. price. Consistent with this Court's precedent, Commerce determined that Section 232 duties are not like Section 201 duties that are not deducted from U.S. price because Section 201 duties serve a different function and Section 232 duties are not as interrelated with antidumping duties as Section 201 duties are. Commerce's determinations should be sustained.

## ARGUMENT

## I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). "Moreover, the Court may not substitute its judgment for that of [Commerce] when the choice is between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation omitted).

When the Court examines the lawfulness of Commerce's statutory interpretations, it employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316 (citation and quotation marks omitted).

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* (quoting *U.S. Steel Grp.*, 96 F.3d at 1362). Consequently, Commerce receives "tremendous

deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the dictates of the trade statute. *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Alt. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted). Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

## II. Commerce's Granting Assan A Duty Drawback Adjustment Is Supported By Substantial Evidence And Is In Accordance With Law

### A. Legal Standard For Duty Drawback

In an antidumping duty proceeding, Commerce determines whether goods are being sold at less than fair value by comparing the export price or constructed export price (generally, the price at which the subject merchandise is sold to an unaffiliated United States purchaser or to an unaffiliated exporter for export to the United States) with the normal value (generally, the price at which the subject merchandise is sold in the exporting country). 19 U.S.C. §§ 1677a (defining export price), 1677b (defining normal value). A product is considered to be sold at less than fair value when the product's export price/constructed export price is lower than its normal value.

*Saha Thai Steel Pipe (Public) Co. Ltd. v. United States,* 635 F.3d 1335, 1338 (Fed. Cir. 2011); 19 U.S.C. § 1677(35)(A). The equation, in its basic form, is as follows: normal value minus (-) U.S. price (export price/constructed export price) = dumping margin (if it is a positive number; if the number is zero or negative, there is no dumping).

Commerce adjusts the prices used to determine export price and normal value under certain conditions. 19 U.S.C. §§ 1677a(c)-(d) (export price); 1677b(a)(6)-(7) (normal value). Under one such adjustment, commonly known as the duty drawback adjustment, Commerce increases the export price for any import duties rebated or not collected by the country of exportation "by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No.103-316, vol. 1, at 820 (1994) (SAA). "In other words, if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase {export price} to account for the rebated or unpaid import duty (the 'duty drawback')." *Saha Thai,* 635 F.3d at 1338.

A duty drawback adjustment to the export price/constructed export price is based on the principle that the "goods sold in the exporter's domestic market are subject to import duties while exported goods are not." *Id.* at 1339. In other words, normal value based on home market sales prices or cost of production are import duty "inclusive," while export market sales prices are import duty "exclusive." As the *Saha Thai* Court held:

> The purpose of the duty drawback adjustment is to account for the fact that the producers remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases normal value. That is, when a duty drawback is granted only for exported inputs, the cost of the duty is reflected in normal value but not in export price. The

> statute corrects this imbalance, which could otherwise lead to an
> inaccurately high dumping margin, by increasing export price to
> the level it likely would be absent the duty drawback.

*Id.* at 1338. Thus, the Federal Circuit has recognized that the duty drawback adjustment is intended to prevent dumping margins from being created (or affected) by the rebate or exemption of import duties on inputs used in the production of subject merchandise.

Commerce employs a two-pronged test to determine when the statutory requirements for a duty drawback adjustment are met. The respondent is required to demonstrate that (1) the import duty paid and the rebate payment are directly linked to, or precedent upon, one another (or the exemption from import duties is linked to the exportation of subject merchandise), and (2) there are sufficient imports of the imported raw materials to account for the drawback received upon the export of the subject merchandise. *See id.* at 1340-41 (affirming Commerce's two-pronged test for duty drawback adjustment).

Commerce does not require that specific inputs be directly traced to the production of specific exports; instead, the input upon which the duty is being rebated or forgiven on export must be *capable* of being used to produce the exported product. *See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.,* 861 F.3d 1269, 1273-74 (Fed. Cir. 2017) (emphasis added). If the two-pronged test is satisfied, Commerce will increase the export price to account for the rebated or unpaid import duty (the duty drawback) that a foreign country offered to a particular company as a rebate or exemption from the normal import duty on an input used to manufacture the subject merchandise. *See Saha Thai,* 635 F.3d at 1339.

### B.    Commerce Lawfully Granted Assan A Duty Drawback Adjustment

The Aluminum Association argues that Assan did not satisfy the two-pronged test to justify a duty drawback and that, therefore, Commerce unlawfully granted Assan a duty

drawback. *See* Aluminum Assoc. Br. at 8-20. However, the Aluminum Association misunderstands Commerce's regulations and practice regarding duty drawback. Commerce lawfully granted Assan a duty drawback adjustment based on record evidence supporting that determination.

Although the Aluminum Association argues that Commerce unlawfully determined that the conditions of *Maverick Tube* were not met, the Aluminum Association misunderstands the law. Commerce lawfully determined that the conditions of *Maverick Tube* were satisfied because (1) the exemption from import duties is linked to the exportation of subject merchandise and (2) the inputs imported under the closed IPC are suitable to produce subject merchandise.

Regarding the first prong of Commerce's test, the duty drawback provision, Commerce's regulations, and Commerce's current practice do not require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment. *See Maverick Tube,* 861 F.3d at 1272. Instead, *Maverick Tube* states that Commerce needs to determine only that a reasonable link exists between the duties imposed and those rebated or exempted. *See id.* at 1341. Assan's record evidence demonstrates that a reasonable link exists between the duty exemption and the exportation of subject merchandise. *See* IDM at 8-11 (P.R. 330). When Assan opened the relevant IPCs with the government of Turkey, Assan documented (1) projected quantities of imports and (2) projected quantities of exports of aluminum sheet based on an approved production yield/loss ratio also documented on the IPC. *See id.* at 8-10. The provided yield/loss ratios that have been approved by the government of Turkey confirm that the quantity of imported raw materials account for the duty drawback or exemption granted. The purpose of the duty drawback adjustment to export price or constructed export price is to ensure that the results of participating in a duty drawback program

do not affect the dumping calculation to either create or eliminate dumping margins, *i.e.*, to make the dumping calculations duty drawback neutral. *Saha Thai*, 635 F.3d 1335 at 1338. To accomplish this, tracing specific inputs into the production of specific exports, as advocated by the Aluminum Association, is unnecessary as long as Commerce's duty drawback adjustment results in a drawback duty neutral margin calculation. *See Saha Thai*; *see also Allied Tube & Conduit Corp. v. United States*, 374 F. Supp. 2d 1257, 1261 (Ct. In'tl Trade 2005). In this case, because the amount of imported raw materials account for the exemption granted, granting a duty drawback makes the dumping calculations drawback neutral. IDM at 8 (P.R. 330).

Regarding the second prong of the test, substantial evidence suggests that at least one imported input under the closed IPC can be used in the production of subject merchandise such that there are sufficient imports of the imported raw materials to account for the drawback received upon the export of the subject merchandise. Although the Aluminum Association is correct in that the Turkish duty drawback system allows for companies like Assan to receive a duty exemption on "equivalent goods" that may not be used to produce subject merchandise, this is not an issue in the case because substantial evidence shows that the imported inputs *can* be used to make subject merchandise. The Aluminum Association's assertion that a certain input could not have been used, based on Assan's description of its production process as beginning with melting operations, is contradicted by other statements and evidence on the record demonstrating the input was used in the production process: (1) Assan identified this imported input as one of the three major inputs used to produce the subject merchandise, IDM at 10 (P.R. 330) (citing Assan DQR at Exhibits D-4 and D-5); and (2) Assan reported that it had substantial purchases of the imported input during the POI and that this input was used in the production of subject merchandise during the POI. *Id*. Therefore, Commerce's determination that Assan's

imported inputs can be used to create subject merchandise is supported by substantial evidence and is in accordance with law.

Because record evidence demonstrates that Assan satisfied both prongs of the duty drawback test described above, Commerce lawfully granted a duty drawback adjustment to Assan.

**C.     Commerce's Duty Drawback Methodology Did Not Unlawfully Limit The Adjustment To U.S. Price**

Assan argues that Commerce's calculation of the drawback adjustment was improperly based on an allocation "to all production for the relevant period based on the costs of inputs during the {period of investigation}." *See* Assan Br. at 9. Commerce's calculation of the drawback adjustment, however, is supported by substantial evidence and in accordance with law.

The antidumping statute requires Commerce to increase export price/constructed export price by the amount of import duties that have been imposed by the country of exportation and have been rebated or not collected by reason of exportation of the subject merchandise. *See* 19 U.S.C. § 1677a(c)(1)(B). Although this provision identifies the duties pertinent to determining the drawback adjustment, the statute is silent as to how duties are to be allocated for adjustment purposes. Because the statute is silent as to *how* Commerce is to calculate a duty drawback adjustment, Commerce has the discretion to formulate a reasonable methodology. *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1358 (Ct. Int'l Trade 2012).

When a statute is silent, the Court decides whether Commerce's interpretation constitutes a permissible construction of the statute. *Chevron*, 467 U.S. at 843. In these circumstances, "'any reasonable construction of the statute is a permissible construction,'" *Timken*, 354 F.3d at 1342 (quoting *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996)), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the

contrary or an unreasonable resolution of ambiguous language." *Eurodif*, 555 U.S. at 316. Thus, so long as it is a reasonable interpretation of the statute, the Court must affirm Commerce's methodology. *Id*.

Under Commerce's duty drawback practice, Commerce will make an upward adjustment to export price/constructed export price based on the amount of the duty imposed on the input and rebated or not collected on the export of the subject merchandise by properly allocating the amount rebated or not collected to all production for the relevant period based on the cost of inputs during the period of investigation. This ensures that the amount added to both sides of the comparison of export price or constructed export price with normal value is equitable, *i.e.*, duty neutral, meeting the purpose of the adjustment as affirmed in *Saha Thai*. *See* IDM at 8 (P.R. 330); *Saha Thai*, 635 F.3d at 1335, 1342.

In this case, Commerce acted consistent with its practice. Based on the facts on the record of this investigation, Commerce found that Assan's import duty costs, based on the consumption of imported inputs during the POI, including imputed duty costs for imported inputs, properly account for the amount of duties imposed, as required by 19 U.S.C § 1677a. *See* IDM at 8-9 (P.R. 330); PDM 10-11 (P.R. 247). Section 1677a(c)(1)(B) provides for an adjustment to U.S. price for "duty drawback" to "prevent dumping margins." However, the amount of the adjustment for duty drawback to "prevent dumping margins" is limited by the amount of the import duties reflected in normal value that may cause the creation of dumping margins. IDM at 10 (P.R. 330). An amount claimed as duty drawback that is in excess of the matching import duties cannot, by definition, be considered duty drawback. *See id.;* 19 U.S.C. § 1677a(c)(1)(B). Accordingly, Commerce has continued to limit the amount of Assan's duty drawback adjustment for its closed IPC under the Turkish IPR by the amount of import duties

reflected in the comparison normal value. IDM at 10 (P.R. 330). Commerce therefore properly added the calculated per unit amount to U.S. price. *See PDM* at 11 (P.R. 247); *see also* 19 C.F.R. § 351.412(c)(2).

Although this Court has disagreed with Commerce's practice, the Federal Circuit has not held that Commerce's current practice is unlawful. We respectfully disagree with the decisions from this Court that state that Commerce's practice is unlawful and contrary to § 1677a. As explained above, § 1677a is silent as to *how* Commerce is to calculate a duty drawback adjustment. Further, Commerce's practice is consistent with *Saha Thai*. Although *Saha Thai* did not specifically address this issue, in stating that it would be "illogical" to increase the export price and not make a corresponding increase to the cost of production and constructed value, the Court endorsed the concept of a "matching principle" that would ensure neutrality by requiring equal adjustments to both the normal value and export price/constructed export price sides of the equation. *Saha Thai*, 635 F.3d at 1338, 1342-43. *Saha Thai*'s "matching principle" applies equally to Commerce's duty neutral methodology because it recognizes that the purpose of the duty drawback adjustment is to permit a duty neutral comparison of export price and normal value in which the amounts on both sides of the comparison are equalized and the dumping margin is not distorted due to the inclusion or exclusion of import duties. *See* IDM at 9-10 (P.R. 330).

In this case, Commerce added the same amount to the U.S. price that is included in the normal value cost calculations, rendering the margin calculation duty drawback neutral. *See* IDM at 9. In accordance with its practice, Commerce made an upward adjustment to U.S. price based on the amount of the duty imposed on the input and rebated or not collected on the export of the subject merchandise by properly allocating the amount rebated or not collected to all

production for the relevant period. Therefore, Commerce's determination to calculate the amount of the drawback adjustment and to limit the adjustment by the amount of import duties reflected in normal value is supported by substantial evidence and in accordance with law.

### III. Commerce's Determination To Deny Assan A Home Market Rebate Adjustment Is Lawful And Supported By Substantial Evidence

By statute, Commerce is required to calculate normal value using the "price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce's regulations further require that Commerce use a price for normal value that is "net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the . . . foreign like product." 19 C.F.R. § 351.401(c). In determining a respondent's entitlement to its claimed adjustment, Commerce has broad discretion. *See Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15641, 15644-45 (Dep't Commerce Mar. 24, 2016) (final rule) (*Modification of Regulations*). Commerce considers a non-exhaustive list of factors as follows:

> (1) whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation;
> (2) how common such post-sale price adjustments are for the company and/or industry;
> (3) the timing of the adjustment;
> (4) the number of such adjustments in the proceeding; and
> (5) any other factors tending to reflect on the legitimacy of the claimed adjustment.

*Id*. Commerce will consider any one or a combination of these factors as appropriate, depending on the record evidence submitted by the respondent in support of its claimed adjustment. *Id*. However, the party seeking to benefit from the adjustment has the burden to prove that it is entitled to such an adjustment. *See Ntn Bearing Corp. of America v. United States*, 104 F. Supp. 2d 110, 126 (Ct. Int'l Trade 2000).

Commerce's determination to deny Assan certain post-sale adjustments is lawful and supported by substantial evidence. Assan argues that it provided sufficient evidence in its Section B Questionnaire and supplemental questionnaire to be entitled to establish home market rebate price adjustments and that Commerce failed to explain its decision. *See* Assan Br. at 36-37. However, Commerce reviewed the record evidence and determined that the sample documentation provided by Assan in response to our request for substantiation of its claimed rebate adjustment was inconsistent and failed to demonstrate that Assan's reporting of its claimed rebates was either accurate or substantiated through documentation showing the terms and conditions of the rebate were met. Specifically, Commerce noted issues with the claimed rebate program with respect to the two customers for whom Assan provided documentation. IDM at 22 (citing Assan Cost Calculation Memo (C.R. 325)) (P.R. 330). In the first instance of sample documentation, Assan "did not demonstrate that the customer reached the sales volume target specified in the rebate program" despite Assan still issuing a rebate. *Id.* In the second instance of sample documentation, Assan "failed to demonstrate that the full amount of the rebate was actually paid." *Id.* Based on the record evidence Assan provided with respect to these two customers, Commerce determined that Assan failed to demonstrate its eligibility for a rebate adjustment. *Id.*

Assan argues that Commerce failed to discuss in-depth the *Modification of Regulations Regarding Price Adjustments* factors that Commerce considered when determining whether Assan was entitled to a price adjustment. *See* Assan Br. at 36-37. However, Commerce did address the factors and found that under 19 C.F.R. § 351.401(c)(5), Assan had not demonstrated that it was entitled to an adjustment for home market price. As stated expressly in the IDM and the Preliminary Analysis Memo, Assan failed to demonstrate that it was entitled to a rebate

adjustment in the home market because the supporting documentation provided did not show that either of the two customers for which Assan provided documentation reached a certain sales volume target specified in the agreement or that the full rebate was paid. *See* IDM at 22 (P.R. 330) (citing Preliminary Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S. (Oct. 6, 2020) (C.R. 324) (Assan Prelim Calc Memo). These were two factors that Commerce, in the discretion afforded to it under 19 C.F.R. § 351.401(c), used to determine that Assan was not entitled to a home market price adjustment. *Id.*

Accordingly, because the record evidence provided by Assan did not demonstrate that it was entitled to the home market rebate adjustment, Commerce's decision that Assan was not entitled to a home market rebate adjustment is supported by substantial evidence and is in accordance with law.

Nor can Assan escape the consequences of its failure to demonstrate that it was entitled to the home market rebate adjustment by shifting the blame to Commerce. *See* Assan Br. at 38-41. Assan argues that Commerce should have issued a supplemental questionnaire if Commerce determined that Assan's questionnaire response was deficient or needed clarification. *Id.* at 38 (citing *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1387 (Ct. Int'l Trade 2019). Assan's reliance on *Jindal Poly Films* is misplaced. In that case, the Court determined that Commerce failed to "articulate its reasoning for denying two . . . adjustments." *Jindal Poly Films*, 365 F. Supp. 3d at 1387. Accordingly, the Court was unable "to review whether an alleged deficiency in {the} questionnaire response was a factor in Commerce's decision making." *Id.* Similar concerns are not present in this case. Commerce explained exactly why it denied Assan's home market rebate adjustment–because the sample supporting documentation Assan provided for two customers failed to support its claimed adjustment.

Assan's response did not contain a deficiency or otherwise need clarification; rather, the information contained in Assan's response failed to establish that Assan was entitled to the claimed adjustment. Commerce is not required to assist a party in making its case or to advise a party that it should try again to provide information to support its desired outcome.

It is Assan's burden to establish its entitlement to a claimed adjustment, *id.*, just as it is Assan's burden to create an accurate record. *Chinsung Indus. Co. v. United States*, 705 F. Supp. 598, 601 (Ct. Int'l Trade 1989). Based on the evidence provided by Assan, it was not entitled to a home market rebate adjustment, and Commerce's decision should be affirmed.

## IV. Commerce's Acceptance Of Assan's Affiliated Freight Charges Is Supported By Substantial Evidence And In Accordance With Law

Under 19 U.S.C. § 1677e, Commerce uses the "facts otherwise available" to reach its determination if "necessary information is not available on the record," or if a party withholds information that Commerce has requested, fails to provide information by the deadline or in the form or manner requested, significantly impedes a proceeding, or provides information that cannot be verified. 19 U.S.C. § 1677e(a). Commerce may apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1).

Application of facts otherwise available is also subject to the requirements of 19 U.S.C. § 1677m(d). If Commerce determines that a response does not comply with its request for information in an antidumping duty review, it shall "promptly inform the person submitting the response of the nature of the deficiency." 19 U.S.C. § 1677m(d). If that party submits further information that continues to be unsatisfactory, or the information is not submitted within the

applicable time limits, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard all or part of that party's original and subsequent responses.

The Aluminum Association argues that Commerce improperly relied on Assan's freight charges in calculating constructed export price. *See* Aluminum Assoc. Br. at 20-26. However, contrary to the Aluminum Association's arguments, Commerce lawfully relied on Assan's freight charges in calculating export price because the record evidence demonstrates that Assan's freight charges were made at arm's length. Therefore, Commerce's determination to use Assan's freight charges is supported by substantial evidence and in accordance with law.

Commerce found no indication that the evidence on the record suggesting that the accuracy and completeness of the freight costs provided by Assan's affiliated freight service provider was insufficient. *See* IDM at 18 (P.R. 330). The Aluminum Association did not identify any deficiencies regarding the information reflected in the supporting documentation on the record or contest the accuracy of the calculation that was used to establish the price charged by the affiliated freight service provider to Assan and its unaffiliated customers. *See id.* . Assan fully cooperated and provided all the information and documentation requested by Commerce to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length. *See id.* In addition, Commerce found no evidence of broader use of the affiliated freight service provider for subject merchandise that would suggest that the information reported by Assan is incomplete. Therefore, Commerce's reliance on Assan's reported freight charges is supported by substantial evidence and is in accordance with law.

The Aluminum Association argues that Commerce should have used an adverse inference in relying on the facts otherwise available on the record for Assan's reported freight information. The Aluminum Association argues that Assan withheld information, impeded Commerce's

investigation, and failed to provide all requested information. *See* Aluminum Assoc. Br. at 27-29. The Aluminum Association, however, fails to identify any deficiencies regarding the information reflected in the supporting documentation on the record or contest the accuracy of the calculation that was used to establish the price charged by the affiliated freight service provider to Assan and its unaffiliated customers. *See id.*; 19 U.S.C. § 1677e(a). Commerce properly found that Assan provided the requested information. *See* PDM at 9 (P.R. 247) (citing Assan Section C Questionnaire Response at 19 (C.R. 52)).

Commerce determined that Assan provided all the information and documentation requested by Commerce to determine whether the price paid by Assan to the affiliated freight service provider was at arms-length. IDM at 18 (P.R. 330). Because Assan reported the necessary information, Commerce lawfully determined that no necessary information was missing from the record for Assan's reported freight costs, and that resorting to the use of facts otherwise available on the record was not appropriate. Absent the need to rely upon facts otherwise available, Commerce further determined that resorting to adverse facts available was inappropriate. *See id.*; 19 U.S.C. § 1677e(b)(1) (providing that an adverse inference is used when selecting from among the facts otherwise available).

Therefore, because Assan reported the necessary information and Commerce found no basis on which to rely on the facts otherwise available, much less resort to an adverse inference, Commerce's determination to rely on Assan's affiliated freight charges in its final determination was reasonable.

## V.     Commerce Lawfully Declined To Use An Adverse Inference With Respect To Assan's Reported Billing Adjustments

Similarly, the Aluminum Association argues that Commerce should have used an adverse inference with respect to Assan's claimed billing adjustments. *See* Aluminum Assoc. Br. at 29-

31. As with Assan's affiliated freight charges, Commerce's determination not to use an adverse inference is supported by law.

As set forth above, Commerce may apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). In its preliminary determination, Commerce determined that Assan failed to demonstrate that it is entitled to the two claimed billing adjustments. IDM at 23 (P.R. 330). Nevertheless, Commerce recognized that Assan had provided records and information, but that the documentation was insufficient to confirm the validity of the claimed adjustments. *Id*. Commerce did not find, however, that Assan was uncooperative or failed to use its best efforts to comply with Commerce's request for information. *See id*. at 23-24. Because the record contains no evidence that Assan failed to cooperate by acting to the best of its ability to comply with Commerce's request, an adverse inference is not warranted. Commerce's determination should be sustained.

## VI. Commerce Properly Deducted The Section 232 Duties From Assan's Constructed Export Price In Accordance With Law

### A. Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price

The goal of Commerce's statutorily prescribed antidumping calculation is to allow Commerce to compare the fair value of the merchandise to the price charged in the United States. 19 U.S.C. § 1677a(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6); *see also, e.g., Apex Exports v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (holding that "{t}he overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise."). Accordingly, both constructed export price and normal value are subject to adjustments "so that they closely reflect

the price of subject merchandise at a common point in the chain of commerce." *Apex Exports*,

777 F.3d at 1374 (citing 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. §

1677b(a)(6)). The antidumping statute directs Commerce to reduce Assan's constructed export

price by "the amount, if any, included in such price, attributable to any additional costs, charges,

or expenses, and *United States import duties*." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).

The term "United States import duties" is not defined in the statute, and Commerce's

interpretation need only be reasonable to be sustained. *See* 19 U.S.C. § 1677a(c)(2)(A); *Timken*

*Co.*, 354 F.3d at 1342; *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed. Cir.

2007).

Commerce explained that its decision to reduce Assan's constructed export price by the

amount of Section 232 duties paid is consistent with the statute's language because Commerce

determined that Section 232 duties are import duties. IDM at 14 (P.R. 330). Commerce also

observed that the Presidential proclamations made pursuant to Section 232 contained no

exception or indication that Section 232 duties should not be treated as "United States import

duties" under the statute. *See id.* at 14-15. To the contrary, the proclamations support the notion

that section 232 duties are to be imposed in addition to other duties unless expressly provided for

in the proclamation. *Proclamation 9740 of April 30, 2018*, 83 Fed. Reg. 20683, 20686 (Apr. 30,

2018) ("All anti-dumping or countervailing duties, or other duties and charges applicable to such

goods shall continue to be imposed, except as may be expressly provided herein."). Indeed, the

President explicitly referred to the Section 232 duties as "ordinary" customs duties, *id.*,

supporting Commerce's determination that section 232 duties are treated as any other duties. *See*

*id*; *see* HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (Posted Mar. 29, 2018) (table

indicating that the rate of duty for steel imports is the duty provided in the regular, applicable

subheading plus 25%). Commerce's interpretation of the phrase "United States import duties" is reasonable and is entitled to deference because it is consistent with the broad language of the statute and with the President's proclamations. *See, e.g.*, *Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996) (the Court must interpret an ambiguous statute "with deference to Commerce's interpretation").

### B. Commerce's Interpretation Is Consistent With Recent Court Precedent

Assan's primary argument is that Commerce's interpretation is inconsistent with *Wheatland Tube*, 495 F.3d 1355. *See* Assan Br. at 15-17. However, this Court has sustained Commerce's analysis distinguishing Section 232 duties from the duties at issue in *Wheatland Tube*. *Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States*, 494 F. Supp. 3d 1374, 1376 (Ct. Int'l Trade 2021). Assan's arguments are, therefore, unavailing.

As an initial matter, Commerce's interpretation of the phrase "United States import duties" as not including antidumping duties has been consistently sustained. *See AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997); *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998); *U.S. Steel Group, a Unit of USX Corp. v. United States*, 15 F. Supp. 2d 892, 898-900 (Ct. Int'l Trade 1998); *Bethlehem Steel Corp. v. United States*, 27 F. Supp. 2d 201, 208 (Ct. Int'l Trade 1998); *see also Wheatland Tube*, 495 F.3d at 1355-60. In *Wheatland Tube*, the Federal Circuit sustained Commerce's interpretation of the same phrase as also not including Section 201 safeguard duties. 495 F.3d at 1355-60. In comparing Section 201 duties with antidumping duties, the Federal Circuit made the following observations:

> (1) "{l}ike antidumping duties, {Section} 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports;"

(2) "{n}ormal customs duties, in contrast, have no remedial purpose;"
(3) "antidumping duties and {Section} 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise;" and
(4) "{Section} 201 safeguard duties are like antidumping duties . . . because they provide only temporary relief from the injurious effects of imports," whereas normal customs duties "have no termination provision, and are permanent unless modified by Congress."

495 F.3d at 1362-63. The Federal Circuit also held that "{t}o assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice." *Id*. at 1365.

However, in its analysis in this underlying investigation, Commerce properly determined that Section 232 duties are not akin to Section 201 safeguard duties or antidumping duties. IDM at 14-17 (P.R. 330). This determination should be sustained. Fundamentally, Section 232 duties differ in their purpose from Section 201 safeguard duties and antidumping duties. In *Wheatland Tube*, "Commerce found that antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise." 495 F.3d at 1362. Assan argues that Commerce's focus on Section 232's national security purpose is misplaced because Section 232 tariffs remedy some type of harm to the domestic industry. Assan Br. at 20-22. But even if Section 232 might be considered remedial in a "broad sense," *Borusan*, 494 F. Supp. 3d at 1374, Section 232 duties are not imposed *because* a domestic industry is being injured or threatened. *See* IDM at 14-15 (P.R. 330). Section 232 duties are imposed to address imports that threaten to impair the national security, *see* 19 U.S.C. § 1862; IDM at 12 (P.R. 330). Although an *effect* of the President's imposition of Section 232 duties may be to assist a

weakened domestic injury, the *purpose* of the duties is to alleviate a national security concern—a purpose much broader than Section 201 or antidumping duties.

Proclamation 9705 states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the *national security*." *Proclamation 9705*, 83 Fed. Reg. 11625, 11627 (Mar. 8, 2018) (emphasis added). The President sought to alleviate the national security risk that our country's steel "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people." *Id.* Antidumping duties and Section 201 safeguard measures, on the other hand, are "directed at the same overarching purpose – protecting the bottom line of domestic producers." *See Wheatland Tube,* 495 F.3d at 1364.

Further, the text of Section 232 concerns itself with "the effects on the *national security* of imports of the article." *See* 19 U.S.C. § 1862(b)(1)(A) (emphasis added). The President may not act to adjust imports *unless* he concurs with the finding of the Secretary of Commerce that articles are being imported in such quantities or under such circumstances as to threaten to impair the national security. *Id.* § 1862(c). By contrast, for an antidumping duty to be imposed, a domestic industry must be materially injured or threatened with material injury. *Wheatland Tube*, 495 F.3d at 1362. Likewise, Section 201 duties may be imposed only if a domestic producer is experiencing serious injury or threat. *Id.* (citing 19 U.S.C. § 2251). The Federal Circuit stated that normal customs duties can be imposed "regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Id.* Section 232 duties may be imposed regardless of whether the United States industry is suffering. Thus, Commerce

reasonably determined that the law and purpose behind Section 232 duties materially differ from Section 201 safeguard and antidumping duties. *See* IDM at 14-15 (P.R. 330).

Assan emphasizes that the Section 232 duties were intended to remedy harms on the domestic industry and protect its viability. Assan. Br. at 25. This argument misses the point. The statute's fundamental concern is national security; it does not prioritize the economic welfare of domestic industries. *See* 19 U.S.C. § 1862(b)(1)(A) ("the Secretary of Commerce . . . shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion."); *id.* § 1862(b)(3)(A) ("the Secretary shall submit to the President a report on the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security"); *id.* § 1862(c)(1)(A)(ii) ("if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."). The viability of the domestic steel industry for defense capabilities is the national security interest that the President was seeking to address. *Proclamation 9705*, 83 Fed. Reg. at 11625. Commerce reasonably determined that Section 232 duties are focused on national security concerns, and not on remedying injury to a domestic industry in the same way that Section 201 and antidumping duties are focused. IDM at 14-15 (P.R. 330). Although the Court in *Borusan* disagreed with some of Commerce's analysis, the Court ultimately concluded that Commerce's reasoning was logical because there are material differences between Section 232 and Section 201 duties. *See* 494 F. Supp. 3d at 1374. Thus, Assan's attempts to equate Sections 201 and 232 are unpersuasive, and the Court should follow this Court's precedent. *Id.* ("{D}ifferentiating its treatment of Section 232 and Section

201 duties . . . is a reasonable decision based on crucial differences between Sections 201 and 232, namely that Section 201 duties are more akin to antidumping duties and that there is an interplay between antidumping duties and Section 201 duties, which is not present with Section 232 duties.").

C.    Section 232 Duties Are Not Temporal Duties

Contrary to Assan's arguments, Section 232 duties are not temporal duties and do not have a set expiration date. *See* Assan Br. at *27-29*. In *Wheatland Tube*, the Federal Circuit sustained Commerce's reasoning that Section 201 and antidumping duties provide "only temporary relief from the injurious effects of imports" unlike normal customs duties. 495 F.3d at 1362. Section 201 duties are generally limited to four years, and antidumping duty orders provide for a termination after five years, with some exceptions. *Id.* (citing 19 U.S.C. §§ 2251 and 1675). "Normal customs duties, however, have no termination provision and are permanent unless modified by Congress." *Id.* Section 232 does not have a termination provision. To the contrary, Congress granted the President discretion to determine the duration of Section 232 duties. *See* 19 U.S.C. § 1862(c) (providing that the President "shall…determine the nature and *duration of the action that*…must be taken to adjust the imports…so that such imports will not threaten to impair the national security." (emphasis added)). In contrast, antidumping and Section 201 duties have a statutory expiration date tied to the cessation of injury. *See* 19 U.S.C. § 2251; *see also* 19 U.S.C. § 1675(d). Thus, Assan's argument that "Section 232 duties are equally temporary as Section 201 duties" is unavailing. *See* Assan Br. at 27.

Moreover, Congress did not describe Section 232 duties as "temporary" duties or set a time limit on the duration of these duties, despite doing so for other duties delegated to the President to implement. *See*, *e.g.*, 19 U.S.C § 2132 (providing that "the President shall proclaim,

*for a period not exceeding 150 days* (unless such period is extended by Act of Congress) – a *temporary* import surcharge" when problems with international payments arise (emphasis added)).

Assan suggests that Section 232 duties are temporary because, unlike ordinary customs duties, Section 232 duties are adjusted and changed. Assan Br. at 27-28. This argument is inconsistent with *Wheatland Tube*. That the duties can be modified or changed at some time does not make them inherently temporary in the same way antidumping and Section 201 duties are temporary. Normal customs duties "have no termination provision and are permanent *unless modified by Congress*." *Wheatland Tube*, 495 F.3d at 1362 (emphasis added). Congress delegated broad authority and discretion to the President to determine the duration of Section 232 duties; Section 232 has no termination provision; and the duties are permanent unless modified by the President. Accordingly, Assan's argument that Section 232 duties should be considered special tariffs because they are temporary should be rejected.

**D.     Deducting 232 Duties From Export Price Does Not Result In A Double Remedy**

Assan also argues that, by deducting Section 232 duties from export price, Commerce mistakenly imposes a double remedy. Assan Br. at 18, 32. Assan cites to *Wheatland Tube* to support its argument that deducting Section 232 duties from export price results in a double remedy. *See* Assan Br. at 17-18, 33. However, as explained above, *Wheatland Tube* dealt with 201 duties, which differ from 232 duties. In *Wheatland Tube*, because section 201 safeguard and antidumping duties effectively treat the same injury, Commerce found that deducting Section 201 duties from United States price could improperly result in the collection of Section 201 duties twice. 495 F.3d at 1362-63. As explained by Commerce in *Stainless Steel Wire Rod from Korea*, the Statement of Administrative Action accompanying the 1921 Act states that "{i}n

31

determining whether to provide {Section 201} relief, and, if so, in what amount, the President will continue the practice of taking into account relief provided under other provisions of law, such as the antidumping" law. 69 Fed. Reg. at 19,160 (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994) reported in 1994 U.S.C.C.A.N. 3773). Congress explicitly intended that the President would take into account any potential overlap between Section 201 and antidumping duties when setting the level of Section 201 duties. *Id.*

In contrast, no similar authority demonstrates that Congress intended that the President would take into account potential overlap between Section 232 and antidumping duties. In this case, the President directed that Section 232 duties should be applied in addition to "any other duties, fees, exactions, and charges applicable to such imported steel articles." *Proclamation 9705*, 83 Fed. Reg. at 11627. The Federal Circuit recently acknowledged that the President's Section 232 tariffs are to be applied "on top of already-applicable antidumping or countervailing duties." *See Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x. 982, 986 (Fed. Cir. 2020). Commerce was properly concerned about double-counting in *Wheatland Tube* because the legislative history indicated that Congress intended the President to take antidumping duties into account when setting Section 201 duties. No similar concerns are present with Section 232 duties. Section 232 duties are not limited to addressing injury, material or otherwise, to the relevant domestic industry caused by imports. *See* 19 U.S.C. § 1862. The focus of Section 232 duties is much different in that it addresses "the capacity of the United States to meet national security requirements." *Id.* Unlike the similarity in purpose and function of antidumping and Section 201 duties, Section 232 actions to "adjust imports" are not limited to addressing the injury to industries caused by import surges or unfairly traded imports. This Court in *Borusan* agreed with Commerce that "{t}here is a clear statutory interplay between Section 201 duties

and antidumping duties, while Section 232 does not reveal any such coordination concerns." *Borusan*, 494 F. Supp. 3d at 1375-76.

In sum, Commerce thoroughly explained why it concluded that Section 232 and 201 duties are different such that *Wheatland Tube* is not controlling, and as this Court determined in *Borusan*, there is simply no overlap between Section 232 and antidumping duties such that double counting is a reasonable concern. Commerce's interpretation of "United States import duties" to include Section 232 duties is reasonable and in accordance with law because it is consistent with the text of the statute, the President's proclamations, and *Wheatland Tube*. Therefore, Commerce's treatment of Section 232 duties in its final determination is lawful and supported by substantial evidence.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain Commerce's final determination in its entirety and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                              /s/ Kyle S. Beckrich
                                         KYLE S. BECKRICH
Natalie Marie Zink                       Trial Attorney
Attorney                                 U.S. Dept. of Justice
U.S. Department of Commerce              Civil Division/National Courts
Office of the Chief Counsel              P.O. Box 480
  for Trade Enforcement and Compliance   Ben Franklin Station
Email: Natalie.Zink@trade.gov            Washington, D.C. 20044
                                         Telephone: (202) 616-9322
                                         Email: kyle.beckrich@usdoj.gov


February 22, 2022                        *Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 9,876 words, including text, footnotes, and headings.

<u>/s/Kyle S. Beckrich</u>
Kyle S. Beckrich