**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| *Plaintiff,* | ) **Non-Confidential Version** |
| v. | ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00246 |
| *Defendant,* | ) Confidential Business Proprietary ) Information Deleted from Pages: 14-17 |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, et al., | ) ) ) |
| *Defendant-Intervenors.* | ) ) |

**REPLY BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S**

Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@afslaw.com

March 24, 2022

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................ 1

II.     SUMMARY OF THE ARGUMENT ................................................... 2

III.    ARGUMENT ...................................................................................... 3

        A.     Commerce's Calculation Of Assan's Duty Drawback Adjustment Was Unlawful ........................................................ 3

        B.     Commerce Improperly Deducted "Special" Section 232 Tariffs From U.S. Price ........................................................ 5

               1.     Section 232 Tariffs Are Imposed Via A Limited Delegation Of Authority By Congress .......................... 6

               2.     Section 232 Tariffs Have A Remedial Purpose Overlapping With AD Duties ................................... 8

        C.     Commerce Unlawfully Denied Assan The Home Market Rebate Adjustment ....................................................... 12

               1.     Commerce's Denial Of Assan's Home Market Adjustments Was Not Supported By Substantial Evidence Or Otherwise In Accordance With Law .................................. 14

               2.     Commerce Unlawfully Declined To Issue A Supplemental Questionnaire ......................................... 16

IV.     PRAYER FOR RELIEF .................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Inst. for Int'l Steel, Inc. v. United States,*
    376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed.
    Cir. 2020), *cert denied*, 141 S. Ct. 133 (2020)................................................8

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021), *appeal docketed* , Consol. No.
    21-2097 (Fed. Cir. June 25, 2021) ....................................................6, 12

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962)................................................................13

*Itochu Bldg. Prods., Co. v. United States,*
    163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ................................13, 16

*Jindal Poly Films Ltd. of India v. United States,*
    365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ................................17, 18

*Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.,* \
    861 F.3d 1269 (Fed. Cir. 2017)......................................................4

*NMB Sing. Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009)....................................................16

*Shakeproof Assembly Components v. United States,*
    268 F.3d 1376 (Fed. Cir. 2001)....................................................19

*Toscelik Profil ve Sac Endustrisi A.S. v. United States,*
    321 F. Supp. 1270 (Ct. Int'l Trade 2018) ........................................16

*Wheatland Tube Co. v. United States,*
    495 F. Supp. 1355 (Fed. Cir. 2007) ..........................................5, 6, 9, 10

**Federal Statutes**

19 U.S.C. § 1673................................................................10

19 U.S.C. § 1675................................................................7

19 U.S.C. § 1677(7)(C)(iii)......................................................9

19 U.S.C. § 1677f(i)(3)(A) ......................................................16

19 U.S.C. § 1677m(d) ................................................................................................16

19 U.S.C. § 1862 .......................................................................................................10

19 U.S.C. § 1862(c)(1)(A)–(B) ...................................................................................7

19 U.S.C. § 1862(d) ....................................................................................................9

19 U.S.C. § 2251 ....................................................................................................7, 10

**Regulations**

19 C.F.R. § 351.401(c) ....................................................................................12, 13, 14

**Presidential Proclamations**

*Proclamation 9704 of March 8, 2018: Adjusting Imports of Aluminum Into the
    United States*, 83 Fed. Reg. 11619, 11619, 11620 (Mar. 15, 2018) .
    *Proclamation 9704* ..........................................................................................11

*Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the
    United States*, 83 Fed. Reg. 20677 (May 7, 2018) ...............................................8

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United
    States*, 83 Fed. Reg. 20683 (May 7, 2018) ..........................................................8

**Administrative Determinations**

*Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of
    Sales at Less Than Fair Value*, 86 Fed. Reg. 13326 (Dep't Commerce Mar. 8,
    2021), P.R. 358, ECF No. 15-1 ............................................................... *passim*

**Other Authorities**

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty
    Proceedings,* 81 Fed. Reg. 15641 (Dep't Commerce March 24, 2016) ...........12, 15

*Publication of a Report on the Effect of Imports of Aluminum on the National
    Security: An Investigation Conducted Under Section 232 of the Trade
    Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508 (Dep't Commerce
    Jul. 6, 2020) ........................................................................................................10

*Publication of a Report on the Effect of Imports of Steel on the National Security:
    An Investigation Conducted Under Section 232 of the Trade Expansion Act of
    1962, as Amended*, 85 Fed. Reg. 40202  (Dep't Commerce Jul. 6, 2020) ........10, 11

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel
    and Aluminum*, 83 Fed. Reg. 46026 (Dep't Commerce Sept. 11, 2018) .................8

*United States – Certain Measures on Steel and Aluminum Products* (DS556), U.S.
Second Written Submission, Apr. 17, 2020) ........................................................................10

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) ) | |
| *Plaintiff*, | ) ) | **<u>Non-Confidential Version</u>** |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | Consol. Court No. 21-00246 |
| *Defendant*, | ) ) | Confidential Business Proprietary |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, et al., | ) ) ) ) | Information Deleted from Pages: 14-17 |
| *Defendant-Intervenors.* | ) ) ) | |

**REPLY BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S.**

I.   **<u>INTRODUCTION</u>**

On behalf of Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan" or "Plaintiff"), we respectfully submit this reply brief in response to Defendant United States' Consolidated Response to Plaintiff's and Consolidated Plaintiffs' Motions for Judgment on the Agency Record dated February 22, 2022 (amended, March 4, 2022), ECF No. 40 ("Def. Resp. Br."), and Defendant-Intervenors' Response in Opposition to Plaintiff's Motion for Judgement on the Agency Record dated February 22, 2022, ECF Nos. 34 and 35 ("D-I Resp. Br.").

For the reasons set forth in Assan's initial brief ("Assan Br."), ECF Nos. 27 and 28, and below, the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty ("AD") investigation of Common Alloy Aluminum Sheet ("CAAS") from Turkey is not supported by substantial evidence or otherwise in accordance with law. *Common Alloy Aluminum Sheet From Turkey: Final Affirmative Determination of Sales at Less Than Fair*

1

*Value*, 86 Fed. Reg. 13326 (Dep't Commerce Mar. 8, 2021) ("*Final AD Determination*"), P.R.

358, ECF No. 15-1, and the accompanying Issues and Decision Memorandum ("*Final I&D*

*Memo*"), P.R. 330, ECF No. 15-2.

## II.   <u>SUMMARY OF THE ARGUMENT</u>

Assan's reply addresses three issues raised by Defendant and Defendant-Intervenors in

their responses: (1) whether Commerce's calculation of Assan's duty drawback adjustment is

supported by substantial evidence and otherwise in accordance with law; (2) whether

Commerce's deduction of the Section 232 tariffs on aluminum from U.S. price is supported by

substantial evidence and otherwise in accordance with law; and (3) whether Commerce's

decision to deny Assan's home market rebate adjustment is supported by substantial evidence

and otherwise in accordance with law.

First, as Defendant acknowledges, the methodology used by Commerce in calculating the

amount of the duty drawback adjustment granted to Assan is "contrary to Federal Circuit

precedent." Def. Resp. Br. at 7. Because Commerce found that Assan satisfied its two-prong test

for drawback eligibility, the *Final AD Determination* should be remanded for Commerce to

recalculate the amount of the duty drawback adjustment granted to Assan in accordance with

Federal Circuit precedent. *Id*.

Second, Commerce's determination to deduct the 10% Section 232 tariffs from Assan's

U.S. sales price is contrary to law and unsupported by substantial evidence on the record. Section

232 tariffs are imposed pursuant to a congressional delegation of tariff making authority, which

is conditional on specific timing provisions outlined in the statute, and have the same remedial

purpose as antidumping and countervailing ("AD/CVD") duties. Treatment of special Section

232 tariffs as "ordinary" import duties within the meaning of the antidumping statute therefore

results in a double remedy and artificially inflates the dumping margin calculated by Commerce in the *Final AD Determination*.

Finally, Assan is entitled to a home market rebate adjustment pursuant to the statute and Commerce's regulations. Assan claimed a home market rebate adjustment for certain sales where identified customers received rebates tied to the volume of purchases made in a given period was supported by sales contracts, proof of payment, and reconciliations to per unit rebate calculations and company accounting.  Commerce failed to provide a full and reasoned explanation as to how Assan's response was insufficient pursuant to the factors set forth in the *Modification of Regulations*. Further, if there was any issue with respect to the information, Commerce failed to issue a supplemental questionnaire and allow Assan to clarify and cure any deficiencies in its response. Commerce should therefore have accepted Assan's reported rebates as a downward adjustment to normal value in the *Final AD Determination*.

## III.   ARGUMENT

### A.   Commerce's Calculation Of Assan's Duty Drawback Adjustment Was Unlawful

In the *Final AD Determination*, Commerce found that Assan was eligible for a duty drawback adjustment and granted Assan such an adjustment based on its well-established two-prong test. *Final I&D Memo* at 8, P.R. 330. Specifically, as detailed in Assan's Response Brief ("Assan Resp. Br."), ECF Nos. 33 and 34, Assan's use of the Turkish Inward Processing Regime ("IPR"), which has been considered by Commerce for decades, satisfies the first prong of Commerce's two-prong test because it specifies that only exports containing qualifying incorporated imported inputs may be used to claim drawback and it requires that the exported product contain the imported raw material inputs. Assan Resp. Br. at 4-5. Assan further demonstrated that there were sufficient imports of the inputs to account for the duty drawback on

3

the exports of CAAS, satisfying the second prong of Commerce's test. *Id.* at 5. Commerce's determination to grant Assan a duty drawback adjustment in the *Final AD Determination* is thus reasonable and supported by substantial record evidence.

As detailed in Assan's opening brief, however, Commerce's calculation of the drawback adjustment was improperly based on an allocation "to all *production* for the relevant period based on the cost of inputs during the POI." *Final I&D Memo* at 8, P.R. 330. (emphasis added). This methodology has been repeatedly rejected by the reviewing courts as inconsistent with the plain language of the statute, and has been abandoned by Commerce in more recent proceedings. Assan Br. at 11-12. As such, it appears that neither Defendant nor Defendant-Intervenors are defending Commerce's calculation of Assan's drawback adjustment in the *Final AD Determination*. Indeed, Defendant explicitly acknowledges that "the methodology used in calculating the amount of the duty drawback adjustment granted to Assan is contrary to Federal Circuit precedent," and requests that "the Court remand the case to Commerce to reconsider its previous position with respect to the amount of the duty drawback adjustment granted to Assan." Def. Resp. Br. at 7.

Defendant-Intervenors do not contest that a remand is appropriate, but claim that "Assan's challenges of the methodology relied on by {Commerce} to calculate an adjustment are moot" because "{Commerce} should not have granted Assan a duty drawback adjustment." D-I Resp. Br. at 10. Specifically, Defendant-Intervenors continue to cite to *Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1273-74 (Fed. Cir. 2017), for the premise that "{a} respondent is not eligible for a duty drawback adjustment . . . the imports upon which the respondent claims an adjustment were not suitable for use in producing subject merchandise." D-I Resp. Br. at 10.  However, as detailed above and in Assan's Response Brief,

4

the record establishes that inputs under Assan's IPC were capable of producing CAAS. *See, e.g.*, Assan Resp. Br. at 6-12. In addition, as detailed in Defendant's Brief, Defendant-Intervenors "misunderstand{} the law" and ignore Commerce's lawful determination "that the conditions of *Maverick Tube* were satisfied because (1) the exemption from import duties is linked to the exportation of subject merchandise and (2) the inputs imported under the closed IPC are suitable to produce subject merchandise." Def. Resp. Br. at 13. Having found that Assan satisfied its requirements for a duty drawback adjustment, Commerce should have simply granted Assan a full duty drawback adjustment to U.S. price by dividing the amount of the uncollected duty by Assan's total exports covered by drawback. Assan Br. at 11-12.

## B.   Commerce Improperly Deducted "Special" Section 232 Tariffs From U.S. Price

In the *Final AD Determination*, Commerce found that "section 232 duties should be treated as U.S. import duties" under the statute and "thereby customs duties which are deducted from U.S. price." *Final I&D Memo* at 14-15, P.R. 330. Commerce's determination was based on its conclusion that the Section 232 tariffs "are not akin to antidumping or section 201 duties" because they focus on a "particular national security risk." *Id.* However, as detailed in Assan's opening brief, Commerce's deduction of the Section 232 tariffs from U.S. price unlawfully increases Assan's AD margin and results in a double remedy. Assan Br. at 20.

It their replies, both Defendant and Defendant-Intervenors note that the reviewing courts have considered factors such as the remedial purpose of the duty, whether the duty has a set termination date, and whether the purpose of the duty overlaps with that of antidumping duties in determining whether a particular duty is "special." D-I Resp. Br. at 13-14 (citing *Wheatland Tube Co. v. United States*, 495 F. Supp. 1355, 1363-66 (Fed. Cir. 2007)); *see also* Def. Resp. Br. at 24-25. Consideration of these factors continues to demonstrate that the Section 232 tariffs are

5

distinguishable from ordinary customs duties and should not be treated as such by Commerce. The Court should thus reconsider its ruling that Commerce's rationale for "differentiating its treatment of Section 232 and Section 201 duties is {not} so lacking in merit that the court must say it is arbitrary." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1376 (Ct. Int'l Trade 2021), *appeal docketed*, Consol. No. 21-2097 (Fed. Cir. June 25, 2021).

### 1.     Section 232 Tariffs Are Imposed Via A Limited Delegation Of Authority By Congress

Congress has the sole authority to impose ordinary customs duties, which are implemented "regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Wheatland Tube*, 495 F.3d at 1362. However, in certain cases, Congress has delegated authority to the Executive Branch to investigate and impose tariffs to remedy, amongst other things, the damaging effects of dumped imports and subsidies (AD/CVD), import surges (Section 201), and to protect national security (Section 232). Assan Br. at 31. In each case, the Executive Branch's authority to act is dependent on a legislated grant of specific authority to impose duties on imports to remediate specific adverse effects from imports. Congress's delegation of authority is conditional on specific provisions outlined in the statute.

Here, Defendant finds it significant that "Congress did not . . . set a time limit on the duration of these duties, despite doing so for other duties delegated to the President to implement." Def. Resp. Br. at 28 According to Defendant, the fact that the Section 232 tariffs can be modified at some point, as they have repeatedly been since their original implementation,[1]

---

[1] Since the implementation*,* the President has modified the Section 232 tariffs on several occasions, including by changing the number of countries covered, by raising and then lowering the applicable duty rates, and by expanding the scope to include certain downstream derivative products. Assan Br. at 28-29.

"does not make them inherently temporary in the same way antidumping and Section 201 duties are temporary." *Id.* at 29. Defendant's argument ignores specific timing factors underlying implementation of the Section 232 tariffs. As Defendant-Intervenors note, "the analytic starting point is the statute's plain language." D-I Resp. Br. at 12. While "Congress granted the President discretion to determine the duration of Section 232 duties," Def. Resp. Br. at 28, the plain language of the statute does not grant the President limitless authority to act. Rather, the statute meaningfully constrains the President's authority, in terms of what the President can do and when the President can do it, by providing specific deadlines for presidential action. Under Section 232, the President has 90 days following a report issued by the Secretary within which to concur with the findings in that report, determine to take action, and determine the nature and duration of that action. 19 U.S.C. § 1862(c)(1)(A)–(B). If the President decides some action is required, he then has 15 days to implement that action. *Id.* These procedural requirements, including strict time limits on presidential action, are analogous to other "special" tariffs like Section 201 and AD duties. *Id.* §§ 2251, 1675. By contrast, ordinary customs duties having no such restrictions, are in no way tied to the finding or cessation of injury, and are "permanent unless modified by Congress." Def. Resp. Br. at 28 (citation omitted).

The delegation of authority was not addressed in *Borusan*, and Defendant and Defendant-Intervenors decline to reckon with the legal significance of its implementation in their responses. The particular manner in which the Section 232 tariffs are imposed, and the time restrictions governing their imposition, highlights the difference between these special tariffs and ordinary customs duties. In deducting the Section 232 tariffs, Commerce likewise unlawfully failed to recognize the critical legal distinction between special duties imposed by the President under

7

U.S. trade remedy statutes like AD/CVD, Section 201, and Section 232, and ordinary customs duties imposed by Congress.

### 2. Section 232 Tariffs Have A Remedial Purpose Overlapping With AD Duties

In the *Final AD Determination*, Commerce emphasized that the Section 232 tariffs are referred to as "ordinary" customs duties in the Annex to *Proclamation 9739*, the Presidential Proclamation establishing the nature and treatment of section 232 duties. *Final I&D Memo* at 15, P.R. 330; *Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 20677 (May 7, 2018) ("*Proclamation 9739*").[2] Defendant and Defendant-Intervenors similarly highlight that the "the President explicitly referred to the Section 232 duties as 'ordinary' customs duties, supporting Commerce's determination that section 232 duties are treated as any other duties." Def. Resp. Br. at 23 (citation omitted); *see also,* D-I Resp. Br. at 18. However, the President's own characterization of the Section 232 tariffs is not the relevant inquiry.[3] As Defendant-Intervenors note, "{t}he issue is not whether Section 232 duties are ordinary customs duties, but rather whether {Commerce} has reasonably interpreted the phrase 'United States import duties' to include Section 232 duties." D-I Resp. Br. at 16. While

---

[2] The *Final I&D Memo* erroneously refers to the Annex to *Proclamation 9740*, which implemented the Section 232 tariffs on steel products, rather than *Proclamation 9739*, which implemented the Section 232 tariffs on aluminum products like CAAS. *See Final I&D Memo* at 15, n. 90, P.R. 330 (citing *Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018) ("*Proclamation 9740*"). The annexes to both *Proclamation 9739* (implementing aluminum tariffs) and *Proclamation 9740* (implementing steel tariffs) refer to the Section 232 tariffs as an "ordinary customs duty."

[3] If self-characterization of the Section 232 tariffs has any weight, it is relevant that both Commerce and this Court have recognized the Section 232 tariffs as "remedial" outside the context of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied*, 141 S. Ct. 133 (2020); *see, e.g., Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) (interim final rule).

Defendant and Defendant-Intervenors contend that "the purpose of Section 232 duties differs from Section 201 and antidumping duties" such that "Section 232 duties fall within the definition of 'United States import duties,'" *id.* at 13, public documentation demonstrates that Commerce and the President viewed the Section 232 tariffs as an alternate means to remedy the same injury to a domestic industry targeted by special tariffs like AD, CVD, and Section 201. Assan Br. at 33.

The imposition of the tariffs was based on those same factors considered by the International Trade Commission ("ITC") in AD/CVD cases, including "the impact of foreign competition on the economic welfare of domestic industries;" "any substantial unemployment, loss of skills or investment;" and "other serious effects resulting from the displacement of any domestic products by excessive imports{.}" 19 U.S.C. § 1862(d); *compare id*. § 1677(7)(C)(iii) (directing the ITC to consider conditions of competition in the U.S. market, U.S. producers' financial experience and employment levels, and other effects related to displacement from imports, including U.S. production, shipments, apparent consumption, market shares, and pricing data). Importantly, unlike ordinary customs duties, Section 232 tariffs cannot be imposed absent a finding that the "U.S. industry is suffering adverse effects as a result of imports." Def. Resp. Br. at 26 (quoting *Wheatland Tube*, 495 F.3d at 1362). That the ITC considers those factors in the context of whether imports "threaten to impair the national security," rather than whether imports are "either unfairly or fairly traded" is irrelevant. D-I Resp. Br. at 14-15,

Indeed, the attempts of Defendant and Defendant-Intervenors to distinguish the Section 232 tariffs on that basis that "the specific circumstance that each section of the statute seeks to remedy {is} distinct" are unavailing. D-I Resp. Br. at 15. Neither party addresses why the particular remedial "purpose" of "alleviat{ing} a national security concern," Def. Resp. Br. at 26, makes Section 232 tariffs more akin to normal customs duties than other trade remedy statutes

like AD/CVD and Section 201. For each provision, "something more" than mere injury to domestic producers must be demonstrated in order for remedial tariffs to be imposed – AD duties require not only a finding of injury to the domestic industry, but also that imports are sold at below fair value (19 U.S.C. § 1673); CVD duties require a finding of injury, but also that imports benefit from government subsidies (*Id.* § 1671); and Section 201 tariffs require a finding of injury, but also a surge in imports (*Id.* § 2251). Likewise, Section 232 tariffs require Commerce to find injury, but also that imports threaten national security. *Id.* § 1862. The addition of national security considerations does not negate the fact that the Section 232 tariffs, like AD/CVD and Section 201 tariffs, are "directed at the same overarching purpose — protecting the bottom line of domestic producers." Def. Resp. Br. at 26 (quoting *Wheatland Tube*, 495 F.3d at 1364).

Though Defendant-Intervenors claims the "objective" of the Section 232 tariffs is not "to prevent or remedy serious injury to U.S. steel and aluminum industries allegedly caused or threatened by imports," D-I Resp. Br. at 17 (quoting *United States – Certain Measures on Steel and Aluminum Products* (DS556), U.S. Second Written Submission at para. 137, Apr. 17, 2020)), their argument is undermined by public statements from both Commerce and the President. For example, Commerce's *Section 232 Steel and Aluminum Reports* repeatedly reference AD orders, contemplating the Section 232 tariffs as an alternative to AD/CVD cases to protect the "financial viability" of U.S. aluminum producers. *See Publication of a Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508, 40518 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Aluminum Report*"); *Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202, 40204, 40216, 40225-26 (Dep't Commerce Jul. 6,

2020) ("*Section 232 Steel Report*"). Commerce notes that while "antidumping and countervailing duty actions can address specific instances of unfairly traded . . . products," that "given the large number of countries from which the United States imports . . . and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded {imports}." *Section 232 Steel Report* at 40211. Commerce further emphasizes that the "U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CVD cases, with seemingly no end in sight," and claims that "{s}maller . . . manufacturers are financially unable to afford these type of cases, or are hesitant to file cases in light of possible market entry retaliation{.}" *Id.* Commerce's report clearly indicates that the Section 232 tariffs are intended as substitute for AD/CVD orders to remedy perceived inequities and "level the playing field" for domestic producers to compete against imports. *Id.* at 40216.

Then President Trump likewise indicated that the Section 232 tariffs were "contemplated as an alternative to other special trade remedies, most notably {AD} duties." Assan Br. at 33. As with AD/CVD duties, the Section 232 tariffs were imposed "in response to specific requests from affected domestic parties" for the explicit purpose of "ensuring the economic viability of our domestic aluminum industry." *Proclamation 9704 of March 8, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11619, 11619, 11620 (Mar. 15, 2018) ("*Proclamation 9704*"). *Proclamation 9704* specifically noted that the goal of the tariffs was "reduce imports to a level that . . . would enable domestic aluminum producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production." *Id.* at 11619.

In this context, Defendant's premise that "assist{ance to} a weakened domestic injury" is merely an "effect" of the Section 232 tariffs, rather than their purpose, is disingenuous. Def.

11

Resp. Br. at 25-26. Given the government's clear "prioritiz{ation} {of} the economic welfare of domestic industries" in imposing these tariffs, *id.* at 27, it is unreasonable for Commerce to conclude that they are now "separate and apart" from other special provisions like AD duties. *Final I&D Memo* at 15, P.R. 330. The Section 232 tariffs are not just remedial in a "broad sense," *Borusan*, 494 F. Supp. 3d at 1374, but rather specifically imposed to remedy perceived injury to the domestic aluminum industry. As such, their deduction from U.S. price in Commerce's dumping calculation results in a double remedy and artificially inflates the dumping margin calculated for Assan. Having collected Section 232 tariffs on Assan's imports of CAAS, it is unlawful for Commerce to collect those tariffs a second time in the form of an increased antidumping margin based on their collection. Assan Br. at 33.

### C.    Commerce Unlawfully Denied Assan The Home Market Rebate Adjustment

In the *Final AD Determination*, Commerce denied Assan's home market rebate adjustment based on the finding that Assan's questionnaire response was inadequate, *i.e.* "for one customer, Assan did not demonstrate that the customer reached the sales volume target specified in the rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the rebate was actually paid." *Final I&D Memo* at 22, P.R. 330. As discussed in Assan's opening brief, Commerce failed to provide a full and reasoned explanation for its decision to deny Assan's home market rebate adjustment as required by the statute and Commerce's regulations. Assan Br. at 35-38.

In their response briefs, both Defendant and Defendant-Intervenors argue that Assan was ineligible for a rebate adjustment in the home market because Assan failed to provide sufficient documentation in response to Commerce's questionnaires. Def. Resp. Br. at 17-18; *see also* D-I Resp. Br. at 25-27. However, 19 C.F.R. § 351.401(c) directs Commerce to consider a non-exhaustive list of five factors in determining whether a home market rebate adjustment is

appropriate. *Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings,* 81 Fed. Reg. 15641, 15644-45 (Dep't Commerce March 24, 2016) (final rule) ("*Modification of Regulations*"). Neither Defendant nor Defendant-Intervenors dispute the fact that Commerce did not specifically address any of the enumerated factors in the *Final AD Determination.* D-I. Resp. Br. at 26. *See also* Def. Resp. Br. at 17-18. Instead, Defendant-Intervenors allude that Commerce's denial of Assan's home market rebate adjustment was based on giving weight to the first factor, *i.e.* whether the respondent "prove{s} that 'buyers were aware of the conditions to be fulfilled and the approximate amount of the rebates at the time of sale.'" D-I Resp. Br. at 26. Nevertheless, in contrast, Defendant allude that Commerce's denial of Assan's home market rebate adjustment was based on "two factors that Commerce, in the discretion afforded to it under 19 C.F.R. 351.401(c)" *i.e.*  the supporting documentation provided by Assan was inadequate to show either the sales volume target was reached or the full rebate was paid. Def. Br. at 18.

The fact that Defendant and Defendant-Intervenors reach different conclusions with respect to Commerce' rationale in denying Assan's home market rebate adjustment further proves that the record lacks any reasoned explanation as required by the statute and Commerce's regulations. The Court "may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'" *Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962)). As argued further below, Assan respectfully requests that the Court remand this case to Commerce to provide an adequate and reasoned explanation for its decision based on factual information on

the record, reopen the record if needed to issue Assan a supplemental questionnaire, and provide

Assan with an adequate opportunity to comment on that decision.

      1.     **Commerce's Denial Of Assan's Home Market Adjustments Was Not Supported By Substantial Evidence Or Otherwise In Accordance With Law**

In its response brief, Defendant contends that Assan failed to demonstrate that it was

entitled to the home market rebate adjustment. Def. Resp. Br. at 17. Defendant supports this

conclusion by simply reiterating the findings of Commerce in its Final Analysis Memo and the

Preliminary Analysis Memo that "the supporting documentation provided did not show that

either of the two customers for which Assan provided documentation reached a certain sales

volume target specified in the agreement or that the full rebate was paid." *Id.* at 18. Defendant

does not explain why Assan's records failed to satisfy any of the enumerated factors set forth in

*Modification of Regulations*. Rather, Defendant argues that Commerce's findings that Assan's

claimed rebate program with respect to two customers were inconsistent, which constitutes the

determinative factors afforded to Commerce under 19 C.F.R. § 351.401(c). *Id.*

Defendant's argument is contrary to law and unsupported by substantial evidence on the

records. As discussed in Assan's opening brief, Assan recognized and addressed the requirements

of the *Modification of Regulations*, explaining that, "Assan follows an annual volume target

based rebate program with certain customers. The rebates are calculated on an annual basis by

the sales department. Assan reports per unit rebated … based {on} actual approved and paid

amounts on a customer specific basis." Assan Br. at 36, quoting Section B Questionnaire

Response of Assan Aluminyum Sanayi ve Ticaret A.S. at 31 (June 29, 2020) ("Sec. B QR"), C.R.

28, P.R. 141. Assan reported all [    ] customers who have received a rebate during the period of

investigation ("POI"), the net sales quantity sold, the net rebate amount paid, and the unit rebate

amount that tied to the home market sales database. Sec. B QR at Exh. B-10.1, C.R. 28, P.R. 141.

For each customer, Assan provided the rebate invoice that shows the rebate payment both inclusive and exclusive of VAT. *Id.* at Exh. B-10.2, C.R. 28-29, P.R. 141.

In its Supplemental Section B questionnaire, Commerce asked Assan to provide supporting documentation with respect to two of the [     ] customers. Supplemental Section B Questionnaire Response of Assan Aluminyum Sanayi ve Ticaret A.S. at 11 (Sept. 3, 2020) ("Supp. B. QR"), C.R. 253, P.R. 217. In response, Assan provided the requested supply contracts for the two customers, the rebate invoices, and the bank receipt evidencing proof of payment. *Id.* at Exh. S3-19, C.R. 255, P.R. 218. At no point during the investigation did Commerce address or explain how any of the five factors of the *Modification of Regulations* were not satisfied, nor did it explain how it weighted any of the factors in deciding not to grant the adjustment. In the preliminary determination, Commerce simply found that the supporting documentation for two of the [     ] customers were insufficient and denied Assan's claimed rebate adjustment for all the customers. Commerce made no changes in the final determination.

At the very least, Commerce should be required to provide further analysis and explanation for its determination. As it currently stands, Commerce's entire decision was based on the facts that the supporting documentation for  two  of the [     ] Assan's customers were incomplete and inconsistent. This is not a sufficient explanation. In its attempt to justify Commerce's finding, Defendant-Intervenors argue that Assan did not address the first factor – *i.e.*, "{w}hether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale." D-I Resp. Br. at 25, quoting *Modification of Regulation*, 81 Fed. Reg. at 15644-45. Contrary to Defendant-Intervenors' post hoc rationalization of Commerce's determination, the government never makes clear in either the underlying investigation or in its response brief what kind of documentation is sufficient to demonstrate that the customers were

aware of the terms and conditions of the adjustment. Indeed, notwithstanding the discrepancies with respect to the target volume specified in the supply contracts for the two selected customers, Assan provided the actual sales quantity sold, the rebate amount paid, supported by rebate invoices for all the [    ] customers in its initial response. Sec. B QR at Exh. B-10.2, C.R. 28-29, P.R. 141. Commerce did not address or explain how any of these documents failed to satisfy any of the factors specified in the *Modification of Regulations.* At most, the records demonstrate that Assan's response as to two customers for which it claimed a rebate adjustment was incomplete and inadequate.

The statute explicitly requires that Commerce to "include in a final determination . . . an explanation of the basis for its determination." 19 U.S.C. § 1677f(i)(3)(A). The Court has also held that "{t}he law clearly requires Commerce to explain the basis for its decision." *Toscelik Profil ve Sac Endustrisi A.S. v. United States,* 321 F. Supp. 1270, 1280 (Ct. Int'l Trade 2018), citing *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) ("{W}hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). In this case, the path of Commerce's reasoning is not reasonably discernable and the Court cannot accept any post hoc rationalizations by Defendant's counsel. *Itochu Bldg. Prods.*, 163 F. Supp. 3d at 1337. Here, Commerce failed to provide a reasoned basis as to how the five factors set forth in the *Modification of Regulations* were not met. We respectfully request that the Court remand the issue to Commerce for further explanation.

### 2. Commerce Unlawfully Declined To Issue A Supplemental Questionnaire

Defendant does not contest that Commerce did not ask Assan to report any of the information required by the *Modification of Regulations* to support a post-sale price adjustment.

NON-CONFIDENTIAL VERSION

Rather, Defendant argues that Assan's response did not contain a deficiency or otherwise need

clarification under 19 U.S.C. § 1677m(d) because the information provided by Assan failed to

establish that Assan was entitled to the claimed adjustment. Def. Resp. Br. at 18-19. Defendant

uses Commerce's failure to ask any questions to support its argument that it was not required to

issue a supplemental questionnaire or ask any questions. In other words, Commerce can decline

to ask a respondent for the information it needs to determine whether a favorable rebate

adjustment is warranted and, by failing to ask the question, Commerce is relieved of the

obligation to ever request any supplemental information to determine if the claimed adjustment

is warranted. This is patently unreasonable as it requires respondents such as Assan to be mind-

readers of what Commerce wishes to have placed on the record of this proceeding. *Jindal Poly

Films Ltd. of India v. United States,* 365 F. Supp. 3d 1379, 1388 (Ct. Int'l Trade 2019). (finding

that Commerce is obligated to issue a supplemental questionnaire seeking clarification of the

information respondent provided, because "Commerce was the only party that could have been

aware of the deficiency in the questionnaire response because it was the only participant in the

review that knew what would satisfy its unarticulated criteria.")

 As discussed in Assan's opening brief, the Supplemental Section B Questionnaire only

selected  two  out of the [ ] customers that Assan claimed a rebate adjustment and requested

Assan to provide supporting documentation, including sample agreements. Supp. B QR at 11,

C.R. 253, P.R. 217. Assan provided the requested information and, in addition, addressed the

terms and conditions of the annual volume target, provided the relevant rebate invoices, and

attached the bank receipts evidencing proof of payment. *Id*. at Exh. S3-19, C.R. 255, P.R. 218.

However, the question did not ask for specific information for all of the factors considered under

the *Modification of Regulations*. Assan did not receive the deficiency determination until the

Preliminary Determination, by which point it was too late to submit new factual information to clarify the concerns raised by Commerce. Memorandum from S. Carey to The File, re: Preliminary Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S. at 3 (Oct. 6, 2020), C.R. 329 ("Preliminary Analysis Memo").

Both Defendant and Defendant-Intervenors argue that Assan's reliance on *Jindal Poly Films* is misplaced. Def. Resp. Br. at 18-19; D-I Resp. Br. at 28-29. The key distinction both Defendant and Defendant-Intervenors contend is that, in *Jindal Poly Films,* Commerce failed to articulate its reasoning for its rejection of the respondent's requested post-sale adjustment, while as here, Commerce explained exactly why it denied Assan's home market rebate adjustment. Def. Resp. Br. at 18; D-I Resp. Br. at 29. The distinction is artificial. In *Jindal Poly Films,* Commerce denied two of Jindal's claimed price adjustment based on the conclusory finding that Jindal failed to satisfy the first, third and fifth factors outlined in the *Final Modification* for either of the denied adjustment. *Jindal Poly Films*, 365 F. Supp. 3d at 1384-85. The Court found that "Commerce did not explain why the adjustments do not meet the 'criteria' or how Commerce evaluated the factors in the {*Modification of Regulations*}. Nor did Commerce discuss the evidence which Jindal supplied in support of its claims." *Id.* at 1385. Based on the finding that Commerce failed to articulate its reasoning, the Court further found that Commerce should have issued a supplemental questionnaire to Jindal. *Id.* at 1387-88.

Similar to the facts presented in *Jindal Poly Films*, here, Commerce denied Assan's home market rebate adjustment based on its conclusory finding that the sample documentation submitted for two customers were inadequate. Commerce did not even address which factors in the *Modification of Regulations* it considered relevant with respect to the sample documentation it determined to be insufficient. Contrary to Defendant's and Defendant-Intervenors' claim,

Commerce failed to articulate any reasoning in denying Assan's home market rebate adjustment pursuant to the *Modification of Regulations*. By declining to issue a supplemental questionnaire and by refusing to provide a detailed analysis of the information submitted by Assan, Commerce failed to comply with the overriding objective of the statute to calculate antidumping margins as accurately as possible. *Shakeproof Assembly Components v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001) (summarizing the Court's reasoning "that the purpose of the statutory provisions is to determine antidumping margins 'as accurately as possible'" (citation omitted)).

## IV.   <u>PRAYER FOR RELIEF</u>

For the foregoing reasons, Assan respectfully requests that this Court find that Commerce's *Final AD Determination* was not based on substantial evidence, nor was it in accordance with the law with respect to the issues set forth in this Reply Brief and in Assan's Brief in Support of Its Motion for Judgment on the Agency Record.

Respectfully submitted,

<u>/s/ Leah N. Scarpelli</u>
Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*

March 24, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Reply Brief filed on March 24, 2022 complies with the word limitation requirement. The word count for Assan's Response Brief, as computed by Arent Fox LLP's word processing system is 5,793.


<u>**/s/ Leah N. Scarpelli**</u>
Leah N. Scarpelli

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*