Slip Op. 23-26

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br> Plaintiff and Consolidated Defendant-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br> Defendant-Intervenors and Consolidated Plaintiffs. | Before: Gary S. Katzmann, Judge <br> Consol. Court No. 21-00246 <br><br> *PUBLIC VERSION* |

## <u>OPINION</u>

[Plaintiff's Motion for Judgment on the Agency Record is granted in part and denied in part. Consolidated Plaintiffs' Motion for Judgment on the Agency Record is granted in part and denied in part. The court stays consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit. Commerce's <u>Final Determination</u> is remanded for reconsideration or further explanation consistent with this opinion.]

Dated: <u>March 1, 2023</u>

<u>Leah Scarpelli</u>, Arent Fox LLP, of Washington, D.C., argued for Plaintiff and Consolidated Defendant-Intervenor Assan Aluminyum Sanayi Ve Ticaret A.S. With her on the briefs were <u>Matthew M. Nolan</u> and <u>Yun Gao</u>.

<u>Kyle S. Beckrich</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department

of Justice, of Washington, D.C., argued for Defendant United States.  With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the briefs were <u>Natalie Marie Zink</u> and <u>Ashlande Gelin</u>, Attorneys, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Joshua R. Morey</u>, Kelley Drye & Warren LLP, of Washington, D.C., argued for Defendant Intervenors and Consolidated Plaintiffs Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members, et al.  With him on the brief were <u>John Herrmann</u>, <u>Paul C. Rosenthal</u>, <u>R. Alan Luberda</u>, and <u>Julia A. Kuelzow</u>.

Katzmann, Judge:    This is an appeal from the U.S. Department of Commerce ("Commerce")'s final affirmative determination in the sales at less-than-fair value ("LTFV") investigation of Common Alloy Aluminum Sheet ("CAAS") from Turkey.  <u>See</u> <u>Common Alloy Aluminum Sheet from Turkey: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 86 Fed. Reg. 13,326 (Dep't Com. Mar. 8, 2021), P.R. 358 ("<u>Final Determination</u>").  Before the court, Petitioner[1] the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group & Individual Members ("the Association" or "Consolidated Plaintiffs" or "Defendant-Intervenors") and Mandatory Respondent[2] Assan Aluminyum Sanayi ve Ticaret A.S.

---

[1] An LFTV investigation is "initiated whenever an interested party . . . files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of [antidumping] dut[ies]."  19 U.S.C. § 1673a(b)(1).

[2] In LTFV investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f–1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to-
>
>> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

("Assan" or "Plaintiff" or "Consolidated Defendant-Intervenor") challenge various adjustments that Commerce made -- or declined to make -- to the values Commerce uses to determine whether foreign goods are being introduced into the United States at less than fair value to the detriment of domestic producers and in violation of American laws designed to promote fair trade.  It is Commerce's practice to adjust the examined values to account for, among other things, U.S. import duties and other shipping costs paid to bring the investigated product into the United States, import duties rebated or not collected by the country of origin upon exportation of the product, and discounts or rebates given on the product in the home market.

Because, as established herein, the court concludes that only certain of Commerce's adjustment choices were supported by substantial evidence and otherwise in accordance with law -- namely, Commerce's treatment of Assan's shipping costs and home market rebates -- the court sustains Commerce's Final Determination in part and remands it in part for further consideration consistent with this opinion.

## BACKGROUND

The court begins by setting out the overarching legal, factual, and procedural background necessary to contextualize the challenges posed by Plaintiff and Consolidated Plaintiffs.  The court will expand upon certain legal, factual, and procedural elements as relevant and necessary in the forthcoming discussion of specific issues, infra pp. 12–59.

### I.      *Legal Background*

Under the Tariff Act of 1930 ("the Act"), Congress empowered Commerce to investigate and, if appropriate, impose duties to counteract dumping.  Sioux Honey Ass'n v. Hartford Fire Ins.

---

(B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  Dumping occurs when a foreign firm sells an identified

product ("subject merchandise") for "less than fair value" in the United States, meaning that the

product is sold at an export price -- or, as in the case at bar, a constructed export price -- that is

lower than the product's normal value.  See Saha Thai Steel Pipe (Pub.) Co. v. United States, 635

F.3d 1335, 1338 (Fed. Cir. 2011).  "[N]ormal value is generally the 'price at which the foreign . . .

product is first sold . . . for consumption in the . . . country [of export],'" reflecting the "home

market price," Maverick Tube Corp. v. Toscelik Profil, 861 F.3d 1269, 1271 (Fed. Cir. 2017)

("Maverick Tube III") (quoting 19 U.S.C. § 1677b(a)(1)(B)(i)); while the constructed export price

is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United

States . . . to a purchaser not affiliated with the producer or exporter," reflecting the "U.S. sales

price," 19 U.S.C. § 1677a(b).

　　　Where Commerce determines that goods are being, or are likely to be, sold at less than fair

value,[3] the agency imposes antidumping duties on the foreign merchandise.  See 19 U.S.C. § 1673.

Commerce determines the appropriate amount of antidumping duties by calculating the "dumping

margin," which is the amount by which the normal value exceeds the export or constructed export

price.  See 19 U.S.C. § 1677(35)(A).  In completing this calculation, Commerce seeks to compare

prices "at a common point in the chain of commerce."  APEX Exports v. United States, 777 F.3d

1373, 1374 (Fed. Cir. 2015).

　　　Achieving "a common point in the chain of commerce," id., requires Commerce to make

certain adjustments to the prices representing normal value and export/constructed export price,

---

[3] And where the United States International Trade Commission makes the additional requisite
finding -- not at issue in the case at bar -- that the sale of such merchandise below fair value is
materially injuring, threatening, or impeding the establishment of an industry in the United States.
See Diamond Sawblades Mfrs. Coal. v. United States, 866 F.2d 1304, 1306 (Fed. Cir. 2017).

*PUBLIC VERSION*

see, e.g., 19 U.S.C. § 1677b;[4] id. § 1677a;[5] 19 C.F.R. § 351.401(c).  As described in greater detail,

infra pp. 12–59, such adjustments can include, inter alia, increasing constructed export price to

reflect "duty drawbacks," or import duties rebated and/or not collected by the country of origin

upon exportation of subject merchandise, see 19 U.S.C. § 1677a(c)(1)(B), decreasing constructed

export price to account for U.S. import duties and other costs paid to bring subject merchandise

into the United States, see id. § 1677a(c)(2)(A), and decreasing normal value to reflect discounts

or rebates given on subject merchandise in the home market, see 19 C.F.R. § 351.102(b)(38).

     Because Commerce identifies dumping by assessing whether a foreign producer/exporter

is selling its products in the United States at less than normal value, as a general rule, it is in the

Petitioner's interest[6] -- who is seeking imposition of antidumping duties -- if the assessed U.S.

sales price (i.e., constructed export price) is low, and the home market price (i.e., normal value) is

high.  By contrast, it is generally in the Respondent's interest[7] -- who is seeking to avoid the

imposition of antidumping duties -- if the assessed U.S. sales price (i.e., constructed export price)

is high, and the home market price (i.e., normal value) is low.  In light of these divergent interests,

Commerce is wary of attempts by parties to manipulate dumping margins, particularly through so-

called "after-the-fact" or "post-sale" adjustments.[8]  "The interested party that is in possession of

---

[4] Section 773 of the Act, as codified at 19 U.S.C. § 1677b, provides the statutory basis for price adjustments to normal value.

[5] Subsection 772(a) of the Act, as codified at 19 U.S.C. § 1677a, provides the statutory basis for price adjustments to constructed export price.

[6] In this case, the Association.

[7] In this case, Assan.

[8] To illuminate how such "manipulation" can occur, take home market rebates and discounts as an example.  Under 19 C.F.R. § 351.102(b)(38), Commerce deducts from normal value discounts and

*PUBLIC VERSION*

the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment."  19 C.F.R. § 351.401(b)(1).

## II.    *Factual Background*

On March 9, 2020, the Association filed an antidumping petition[9] concerning imports of Common Alloy Aluminum Sheet ("CAAS") from Turkey.  See Mem. to DAS for Operations Pertaining to Interested Parties Resp't Selection at 1 (Apr. 29, 2020), C.R. 15, P.R. 49 ("Mem. to DAS").  In response, on March 30, 2020, Commerce initiated a LTFV investigation of CAAS from Turkey covering the period of January 1, 2019 through December 31, 2019.  Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 19,444 (Dep't Com. Apr. 7, 2020), P.R. 34 ("LTFV Initiation").  Commerce defined the scope of the products covered by the investigation as follows:

> [C]ommon alloy aluminum sheet, which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of this investigation includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX series core, to which cladding layers are applied to either one or both sides of the core.  The use of a proprietary alloy or non - proprietary alloy that is not specifically registered by the Aluminum Association as a discrete

---

rebates given on sales of subject merchandise in the home market.  If Commerce were to permit deductions for home market rebates and/or discounts granted "after it became known that certain sales would be subject" to an antidumping duty, producers/exporters could use discounts and rebates to lower normal value (i.e., home market prices) relative to export value (i.e., U.S. prices) post-hoc, and thereby reduce or eliminate dumping margins.  China Steel Corp. v. United States, 43 CIT__, __, 393 F. Supp. 3d 1322, 1347 (2019).

[9] Supra note 1.

1XXX-, 3XXX-, or 5XXX-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope.

LTFV Initiation App. at 19,449.

Commerce selected Assan, a Turkish manufacturer and exporter of CAAS, as a mandatory respondent,[10] see Mem. to DAS at 7, and preliminary assigned Assan a dumping margin of 12.65 percent on October 6, 2020, see Common Alloy Aluminum Sheet from Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 65,346, 65,347 (Dep't Com. Oct. 15, 2020), P.R. 264 ("Preliminary Determination").  In calculating this preliminary margin, Commerce granted and denied certain adjustments requested by the parties to Assan's constructed export price:[11]  Namely, Commerce both increased the constructed export price by granting a duty drawback adjustment to Assan for import duties rebated and/or not collected and depressed the constructed export price through: the (1) denial of billing adjustments claimed by Assan to correct certain errors and (2) application of a reduction for freight expenses Assan paid to an affiliated service provider.  See generally PDM.

On January 6, 2021, Assan filed an administrative case brief challenging Commerce's preliminary margin calculation.  Specifically, Assan claimed Commerce erroneously: (i) depressed the constructed export price by using a "duty neutral" methodology to implement Assan's duty

---

[10] Supra note 2.

[11] Commerce utilized constructed export price because Assan reported no sales of subject merchandise to an unaffiliated purchaser in the United States.  See 19 U.S.C. § 1677a(a)–(b).  As such, Commerce relied on sales made on Assan's behalf by its U.S. sales affiliate, Kibar Americas, to unaffiliated purchasers in the United States.  See Mem. from J. Maeder to J. Kessler, re: Dec. Mem. for the Prelim. Affirmative Determ. in the Less Than Fair Value Investigation of Common Alloy Aluminum Sheet from Turkey at 9 (Dep't Com. Oct. 6, 2020), P.R. 247 ("PDM").

drawback adjustment as well as by improperly deducting tariffs imposed on Assan's subject

merchandise under Section 232 of the Trade Expansion Act of 1962;[12] and (ii) inflated Assan's

normal value by denying Assan a downward home market rebate adjustment for customers who

received discounts for certain volume purchases in a given period.  See Case Br. of Assan

Aluminyum Sanayi ve Ticaret A.S. (Jan. 6, 2021), P.R. 309, C.R. 400 ("Pl.'s Case Br."); Rebuttal

Br. of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 19, 2021), P.R. 317, C.R. 404 (Pl.'s Rebuttal

Br.").  For its part, the Association filed an administrative case brief contending that Commerce

erroneously: (i) inflated the constructed export price by granting Assan a duty drawback

adjustment for which it was ineligible as well as by declining to apply adverse facts available

("AFA")[13] both in calculating the deduction for affiliated freight charges and in determining

Assan's eligibility for certain billing adjustments; and (ii) lowered Assan's normal value by

declining to apply AFA where Assan failed to provide documentation for its claimed home market

rebate adjustments.  See Pet'r's Case Br. (Jan. 6, 2021), P.R. 309, C.R. 401 ("Consol. Pls.' Case

Br.").

     The Department issued its Final Determination on March 8, 2021, assigning Assan a final

dumping margin of 2.02 percent.  Final Determination at 13,327.  In calculating this final dumping

margin, Commerce made no changes to its adjustments for duty drawbacks, Section 232 tariffs,

home market rebates, or affiliated freight charges; however, Commerce modified its billing

adjustments by using Assan's reported information on the record -- rather than the lowest reported

value, as in the Preliminary Determination -- to lower the constructed export price.  See Issues and

---

[12] Background information on Section 232 of the Trade Expansion Act of 1962 is provided, infra
pp. 54–55.

[13] Background information on AFA is provided, infra pp. 46–47.

Dec. Mem. for the Final Affirmative Determ. in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey, and Final Negative Determination of Critical Circumstances at 11, 14–18, 22–24 (Dep't Com. Mar. 1, 2021), P.R. 330 ("IDM").

### III.   Procedural Background

On May 21, 2021, Assan filed a complaint challenging Commerce's <u>Final Determination</u>. <u>See</u> Assan Compl., May 21, 2021, ECF No. 4.  On June 7, 2021, the Association intervened in the case as a matter of right.  <u>See</u> Mot. to Intervene as Def.-Inter., June 6, 2021, ECF No. 10. Separately, the Association initiated its own appeal of Commerce's determination, <u>see</u> Ass'n Compl., June 22, 2021, ECF No. 10, which this court consolidated into Assan's case upon a consent motion made on July 26, 2021, <u>see</u> Order Granting Mot. to Consolidate Cases, July 27, 2021, ECF No. 18.  Assan and the Association each moved for judgment on the agency record on November 22, 2021.  <u>See</u> Assan's Mem. of L. in Supp. of Mot. for J. on Agency R., Nov. 22, 2021, ECF No. 27 ("Pl.'s Br."); <u>see also</u> Ass'n's Mem. of L. in Supp. of Mot. for J. on Agency R., Nov. 22, 2021, ECF No. 29 ("Consol. Pls.' Br.").  Assan, the Association, and the Government filed responses to the respective motions on February 22, 2022.  <u>See</u> Resp. Br. of Assan to Pet'r's Rule 56.2 Mot. for J. on Agency R., Feb. 22, 2022, ECF No. 33 ("Pl.'s Resp."); Ass'n's Resp. in Opp. to Pl.'s Mot. for J. on Agency R., Feb. 22, 2022, ECF No. 35 ("Consol. Pls.' Resp."); U.S. Gov't's Consol. Resp. to Pl.'s & Consol. Pls.' Mot. for J. on the Agency R., Feb. 22, 2022, ECF No. 40 ("Def.'s Br.").  On March 24, 2022, Assan and the Association filed their respective replies.  <u>See</u> Reply Br. of Assan, Mar. 24, 2022, ECF No. 43 ("Pl.'s Reply"); Ass'n's Reply Br., Mar. 24, 2022, ECF No. 45 ("Consol. Pls.' Reply").

On June 10, 2022, this court issued a preliminary question to the parties, <u>see</u> Ct.'s Prelim. Q., Jun. 10, 2022, ECF No. 54, to which all parties responded in writing on June 24, 2022, <u>see</u>

Assan's Resp. to Ct.'s Prelim. Q. of Jun. 10, 2022, Jun. 24, 2022, ECF. No. 55 ("Pl.'s Prelim. Q.

Resp."); Ass'n's Resp. to Ct.'s Prelim. Q., Jun. 24, 2022, ECF. No. 56 ("Consol. Pls.' Prelim. Q.

Resp."); U.S. Gov't's Resp. to Ct.'s Prelim. Q., Jun. 24, 2022, ECF. No. 57 ("Def.'s Prelim. Q.

Resp.").  The court then issued questions for oral argument on July 5, 2022, <u>see</u> Ct.'s Qs. for Oral

Arg., July 5, 2022, ECF Nos. 58–59, and an additional question for the Government on July 7,

2022, <u>see</u> Ct.'s Supp. Q. for Oral Arg., July 7, 2022, ECF No. 60, to which the parties responded

in writing on July 15, 2022, <u>see</u> Assan's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022, ECF No.

68 ("Pl.'s Oral Arg. Subm."); Ass'n's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022, ECF No. 63

("Consol. Pls.' Oral Arg. Subm."); U.S. Gov't's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022,

ECF No. 64 ("Def.'s Oral Arg. Subm.").  After examining the parties' written responses, the court

presented parties with supplemental questions to be addressed verbally at oral argument.  <u>See</u> Ct.'s

Suppl. Qs. for Oral Arg., July 18, 2022, ECF Nos. 66–67.

Oral argument took place on Tuesday, July 19, 2022.  ECF No. 71.  Following oral

argument, the parties submitted post-oral argument briefing to the court.  <u>See</u> Assan's Post-Arg.

Subm., July 26, 2022, ECF No. 72 ("Pl.'s Suppl. Br."); U.S. Gov't's Post Arg. Subm., July 26,

2022, ECF No. 74 ("Def.'s Suppl. Br."); Ass'n's Post Arg. Subm., July 26, 2022, ECF No. 76

("Consol. Pls.' Suppl. Br.").

Finally, to aid its adjudication, the court submitted supplemental questions to the parties

on October 14, 2022 for answers in writing.  <u>See</u> Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 14, 2022,

ECF Nos. 79–80.  With the parties' responses in hand, <u>see</u> Assan's Resp. to Ct.'s Oct. 14, 2022

Suppl. Qs., Oct. 28, 2022, ECF No. 81 ("Pl.'s Suppl. Qs. Resp."); Ass'n's Resp. to Ct.'s Oct. 14,

2022 Suppl. Qs., Oct. 28, 2022, ECF No. 83 ("Consol. Pl.'s Suppl. Qs. Resp."); U.S. Gov't's Resp.

to Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 28, 2022, ECF No. 85 ("Def.'s Suppl. Qs. Resp."), the case

is now decision ready.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19

U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i); see also NEC Corp. v. United States, 151 F.3d 1361,

1374 (Fed. Cir. 1998) (Under 28 U.S.C. § 1581(c), "[a]n importer may appeal from Commerce's

final determination to the United States Court of International Trade.").  In reviewing antidumping

determinations, the court will sustain "'any determination, finding or conclusion' by Commerce

unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with

law.'"  Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19

U.S.C. § 1516a(b)(1)(B)).

The substantial evidence standard is satisfied by "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," Universal Camera Corp. v. NLRB, 340

U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)), which

requires "less than the weight of the evidence," Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620

(1966), but "more than a mere scintilla," Elbit Systems of America, LLC v. Thales Visionix, Inc.,

881 F.3d 1354, 1355 (Fed. Cir. 2018) (quoting In re Nuvasive, Inc., 842 F.3d 1376, 1379 (Fed.

Cir. 2016)).  That a court could draw inconsistent conclusions from the record does not render

Commerce's findings unsupported by substantial evidence, see Consolo, 383 U.S. at 620, so long

as the agency has "examine[d] the relevant data[,] articulate[d] a satisfactory explanation," Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck

Lines v. United States, 371 U.S. 156, 168 (1962)), and accounted for detracting evidence,

Universal Camera, 340 U.S. at 488.

An agency acts contrary to law if its decision-making is arbitrary or unreasoned.  See Burlington Truck Lines, 371 U.S. at 167–68.  To be sufficiently reasoned, Commerce must establish "a 'rational connection between the facts found and the choice[s] made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013).   In reviewing Commerce's determinations, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," State Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)), but may uphold an agency's action "where the agency's decisional path is reasonably discernable," Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## DISCUSSION

Before the court, Assan argues that Commerce's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law because Commerce erroneously: (1) employed a "duty neutral" methodology when adding Assan's duty drawback adjustment to the constructed export price; (2) declined to deduct home market rebates granted by Assan from the normal value; and (3) deducted tariffs paid by Assan under Section 232 of the Trade Expansion Act of 1962 from the constructed export price.  See generally Assan Compl.  For its part, the Association argues that Commerce's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law because Commerce erroneously: (1) added any duty drawback adjustment to the constructed export price; and (2) deducted too little from the constructed export price for Assan's affiliated freight charges and certain billing adjustments.  See generally Ass'n Compl.

For the reasons stated herein, the court sustains Commerce's general grant of a duty drawback adjustment to Assan but assesses that Commerce's specific implementation of said adjustment contravened Federal Circuit precedent.  The court further sustains Commerce's treatment of the adjustments pertaining to Assan's home market rebates and affiliated freight costs. However, the court holds that Commerce's treatment of Assan's billing adjustments does not accord with law.  Finally, the court stays consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit of an identical issue in a separate case.

Accordingly, the court grants Plaintiff's Motion for Judgment on the Agency Record in part and denies it in part and grants Consolidated Plaintiffs' Motion for Judgment on the Agency Record in part and denies it in part.  The court remands Commerce's <u>Final Determination</u> for reconsideration or further explanation consistent with this opinion.

**I.      *Commerce's Awarded Duty Drawback Adjustment Does Not Accord with Law.***

**A.      *Issue-specific Legal Background***

**1.      *Duty Drawback Adjustments***

A "duty drawback adjustment" comes into play where "a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States." <u>Saha Thai</u>, 635 F.3d at 1338.  Under such circumstances, Commerce adjusts upward a respondent's export or constructed export price by the amount of the rebated or unpaid import duty.  The agency does as such, because antidumping duties are calculated by measuring the amount by which normal value (as here measured by sales price in the home market) exceeds constructed export price (as measured by U.S. sales price); accordingly, where producers remain subject to import duties only when they sell subject merchandise domestically, home market price (i.e., normal value) is inflated relative

to U.S. sales price (i.e., export or constructed export price), thereby potentially resulting in the

calculation of inaccurately high dumping margins.  Id.

Subparagraph 1677a(c)(1)(B) of 19 U.S.C. provides for Commerce's grant of a duty

drawback adjustment, instructing:

> The price used to establish export price and constructed export price shall be . . .
> increased by . . . the amount of any import duties imposed by the country of
> exportation which have been rebated, or which have not been collected, by reason
> of the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B).  Commerce has developed a two-prong test -- upheld by the Federal

Circuit as lawful in Saha Thai, 635 F.3d at 1040–41 -- to assess duty drawback eligibility under

19 U.S.C. § 1677a(c)(1)(B).  The Saha Thai test asks:

> (1) [whether] the [relevant] rebate and import duties are dependent upon one
> another, or in the context of an exemption from import duties, that the
> exemption is linked to the exportation of the subject merchandise; and
>
> (2) [whether] there are sufficient imports of the raw material to account for the duty
> drawback on the exports of the subject merchandise.

635 F.3d at 1340, 1341.  In applying this test, Commerce "looks for a reasonable link between the

duties imposed and those rebated or exempted."  IDM at 8 (emphasis added).  Although parties

here agree that this "reasonable link" requires that the relevant imports be "capable of" producing

the exported subject merchandise, see, e.g., Def.'s Br. at 12; Pl.'s Resp. at 9; Consol. Pls.' Br. at

18, parties disagree as to what "capability" requires following the Federal Circuit's decision in

Maverick Tube III, 861 F.3d 1269.[14]

---

[14] The court notes that in their briefing, parties refer to the Federal Circuit's decision as "Maverick
Tube II."  See, e.g., Consol. Pls.' Br. at 2; Pl.'s Resp. at 7.  However, because the Maverick Tube
line of cases comprises three opinions, see Maverick Tube Corp. v. United States, 39 CIT __, __,
107 F. Supp. 3d 1318, 1335 (2015) ("Maverick Tube I"), Maverick Tube Corp. v. United States,
40 CIT __, __, 163 F. Supp. 3d 1345, 1355 (2016) ("Maverick Tube II"), Maverick Tube III, 861
F.3d 1269, the court refers to the Federal Circuit's decision as Maverick Tube III.

## 2.    *Turkey's Inward Processing Regime*

Turkey maintains an Inward Processing Regime ("IPR"), under which exporters of merchandise that has been processed in Turkey may have their duty liability on imports forgiven if the exporter satisfies certain requirements.  See Section C Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. C-8 (June 29, 2020) C.R. 52; P.R. 142-143 ("Pl.'s Sec. C QR Resp.").  Specifically, interested firms in Turkey secure Inward Processing Certificates ("IPC"), which represent that inputs used for the production of relevant exports fall within the same 8-digit HTS[15] classification as those inputs for which an exemption has been sought.  Id. at Ex. C-8, 7–8.  Duty liability is extinguished when an IPC is "closed," meaning that an exporter has demonstrated sufficient amounts of corresponding imports and exports to Turkish authorities. See id. at Ex. C-8, 42–43.  "In prior investigations Commerce has found that Turkish companies that meet the requirements under Turkey's [IPR] . . . have satisfied the statute and [Saha Thai] two-prong test for duty drawback adjustments."  PDM at 10; see, e.g., Welded Line Pipe from the Republic of Turkey, 80 Fed. Reg. 61,362 (Dep't Com. Oct. 13, 2015), and accompanying Issues and Dec. Mem. at 7 (Oct. 5, 2015).

### B.    *Issue-specific Factual and Procedural Background*

On March 30, 2020, Commerce initiated a LTFV investigation into Turkish exports of not

---

[15] "Harmonized Tariff Schedules" derive from the international Harmonized System ("HS"), which "is a standardized numerical method" "used by customs authorities around the world to identify [traded] products when assessing duties and taxes and for gathering statistics." Harmonized Sys. (HS) Codes, Int'l Trade Admin., www[.]trade[.]gov/harmonized-system-hs-codes (last visited Feb. 17, 2022).  "The HS assigns specific six-digit codes [to] . . . commodities." Id.  Although the first six-digit are standardized across countries, individual nations may "add longer codes to the first six digits for further [country-specific] classification," generally at the eight- or ten-digit level.  Id.  [Please note, in order to disable links to outside websites, the court has removed the "http" designations and bracketed the periods within hyperlinks.  For archived copies of any webpages cited in this opinion, please consult the docket.]

Case 1:21-cv-00246-GSK   Document 93   Filed 03/08/23   Page 16 of 59

Consol. Court No. 21-00246                                                                    Page 16
**PUBLIC VERSION**

clad aluminum sheet manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy[16] and multi-alloy, clad aluminum sheet produced from a 3XXX series[17] at a thickness of greater than 0.2 mm but less than 6.3 mm.  LTFV Initiation App. at 19,449.  In response to a questionnaire from Commerce, Assan reported that it both exported subject merchandise and imported [[

]] under Turkey's IPR.  See Pl.'s Sec. C QR Resp. Ex. C-11 at 44–45.  Specifically, Assan reported that under IPC [[      ]], it exported to the United States subject merchandise -- as captured under HTS codes [[            ]][18] and [[              ]][19] -- after it had imported into Turkey [[   ]] entries of what it referred to as [[                 ]] inputs -- covered by HTS [[            ]][20] and [[              ]].[21]  See Resp. to Req. for Docs. in Lieu of Verification of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. V-20 (Dec. 18, 2020), C.R. 373, 374, 379; P.R. 305 ("Pl.'s Resp. to Req. for Docs.").  Although the Harmonized Tariff Schedule does not define aluminum by alloy, supra notes 18–21, Turkish authorities closed IPC [[      ]] upon Assan's submission of yield/loss ratios demonstrating, to the Turkish Government's satisfaction, the

---

[16] Or other consistent chemistry.

[17] Or other consistent chemistry.

[18] HTS [[          ]] covers [[
                                                              ]].  See Pl.'s Sec. C QR Resp.
at Ex. S4-4.

[19] HTS [[          ]] covers [[
                                                              ]].  See Pl.'s Sec. C QR
Resp. at Ex. S4-4.

[20] HTS [[            ]] covers [[                                  ]].  See Pl.'s Sec. C
QR Resp. at Ex. S4-4.

[21] HTS [[            ]] covers [[
       ]].  See Pl.'s Sec. C QR Resp. at Ex. S4-4.

amount of imported input used to produce the exported products under the IPC, see Pl.'s Sec. C

QR Resp. at Ex. C-10.

At the Preliminary Determination stage, Commerce granted Assan a duty drawback

adjustment, citing prior agency findings that participation in Turkey's IPR satisfies the Saha Thai

two-prong test. See PDM at 10. In applying said adjustment, Commerce "allocate[ed] the amount

[of import duties] rebated or not collected to all production for the relevant period based on the

cost of inputs during the period of investigation." Id. The Association thereafter submitted

comments to Commerce asserting that because "[t]he scope of th[e] investigation covers aluminum

sheet produced from only certain alloys" -- namely, alloys from a 1XXX-, 3XXX-, or 5XXX-

series -- "to the extent Assan's imports involve merchandise produced from a different alloy, i.e.,

a 2XXX-, 4XXX-, 6XXX-, 7XXX-, or 8XXX-series alloy, these imports could not be used by

Assan to produce subject merchandise." Letter from Kelley Drye & Warren LLP to Sec. of Com.

Pertaining to Pet'r's Post-Prelim. Cmts. at 4, 6 (Nov. 11, 2020) C.R. 359, P.R. 279. Accordingly,

the Association advocated that "the Department should . . . require Assan to establish that its

imports are capable of being used to produce the merchandise under consideration." Id. at 6.

On December 10, 2020, Commerce sent a questionnaire "in lieu of verification" to Assan

asking it to, inter alia:

(a) . . . Confirm that the grades of the[] imported [[          ]] [under IPC
[[   ]] sequence numbers [[  ]] to [[  ]]] could have been used in the
production of the subject merchandise.
(b) For the purchase sequence number [[  ]] and [[  ]], . . . identify the alloy
specification of each imported [[          ]].

Letter from USDOC to Mayer Brown Pertaining to Assan Req. Doc. in Lieu of Verification at 7

(Dep't Com. Dec. 11, 2020) C.R. 372, P.R. 301 ("Req. for Docs.").

In response to request (a), Assan stated that "the transactions identified by Commerce" --

namely, sequence numbers [[   ]] to [[   ]] -- "are all inputs suitable for production of [[

              ]]."  Pl.'s Resp. to Req. for Docs. at 374, 379 (emphasis added).  In response to

request (b), Assan likewise stated that "[t]he transactions listed by Commerce" -- namely, sequence

numbers [[   ]] and [[   ]] -- "are inputs suitable for production of [[                              ]]."

Id. at 15 (emphasis added).  Despite not confirming that the inputs specifically identified in

Commerce's "spot check" were suitable for production of the subject merchandise, see id.; see

also Pl.'s Oral Arg. Subm. at 5 ("The alloy series for the [[           ]] imported under IPC [[     ]]

is not on the record."), Assan maintained "that imports under th[e] IPR include also inputs suitable

for the production of CAAS," as purportedly evidenced by Assan's export of [[            ]] tons of

subject merchandise under IPC [[       ]], id. at 14–15.

Commerce continued to grant Assan a duty drawback adjustment in the Final

Determination on the grounds that, consistent with the Saha Thai two-prong test, (1) the exemption

Assan received under Turkey's IPR was linked to exportation of the subject merchandise, and (2)

there were sufficient imports of the raw material to account for the duty drawback on the export

of subject merchandise.  See IDM at 8.  Commerce explained that where "the record evidence does

not demonstrate that none of the inputs imported under [Assan's] closed IPC are suitable for the

production of subject merchandise," but rather "suggests that at least one imported input under the

closed IPC can be used in the production of subject merchandise," Commerce was satisfied that

"the consumption of imported inputs during the [period of investigation], including imputed duty

costs for imported inputs, properly account[ed] for the amount of duties imposed," id. at 9, 11.

Finally, in applying the duty drawback adjustment, Commerce continued to allocate the amount

rebated or not collected to all production for the relevant period based on the cost of inputs during the period of investigation.  Id. at 8.

### C.     Analysis

Before the court, parties raise two issues concerning Commerce's grant of a duty drawback adjustment to Assan.  As a preliminary matter, the Association argues that Assan is ineligible for a duty drawback adjustment.  See Consol. Pls.' Br. at 15–16.  By contrast, Assan argues that although Commerce was correct in granting it a duty drawback adjustment, the "duty neutral" methodology that Commerce employed to calculate Assan's specific adjustment was not in accordance with law.  See Pl.'s Br. at 12–16.  For its part, the Government acknowledges that its "duty neutral" methodology conflicts with intervening Federal Circuit precedent and requests a voluntary remand to recalculate the granted adjustment. Def.'s Br. at 15.  For the reasons stated below, the court sustains Commerce's general grant of a duty drawback adjustment to Assan, but remands for Commerce to reapply the adjustment in accordance with the Federal Circuit's latest directive.

### 1.     Commerce's General Grant of a Duty Drawback Adjustment to Assan Accords with Law.

Resolution of this threshold aspect of the duty drawback issue turns on the definition of "capability" and who gets to define it.  The Association argues that because "[t]he only evidence concerning sample imported inputs [[                              ]] demonstrates that [Assan's] imported inputs are incapable of being used to produce CAAS," such failure to prove "capability" precludes Assan from receiving a duty drawback adjustment under the Federal Circuit's decision in Maverick Tube III.  See Consol. Pls.' Oral Arg. Subm. at 5.  By contrast, although the Government and Assan agree that Commerce's two-prong Saha Thai test requires relevant imports to be "capable

of" producing the exported subject merchandise, <u>see</u> Def.'s Br. at 12; Pl.'s Resp. at 9, they assert

the Association misreads <u>Maverick Tube III</u>; the Government and Assan maintain that where

"there are sufficient imports of the imported raw materials to account for the drawback received

upon the export of the subject merchandise," a respondent's inputs are imputably "capable of"

producing the exported product.  <u>See</u> Def.'s Br. at 13–15; Pl.'s Resp. at 8, 11 (substantively

similar).  Adhering to fundamental principles of administrative law, the court sustains Commerce's

general grant of a duty drawback adjustment to Assan.

As a starting point, the court agrees that the Association overstates the implications of the

Federal Circuit's holding in <u>Maverick Tube III</u>.  <u>See, e.g.</u>, Consol. Pls.' Br. at 18 ("Petitioners

argue[] that[] pursuant to <u>Maverick Tube [III]</u>, a respondent claiming a duty drawback adjustment

is required to demonstrate that the imported inputs are <u>capable of</u> being used in the production of

subject merchandise." (emphasis in original)).  In that case -- concerning Commerce's LTFV

investigation into certain Oil Country Tubular Goods from Turkey -- the Federal Circuit reviewed

Commerce's decision to deny a duty drawback adjustment to a respondent, who despite satisfying

the requirements of Turkey's duty drawback regime, otherwise "admitted that none of the inputs

for which duties were exempted were used, or capable of being used, in the production of subject

merchandise." <u>Maverick Tube II</u>, 163 F. Supp. 3d at 1355.  The Federal Circuit framed the

question before it as whether Commerce's determination "that duty drawbacks are only available

for potential inputs of the subject merchandise" constituted a permissible interpretation of 19

U.S.C. § 1677a(c)(1)(B).  <u>Id.</u> at 1274.  In concluding that "Commerce's interpretation was entirely

reasonable," the Federal Circuit explained:

> Section 1677a(c)(1)(B) neither endorses nor prohibits Commerce's view that duty
> drawback adjustments are only available to offset duties on goods that are suitable
> for use as inputs for the subject merchandise.  The statutory text emphasizes that

> duty drawback adjustments are allowed only when import duties are rebated or not
> collected "by reason of the exportation of the subject merchandise to the United
> States." 19 U.S.C. § 1677a(c)(1)(B).  This language signals that Congress intended
> Commerce to grant duty drawback adjustments only when there is some kind of
> connection between the nonpayment of import duties and the exportation of the
> subject merchandise to the United States.  But the statute does not specify whether
> Commerce should or should not grant an adjustment for the nonpayment of import
> duties on materials incapable of producing the merchandise exported to the United
> States.

Id. at 1273, 1274.  Accordingly, Maverick Tube III did not impose a threshold "capability" test

onto Commerce's grant of a duty drawback adjustment, but merely held that Commerce's own

requirement of "capability" was a permissible interpretation of 19 U.S.C. § 1677a(c)(1)(B).

In the absence of either statute or Federal Circuit precedent establishing a "capability"

requirement, the question before this court is, consequently, whether Commerce arbitrarily

deviated from its prior interpretation and practice in granting a duty drawback adjustment to Assan.

SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]gency action is

arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."

(quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996))).

Of course, "[t]he fact that Commerce [may have] changed its policy is" not dispositive, "as

Commerce is entitled to change its views, and a new administrative policy based on a reasonable

statutory interpretation is nonetheless entitled to . . . deference."  Saha Thai, 635 F.3d at 1342

(quoting Rust v. Sullivan, 500 U.S. 173, 186–87 (1991)); see also Maverick Tube I, 107 F. Supp.

3d at 1335 (acknowledging "Commerce may in the future change its views on which circumstances

warrant a duty drawback adjustment").  However, Commerce does not purport to change its

interpretation, but rather suggests that Petitioners simply do not understand the agency's

"capability" requirement, as evidenced by Commerce's disagreement that the present case is

factually analogous to that of <u>Maverick Tube</u>.  <u>See</u> IDM at 11.[22]  The court is satisfied that

Commerce has here "articulate[d] a satisfactory explanation for its" determination.  <u>State Farm</u>,

463 U.S. at 43 (quoting <u>Burlington Truck Lines</u>, 371 U.S. at 168).

Commerce granted a duty drawback adjustment to Assan in the <u>Final Determination</u>

because the agency found that, consistent with the <u>Saha Thai</u> test: (1) the exemption that Assan

received under Turkey's IPR was linked to exportation of the subject merchandise; and (2) there

were sufficient imports of the raw material -- namely, [[                    ]] -- to account for the duty

drawback on the export of subject merchandise CAAS.  <u>See</u> IDM at 8.  In so deciding, Commerce

expressly rejected Petitioners' argument that <u>Maverick Tube III</u> portends Assan's ineligibility, <u>see</u>

IDM at 5, explaining that where "the record evidence does not demonstrate that <u>none</u> of the inputs

imported under the closed IPC are suitable for the production of subject merchandise" "the

conditions noted by the petitioners in <u>Maverick Tube [III]</u> are not met in this case."  IDM at 11

(emphasis added).  "None" is the operative word.

For example, in the investigation underlying <u>Maverick Tube</u>, the subject merchandise

could only be produced from a grade of coil known as "J55 coil" and the respondent admitted that

it "sourced all its J55 coils from a domestic Turkish producer," such that "<u>none</u> of the [inputs] for

which duties were exempted [under the Turkish IPR], i.e., the non-J55 coils, were capable of being

used to produce [the subject merchandise]."  <u>Maverick Tube III</u>, 861 F.3d at 1272 (emphasis

added).  Logically, where there are admittedly no imports of the required inputs, there can be no

---

[22] The court notes that the Association relies exclusively on the <u>Maverick Tube</u> line of cases and underlying investigation to establish its interpretation of "capability" and Commerce's past practice.  Where, as explained <u>infra</u>, the court is satisfied that Commerce has sufficiently distinguished <u>Maverick Tube</u> on the facts, the Association has supplied no alternative basis to support its conception of Commerce's past practice.

"import duties . . . rebated, or . . . not collected, by reason of . . . exportation" for purposes of 19 U.S.C. § 1677a(c)(1)(B).  As such, Commerce denied the Maverick Tube respondent a duty drawback adjustment despite otherwise qualifying under Turkey's duty drawback regime. However, in so denying, Commerce was clear that its decision was limited to "these unique facts" "rarely . . . faced by the Department in prior antidumping proceedings involving Turkey."  See Redetermination Pursuant to Ct. Remand Order in Maverick Tube Corp. v. United States at 26, Consol. Ct. No. 14-00244, Feb. 2, 2016, ECF No. 111 (footnotes omitted).

By contrast, Commerce has supportably found that such "unique facts" do not exist here. Specifically, Commerce explained that where Assan "identified [[                    ]] as one of the three major inputs used to produce the subject merchandise" and "reported that it had substantial purchases of the imported input during the [period of investigation] and that this input was used in the production of subject merchandise during the [period of investigation]," IDM at 11, "evidence suggests at least one imported input under the closed IPC can be used in the production of subject merchandise," id. (emphasis added).

In sum, it is not that parties disagree that imports must be "capable of" producing the exported subject merchandise in order to merit a duty drawback adjustment, see, e.g., Def.'s Br. at 12; Pl.'s Resp. at 9; Consol. Pls.' Br. at 18, but rather that parties disagree as to the definition of "capable of."  The Association posits that "capable of" means demonstrably capable of, see, e.g., Consol. Pls.' Reply at 5 (arguing that where Assan "did not establish that [its] inputs could be used to produce CAAS," it "failed to meet its burden of establishing eligibility for a duty drawback adjustment under Maverick Tube [III]"); whereas Commerce's decisional document suggests that "capable of" means potentially capable of, or in other words, not demonstrably incapable of, see IDM at 11 (finding Maverick Tube III satisfied where "evidence suggests that at least one imported

input under the closed IPC <u>can be</u> used in the production of subject merchandise and "the record

. . . does not demonstrate that <u>none</u> of the inputs imported under the closed IPC <u>are suitable</u>"

(emphasis added)).

Because the Federal Circuit has already determined that the relevant statute imposes no

"capability" requirement <u>at all</u>, 861 F.3d at 1273–74 (discussing 19 U.S.C. § 1677a(c)(1)(B)), and

because Commerce has articulated a reasonable conception of "capability" -- that factually

distinguishes the case at bar from <u>Maverick Tube III</u> while still requiring "<u>some kind of connection</u>

between the nonpayment of import duties and the exportation of . . . subject merchandise to the

United States," <u>id.</u> (emphasis added) -- the court sustains Commerce's general grant of a duty

drawback adjustment to Assan.[23],[24]

---

[23] In light of the above, the court deems unavailing the Association's argument that Assan "failed"
the Department's "spot check" for certain [[                    ]]. <u>See, e.g.</u>, Consol. Pls.' Oral Arg.
Subm. at 5 ("The only evidence concerning sample imported inputs [[o
    ]] demonstrates that [Assan's] imported inputs are incapable of being used to produce
CAAS."). While this "spot check" may have revealed that certain inputs imported under sequence
numbers [[   ]] to [[   ]] of IPC [[      ]] were unsuitable for production of subject merchandise --
a point that Assan does not concede, <u>see, e.g.</u>, Pl.'s Resp. at 11–12 ("Petitioners' premise that
inputs <u>suitable</u> for production of non-subject merchandise are not <u>capable</u> of producing subject
merchandise is not supported by the record." (emphasis in original)); Pl.'s Oral Arg. Subm. at 5
("The alloy series for the [[           ]] imported under IPC [[      ]] is not on the record.") -- it has
not been established that <u>none</u> of the imports under the [[    ]] sequence numbers were "capable."
As such, the case at bar is not analogous to <u>Maverick Tube III</u>.

[24] The court notes in closing that while it might have been ideal if Commerce had asked
respondents to affirmatively prove that the inputs for which they received duty exemptions or
rebates were capable of producing the subject merchandise, Commerce "must [be allowed to]
exercise some discretion in determining how wide a search it will make in order to arrive at a
proper adjustment." <u>Far East Mach. Co. v. United States</u>, 12 CIT 972, 978, 699 F. Supp. 309, 315
(1988). Commerce constantly balances its obligation "to facilitate the determination of dumping
margins as accurately as possible," <u>Allied–Signal Aerospace Co. v. United States</u>, 996 F.2d 1185,
1191 (Fed. Cir. 1993)), with its prerogative to leverage its expertise "to draw . . . appropriate line[s]
under various fact patterns between the various types of investigations it performs," <u>Far East Mach.
Co.</u>, 12 CIT at 978, 699 F. Supp. at 315. Commerce has exercised such discretion here and, for
the reasons articulated above, the court discerns no error.

## 2.      *Commerce's Specific Calculation of Assan's Duty Drawback Adjustment Does Not Accord with Law.*

Having sustained Commerce's general grant of a duty drawback adjustment to Assan, the court next considers Commerce's specific calculation of the duty drawback adjustment. Commerce allocated the exempted duties over Assan's total production rather than over only Assan's total exports of the subject merchandise, thereby utilizing a so-called "duty neutral methodology."  See IDM at 8–9 ("Commerce will make an upward adjustment to [export price] and [constructed export price] based on the amount of the duty imposed on the input and rebated or not collected on the export of the subject merchandise by properly allocating the amount rebated or not collected to all production for the relevant period based on the cost of inputs during the [period of investigation].").  In so proceeding, Commerce asserted "there has been no finding in the [Federal Circuit] that Commerce's duty neutral methodology, as applied here, is inconsistent with the statute."  Id. at 9.

Since Commerce issued its Final Determination, the Federal Circuit has ruled that a "duty neutral methodology" is incompatible with the plain language of section 1677a(c)(1)(B).  See Uttam Galva Steels Ltd. v. United States, 42 CIT __, 311 F. Supp. 3d 1345, 1355 (2018), aff'd 997 F.3d 1192 (Fed Cir. 2021).  Commerce does not contest that the methodology it used to calculate Assan's duty drawback adjustment is inconsistent with this subsequent Federal Circuit precedent and now asks the court for a voluntary remand so that the agency may recalculate the adjustment.  Def.'s Br. at 15.  A remand is generally required when an intervening event affects the validity of the agency action, see SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001), and "a new legal decision" qualifies as an "intervening event" justifying remand, see MaxLinear, Inc. v. CF CRESPE LLC, 880 F.3d 1373, 1377 (Fed. Cir. 2018) (quoting SKF USA

Inc., 254 F.3d at 1028).  As such, the court grants Commerce's voluntary remand request so that

the agency may recalculate Assan's duty drawback adjustment in accordance with the latest

Federal Circuit precedent.

> **II.     Commerce's Denial of a Home Market Rebate Adjustment to Assan is Supported
>          by Substantial Evidence and Otherwise in Accordance with Law.**

> **A.     Issue-Specific Legal Background**

> **1.     Home Market Rebate Adjustments**

Before calculating a dumping margin, Commerce adjusts normal value so that it is "net of

price adjustments."  19 C.F.R. § 351.401(c).  This means that Commerce decreases normal value

to account for, inter alia, discounts or rebates given to buyers of subject merchandise in the home

market, which lower home market prices.   See 19 C.F.R. § 351.102(b)(38).   While such

adjustments are intended to allow Commerce to compare prices "at a common point in the chain

of commerce," APEX Exports, 777 F.3d at 1374, they also create an "opportunity for

manipulation" of normal value, and thereby dumping margins;[25] to decrease the chances that an

investigated party will receive an adjustment for rebates/discounts granted "after it bec[o]me[s]

known that certain sales [are] subject to [antidumping duty] review" for the purpose of reducing

dumping margins, Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. Am. Cast Iron Pipe Co.,

5 F.4th 1367, 1375 (Fed. Cir. 2021), Commerce has developed "a non-exhaustive list of factors

that it may consider" to evaluate requests for "post-sale price adjustments."  These factors include:

> (1) whether the terms and conditions of the adjustment were established and/or
> known to the customer at the time of sale, and whether this can be demonstrated
> through documentation;
> (2) how common such post-sale price adjustments are for the company and/or
> industry;
> (3) the timing of the adjustment;

---

[25] Supra note 8.

(4) the number of such adjustments in the proceeding; and
(5) any other factors tending to reflect on the legitimacy of the claimed
adjustment.

Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81

Fed. Reg. 15,641, 15,644–45 (Dep't Com. Mar. 24, 2016) ("Modification of Regulations").

## 2.      *Deficient Submissions*

If Commerce determines "that a response to a request for information . . . does not comply

with [its] request, [Commerce] shall promptly inform the [respondent] of the nature of the

deficiency and shall, to the extent practicable, provide [the respondent] with an opportunity to

remedy or explain the deficiency."  19 U.S.C. § 1677m(d).  If Commerce finds the "information

[submitted] in response to such deficiency" is "not satisfactory," the agency may "disregard all or

part of the original and subsequent responses," "subject to subsection (e)."[26]  Id.

## B.      *Issue-Specific Factual and Procedural Background*

In an initial Section B Questionnaire, Commerce asked Assan to report rebates granted on

sales of subject merchandise in the home market and to explain its policies and practices attending

such grants, including when in the sales process the rebate terms and conditions are set.  See

Section B Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at 31–32 (June 29,

2020) C.R. 28–29; P.R. 141 ("Pl.'s Sec. B QR Resp.").  Assan responded on June 29, 2020, that it

granted rebates to [[          ]] customers during the period of investigation, id. at Ex. B-10.1, which

---

[26] Although not pertinent to the court's resolution of this issue, infra, for the sake of completeness,
the court notes subsection (e) further instructs that Commerce may not "decline to consider
information that is . . . necessary to the determination but does not meet all the applicable
requirements" when the information is: (1) timely; (2) verifiable; (3) "not so incomplete that it
cannot serve as a reliable basis for reaching the applicable determination;" (4) submitted by a party
acting to the best of its ability; and (5) usable without undue difficulties.  Id. § 1677m(e).

were awarded based on customer-specific consumption-targets[27] that Assan sets annually, id. at

31–32.  As just [[    ]] examples, Assan reported awarding customer [[

      ]] a rebate of [[                              ]] for its purchases in 2019 of [[              ]]

of products, while  Assan  awarded  customer  [[                                   ]]  a  rebate  of

[[                              ]] for its purchases in 2019 of [[              ]] of products.  Id. at Ex.

B-10.1.

      Upon  consideration  of  Assan's  initial  Section  B  Questionnaire  responses,  Commerce

issued a supplemental questionnaire on August 13, 2020, asking Assan to provide documentation

-- including sample agreements -- demonstrating how the "annual volume targets" were calculated

for [[                              ]] and [[                              ]].  See Letter from

USDOC to Mayer Brown Pertaining to Assan Section B Suppl. Questionnaire at 3 (Dep't Com.

Aug. 13, 2020) C.R. 141, P.R. 186 ("Suppl. Sec. B QR.").  Commerce further directed Assan to

provide proof of payment of the claimed rebates to the identified customers.  Id.

      Assan submitted documentation to substantiate the rebates awarded to customer [[

                              ]] on September 3, 2020.  See Suppl. Section B Questionnaire Resp. of

Assan Aluminyum Sanayi ve Ticaret A.S. (Sept. 3, 2020) C.R. 253, 255; P.R. 217, 218 ("Pl.'s

Suppl. Sec. B QR Resp.").   First, Assan included a 2019 Rebate Agreement enumerating

consumption targets, the achievement of which would entitle [[                              ]]

to a rebate.  By the terms of this Agreement, [[                              ]] was not entitled

to any annual rebate until its consumption of Assan's products in 2019 exceeded [[       ]].

Id. at Ex. S3-19.  Second, Assan included a bank receipt showing payment of [[

---

[27] As measured by volume of products purchased.

]] to customer [[                                      ]] on [[                      ]].  Id.

In addition, on September 3, 2020, Assan submitted documentation to substantiate the
rebates awarded to customer [[                                      ]].  Id.  First, Assan included a 2019
Supply Contract, which likewise enumerated consumption targets that would entitle [[
]] to a rebate.  By its terms, if in 2019 [[                                                ]]
purchased over [[            ]] of certain products, Assan would provide [[
]] with a rebate of [[                              ]], and if [[                                    ]]
purchased over [[            s]], Assan would provide [[                                ]] with a
rebate of [[                        ]].  Id.  Second, Assan included a bank receipt showing payment
of [[                        ]] to customer [[                              ]] on [[
]].  Id.

With this supplemental documentation in hand, Commerce declined to grant a home market
rebate adjustment to Assan in calculating the preliminary dumping margin.  See Mem. from S.
Carey to the File, re: Prelim. Determ. Margin Calc. for Assan Aluminyum Sanayi ve Ticaret A.S.
(Dep't Com. Oct. 6, 2020) C.R. 329, 330 ("Prelim. Margin Calc. Mem.").  Commerce's stated
rationale for this preliminary denial was that Assan's "[s]ample documentation d[id] not
demonstrate customer met sales threshold and proof of payment d[id] not match rebate reported."
Id.  Following the Preliminary Determination, Commerce issued a questionnaire "in lieu of
verification" in which the Department sought no additional information pertaining to Assan's
requested home market rebate adjustment.  See Pl.'s Resp. to Req. for Docs.  Assan, thereafter,
submitted a case brief challenging Commerce's characterization of the sample documentation.  See
Pl.'s Case Br. at 11–13.

In the Final Determination, Commerce continued to deny Assan a home market rebate adjustment on the grounds that "Assan [had] failed to demonstrate its eligibility for" one.  IDM at 22.  Commerce reiterated its prior reasoning that "for one customer, Assan did not demonstrate that the customer reached the sales volume target specified in the rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the rebate was actually paid."  Id.

### C.    *Analysis*

Before the court, Assan argues that Commerce erred in denying it a home market rebate adjustment on two grounds:  First, Assan argues that where Commerce did not discuss any of the Modification of Regulations factors in its various decisional documents, Commerce's denial was conclusory and otherwise not in accordance with law, Pl.'s Br. at 36–37; and second, Assan argues that to the extent Commerce assessed deficiencies in Assan's documentation, the agency was required to afford Assan an opportunity to cure, id. at 38.  By contrast, the Association and the Government argue that Commerce's explanation for the adjustment denial was sufficient, see Def.'s Br. at 17–18; Consol. Pl.'s Resp. at 25, and that because the agency simply assessed Assan to be ineligible for a home market rebate adjustment -- and not that its responses were deficient -- the agency had no obligation to afford Assan an opportunity to cure, see Def.'s Br. at 18; Consol. Pl.'s Resp. at 26–28.  The court agrees with the Association and the Government on both points.

### 1.    *Commerce's Explanation was Legally Sufficient.*

It is uncontested that Commerce did not "specifically cite" any of the Modification of Regulations factors in denying Assan a home market rebate adjustment.  See, e.g., Consol. Pls.' Resp. at 26.  However, it is not clear -- as a threshold matter -- that Commerce was required to do so.  The Federal Register notice announcing the Modification of Regulations factors states that Commerce "adopted in this final rule a non-exhaustive list of factors that it may consider in

determining whether to accept a price adjustment that is made after the time of sale." 81 Fed. Reg. at 15,641 (emphasis added); see also id. at 15,642–43 ("The Department has further provided in this final rule, . . . a non-exhaustive list of factors which it <u>may</u> consider in determining whether to accept price adjustments that are made after the time of sale (emphasis added)). "The word 'may[]' . . . usually implies some degree of discretion." <u>United States v. Rodgers</u>, 461 U.S. 677, 706 (1983); <u>see also</u> <u>Kingdomware Techs., Inc. v. United States</u>, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

But even assuming arguendo that Commerce had to consider at least one of the <u>Modification of Regulations</u> factors in denying Assan a home market rebate adjustment, <u>see</u> 81 Fed. Reg. at 15,645 (instructing Commerce "may consider <u>any one</u> or a combination of these factors in making its determination" (emphasis added)), it is "reasonably discernible" that the agency did so, <u>see</u> <u>Wheatland Tube</u>, 161 F.3d at 1369–70 (A court may sustain an agency's action "where the agency's decisional path is reasonably discernible."). Consistent with the fifth factor of the <u>Modification of Regulations</u> -- which directs Commerce to consider "other factors tending to reflect on the legitimacy of the claimed adjustment" -- the agency identified that "for one customer, Assan did not demonstrate that the customer reached the sales volume target specified in the rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the rebate was actually paid." IDM at 22.

To understand why these identified issues "reflect on the legitimacy of the claimed adjustment," 81 Fed. Reg. at 15,645, recall that the "mischief" that motivated Commerce's development of the <u>Modification of Regulations</u> factors was the concern that investigated parties could use post-sale rebates/discounts to reduce home market sales prices (i.e., normal value) "after

it became known that certain sales were subject to [antidumping duty] review," <u>Am. Cast Iron Pipe Co.</u>, 5 F.4th at 1375.  Such manipulation by investigated parties would allow them to artificially eliminate disparities between normal value and U.S. sales prices (i.e., export or constructed export price), thereby reducing dumping margins post hoc.  <u>Id.</u>  This "mischief" is implicated by both of the issues that Commerce identified with Assan's claimed rebates.

For instance, Commerce first noted that Assan claimed a rebate for a customer but was unable to demonstrate "that the customer reached the sales volume target specified in the rebate agreement" to entitle it to such a rebate, IDM at 22; this raises questions as to whether Assan awarded unearned rebates post hoc to reduce normal value.  Commerce next noted that Assan claimed to have awarded a rebate for a certain amount to a customer but was unable "to demonstrate that the full amount of the rebate was actually paid," <u>id.</u>; this raises questions as to whether Assan reported inflated rebate amounts to the agency -- that Assan did not actually pay -- to secure greater reductions to normal value than deserved.  Both issues, thus, undermine "the legitimacy of [Assan's] claimed adjustment," such that Commerce's reasoning accords with the fifth factor of the <u>Modification of Regulations</u>.  Because Commerce -- at most -- only had to "consider any <u>one</u> . . . of the[] [<u>Modification of Regulations</u>] factors," 81 Fed. Reg. at 15,645 (emphasis added), the court finds Commerce's rationale for denying a home market rebate adjustment to Assan to be legally sufficient.

### 2.   *Commerce had No Obligation to Afford Assan an Opportunity to Cure.*

In the alternative, Assan argues that if Commerce assessed deficiencies in the submitted documentation, the agency was required to provide sufficient notice of said deficiency and afford an opportunity to cure under 19 U.S.C. § 1677m(d).  Pl.'s Br. at 38.  By contrast, the Government

and the Association assert that where Commerce did not assess Assan's responses to be deficient -- but simply found that Assan was not entitled to an adjustment -- the agency had no obligation to issue an additional supplemental questionnaire under 19 U.S.C. § 1677m(d).  See Consol. Pl.'s Resp. at 26–28; Def.'s Br. at 18–19.  Here too, the court agrees with the Government and the Association.

In response to Assan's claim of rebates paid to [[   ]] customers in the initial Section B Questionnaire, Commerce issued a Supplemental Section B Questionnaire requesting the following:

> Please provide documentation, including sample agreements, showing how the "annual volume target" was calculated for [[
>                                                    ]]  Include proof of payment for the reported rebates granted to these customers in Exhibit B-10.1.

Suppl. Sec. B QR. at 3.  As explained below, on their face, certain of Assan's responsive documents demonstrated that Assan was not eligible for the home market rebate adjustment it claimed before the agency.

Concerning customer [[                                    ]], in its supplemental reply, Assan included a 2019 Rebate Agreement enumerating consumption targets, the achievement of which would entitle [[                               ]] to a rebate.  By the Agreement's plain terms, customer [[                               ]] was not entitled to any rebate until its consumption of Assan's products in 2019 exceeded [[           ]].  See Pl.'s Suppl. Sec. B QR Resp. at Ex. S3-19.  In its original Section B Questionnaire response, Assan reported awarding a rebate of [[                   ]] to customer [[                               ]] during the period of investigation, despite the fact that customer [[                           ]] purchased only [[            ]] of Assan's products in 2019, see Pl.'s Sec. B QR Resp. at Ex. B-10.1 -- an amount

below the minimum consumption threshold established in the 2019 Rebate Agreement.  Thus, the

documentation Assan submitted in response to Commerce's Supplemental Section B

Questionnaire revealed that, at least per the terms of the 2019 Rebate Agreement, customer [[

                         ]] was not entitled to the rebate claimed by Assan in its original

questionnaire.

      Turning to customer [[                                ]], in its original questionnaire

response, Assan reported granting a rebate of [[                    ]] to [[

         ]] for its purchases in 2019.  See id. at Ex. B-10.1.  Nevertheless, when subsequently

asked by Commerce for "proof of payment for the reported rebates granted . . . in Exhibit B-10.1,"

see Suppl. Sec B QR at 3, Assan submitted a bank receipt showing payment of [[

         ]] to customer [[                          ]], see Pl.'s Suppl. Sec. B QR Resp. at Ex.

S3-19 -- an amount significantly below[28] the rebate amount of [[                  ]] claimed

in Assan's original Section B submission.[29]  Thus, here too, Assan's documentation contradicted

its originally claimed rebate amount.

---

[28] Even by a rough conversion.

[29] The court notes that the discrepancy with Assan's proof of payment might be the result of a
typographical error.  For instance, Assan initially submitted a rebate invoice indicating that
[[                       ]] was entitled to a rebate amount of [[           ]] Turkish Lira
or [[        ]] U.S. dollars.  See Pl.'s Sec B QR Resp. at Ex. B-10.1.  The bank receipt Assan
later submitted documents a payment of [[          ]] U.S. dollars, a figure that is off by [[    ]] -
- admittedly significant -- digit.  See Pl.'s Suppl. Sec. B QR Resp. at Ex. S3-19.  Thus, it is possible
that Assan's proof of payment contained a typo; alternatively, it is possible that Assan paid a rebate
that was lower by [[        ]] U.S. dollars than the one claimed before the agency.  Regardless, as
established infra, because the submitted document on its face appeared to be "complete and
accurate," but simply demonstrated Assan's ineligibility for a rebate adjustment, Commerce was
"not require[d] . . . to issue a supplemental questionnaire seeking assurances that the initial
response was [indeed] complete and accurate."  ABB Inc. v. United States, 42 CIT __, __, 355 F.
Supp. 3d 1206, 1222 (2018).

Assan's invocation of 19 U.S.C. § 1677m(d) to suggest legal error is unavailing. Subsection 1677m(d) instructs that where a respondent's "response to a request for information . . . does not comply with [Commerce's] request, [Commerce] shall promptly inform the [respondent] of the nature of the deficiency and shall, to the extent practicable, provide [the respondent] with an opportunity to remedy or explain the deficiency."  But here, Assan complied with Commerce's request -- consistent with the agency's Supplemental Questionnaire, Assan submitted "sample agreements, showing how the 'annual volume target' was calculated for [[                                   ]] and [[                                        ]]" as well as "proof of payment."  Suppl. Sec B QR. at 3.  Commerce had no reason to question whether Assan's submissions were complete or accurate, but rather -- as demonstrated above -- supportably found that certain of these documents, on their face, revealed that Assan was not entitled to the home market rebate adjustments originally claimed.  "Commerce [was] not obligated to issue a[n additional] supplemental questionnaire to the effect of, 'Are you sure?'"  ABB Inc., 355 F. Supp. 3d at 1222.

In sum, where Assan's supplemental documents more than failed to substantiate -- but rather contradicted -- Assan's claimed rebate amounts, Commerce's denial of a home market rebate adjustment was supported by substantial evidence and otherwise in accordance with law.

**III.  *Commerce's Reliance on Assan's Affiliated Freight Costs is Supported by Substantial Evidence and Otherwise in Accordance with Law.***

**A.  *Issue-Specific Legal Background***

**1.  *Affiliated Freight Adjustments***

In calculating constructed export price, Commerce deducts "any additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of

shipment in the exporting country to the place of delivery to the United States."  19 U.S.C.
§ 1677a(c)(2).  Because, as previously noted, Commerce identifies dumping by assessing whether
a product is being sold in the United States at a price lower than its normal value (as here, measured
by home market prices), logically, "costs . . . incident to bringing the subject merchandise . . . to
the United States" are only relevant to exported products and are not reflected in the prices of
subject merchandise sold in the home market.  As such, these costs inflate export or constructed
export price (as measured by U.S. sales prices) relative to normal value, potentially distorting the
dumping margin.  Thus, in order to compare prices "at a common point in the chain of commerce,"
APEX Exports, 777 F.3d at 1374, Commerce deducts "costs . . . incident to bringing the subject
merchandise . . . to the United States" from export and/or constructed export price.

      Where a respondent uses a service provider with which it is affiliated to transport its subject
merchandise, "Commerce must determine whether [such] transactions with the affiliated company
were made at arm's-length" or whether such transactions are "comparable to transactions
conducted with an unaffiliated party."  Hyundai Steel Co. v. United States, 41 CIT __, __, 279 F.
Supp. 3d 1349, 1355 (2017).  Commerce undertakes such an inquiry because "the prices paid to
. . . affiliated providers may not reflect . . . market price for those services," Hyundai Steel Co. v.
United States, 42 CIT __, __, 319 F. Supp. 3d 1327, 1334 (2018), and deducting too much or too
little from the constructed export price will distort the dumping margin.[30]

---

[30] To give a concrete example, imagine that an affiliated shipper charges a respondent $10 to bring
its subject merchandise to the United States, when the market rate is $100.  If Commerce relies on
this $10 affiliated rate to reduce constructed export price, the respondent's U.S. sales prices will
appear higher than if Commerce had relied upon the $100 market rate.  Accordingly, under the
$10 scenario, constructed export price is inflated such that a comparison against normal value will
result in a distorted dumping margin (or no dumping margin at all).
      Thus, the foregoing illuminates another "opportunity for manipulation" of dumping
margins, Am. Cast Iron Pipe Co., 5 F.4th at 1375; namely, that an affiliated shipper could charge

### 2.      *Facts Otherwise Available*

Where an interested party "withholds information" or otherwise does not comply with

Commerce's requests, see 19 U.S.C. § 1677e(a)(2), or "necessary information is not available on

the record," id. § 1677e(a)(1), Commerce uses "facts otherwise available" to fill informational

gaps and render determinations, id. § 1677e(a).  If Commerce "finds that an interested party . . .

failed to cooperate by not acting to the best of its ability to comply with a request for information,"

Commerce "may" apply an adverse inference in selecting among the facts otherwise available.  Id.

§ 1677e(b)(1).

### B.      *Issue-Specific Factual and Procedural Background*

In its initial submission to Commerce, Assan indicated that it relies on an affiliated freight

supplier, [[                    ]], to transport merchandise from its plant to the port of export.  See Pl.'s

Sec C QR Resp. at 35.  Accordingly, in the Supplemental Section C Questionnaire, Commerce

asked Assan to:

> (a) [P]rovide a worksheet calculating the average price that the affiliated company
> [[                    ]] charged to unaffiliated customers for the same logistical
> services related to transporting subject merchandise to the port for export.
> Provide a price comparison of this average price to the average price reported
> for foreign inland freight, noting the discount or premium between the two
> average prices.

> (b) Provide sample documentation related to [[                    ]]'s charge to Assan
> (identify the sale observation), and the charge to unaffiliated companies using
> [[                    ]]'s same logistical services.

---

a purposefully low shipping price in order to secure a smaller reduction from constructed export
price, and thereby artificially prop up U.S. prices relative to home market prices/normal value.
Hence, Commerce undertakes to verify that affiliated freight charges are transacted at arm's-
length.

Letter from M. Hoadley to Assan Aluminyum Sanayi ve Ticaret A.S., re: Section C Suppl. Questionnaire at 5 (Dep't Com. Aug. 24, 2020) C.R. 221, P.R. 203 ("Suppl. Sec. C QR").

Assan responded by submitting: (1) a worksheet comparing the average price -- derived from [[      ]] invoices -- of [[                                      ]] that [[                   ]] charged Assan for inland freight to port services, versus the price of [[                          ]] that [[

[[      ]] charged to [[   ]] unaffiliated customer -- derived from [[                   ]] bearing the notation [[

                      ]]; (2) [[   ]] invoice for inland freight to port services issued by [[                   ]] to [[   ]] unaffiliated customer; (3) [[   ]] invoice for such services issued by [[                   ]] to Assan; and (4) [[   ]] invoice for inland freight to port services issued by a third-party service provider to Assan.  <u>See</u> Suppl. Section C Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. S4-15 (Sept. 10, 2020) C.R. 283, 284; P.R. 227 ("Pl.'s Suppl. Sec. C QR Resp.").  Upon review of Assan's submissions, Commerce utilized Assan's reported affiliated freight costs in rendering the <u>Preliminary Determination</u>.

Although Commerce did not request additional information on this field in its post-<u>Preliminary Determination</u> questionnaire in lieu of verification, <u>see</u> Req. for Docs., the Association challenged the sufficiency of certain aspects of Assan's Supplemental C Questionnaire response in its administrative case brief, <u>see</u> Consol. Pls.' Case Br. at 19–22.  Specifically, the Association argued that where Assan supplied only [[                   ]] that [[                   ]] issued to [[   ]] unaffiliated customer, Assan failed to comply with Commerce's request for average pricing; moreover, because, in the Association's estimation, Assan did not provide all of the requested documentation, substantial evidence did not support the agency's affirmative arm's-length finding and Commerce should have instead relied on adverse facts available to supply the missing

Consol. Court No. 21-00246                                                            Page 39
**PUBLIC VERSION**

information.  Id.  By contrast, Assan explained in its rebuttal brief to the agency that because there

was [[          ]] transaction between [[                 ]] and [[   ]] unaffiliated customer during

the period of investigation, its submission complied with Commerce's request.  Pl.'s Rebuttal Br.

at 16–17.

Commerce continued to rely on Assan's reported affiliated freight costs in the Final

Determination.  In so proceeding, Commerce noted several objections raised by the Association in

response to the agency's preliminary reliance on Assan's reported affiliated freight charges,

including, inter alia, that [[                 ]] did not make a profit during the period of investigation

and that the invoices submitted for Assan versus those submitted for [[   ]] unaffiliated customer

represented transportation services covering dissimilar distances.  See IDM at 17.  Nevertheless,

Commerce concluded that:

> We find no indication that the evidence on the record concerning the accuracy and
> completeness of the freight costs provided by Assan's affiliated freight service
> provider is insufficient.  The petitioners did not identify any deficiencies regarding
> the information reflected in the supporting documentation on the record or contest
> the accuracy of the calculation that was used to establish the price charged by the
> affiliated freight service provider to Assan and its unaffiliated customers.  Rather,
> the petitioners' arguments did not address the accuracy of the information and
> documents reported by Assan.  Assan has fully cooperated and provided all the
> information and documentation requested by Commerce in order to determine
> whether the price paid by Assan to the affiliated freight service provider was at
> arms-length.  In addition, Commerce finds no evidence of broader use of the
> affiliated freight service provider for subject merchandise that would suggest that
> the information reported by Assan is incomplete.  Therefore, we will continue to
> rely on the information on the record and use Assan's reported per unit cost . . . in
> this final determination.

Id. at 18.

### C.  *Analysis*

Before the court, the Association argues that Commerce unlawfully relied on Assan's

reported affiliated freight costs because Assan did not comply with the agency's requests for

information and substantial evidence otherwise does not support a finding of arm's-length pricing.

See Consol. Pls.' Br. at 22–27.  By contrast, the Government and Assan maintain that where Assan

provided all of the information requested by the agency, Commerce was right to use Assan's

affiliated freight costs without reliance on facts otherwise available or adverse inferences, and that

the record otherwise establishes the arm's-length nature of Assan's reported freight charges.  See

Def.'s Br. at 19–21; Pl.'s Resp. at 15–20.  Because the court agrees that substantial evidence

supports both of the agency's determinations -- that Assan fully cooperated in the investigation

and that Assan paid arm's-length prices for inland freight services -- Commerce lawfully deducted

Assan's reported affiliated freight costs from the constructed export price.

> **1.    *Substantial Evidence Supports Commerce's Determination That
> Assan Fully Cooperated in Responding to the Agency's
> Information Requests.***

Recall that in order to assess whether Assan paid arm's-length prices to affiliated freight

service provider [[                    ]], Commerce asked Assan to submit four batches of documents:

(i)    A worksheet calculating the average price that affiliated company [[
       ]] charged to unaffiliated customers;
(ii)   A price comparison with the average price that affiliated company [[
       ]] reportedly charged to Assan;
(iii)  Sample documentation showing [[                    ]]'s charges to Assan; and
(iv)   Sample documentation showing [[                    ]]'s charges to unaffiliated
       customers.

Suppl. Sec. C QR at 5.  Parties do not contest that Assan satisfied its submission obligations under

(ii), (iii), and (iv); however, the Association argues that because Assan submitted only [[

                                                              ]], it failed to comply with

Commerce's request for average prices paid by unaffiliated customers under (i).  Moreover, the

Association argues that the explanation Assan proffered in its rebuttal brief to the agency --

namely, that there was [[          ]] transaction between [[                    ]] and [[    ]] unaffiliated

customer during the period of investigation -- comprised untimely new factual information that Commerce impermissibly considered in deeming Assan cooperative.  See Consol. Pls.' Br. at 25–26 (citing 19 C.F.R. § 351.301(c) (specifying deadlines for submitting factual information)). Because the court assesses that Assan's rationale is evident from the documentation submitted in response to the Supplemental Section C Questionnaire, the court holds that substantial evidence supports Commerce's determination that Assan cooperated in the investigation and provided the agency with the requested information.

First, Assan included the unaffiliated freight pricing information in a document entitled "Weighted Average Price for Inland Freight," directly below a table in which Assan calculated the average price it paid to [[            ]], as derived from [[   ]] invoices.  See Pl.'s Suppl. Sec. C QR Resp. at Ex. S4-15.  The court construes this title and placement as strong evidence that the unaffiliated freight costs included in the document likewise reflect an average.  Moreover, contrary to the Association's argument that Assan failed to indicate in its Supplemental Section C Questionnaire response that the [[          ]] submitted for [[  ]] unaffiliated customer was also the [[          ]] issued by [[            ]], see id. at 25–26, the unaffiliated freight price of [[          ]] is directly preceded by the notation [[

]], see id. at Ex. S4-15.  Thus, Assan discernibly explained -- and in a timely fashion -- that there was [[

]] transaction between [[          ]] and [[  ]] unaffiliated customer to report.  Of course, where there is [[                    ]], the price listed in [[    ] invoice is also [[            ]].

In light of the above, the court agrees that substantial evidence supports Commerce's determination that Assan fully cooperated in responding to the affiliated freight-related

information requests, such that Commerce did not need to rely on facts otherwise available or
adverse inferences.

> ### 2. Substantial Evidence Supports Commerce's Determination that Assan's Affiliated Freight Charges were Made at Arm's-Length.

The Association further argues that "record evidence indicates [Assan's] affiliated charges
were not made at arm's length, and [that] the Department failed to address . . . detracting evidence"
in holding otherwise, see Consol. Pls.' Br. at 22; the Government and Assan disagree, see Def.'s
Br. at 20 ("[R]ecord evidence demonstrates that Assan's freight charges were made at arm's
length."); Pl.'s Resp. at 18–20 (substantively similar).  Because the court determines that
Commerce's affirmative arm's-length finding is supported by substantial evidence and that the
agency's explanation is legally sufficient, the court holds that Commerce permissibly deducted
Assan's reported affiliated freight costs from the constructed export price.

To begin, Commerce noted in its decisional document that the Association:

> did not identify any deficiencies regarding the information reflected in the
> supporting documentation on the record or contest the accuracy of the calculation
> that was used to establish the price charged by the affiliated freight service provider
> to Assan and its unaffiliated customers.  Rather, the petitioners' arguments did not
> address the accuracy of the information and documents reported by Assan.

IDM at 18.  The court understands this to mean that the Association did not challenge before the
agency the authenticity or accuracy of the underlying figures presented in Assan's documentation.
Stated more concretely, where Assan submitted that the average price charged by [[

        ]] to Assan was [[                                      ]], the Association did not challenge
the accuracy of this figure; and where Assan submitted that [[           ]] charged [[   ]]
unaffiliated customer [[                      ]], the Association did not question whether this was
indeed the price charged for the stated services.  Accordingly, because the court has already

accepted that Assan's worksheet reflects average pricing, <u>supra</u>, and because the Association has

not challenged the accuracy of these attendant figures, <u>see</u> IDM at 18, the court holds that

Commerce  supportably  assessed  [[                    ]]'s  charge  of  [[

        ]] to Assan to be sufficiently comparable to [[                ]]'s charge of [[

    ]] to [[    ]] unaffiliated customer, such that Assan's reported freight charges reflect arm's-

length prices.

       Nevertheless, the Association maintains that Commerce's affirmative arm's-length finding

was  legally  deficient  because  the  agency's  explanation  failed  to  account  for  the  following

detracting evidence: (i) that the [[                ]] issued by [[                ]] to an unaffiliated

customer was for a comparatively short distance, such that it was incomparable to the invoice

issued to Assan; (ii) that [[                ]]'s tax returns and other financial documents revealed

the company incurred a loss during the period of investigation, such that it was unlikely that

[[                ]] charged Assan arm's-length prices; and (iii) that [[                ]] had a high

level  of  [[                    ]],  such  that  "it  is  unlikely"  that  the  [[                ]]  to  an

unaffiliated  customer  represented  [[                ]]  that  [[                ]]  served  an

unaffiliated customer. <u>See</u> Consol. Pls.' Br. at 26–27. While it is true as a general proposition that

Commerce  "must  take  into  account  whatever  in  the  record  fairly  detracts"  from  the  weight  of

evidence, <u>CS Wind Viet. Co. v. United States</u>, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting

<u>Gerald Metals, Inc. v. United States</u>, 132 F.3d 716, 720 (Fed. Cir. 1997))), as a threshold matter,

the  court  is  not  convinced  that  the  above  "evidence"  "fairly  detracts"  from  Commerce's

determination.  Accordingly, this line of argument is unavailing.

       Concerning the Association's first contention, parties draw differing inferences from the

invoices of [[                ]].  <u>Compare</u> <u>id.</u> at 26 (maintaining the distance documented in [[    ]]

unaffiliated customer invoice -- from [[                        ]] to the [[          ]] port -- is comparatively short), with Pl.'s Resp. at 18 (maintaining that the [[          ]] port is approximately the same distance to both [[            ]] and Assan's plant in [[          ]]). Thus, whether one views the distance information documented in the invoices as "supporting" or "detracting" evidence is a matter of interpretation. Where Commerce explicitly recited the Association's distance-derived concerns in its decisional document, see IDM at 17, yet continued to rely on Assan's reported affiliated freight charges in rendering the Final Determination, id. at 18, it is reasonably discernible that on-net Commerce viewed the invoices as supportive of an arm's-length finding. Absent maps in the record, "more than one competing inference regarding distance 'seem[s] plausible.'" SMA Surfaces, Inc. v. United States, 47 CIT __, __, 2023 WL 166022, at *10 (Jan. 12, 2023). For the court to now characterize the differing distances as "detracting evidence" would amount to "favor[ing] [Consolidated] Plaintiffs' preferred evidentiary inference over another reasonable [one]," which "the court cannot do." Id. (quoting Aristocraft of Am., LLC v. United States, 42 CIT __, __, 331 F. Supp. 3d 1372, 1380 (2018), as amended (Apr. 17, 2019)).

        The Association's second and third contentions rely on "evidence" that is speculative at best, inapposite at worst. Concerning the second contention, the Association invokes [[

    ]]'s lack of profitability during the period of investigation to make the broader argument that [[                ]] would have been profitable had it charged Assan arm's-length prices. See Consol. Pls.' Br. at 27. First, such an argument rests on "mere speculation" and "[i]t is well established that speculation does not constitute 'substantial evidence.'" Jinxiang Yuanxin Imp. & Exp. Co. v. United States, 39 CIT __, __, 71 F. Supp. 3d 1338, 1351 (2015) (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009)). But more importantly, although Commerce did acknowledge Petitioner's objection in its decisional document, see IDM at 17, the

Case 1:21-cv-00246-GSK   Document 93   Filed 03/08/23   Page 45 of 59

Consol. Court No. 21-00246                                                    Page 45
*PUBLIC VERSION*

Association itself concedes that "there is no 'requirement' to demonstrate that the []affiliated company was profitable," Consol. Pls.' Reply at 9 n.5. Inapposite evidence does not "fairly detract" from Commerce's determination.

The Association's third line of argument -- that "it is unlikely" [[          ]] served only [[   ]] unaffiliated customer given its high level of [[              ]] -- likewise rests on impermissible speculation. Moreover, it fails to recognize that "Commerce's analysis is specific to the shipping of <u>subject merchandise</u> between Assan and [[          ]]." Def.'s Oral Arg. Subm. at 10 (emphasis added). Accordingly, as Commerce itself seems to acknowledge in its decisional document, whether [[          ]] had [[          ]] unaffiliated customers during the period of investigation is not the relevant inquiry. <u>See</u> IDM at 18 ("Commerce finds no evidence of broader use of the affiliated freight service provider <u>for subject merchandise</u> that would suggest that the information reported by Assan is incomplete." (emphasis added)). In short, because the court is not persuaded that the Association has identified "evidence" that "fairly detracts" from Commerce's determination, the Association's assertion of legal error on the grounds that Commerce insufficiently accounted for such "detracting evidence" is correspondingly unpersuasive.

Having held that substantial evidence supports both of the agency's findings -- that Assan fully cooperated in the investigation and that Assan paid arm's-length prices for inland freight services -- the court sustains Commerce's deduction of Assan's reported affiliated freight costs from the constructed export price.

> IV. *Commerce's Treatment of Assan's Billing Adjustments Does Not Accord with Law.*
>
>     A. *Issue-Specific Legal Background*

### 1.   *Billing Adjustments*

In determining constructed export price, Commerce uses a price that is "net of price adjustments," including "other adjustment[s]."  See 19 C.F.R. §§ 351.401(c), 351.102(b).  Such "other adjustment[s]" can include billing adjustments that capture, inter alia, invoicing errors or product quality adjustments.  See Pl.'s Suppl. Sec. C QR Resp. at 5–6.  Before the agency, Assan claimed an invoicing error adjustment -- reflecting revenue resulting from billing errors, see Pl.'s Case Br. at 13 -- which would increase U.S. sales price/constructed export price,[31] Pl.'s Oral Arg. Subm. at 16, as well as a product quality adjustment -- reflecting expenses resulting from quality errors, see Pl.'s Case Br. at 13 -- which would decrease U.S. sales price/constructed export price,[32] Pl.'s Oral Arg. Subm. at 16.  The burden of demonstrating entitlement to and the extent of an adjustment lies with the interested party in possession of the relevant information.  See 19 C.F.R. § 351.401(b)(1).

### 2.   *Adverse Facts Available*

Where Commerce has made a "valid decision to use facts otherwise available," Shandong Huarong Mach. Co. v. United States, 30 CIT 1269, 1301, 435 F. Supp. 2d 1261, 1289 (2006), Commerce "may" then make the additional decision to "'use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available,'" if Commerce finds that the respondent "'has failed to cooperate by not acting to the best of its ability . . . .'" Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(b)(1)).  "Commerce has . . . discretion" both in "choos[ing] among the available record

---

[31] And thereby, reduce dumping margins.

[32] And thereby, increase dumping margins.

information," <u>Nan Ya Plastics Corp. v. United States</u>, 810 F.3d 1333, 1346 (Fed. Cir. 2016), and

in whether to "use an inference that is adverse" under § 1677e(b), <u>Uttam Galva Steels Ltd. v.</u>

<u>United States</u>, No. 2021-2119, 2022 WL 1419596, at *2 n.5 (Fed. Cir. May 5, 2022).  Moreover,

"Commerce is not statutorily required to select a method that is the 'most' or 'more' reasonably

adverse."  <u>Timken Co. v. United States</u>, 354 F.3d 1334, 1346 (Fed. Cir. 2004) (quotation omitted).

### B.    *Issue-Specific Factual and Procedural Background*

In an initial questionnaire, Commerce asked Assan to report price adjustments as follows:

> Report any price adjustments made for reasons other than discounts or rebates.
> State whether these billing adjustments are reflected in your gross unit price.
> Report a decrease in price as a negative figure and an increase in price as a positive
> figure.  Report zero in this field if no adjustments were made to the price.  Create a
> separate field for each type of billing adjustment (e.g., corrections of invoicing
> errors, post-invoicing price adjustments).  Describe the nature of each type of
> billing adjustment that is recognized in your sales records.  Describe the document
> flow employed to process the price changes.

Pl.'s Sec. C QR Resp. at 28–29.  Despite Commerce's instructions to "[c]reate a separate field for

each type of billing adjustment," <u>id.</u>, Assan initially reported its billing adjustments and discounts

incurred within a single field, entitled "BILLADJU," <u>see</u> Pl.'s Case Br. at 14.

Accordingly, in the Supplemental Section C Questionnaire, Commerce again asked Assan

to separate each billing adjustment into its own field and further asked Assan to submit sample

documentation for each reported billing adjustment on an invoice-specific and customer-specific

basis.  <u>See</u> Pl.'s Suppl. Sec. C QR Resp. at 5–6.  In reply, Assan "aligned the reporting of billing

adjustments and other discounts with the accounting classification" and reported the following,

separate billing adjustments:

BILLADJ1U: [[                    ]]
BILLADJ2U: [[                         ]]
BILLADJ3U: [[                       ]]

   BILLADJ4U: [[                                                                      ]]
   OTHDISU: [[                          ]]

Id. at 5.  With regard to BILLADJ1U -- which reflects revenue resulting from billing errors, see

Pl.'s Case Br. at 13, Assan reported revenue of [[                                        ]], see Pl.'s Oral Arg.

Subm. at 16; and with regard to BILLADJ2U -- which reflects expenses resulting from quality

errors, see Pl.'s Case Br. at 13, Assan reported expenses of [[                                      ]], see Pl.'s

Oral Arg. Subm. at 16.  Assan further purported to submit "sample billing adjustment credit notes

f[or] each type" of adjustment, see Pl.'s Suppl. Sec. C QR Resp. at 5, but responded that it had "no

invoice specific billing adjustments" to submit, id. at 6.

   In rendering the Preliminary Determination, Commerce rejected the adjustments recorded

in BILLADJ1U and BILLADJ2U on the basis that Assan had only provided sample documentation

related to BILLADJ3U and BILLADJ4U in response to the Supplemental Section C

Questionnaire.   See Pl.'s Case Br. at 14.   Accordingly, where "no sample supporting

documentation was provided or the sample supporting documentation could not be tied to the

respective per unit amounts reported in the U.S. database," see Prelim. Margin Calc. Mem. at 5–

6, Commerce preliminarily set BILLADJ1U -- which would result in an upward adjustment to

U.S. sales price and, thereby, benefit Assan by decreasing the dumping margin -- to zero, and set

BILLADJ2U -- which would result in a downward adjustment to U.S. sales price, and thereby,

disadvantage Assan by increasing the dumping margin -- to the lowest reported value for such

adjustments.  See id.  Although Commerce did not claim to have applied an adverse inference in

its Preliminary Determination, Assan noted the "adverse impact" of Commerce's billing

adjustments in its case brief before the agency.  See Pl.'s Case Br. at 15.

Commerce asked no further questions nor requested additional documentation on these other adjustments in its questionnaire sent "in lieu of verification" following the <u>Preliminary Determination</u>.  <u>See</u> Req. for Docs.  Nevertheless, in the <u>Final Determination</u>, Commerce changed its approach with respect to BILLADJ2U and relied on Assan's specifically reported information -- rather than relying on the lowest reported value in the record -- to adjust downward Assan's U.S. sales price.  <u>See</u> Mem. from S. Carey to the File, re Final Determ. Margin Calc. for Assan Aluminyum Sanayi ve Ticaret A.S. at 3 (Dep't Com. Mar. 1, 2021) C.R. 407; P.R. 333 ("Final Margin Calc. Mem.").

Commerce split its rationale for this change across several decisional documents.  In Commerce's memorandum explaining its final margin calculation, Commerce explained:

> Assan reported certain home market and U.S. price adjustments where no sample supporting documentation was provided or the sample supporting documentation could not be tied to the respective per unit amounts reported in the home market database.[3]  For BILLADJ2U, LATEPAYH and MARNINU, we are now using Assan's reported information.[4]
>
> . . .

---

[3] <u>See</u> IDM, at 4 and Comments 5-7.
[4] <u>Id.</u> at Comment 5.

<u>Id.</u> at 3.  Commerce further stated in the final Issues and Decision Memorandum:

> As explained in detail in the <u>Preliminary Determination</u>, Assan failed to demonstrate that it is entitled to these two adjustments to U.S. price.  Although aggregate totals for each of these billing adjustments were reported and tied to the SAP accounts and trial balance, no customer-specific documentation was provided.  Specifically, the sample documentation which was provided for Assan's other reported billing adjustments included copies of credit notes which verified the purpose of these adjustments.  In the case of the reported billing adjustments related to billing and quality errors under BILLADJ1U and BILLADJ2U, we have no credit notes or other source documentation on the record to confirm the validity of these adjustments.  Since Assan has not demonstrated that it is entitled to

*PUBLIC VERSION*

> BILLADJ1U which benefits Assan, we will continue to deny this adjustment for
> the final determination[.]
>
> As discussed above, we disagree that use of an adverse inference under section
> 776(b) of the Act is warranted.  In the <u>Preliminary Determination</u>, we incorrectly
> set BILLADJ2U to the lowest reported value.  For the final determination, we will
> use the reported information on the record for BILLADJ2U since this adjustment
> does not benefit Assan because it results in a lower U.S. price.

IDM at 23–24.  The introductory clause of Commerce's second paragraph -- i.e., "[a]s discussed

above" -- refers to the portion of the Issues and Decision Memorandum in which Commerce

addressed its treatment of Assan's price adjustments for Marine Insurance and Late Payments.

There Commerce stated:

> We disagree with the petitioners that Commerce applied facts available with an
> adverse inference (AFA) under section 776(b) of the Act in the <u>Preliminary</u>
> <u>Determination</u>, or that it is warranted for this final determination.  We find that,
> throughout the course of this investigation, Assan has cooperated with Commerce's
> requests for this information, and it has answered each request for this information
> to the best of its ability.  Therefore, we find no basis to apply AFA in this case.

See <u>Id.</u> cmt. 5 at 20–21.

###   C.       *Analysis*

Before the court, the Association argues that because Commerce "failed to explain its

decision not to apply an adverse inference in its selection of facts available," Consol. Pls.' Reply

at 11, the agency's "conclusion in the <u>Final Determination</u> is unreasonable and contrary to law,"

Consol. Pls.' Br. at 30.  By contrast, the Government and Assan maintain that "the record contains

no evidence that Assan failed to cooperate by acting to the best of its ability to comply with

Commerce's request," such that "an adverse inference is not warranted."  Def.'s Br. at 22; Pl.'s

Resp. at 22 (substantively similar).  Moreover, Assan maintains that "Commerce's rationale is

clearly detailed in the <u>Final [] Determination</u>."  <u>Id.</u>  The court agrees with the Association that

Commerce's reasoning was legally deficient and remands to the agency for further explanation.

As noted above, although in the Preliminary Determination Commerce used the lowest reported value in the record to implement Assan's BILLADJ2U adjustment, see Prelim. Margin Calc. Mem. at 5–6, in the Final Determination, Commerce instead relied on Assan's reported values, see Final Margin Calc. Mem. at 3.   The practical implication of this change is that Commerce's original billing adjustment methodology reduced Assan's U.S. price to a greater extent -- and thereby increased Assan's dumping margin to a greater extent -- than the revised methodology that Commerce employed in rendering the Final Determination.   Of course, as a general matter, "Commerce may change its stance on issues decided preliminarily in its final determinations," Gov't of Arg. v. United States, 45 CIT __, __, 542 F. Supp. 3d 1380, 1391 (2021), however, in so doing, Commerce must "explain[] [its] reasoning for the change and 'its decision [must be] supported by substantial evidence and in accordance with law.'"  Id.  Commerce has not satisfied these requirements here.

Commerce's rationale for revising the BILLADJ2U adjustment consists of the agency's statement that it "incorrectly set BILLADJ2U to the lowest reported value" "[i]n the Preliminary Determination" and that it "disagree[d] that use of an adverse inference . . . is warranted."  IDM at 24.  Commerce further cross-referenced its treatment of Assan's price adjustments for Marine Insurance and Late Payments, see id. ("As discussed above . . . "), in which the agency stated:

> We disagree with the petitioners that Commerce applied facts available with an adverse inference (AFA) under section 776(b) of the Act in the Preliminary Determination, or that it is warranted for this final determination.  We find that, throughout the course of this investigation, Assan has cooperated with Commerce's requests for this information, and it has answered each request for this information to the best of its ability.  Therefore, we find no basis to apply AFA in this case.

Id. cmt. 5 at 20–21.  As an initial matter, the Association contests that Commerce's Marine Insurance and Late Payments explanation can be imputed to the BILLADJ2U adjustment context.

<u>See</u> Consol. Pls.' Reply at 12 ("Given that the application of adverse facts available relates to

specific gaps in the record, and not the total disregard of information, Commerce's reference to its

'discuss[ion] above' on an unrelated issue is not supported by substantial evidence or in

accordance with law." (alteration in original)).  The court need not resolve this point of contention,

because even assuming arguendo that the Marine Insurance and Late Payments explanation can be

imputed, it is insufficient.

      The court so finds, because it is not "reasonably discernible" what evidence supports the

agency's conclusions that "Assan . . . cooperated with Commerce's requests for . . . information[]

and . . . answered each request for . . . information to the best of its ability" -- the crux of

Commerce's proffered rationale.  IDM cmt. 5 at 20–21.  It is axiomatic that "[c]onclusory

statements that do not explain how a determination was reached are . . . insufficient."  <u>In re Section</u>

<u>301 Cases</u>, 46 CIT __, __, 570 F. Supp. 3d 1306, 1338 (2022) (citing <u>Int'l Union, United Mine</u>

<u>Workers of Am. v. Mine Safety & Health Admin.</u>, 626 F.3d 84, 94 (D.C. Cir. 2010)).  This

proposition is especially impactful here because the agency has summarily asserted that Assan

acted to "the best of its ability" while enumerating -- without any attempt to reconcile -- evidence

that seemingly detracts from this conclusion.  <u>See, e.g.</u>, IDM at 23 (noting that Assan provided "no

customer-specific documentation" for BILLADJ1U and BILLADJ2U, despite providing "copies

of credit notes" for other reported billing adjustments, such that Commerce could not "confirm the

validity of these adjustments").  The agency may have a reason as to why such a failure to provide

the requested information is not inconsistent with its assessment that Assan acted to "the best of

its ability," but any such rationale is not, as of now, reasonably discernible.

      Finally, the court acknowledges -- and it is undisputed -- that whether to apply adverse

inferences is a matter within Commerce's discretion.  <u>See, e.g.</u>, Consol. Pls.' Oral Arg. Subm. at

12 (that "this authority is discretionary is manifested by section 1677e(b)'s use of the permissive

term 'may,' which stands in contraposition to section 1677e(a)'s use of the mandatory term

'shall.'" (quoting <u>Dorbest Ltd. v. United States</u>, 30 CIT 1671, 1736, 462 F. Supp. 2d 1262, 1317

(2006)).  Accordingly, Commerce <u>could</u> have declined to apply adverse facts available <u>even if</u> it

had affirmatively found that Assan failed to act to the best of its ability.  But as it stands, that is

not what Commerce did.  Commerce "did not [purport to] rely on its discretion under 19 U.S.C.

§ 1677e(b) to not apply an adverse inference, despite Assan's failure to cooperate," <u>id.</u> at 13, but

rather made an affirmative factual finding that "Assan . . . cooperated with Commerce's requests

for . . . information[] and . . . answered each request for . . . information to the best of its ability."

<u>Id.</u> cmt. 5 at 20–21.  Because "an agency's action must be upheld, if at all, on the basis articulated

by the agency itself," <u>State Farm</u>, 463 U.S. at 50 (citing <u>SEC v. Chenery</u>, 332 U.S. 194, 196

(1947)), Commerce's "best of its ability" finding must be supported by substantial evidence; as of

now, for the reasons stated above, it is not reasonably discernible that the agency's determination

is so supported.

The court, thus, remands this issue to the agency for further explanation consistent with the

court's opinion.

### V.     *The Court Stays Consideration of Commerce's Deduction of Section 232 Tariffs From Constructed Export Price Pending Resolution of the Issue by the Federal Circuit.*

#### A.     *Issue-Specific Legal Background*

##### 1.     *United States Import Duties*

Section 1677a(c)(2)(A) of 19 U.S.C. directs Commerce to reduce constructed export price

by "the amount, if any, included in such price, attributable to any additional costs, charges, or

expenses, and United States import duties."  Def.'s Br. at 23.  Logically, no "United States import

duties" are paid on subject merchandise sold in the home market, but prices paid in the United

States likely reflect such duties -- creating the possibility that constructed export price could be

inflated relative to normal value.  Consequently, to further Commerce's goal of comparing prices

"at a common point in the chain of commerce," APEX Exports, 777 F.3d at 1374, Commerce

deducts "United States import duties" paid from the U.S. sales price (i.e., constructed export price).

        In a series of prior litigations, the Federal Circuit has declared the phrase "United States

import duties" in 19 U.S.C. § 1677a(c)(2)(A) to be ambiguous and sustained various Commerce

determinations that certain duties -- including antidumping duties and safeguard duties imposed

under Section 201 of the Trade Act of 1974[33] -- comprise "special tariffs," rather than "United

States import duties," that should not be deducted from constructed export price.  See Wheatland

Tube Co. v. United States, 495 F.3d 1355, 1359–60, 1365 (Fed. Cir. 2007).

## 2.       *Section 232 Tariffs*

        Under Section 232 of the Trade Expansion Act of 1962, as codified at 19 U.S.C. § 1862,

the President may impose tariffs -- herein referred to as "Section 232 tariffs" -- to remedy assessed

threats posed to national security by implicated imports.  Commerce has previously assessed

Section 232 tariffs to constitute "United States import duties" for purposes of 19 U.S.C.

§ 1677a(c)(2)(A) and deducted them from constructed export price in prior investigations.  See,

e.g., Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States, 45 CIT __, __, 494 F. Supp.

3d 1374 (2021), appeal docketed, Fed. Cir. No. 2021-2097;  Deacero S.A.P.I de C.V. v. United

---

[33] "Section 201 of the Trade Act of 1974 . . . [a]llows the President to impose temporary duties
and other trade measures if the U.S. International Trade Commission . . . determines a surge in
imports is a substantial cause or threat of serious injury to a U.S. industry."  BROCK R. WILLIAMS,
CONG. RSCH. SERV., R45529, TRUMP ADMINISTRATION TARIFF ACTIONS:
FREQUENTLY ASKED QUESTIONS 2 (2020).

States ("Daecero"), 45 CIT __, Slip Op. 21-171, 2021 WL 6067010 (Dec. 20, 2021), appeal

docketed, Fed. Cir. No. 2022-1486;  Power Steel Co., Ltd. v. United States, 45 CIT __, Slip Op.

21-173, 2021 WL 6098309 (Dec. 23, 2021).   The Federal Circuit is currently considering

Commerce's treatment of Section 232 tariffs in Borusan, Fed. Cir. No. 2021-2097.

### B.     *Issue-specific Factual and Procedural Background*

Certain CAAS imported during the period of investigation by Turkish Respondents --

including Assan -- were subject to Section 232 tariffs imposed pursuant to Publication of a Report

on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted under

Section 232 of the Trade Expansion Act of 1962, as amended, 85 Fed. Reg. 40,508 (Dep't

Commerce Jul. 6, 2020).   See Pl.'s Sec. C QR Resp. at App. V.   In the Final Determination,

Commerce concluded that "section 232 duties should be treated as U.S. import duties" under 19

U.S.C. § 1677a(c)(2)(A) and, thus, deducted the amount paid by Assan from U.S. sales

prices/constructed export value.  IDM at 14–15.

### C.     *Analysis*

Before the court, Assan contests Commerce's deduction of Section 232 tariffs from

constructed export price and argues that such duties should be treated as "special tariffs" -- akin to

antidumping duties and section 201 safeguard duties -- rather than as "United States import duties."

Pl.'s Br. at 18–19.   In contrast, the Government and the Association maintain that Commerce's

decision accords with law, as demonstrated by recent decisions from this court sustaining such

deductions.  See, e.g., Borusan, 494 F. Supp. 3d at 1374; Deacero, 2021 WL 6067010; Power Steel

Co., 2021 WL 6098309.  This precise issue is currently before the Federal Circuit in Borusan, Fed.

Cir. No. 2021-2097, and as the parties agree,[34] the Federal Circuit's ruling in <u>Borusan</u> will be

dispositive on the matter in the case at bar.

 Accordingly, on June 10, 2022, the court issued to the parties a preliminary question

asking:

> Can and should this court stay consideration of the Section 232 tariff issue pending
> final adjudication by the Federal Circuit?

Ct.'s Prelim. Q. at 2.  The court received a range of answers:  Although all parties agree that this

court has the authority to stay the Section 232 issue pending final resolution by the Federal Circuit,

<u>see</u> Pl.'s Prelim. Q. Resp. at 2; Consol. Pls.' Prelim. Q. Resp. at 2; Def.'s Prelim. Q. Resp. at 2,

Assan responded that yes, the court should stay the issue, but should also proceed to resolve the

remaining issues, <u>see</u> Pl.'s Prelim. Q. Resp.; the Government responded that yes, the court should

stay the Section 232 issue, but should also stay the entire case pending resolution of the 232 issue

by the Federal Circuit, <u>see</u> Def.'s Prelim. Q. Resp.; and the Association responded that no, the

court should not stay the Section 232 issue, but to the extent the court chooses to, it should proceed

to resolve the remaining issues in the interim, <u>see</u> Consol. Pls.' Prelim. Q. Resp.

 When contemplating a stay, a court must "weigh [the] competing interests," <u>Landis v. N.</u>

<u>Am. Co.</u>, 299 U.S. 248, 254–55 (1936), but ultimately the decision rests "within the sound

discretion of the trial court," <u>Cherokee Nation of Okla. v. United States</u>, 124 F.3d 1413, 1416 (Fed.

---

[34] <u>See, e.g.</u>, Pl.'s Prelim. Q. Resp. at 5 ("The <u>Borusan</u> appeal involves the identical issue to that raised by Assan in this appeal and the CAFC's ruling will govern the Court's ruling with regards to that issue without the need for oral argument or further briefing."); Def.'s Prelim. Q. Resp. at 3 ("If the Federal Circuit reverses Commerce's determination and holds that section 232 duties are not 'United States import duties' and cannot be deducted when determining U.S. price, this Court will need to remand the case to Commerce with the instructions to comply with the Federal Circuit's decision."); Consol. Pls.' Prelim. Q. Resp. at 2 ("Should the Court of Appeals uphold the Department's interpretation, its decision would very likely be dispositive of whether the Department's deduction of Section 232 duties from constructed export price is also in accordance with law in this case.").

Cir. 1997).  In the past, this court has issued a stay where "pending litigation in the Court of

Appeals [wa]s likely to affect the disposition" of the case at bar.  See SKF USA Inc. v. United

States, 36 CIT 842, 844 (2012); see also RHI Refractories Liaoning Co. v. United States, 35 CIT

407, 774 F. Supp. 2d 1280 (2011).  Because the Federal Circuit has already heard oral argument

in Borusan, see Oral Arg., No. 21-2097, Feb. 7, 2023, ECF No. 80 -- such that any stay "will not

[be] indefinite" -- and because "a stay will promote judicial economy and preserve the resources

of the parties and the court," the court deems a stay of the Section 232 issue appropriate.  RHI

Refractories, 35 CIT at 411, 774 F. Supp. 2d at 1285.

       The court next considers the appropriate scope of the stay.  The United States asks the court

to stay the entire case pending the Federal Circuit's resolution of Borusan, Def.'s Prelim. Q. Resp.

at 3, while Assan and the Association ask the court to presently resolve the remaining issues, see

Pl.'s Prelim. Q. Resp. at 2; Consol. Pls.' Prelim. Q. Resp. at 3.  On the one hand, the court

acknowledges that the remaining issues "are factually and legally distinct," Pl.'s Prelim. Q. Resp.

at 2, such that the Federal Circuit's answer to the Section 232 question will not resolve them; on

the other hand, the court acknowledges that each of the remaining issues feeds into the calculation

of a single dumping margin for Assan, such that the case may not be fully resolvable until all of

the issues are resolved.

       Overcoming this latter point, the court assesses certain unique facts that render separable

the Section 232 issue.  Specifically, as of now, Commerce has calculated a final dumping margin

of 2.02 percent for Assan.  Final Determination at 13,327.  As Plaintiff notes, under 19 U.S.C.

§ 1673b(b)(3), a dumping margin that is "less than 2 percent" is "de minimis" and must be

disregarded by Commerce.  See 19 U.S.C. § 1673b(b)(3); id. at § 1673d(a)(4) (both stating "the

administering authority shall disregard any weighted average dumping margin that is de minimis").

Assan maintains that "[i]f the [c]ourt agrees with [it] on either of the other two counts raised in its complaint -- [i.e.,] the calculation of Assan's duty drawback adjustment (Count I) or the denial of its home market rebate adjustment (Count II) -- the recalculated dumping margin for Assan will be less than 2 percent, or de minimis" and Commerce must disregard it.  Pl.'s Prelim. Q. Resp. at 4.  Such an occurrence would render Assan no longer subject to the antidumping duty order on CAAS from Turkey, thereby mooting Assan's remaining arguments before this court.[35]

Because the court has already resolved to: (1) remand[36] Commerce's calculation of Assan's duty drawback adjustment to comply with the Federal Circuit's latest direction; (2) sustain[37] Commerce's denial of a home market rebate adjustment to Assan; (3) sustain Commerce's reliance on Assan's affiliated freight costs; and (4) remand Commerce's treatment of Assan's billing adjustment for further explanation, it is conceivable[38] that Commerce may calculate a de minimis rate for Assan upon remand, even assuming arguendo the proper deduction of Section 232 tariffs from constructed export price.  As such an outcome would ultimately dispose of Assan's claims, the court -- balancing the "historic federal policy against piecemeal appeals," Timken Co. v. Regan, 5 CIT 4, 6 (1983) (internal quotation marks and citation omitted), with the "suppleness" of "the processes of justice" to "adapt[] to varying conditions," Landis, 299 U.S. at 256 -- stays

---

[35] Any such outcome would also seem to conserve party resources beyond the scope of this litigation where Commerce has already begun the first administrative review of the antidumping duty order on CAAS from Turkey.  Pl.'s Prelim. Q. Resp. at 5.  As Plaintiffs note, "Commerce's selection of Assan as a mandatory respondent, and Assan's participation in the first administrative review, will be moot if it is assigned a de minimis dumping margin in the investigation underlying the review and no longer subject to the antidumping duty order on CAAS from Turkey."  Id.

[36] In accordance with Assan's request.

[37] Contrary to Assan's request.

[38] Though the court does not presuppose.

consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit and

resolves the remaining issues in accordance with the foregoing.  The court hereby:

ORDERS Commerce to assess -- assuming arguendo the proper deduction of Section 232

tariffs from constructed export price and in light of the court's foregoing resolution of the

remaining issues -- whether the recalculated dumping margin for Assan will be de minimis.  If

Commerce renders such a de minimis finding, Commerce shall file with this court and provide to

the parties its remand results within 90 days of the date of this order; thereafter, the parties shall

have 30 days to submit briefs addressing the revised remand determination with the court, and the

parties shall have 30 days thereafter to file reply briefs with the court; the court further

ORDERS that if Commerce does not render such a de minimis finding or is unable to make

such an assessment at this time, Commerce shall file with this court and provide to the parties a

status report explaining as such within 90 days of the date of this order.  Under such a scenario,

Commerce shall file with this court and provide to the parties its remand results within 90 days of

the final resolution by the Federal Circuit of Borusan Mannesmann Boru Sanayi Ve Ticaret v.

United States, 45 CIT __, 494 F. Supp. 3d 1374 (2021), appeal docketed, Fed. Cir. No. 21-2097;

thereafter, the parties shall have 30 days to submit briefs addressing the revised remand

determination with the court, and the parties shall have 30 days thereafter to file reply briefs with

the court.

SO ORDERED.

/s/  Gary S. Katzmann
                                                                     Gary S. Katzmann, Judge


Dated:  March 1, 2023
           New York, New York