A-489-839
Remand
Slip Op. 23-26
POI: 01/01/2019 – 12/31/2019
**Public Document**
E&C/OVII: SC

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
**Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023)**
**Common Alloy Aluminum Sheet from the Republic of Turkey**

FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023) (*Remand Order*).  These final results of redetermination concern the final determination of the antidumping duty investigation of common alloy aluminum sheet from the Republic of Turkey (Turkey).[1]  The petitioner is the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group & Individual Members (the Association).  The respondents in this investigation are the following companies:  Assan Aluminyum Sanayi ve Ticaret A.S. (Assan); and Teknik Aluminyum Sanayi A.S.

On March 1, 2023, the Court sustained, in part, and remanded, in part, Commerce's *Final Determination*.  As an initial matter, the Court stayed consideration of the section 232 tariff issue[2] pending final resolution by the U.S. Court of Appeals for the Federal Circuit (Federal

---

[1] *See Common Alloy Aluminum Sheet from Turkey:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 13326 (March 8, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).  This final affirmative determination for Turkey was inadvertently published under the case number for the Italy proceeding (A-475-842).  The correct case number for Turkey is A-489-839.
[2] *See Remand Order* at 13 and 53-59.

Circuit) of an identical issue in a separate case.[3] The Court upheld Commerce's determinations concerning Assan's shipping costs[4] and home market rebates[5] as supported by substantial evidence and otherwise in accordance with law. With respect to Commerce's determination regarding its application of a "duty neutral" methodology for duty drawback, the Court sustained Commerce's grant of a duty drawback adjustment to Assan but held that Commerce's specific implementation of this duty drawback adjustment contravenes Federal Circuit precedent.[6] Commerce also acknowledged that its "duty neutral" methodology was inconsistent with current court precedent and requested a voluntary remand, which the Court granted in its *Remand Order*.[7] Finally, the Court held that Commerce's modification to Assan's billing adjustments related to quality errors[8] was unlawful, and remanded to Commerce for further explanation.[9]

## II.   ANALYSIS OF REMANDED ISSUES

### A.   Duty Drawback Adjustment

In the *Final Determination*, Commerce found that Assan satisfied the criteria for a duty drawback adjustment. Following the "duty neutral" methodology, we made an upward adjustment to constructed export price (CEP) based on the amount of the duty imposed on the input that was not collected as a result of the export of subject merchandise, by allocating the amount not collected to all production for the relevant period based on the cost of inputs during the period of investigation (POI), January 1, 2019, through December 31, 2019. This ensures

---

[3] On March 15, 2023, the Federal Circuit affirmed that section 232 duties are considered U.S. import duties under the antidumping statute; thus, Commerce will not make any changes to its section 232 analysis on remand. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).
[4] *See Remand Order* at 13 and 35-45.
[5] *Id.* at 13 and 26-35.
[6] *Id.* at 13-26; *see also Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1197 (Fed. Cir. 2021) (*Uttam Galva Steels*).
[7] *See Remand Order* at 25-26.
[8] *See Final Determination* IDM at Comment 7.
[9] *See Remand Order* at 13 and 45-53.

that the amount added to both sides of the comparison of export price (EP) or CEP with normal value is equitable.[10] The Court sustained Commerce's general grant of a duty drawback adjustment to Assan, explaining that Commerce properly exercised its discretion in determining that some of the inputs in question were "capable" of being used to produce subject merchandise.[11] However, the Court held that Commerce's calculation of Assan's duty drawback adjustment was unlawful, in light of the Federal Circuit's holding in *Uttam Galva Steels* that the "duty neutral" methodology used by Commerce is incompatible with the plain language of section 772(c)(1)(B) of the Tariff Act of 1930, as amended (the Act).[12] Because Commerce acknowledged this point, the Court granted the agency's request for a voluntary remand to recalculate the adjustment.

On remand, Commerce has revised its duty drawback methodology by adopting a methodology that divides the amount of duties exempted on the Inward Processing Certificate (IPC) closed during the POI over the total quantity of exports made under that closed IPC to calculate a per-unit duty drawback adjustment that reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the POI.[13] The information needed to make this adjustment was reported in the field DTYDRAWU of the U.S. sales database that was used in the *Final Determination*.[14] This methodology is consistent with both the Court's *Remand Order* and the Federal Circuit's ruling – that the statute requires an upward adjustment to EP or CEP based on the entire drawback that occurred "by reason of the

---

[10] *See Final Determination* IDM at Comment 1.
[11] *See Remand Order* at 24 (footnotes 23-24).
[12] *Id.* at 25 (citing *Uttam Galva Steels Ltd. v. United States*, 311 F. Supp. 3d 1345, 1355 (CIT 2018), *aff'd Uttam Galva Steels*, 997 F.3d 1192.
[13] *See, e.g.*, *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 7941 (February 7, 2023) (*Rebar from Turkey Final Results*), and accompanying IDM at Comment 5.
[14] *See* Memorandum, "Final Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated March 1, 2020 (Final Analysis Memorandum), at 2.

exportation of the subject merchandise to the United States," in accordance with section 772(c)(1)(B) of the Act.[15] As evident from the disclosed calculations, we have not made any changes to the duty drawback adjustment made to cost.[16]

### B. Home Market Product Quality Adjustment

In the underlying review, Commerce instructed Assan to report any billing adjustments – other than discounts or rebates – by creating a separate field for each billing adjustment type as reflected in its gross unit price.[17] Specifically, Assan was instructed to report a decrease in price as a negative figure, an increase in price as a positive figure, and to report zero if no adjustments were made to its U.S. price.[18] Because Assan failed to follow these instructions and, instead, reported its billing adjustments within a single field,[19] Commerce again instructed Assan to separate each billing adjustment and to submit sample documentation for each reported adjustment.[20] In responding to Commerce's second request, however, Assan failed to provide supporting documentation for the field BILLADJ2U (*i.e.*, quality adjustments).[21] Consequently, for purposes of its *Preliminary Determination*,[22] Commerce relied on the lowest value that Assan reported under the variable BILLADJ2U, noting that no sample supporting documentation was provided that could be tied to the respective per-unit amounts reported in the U.S. sales

---

[15] *See Remand Order* at 50-53.
[16] *See* Final Analysis Memorandum at 3.
[17] *See* Assan's Letter, "Common Alloy Aluminum Sheet from Turkey: Section C Questionnaire Response Section," dated June 29, 2020 (Assan June 29, 2020 QR), at 28-29.
[18] *Id*.
[19] *Id*.
[20] *See* Assan's Letter, "Common Alloy Aluminum Sheet from Turkey: Supplemental Section C Questionnaire Response," dated September 10, 2020 (Assan September 10, 2020 SQR), at 5-6.
[21] *Id*.
[22] *See Common Alloy Aluminum Sheet from Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 65346 (October 15, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

database.[23] Because the "lowest value" in this case is the most negative number, and because BILLADJ2U is added to U.S. price, the effect of relying on the lowest value reported by Assan was that the net U.S. price calculated by Commerce was lower than if Commerce had relied on all of the values reported by Assan under this variable. Therefore, in the *Preliminary Determination*, Commerce effectively made an adverse adjustment in calculating Assan's dumping margin, though Commerce did not reference sections 776(a) and (b) of the Act. Because relying on the lowest value had the effect of reducing the net U.S. price, this preliminary adjustment resulted in a higher margin for Assan than if Commerce had relied on all of the values reported by Assan. The Court acknowledges this outcome in describing the preliminary adjustment:

> Commerce preliminarily set … BILLADJ2U – which would result in a downward adjust to U.S. sales price, and thereby, disadvantage Assan by increasing the dumping margin – to the lowest reported value for such adjustments. Although Commerce did not claim to have applied an adverse inference in its *Preliminary Determination*, Assan noted the "adverse impact" of Commerce's billing adjustments in its case brief before the agency.[24]

In the *Final Determination*, Commerce revised its approach by relying, instead, on all of Assan's reported information, explaining that relying on the reported information on the record for BILLADJ2U "{…} does not benefit Assan because it results in a lower U.S. price."[25] However, as the Court explained:

> The practical implication of {the change between the *Preliminary Determination* and the *Final Determination*} is that Commerce's original billing adjustment methodology reduced Assan's U.S. price to a greater extent – and thereby increased Assan's dumping margin to a greater extent – than the revised methodology that Commerce employed in rendering the *Final Determination*.[26]

---

[23] *See Final Determination* IDM at Comment 7; *see also* Memorandum, "Preliminary Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated October 6, 2020 (Preliminary Analysis Memorandum), at section V.B. "Price Adjustments."
[24] *See Remand Order* at 48 (citations omitted).
[25] *See Final Determination* IDM at Comment 7.
[26] *See Remand Order* at 51.

The Court held that Commerce's unexplained modification to the approach taken for adjusting for billing adjustments reported by Assan for quality errors, in which Commerce relied on the reported information on the record instead of the lowest reported value that was used in the *Preliminary Determination*,[27] was unlawful.  Specifically, the Court held that while "Commerce may change its stance on issues decided preliminarily in its final determinations,"[28] Commerce had failed to explain its reasoning for the change or to support the decision with substantial evidence.[29]  The Court elaborated that the lack of an explanation for the reversal was especially important here because Commerce had enumerated evidence that seemingly detracts from the decision not to apply adverse facts available (AFA).[30]  In particular, the Court referenced Commerce's concern with the lack of customer-specific documentation for BILLADJ2U, such as copies of credit notes, such that Commerce could not confirm the validity of the adjustment.[31]  Therefore, the Court remanded to Commerce for further explanation.[32]

On remand, upon further reconsideration, Commerce finds that it is necessary to rely on the facts otherwise available, pursuant to section 776(a) of the Act, in determining the proper value for Assan's billing adjustments for quality errors.  Under section 776(a) of the Act, the application of facts available requires Commerce to:  (1) identify necessary information missing from the record; or (2) determine whether a party has (A) withheld requested information; (B) failed to provide information by established deadlines or in the form or manner requested; (C) significantly impeded the review; or (D) provided information that cannot be verified.  Here, we

---

[27] *See Preliminary Determination*; and Preliminary Analysis Memorandum at section V.B. "Price Adjustments."
[28] *See Remand Order* at 51 (citations omitted).
[29] *Id*.
[30] *Id.* at 52.
[31] *Id*.
[32] *Id.* at 13 and 52.

find that the application of facts available is warranted, pursuant to sections 776(a)(1) and (2)(A)-(B) and 2(D) of the Act.

Commerce requested that Assan provide supporting documentation (*e.g.*, customer specific documentation) for each billing adjustment as reflected in its U.S. price. Instead, Assan withheld information and provided incomplete supporting documentation needed to corroborate and verify the proper adjustment for BILLADJ2U.[33] Indeed, as the Court explains, Commerce found in the *Final Determination* that Assan provided inadequate information to allow the agency to confirm the validity of the adjustment;[34] however, Commerce did not invoke section 776(a) of the Act, as it does now. Specifically, Assan provided no customer-specific documentation, such as credit notes detailing the billing adjustments for quality errors, in response to Commerce's requests to do so in its initial and supplemental questionnaires.[35]

Furthermore, Commerce determines that an adverse inference is warranted in selecting from among the facts otherwise available, because Assan failed to act to the best of its ability in complying with Commerce's requests for information in the initial and supplemental questionnaires.[36] Accordingly, on remand, we have assumed that the correct billing adjustment is the lowest value Assan reported as a billing adjustment for quality errors. Specifically, as explained above, because the lowest value Assan reported is a negative number, and because the variable BILLADJ2U is added to U.S. price, this adjustment results in the largest deduction from U.S. price that can be made based on the various values Assan reported under this variable and, thus, results in a higher dumping margin than if Commerce had relied on the variable as reported by Assan. In summary, the proper application of AFA results in a return to the BILLADJ2U

---

[33] *See* Assan September 10, 2020 SQR at 5-6.
[34] *See Remand Order* at 52; and Final Determination IDM at 23.
[35] *See Final Determination* IDM at 23.
[36] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (*Nippon Steel*).

adjustment made in the *Preliminary Determination*.  Consequently, we have recalculated Assan's dumping margin using the lowest billing adjustment reported for a quality error as BILLADJ2U, as we did in the *Preliminary Determination*.

## III.     INTERESTED PARTY COMMENTS

On May 10, 2023, Commerce issued its draft results of redetermination and provided interested parties an opportunity to comment on Commerce's analysis and redetermination.[37] Commerce received comments from the petitioner and Assan.[38]  These comments are addressed below.  After considering these comments, we made no changes to our conclusions in the Draft Results for these final results of redetermination.

Comment 1:  Whether Assan is Eligible for a Duty Drawback

*Petitioner's Comments*:

- Contrary to the court's opinion, Assan is not eligible for a duty drawback adjustment.

- Satisfying the Turkish drawback system is an insufficient reason to be granted a duty drawback adjustment under U.S. law.

- Because the record shows that the imported materials used by Assan to satisfy the Turkish drawback system were not capable of being used to produce subject merchandise, Commerce's grant of a duty drawback adjustment to Assan is unreasonable and contrary to the Federal Circuit's decision in *Maverick Tube III*.[39]

---

[37] *See* Draft Results of Redetermination Pursuant to Court Order, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023), dated May 10, 2023 (Draft Results).
[38] *See* Petitioners' Letter, "Common Alloy Aluminum Sheet from Turkey – Petitioners' Comments on Draft Redetermination Concerning Assan Aluminyum Sanayi ve Ticaret A.S.," dated May 18, 2023 (Petitioner's Comments); *see also* Assan's Letter, "Common Alloy Aluminum Sheet From Turkey:  Assan's Comments on Draft Remand Redetermination Pursuant to Court Remand," dated May 17, 2023 (Assan's Comments).
[39] *See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1271 (Fed. Cir. 2017) (*Maverick Tube III*).

*Assan's Comments*:

- Commerce's duty drawback adjustment to U.S. price without applying its so called "duty neutral" methodology is correct, and consistent with the Court's *Remand Order* and with the Federal Circuit's precedent.

**Commerce's Position:**  As an initial matter, the Turkish duty drawback program satisfies Commerce's criteria for granting a U.S. price adjustment under section 772(c)(1)(B) of the Act and has been repeatedly acknowledged and upheld by the courts.[40]  To decide whether to make a duty drawback adjustment, Commerce applies a two-pronged test, which requires a party seeking the adjustment to demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.[41]

The Court ruled that Commerce's general grant of a duty drawback adjustment to Assan is in accordance with the law.[42]  Specifically, the Court stated that the Federal Circuit's ruling in *Maverick Tube III* found that section 772(c)(1)(B) of the Act does not impose a threshold "capability" test onto Commerce's grant of a duty drawback adjustment, explaining instead that Commerce's decision to limit adjustments to inputs capable of being used to produce the exported product was a permissible interpretation of section 772(c)(1)(B) of the Act.[43]  Moreover, the Court ruled that Commerce articulated a reasonable conception of "capability" based on the record evidence that at least one imported input under the closed IPC can be used in

---

[40] *See, e.g.*, *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011) (*Saha Thai Steel*); *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1362 (CIT 2020); *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1314, 1319 (CIT 2019); and *Eregli Demir ve Celik Fabrikalari T.A.S v. United States*, 357 F. Supp. 3d 1325, 1329 (CIT 2018)
[41] *See Saha Thai Steel*, 635 F.3d at 1338.
[42] *See Remand Order* at 19.
[43] *Id.* at 21 (citing *Maverick Tube III*, 861 F.3d at 1271-74).

9

the production of subject merchandise.[44]  The statutory text "by reason of the exportation of the subject merchandise to the United States" signaled Congress's intention for Commerce to grant duty drawback adjustments "only when there is some kind of connection between the nonpayment of import duties and the exportation of the subject merchandise to the United States."[45]  Because Commerce was able to find a connection between the non-payment of import duties and the exportation of subject merchandise to the United States, Commerce's general grant of a duty drawback adjustment to Assan is reasonable and in accordance with the statute.

Comment 2:  Calculation of Assan's Duty Drawback

*Petitioner's Comments*:

- By assigning to each U.S. sale a per-unit drawback amount that applies only to exports made pursuant to the closed IPC, regardless of whether Assan exported that U.S. sale pursuant to that closed IPC, Commerce exaggerates the duty drawback applicable to Assan's U.S. sales.

- Commerce's duty drawback calculation incorrectly assumes that Assan exported all of its U.S. sales pursuant to this closed IPC.

- Commerce's calculation of the duty drawback adjustment is inaccurate because it relies on all the exports reflected on the closed IPC which includes export destinations other than the United States as well as exports made outside of the POI.

- Commerce's calculation is inconsistent with the statute under section 772a(c)(1)(B) of the Act, which defines a duty drawback adjustment as "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."

---

[44] *Id.* at 24.
[45] *See Maverick Tube III*, 861 F.3d at 1274.

- Commerce should use the methodology in *Aluminum Foil from Turkey* that relied only on exports of aluminum foil to the United States during the period of review as documented on closed IPCs, and allocated the amount of this benefit to all reported U.S. sales.[46] This complies with the statutory directive under section 772 a(c)(1)(B) of the Act that the amount of drawback be the amount of duties exempted "by reason of the exportation of the subject merchandise to the United States."

*Assan's Comments*:

- Commerce's calculation of the duty drawback adjustment is in accordance with the *Remand Order* and is consistent with the Federal Circuit's precedent.

**Commerce's Position:** In the underlying investigation, Commerce made it clear that the duty drawback provision, Commerce's regulations, and Commerce's practice do not require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment.[47] Instead, Commerce, in accordance with the law, requires a respondent to demonstrate that a reasonable link exists between the duties imposed and those rebated or exempted, which the record supports in this case.[48] The purpose of the duty drawback adjustment is to "account for the fact that the producers remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases {normal value}."[49] A duty drawback adjustment ensures that the

---

[46] *See Certain Aluminum Foil from the Republic of Turkey: Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 84 FR 23686 (May 4, 2021), and accompanying PDM, at 11, unchanged in *Certain Aluminum Foil from the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 52880 (September 23, 2021) (*Aluminum Foil from Turkey*), and accompanying IDM at Comment 7.
[47] *See Final Determination* IDM at 9.
[48] *See Maverick Tube III*, 861 F.3d at 1274.
[49] *See Saha Thai Steel*, 635 F.3d at 1338 (explaining how to account for the fact that a producer remains subject to the import duty when it sells the subject merchandise domestically, the duty drawback adjustment provides an "apples-to-apples" comparison between the foreign market value and the U.S. price.); *see also Apex Exports v.*

results of participating in a duty drawback program do not affect the dumping calculation.[50] Furthermore, Commerce explained that it is unnecessary to trace specific inputs into the production of specific exports, as claimed by the petitioners.[51] As such, Commerce's current duty drawback methodology, as explained in *Rebar from Turkey*, divides the amount of total duties exempted on the IPC closed during the POI over the total quantity of exports made under that closed IPC to calculate a per-unit duty drawback adjustment.[52] This methodology reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the POI.[53]

    The petitioner's comments which argue for the use of Commerce's methodology in *Aluminum Foil from Turkey* raise the same arguments that Commerce subsequently addressed in *Rebar from Turkey*, finding that the statutory purpose of the duty drawback provision is fulfilled by eliminating, to the extent possible, any effect of the Turkish duty drawback system on the dumping calculations by spreading the duty actually drawn back generally over all the exports in the closed IPC.[54] The petitioners' argument suffers the same deficiencies as those noted by Commerce in *Rebar from Turkey Final Results*, where Commerce rejected a similar argument on the basis that it amounts to attempting specific tracing of imported inputs into a specific product being produced and whether that specific product is exported, even though the Turkish duty drawback system does not require these specific links for duty drawback to be granted.[55] As articulated in the Federal Circuit case *Uttam Galva Steels*, "the duty drawback statute requires an

---

*United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (noting that "{t}he overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.")
[50] *Id*.
[51] *See Final Determination* IDM at 9.
[52] *See Rebar from Turkey Final Results* IDM at Comment 5.
[53] *Id*.
[54] *Id*.
[55] *Id*.

adjustment to "export price" based on the full extent of the duty drawback."[56]  The statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports.[57]  Moreover, the Federal Circuit went as far as to state that "{i}t does not make a difference whether the imported inputs that qualified for a drawback were actually incorporated into goods sold in the exporter's domestic market because the {foreign} government credited the drawback to the quantity of goods that were in fact exported … ."[58]  The Court explained that the entire drawback was allowed "by reason of exportation."[59]

Accordingly, we continue to find Commerce's current methodology as described in the steel concrete reinforcing bar from Turkey proceeding to be the most appropriate methodology to calculate a per-unit duty drawback adjustment.  This methodology reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the POI, consistent with the current Federal Circuit precedent in *Uttam Galva Steels* that the statute does not require that the imported material be traced directly from importation through exportation.[60]  In this case, the consumption ratios associated with the closed IPC define the limits of the per-unit duty drawback benefit, which reasonably spreads these associated import duty exemptions generally over the proper universe of exports that actually fulfilled the export obligation.[61]  In other words, we find that any other method to reallocate specific duty exemptions on a closed IPC over a different universe of exports would likely introduce inaccuracies, as the Turkish duty drawback system does not trace the actual use of the imported

---

[56] *See Uttam Galva Steels*.
[57] *Id*.
[58] *Id*.
[59] *Id*.
[60] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 82 FR 23192 (May 22, 2017) (*Rebar from Turkey Final Determination*), and accompanying IDM at Comment 1.
[61] *See* Assan June 29, 2020 QR at 44-45 and Exhibit C-10; *see also* Assan September 10, 2020 SQR at 1 and Exhibit S4-1.

input to the actual finished product that is exported.[62] Given the current Federal Circuit precedent in *Uttam Galva Steels*,[63] instructing Commerce to consider the entire drawback when calculating duty drawback adjustments, Commerce reasonably granted and calculated Assan's duty draw back adjustment.[64]

Comment 3:  Whether to Apply AFA to Assan's Home Market Quality Bill Adjustments

*Assan's Comments:*

- The Court explained that Commerce could have declined to apply AFA even if it had affirmatively found that Assan failed to act to the best of its ability.

- Assan was not uncooperative and had used its best efforts in providing available documentation and records to confirm the validity of the claimed billing adjustments.

- Commerce has previously noted that Assan had acted to the best of its ability in responding to Commerce's request for information.[65]

The petitioner did not comment on this issue.

**Commerce's Position:**  Although the Court acknowledged that Commerce has discretion on whether to apply AFA, the Court ruled that Commerce failed to explain the reason for its change of decision with regard to this billing adjustment for quality errors, which the Court ruled was not supported by substantial evidence.[66]  Moreover, in remanding this matter, the Court highlighted evidence of Commerce's concern with the lack of customer-specific documentation

---

[62] *See Final Determination* IDM at Comment 1 (citing *Rebar from Turkey Final Determination* IDM at Comment 1); *see also Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342 (CIT 2020) (holding that a proposed methodology by domestic producers was unsupported by statute or regulation).
[63] *See Uttam Galva Steels Ltd.*, 997 F.3d at 1197.
[64] Courts have recognized the need for Commerce to have "some discretion in determining how wide {of} a search it will make," and "some methodological flexibility," as to comply with the statutory mandate of calculating "the most accurate dumping margins possible."  *See Far E. Mach. Co. v. United States*, 699 F. Supp. 309, 315 (CIT 1988); *see also Maverick Tube Corp. v. United States*, 163 F. Supp. 3d 1345, 1358 (CIT 2016).
[65] *See Final Determination* IDM at Comment 5.
[66] *See Remand Order* at 51.

for BILLADJ2U, such as copies of credit notes, such that Commerce could not confirm the validity of the adjustment.[67] Therefore, Commerce has revisited its reasoning as instructed by the Court and now acknowledges that the deficiencies noted by this failure to provide the supporting documentation after multiple requests constitutes a failure by Assan to act to the best of its ability under sections 776(a) and (b) of the Act. Therefore, consistent with the Court's opinion, Commerce determines that an adverse inference is warranted in selecting from among the facts otherwise available, because Assan failed to act to the best of its ability in complying with Commerce's specific requests for information in the initial and supplemental questionnaires.[68] Accordingly, on remand, we have assumed that the correct billing adjustment is the lowest value Assan reported as a billing adjustment for quality errors.

Comment 4:  Assan's Exclusion from the Order and Termination of Administrative Review

*Assan's Comments*:

- Because Commerce properly calculated a *de minimis* margin for Assan, Assan should be excluded from the antidumping duty order.[69]

- Commerce's first administrative review of Assan should be terminated as a result of Assan's exclusion from the order.[70]

The petitioner did not comment on this issue.

---

[67] *Id*.
[68] *See Nippon Steel*, 337 F.3d at 1382.
[69] *See* section 733(b)(3) of the Act; *see also Beijing Tianhai Industry Co., Ltd. v. United States*, 255 F. Supp. 3d 1311 (CIT 2017) (sustaining Commerce's remand redetermination excluding a respondent from the order after calculating a *de minimis* margin on remand).
[70] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 47058 (August 23, 2021), and accompanying IDM at 1-2 (discontinuing the review with respect to respondent after the Court judgment that merchandise produced and exported by respondent was excluded from the order).

**Commerce's Position:** The net effect of the changes made by Commerce pursuant to the *Remand Order* results in a *de minimis* margin for Assan.[71] Should the Court sustain these final results of redetermination, Commerce intends to publish a notice of court decision not in harmony with the results of the *Final Determination* and notice of amended final determination and order. The effect of these final results of redetermination on the first administrative review is beyond the purview of this segment of the proceeding. The implications of a *de minimis* margin, once a final and conclusive decision is issued, is appropriately addressed in that segment of the proceeding.

## IV. FINAL RESULTS OF REDETERMINATION

As a result of this *Remand Order*, Commerce has recalculated Assan's duty drawback adjustment in accordance with the latest Federal Circuit precedent in *Uttam Galva Steels* and our current methodology for making the upward adjustment to U.S. price under the Turkish duty drawback regime. In addition, Commerce has determined that the record evidence supports the application of AFA with respect to the billing adjustment for quality errors and has recalculated Assan's dumping margin using the lowest billing adjustment reported for a quality error as BILLADJ2U, as we did in the *Preliminary Determination*.

We made no changes to the Draft Results. The net effect of the two changes noted above results in a *de minimis* margin for Assan.[72] Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination and order in the *Federal Register*. In the event that the Court's ruling is not appealed or, if appealed,

---

[71] *See* Memorandum, "Draft Results of Redetermination; Revised Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated May 10, 2023.
[72] *Id.*

upheld by a final and conclusive court decision, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection.

5/30/2023

X 

Signed by: LISA WANG

Lisa W. Wang  
Assistant Secretary  
  for Enforcement and Compliance