IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br>*Plaintiff,* <br><br>v. <br><br>UNITED STATES, <br><br>*Defendant,* <br><br>and <br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.*, <br>*Defendant-Intervenors.* | Consol. Court No. 21-00246 |

**DEFENDANT'S RESPONSE TO COMMENTS
ON COMMERCE'S REMAND REDETERMINATION**

|   |   |
|---|---|
| | BRIAN M. BOYNTON <br> Principal Deputy Assistant Attorney General |
| | PATRICIA M. MCCARTHY <br> Director |
| | REGINALD T. BLADES, JR. <br> Assistant Director |
| OF COUNSEL: <br><br> ASHLANDE GELIN <br> Attorney <br> Office of the Chief Counsel <br>    for Trade Enforcement and Compliance <br> U.S. Department of Commerce <br> Washington, D.C. <br><br> July 31, 2023 | KYLE S. BECKRICH <br> Trial Attorney <br> U.S. Dept. of Justice <br> Civil Division/National Courts <br> P.O. Box 480 <br> Ben Franklin Station <br> Washington, D.C. 20044 <br><br> Attorneys for Defendant |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ........................................................................................................................2

    I.    Standard Of Review ...........................................................................................2

    II.    Commerce's Duty Drawback Methodology Should Be Sustained ........................2

        A.    Commerce's Recalculation Of Assan's Duty Drawback Adjustment Is Supported By Substantial Evidence And In Accordance With Law ...........2

        B.    Commerce Properly Rejected The Aluminum Association's Alternative Methodology ................................................................................................8

    III.    Commerce Properly Applied Adverse Facts Available To Assan's Home Market Quality Billing Adjustments ............................................................................12

CONCLUSION ....................................................................................................................14

i

# **TABLE OF AUTHORITIES**

**Cases**                                               **Page(s)**

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
   Slip Op. 23-26, 624 F. Supp. 3d 1343 (Ct. Int'l Trade March 1, 2023) ..............................passim

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)..................................................................................................................2

*HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S.*,
   439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020).............................................................. 5, 6, 8, 9

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)..........................................................................2

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016) ..................................................................................12, 13, 14

*Tianjin Magnesium Int'l Co. v. United States,*
   844 F. Supp. 2d 1342 (2012)...................................................................................................12

*Uttam Galva Steels Ltd. v. United States*,
   997 F.3d 1192 (Fed. Cir. 2021) ........................................................................................passim

**Statutes**

19 U.S.C. § 1677a....................................................................................................................3, 5

19 U.S.C. § 1677e........................................................................................................................13

**Other Authorities**

*Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales
   at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021) ....................8

*Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative
   Review and Final Determination of No Shipments; 2015-2016,* 82 Fed. Reg. 47,477 (Dep't of
   Commerce Oct. 12, 2017) ..........................................................................................................3

*Redetermination at Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of
   Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-
   2021*, 88 Fed. Reg. 7,941 (Dep't Commerce Feb. 7, 2023).......................................................9

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 7,118 (Dep't of Commerce Feb. 8, 2022) ................................................................................... 7

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> *Defendant*, ) <br> ) <br> and ) <br> ) <br> ALUMINUM ASSOCIATION COMMON ALLOY ) <br> ALUMINUM SHEET TRADE ENFORCEMENT ) <br> WORKING GROUP AND ITS INDIVIDUAL ) <br> MEMBERS, ET AL., ) <br> ) <br> *Defendant-Intervenors*. ) | Consol. Court No. 21-00246 |

## DEFENDANT'S RESPONSE TO COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to comments filed by plaintiff, Assan Aluminyum Sanayi ve Ticaret A.S. (Assan), and consolidated plaintiffs Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its working members (Aluminum Association).  *See* ECF No. 99 (Assan Cmts); ECF No. 100 (Al. Cmts).  The parties' comments address the remand redetermination issued by the Department of Commerce (Commerce), *see* Final Results of Redetermination Pursuant to Court Remand, May. 31, 2023 (Remand Redetermination), ECF No. 94, pursuant to this Court's opinion and remand order, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Slip Op. 23-26, 624 F. Supp. 3d 1343 (Ct. Int'l Trade March 1, 2023) (Remand Order), ECF No. 87.

# ARGUMENT

## I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II. Commerce's Duty Drawback Methodology Should Be Sustained

### A. Commerce's Recalculation Of Assan's Duty Drawback Adjustment Is Supported By Substantial Evidence And In Accordance With Law

As instructed in the Court's Remand Order, Commerce revised its duty drawback methodology to comply with the Federal Circuit's holding in *Uttam Galva Steels v. United States*. *See Assan Aluminyum*, 624 F. Supp. 3d at 1362 (*citing Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192 (Fed. Cir. 2021)). Although the Remand Order upheld Commerce's determination to grant Assan a duty drawback adjustment, the Court held that Commerce's specific implementation of this adjustment contravened Federal Circuit precedent. *See Assan Aluminyum*, 624 F. Supp. 3d at 1362. Commerce acknowledged the conflict between its final determination and *Uttam Galva Steels* and asked for a voluntary remand to recalculate Assan's duty drawback adjustment, which the Court granted. *Id*.

Initially, Commerce calculated Assan's duty drawback adjustment by allocating the amount of exempted duties not collected to all production for the relevant period based on the cost of inputs during the period of investigation. *See* Remand Redetermination at 2-3. This is also known as a duty neutral methodology that ensures that the amount added to both sides of the

comparison of export price and normal value are equitable. *Id*. The duty neutral methodology allocates the duty drawback adjustment between exported goods and home-market goods, which lessens a respondent's overall duty drawback to export price. *See Uttam Galva Steels*, 997 F.3d at 1197. However, the Federal Circuit in *Uttam Galva Steels* explained that § 1677a(c)(1)(B) requires an upward adjustment to export price based on the entire drawback that occurred by reason of exportation of subject merchandise to the United States. *Id*. The Federal Circuit held that Commerce's duty neutral methodology was therefore incompatible with the plain language of the statute because it did not account for the drawback benefit in its entirety and imposed an additional requirement on a respondent to trace particular imported goods to U.S. exports. *Id*. at 1197-98.

Under the Turkish duty drawback program, Commerce's practice is to consider the benefits of the exempted duties once an Inward Processing Certificate (IPC) is closed. *See, e.g., Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016,* 82 Fed. Reg. 47,477 (Dep't of Commerce Oct. 12, 2017), and accompanying IDM (explaining how Commerce "cannot be certain that a company has satisfied the export requirements under a {IPC} until the {IPC} is closed.")). Therefore, on remand, instead of calculating Assan's duty drawback adjustment based on its total production, Commerce recalculated Assan's duty drawback adjustment by dividing the amount of duties exempted on the closed IPC over the total amount of exports made under that same closed IPC. This methodology is consistent with the statute and reasonably reflects the drawback benefits that a respondent receives by reason of exportation to the United States as directed by this Court and the Federal Circuit. *See Assan Aluminyum*, 624 F. Supp. 3d

at 1359 (remanding Commerce "to reapply the {duty drawback} adjustment in accordance with the Federal Circuit's latest directive."); *see Uttam Galva Steels*, 997 F.3d at 1197.

The Aluminum Association presents several arguments against Commerce's methodology, all of which disregard the Federal Circuit's ruling in *Uttam Galva Steels* and would require Commerce to trace specific inputs into the production of specific exports. *See* Remand Redetermination at 11-12; *see generally* Al. Cmts. The Aluminum Association first asserts that Commerce's current methodology "overstates the duty drawback adjustment by increasing Assan's U.S. price for all sales by a per-unit amount that is applicable to only a small portion of Assan's U.S. sales." Al. Cmts at 2. According to the Aluminum Association, Commerce should trace imported goods subject to the duty drawback to specific exports of subject merchandise. *Id.* at 4-5. But that argument is directly contrary to what the Federal Circuit has held that the duty drawback statute requires. The Federal Circuit has held that the "duty drawback statute requires an adjustment to 'export price' based on the *full extent* of the duty drawback" and that Commerce is not required to "trace particular imported goods to U.S. exports." *Uttam Galva Steels*, 997 F.3d at 1197-98. Indeed, "{i}t does not make a difference whether the imported inputs that qualified for a drawback were actually incorporated into goods sold." *Id.* at 1198.

Next, the Aluminum Association argues that because Commerce's methodology includes liabilities forgiven based on exports of "non-subject merchandise, merchandise exported to third countries, and merchandise exported outside of the {} period of investigation," Commerce's methodology is contrary to the statute's plain language. Al. Cmts at 5-7. In so arguing, the Aluminum Association attempts to establish a direct link between imported inputs and U.S.

4

exports. That argument misunderstands the statute, Commerce's practice, and the Turkish duty drawback program by attempting to match imported inputs with U.S. sales.

As explained above, the Federal Circuit has confirmed that the duty drawback statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports. *See Uttam Galva Steels*, 997 F.3d at 1197. The duty drawback statute provides,

> The price used to establish export price and constructed export price shall be—(1) increased by—(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B). In *Uttam Galva Steels*, the Federal Circuit explained that "the duty drawback statute requires an adjustment to 'export price' based on *the full extent* of the duty drawback," regardless of the source of the input used to produce the foreign goods "because the {foreign} government credited the drawback to the quantity of goods that were in fact exported." *See Uttam Galva Steels*, 997 F.3d at 1197 (emphasis added). Neither Commerce nor the statute require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment because the foreign government has credited the respondent based on the closed IPC. Remand Redetermination at 11. The conditions set forth in the Aluminum Association's arguments would impose additional requirements to Commerce's duty drawback methodology, requirements already ruled unlawful by the Federal Circuit.

Further, under the Turkish duty drawback program, Commerce's practice is to rely on a respondent's closed IPC, a methodology that has been upheld by this Court and acknowledged by the Aluminum Association in support of its own arguments. *See HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S.*, 439 F. Supp. 3d 1342, 1349 (Ct. Int'l Trade 2020) (upholding

5

Commerce's requirement of closed IPC, which demonstrates that "Turkish government has forgiven the duty liability"); *see also* Al. Cmts at 6-7.  In light of *Uttam Galva Steels*, Commerce's methodology now considers the entire duty drawback within the parameters established under a closed IPC.  Remand Redetermination at 12-13.  As further explained in the Remand Redetermination, "the consumption ratios associated with the closed IPC define the limits of the per-unit duty drawback benefit, which reasonably spreads these associated import duty exemptions generally over the proper universe of exports that actually fulfilled the export obligation." *Id*. at 13.  Accordingly, Commerce's determination to rely on the exempted duties and exports established under the closed IPC (*i.e.*, using information that defines the limits of the per-unit duty drawback benefits) in calculating the consumption ratio (*i.e.*, per-unit drawback benefit) for Assan's U.S. sales during the period of investigation, is supported by substantial evidence and is in accordance with law.  *Id*.

Moreover, the Aluminum Association's arguments asserting that Commerce acted contrary to the plain meaning of the statute question whether Assan should have been granted a duty drawback adjustment in the first place, a decision that this Court has already sustained.  *Assan Aluminyum*, 624 F. Supp. 3d at 1362.  The statutory text "by reason of the exportation of the subject merchandise to the United States" signaled Congress's intention for Commerce to grant duty drawback adjustments "when there is some kind of connection between the nonpayment of import duties and the exportation of the subject merchandise to the United States."  Remand Redetermination 9-10.  Thus, to receive a duty drawback adjustment, a respondent must demonstrate that a reasonable link exists between the duties imposed and those rebated or exempted to receive a U.S. price adjustment, which the record supports in this case through Assan's closed IPC.  *Id*.  This Court already recognized that the record demonstrates

6

"some kind of connection between the nonpayment of import duties and the exportation of . . . subject merchandise to the United States." *See Assan Aluminyum*, 624 F. Supp. 3d at 1362. There is no requirement that Commerce impose the additional requirements to its duty drawback methodology that the Aluminum Association suggests.

Finally, the Aluminum Association asserts that using a closed IPC undermines Commerce's methodology and that applying the calculated consumption rates to all of Assan's U.S. sales was improper. Al. Cmts at 4-7. The Court should reject this argument. Under the Turkish duty drawback program, "{a} paid duty or duty liability does not qualify as a drawn back duty until the refund occurs or the liability is extinguished by the government." Al. Cmts at 7 (citing *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 7,118 (Dep't of Commerce Feb. 8, 2022), and accompanying IDM). In other words, a duty liability remains contingent until an IPC is closed by the Turkish government. *Id*. Therefore, when calculating Assan's per-unit duty drawback amount, Commerce explained that "any other method to reallocate specific duty exemptions on a closed IPC over a different universe of exports {*i.e.*, exports outside the closed IPC} would likely introduce inaccuracies, as the Turkish duty drawback program does not trace the actual use of the imported input to the actual finished product that is exported." Remand Redetermination at 13. Because the record demonstrates a connection exists between the non-payment of import duties and the exportation of subject merchandise to the United States and Commerce considered the entire duty drawback pursuant to *Uttam Galva Steels*, Commerce's duty drawback methodology is supported by substantial evidence and in accordance law.

7

### B. Commerce Properly Rejected The Aluminum Association's Alternative Methodology

On remand, the Aluminum Association proposed an alternative methodology found in *Aluminum Foil from Turkey* and claimed that Commerce's "explanation for declining to rely on {that} methodology {}, is unreasonable and therefore unlawful." *See* Al. Cmts at 8 (referencing *Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021), and accompanying IDM (*Aluminum Foil from Turkey*)). However, that methodology was properly rejected by Commerce in its Remand Redetermination. *See* Remand Redetermination at 12-14; *see also Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342, 1349-50 (Ct. Int'l Trade 2020) (holding that Commerce's rejection of a proposed methodology by domestic producers was reasonable when that methodology was unsupported by statute or regulation).

Fundamentally, the methodology articulated in *Aluminum Foil from Turkey* would again require Commerce to trace specific imported inputs to U.S. exports, a link that is not required under the Turkish duty drawback program for a duty drawback to be granted. *See* Al. Cmts at 8 (citing *Aluminum Foil from Turkey*). The Aluminum Association argues that Commerce should apply a methodology that calculates the drawback adjustment based on "the total amount of duty drawback for exempted import duties associated with exports of subject merchandise during the POI, that fall under the Harmonized Tariff Schedule subheadings for in-scope merchandise." *Id.* But as we have explained, the Federal Circuit has held that the duty drawback statute does not require that Commerce trace "particular imported goods to U.S. exports." *Uttam Galva Steels*, 997 F.3d at 1197-98. Because the Aluminum Association argues for a methodology that would require tracing and because that is not a requirement of the statute, Commerce reasonably

8

rejected the Aluminum Association's proposed methodology. *Habas Sinai, A.S.*, 439 F. Supp. 3d at 1349-50.

In support of the methodology in *Aluminum Foil from Turkey*, the Aluminum Association argues that Assan's duty drawback adjustment was "not based on duty liability extinguished by the Turkish government 'by reason of the exportation of the subject merchandise' or 'by reason of the exportation' of any merchandise 'to the United States.'" Al. Cmts at 9. As mentioned above, this argument calls into the question whether Assan was entitled to a duty drawback adjustment in the first place, an issue already addressed above and upheld by this Court's remand opinion. *See Assan Aluminyum*, 624 F. Supp. 3d at 1362. The Aluminum Association's attempt to relitigate whether a duty drawback adjustment should have been granted should be rejected.

On remand, Commerce explained that the Aluminum Association's proposed methodology has been addressed and rejected in *Rebar from Turkey*. *See* Remand Redetermination at 12 (citing *Redetermination at Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed. Reg. 7,941 (Dep't Commerce Feb. 7, 2023) (*Rebar from Turkey*), and accompanying IDM). As explained in *Rebar from Turkey* and in the Remand Redetermination, "the statutory purpose of the duty drawback provision is fulfilled by eliminating, to the extent possible, any effect of the Turkish duty drawback program on the dumping calculations by spreading the duty actually drawn back generally over all the exports in {a} closed IPC." *Id*. When a methodology would require "specific tracing of imported inputs into a specific product being produced" and a determination as to "whether that specific product is exported," that methodology should be rejected as beyond the requirements of the statute. *Id*.

9

The Aluminum Association argues that *Rebar from Turkey* is inapposite because it is not arguing that Commerce limit Assan's duty drawback benefits to certain months in a period of review. Al. Cmts at 10. However, the practice articulated in *Rebar from Turkey* is applicable any time a methodology imposes any sort of limitation on a duty drawback adjustment that would require tracing. Remand Redetermination at 12-13. Even if the Aluminum Association is not proposing a tracing requirement identical to that proposed in *Rebar from Turkey*, the Aluminum Association still proposes a methodology in which tracing would be required. Accordingly, Commerce reasonably explained that the current methodology as described in *Rebar from Turkey* as the most appropriate methodology to calculate Assan's duty drawback adjustment because this methodology reasonably reflects the duties exempted for the exports of subject merchandise made to the U.S. during the period of investigation. *Id.* at 13.

Lastly, the Aluminum Association's attempt to distinguish this case from *Uttam Galva Steels* is unpersuasive. Al Cmts at 10-11. The Aluminum Association argues that *Uttam Galva Steels* analyzes requirements related to only "source and final consumption of the imported goods." *Id.* at 11. The Aluminum Association argues that *Uttam Galva Steels* does not apply to "the question {of} the destination of the exported merchandise, which is a requirement that is specified explicitly in the statute." *Id.* That argument ignores the Federal Circuit's directive that the purpose of the duty drawback statue is to correct the imbalance created when "a duty drawback is granted only for exported inputs, {and} the cost of the duty is reflected in {normal value} but not in {export price}." *See Uttam Galva Steels*, 997 F.3d at 1197. The Federal Circuit emphasized that Commerce's attempts to trace an imported product lessened the respondent's overall duty drawback adjustment. *Id.* The holding states that –

> The duty drawback statute requires an adjustment to "export price" based on the full extent of the duty drawback. It does not impose

>> an additional requirement that the respondent trace particular imported goods to U.S. exports.

*Id*. at 1197-98. The Aluminum Association's argument that the Federal Circuit did not include an analysis on the destination of the exported merchandise misses the point. Al. Cmts at 10-11. The Federal Circuit explained that it does not make a difference whether the imported inputs qualified for a drawback were actually incorporated into goods sold "because the {foreign} government credited the drawback to the quantity of goods that were in fact exported." *Id.* at 1198.

In sum, all of the Aluminum Association's arguments amount to tracing imported inputs into a specific product being produced and whether that specific product is being exported, even though the Turkish duty drawback program does not require these specific links for duty drawback to be granted. Remand Redetermination at 12-13. Further, the proposed methodology suggested by the Aluminum Association is contrary to Federal Circuit precedent and the duty drawback statute. Commerce's current methodology divides the amount of duties exempted under a closed IPC, over total exports under the closed IPC, and applies the per-unit amount (*i.e.*, consumption ratio) to all U.S. sales during the period of investigation. *Id*. The consumption ratio associated with the closed IPC reasonably reflects the duties exempted over the proper universe of exports that fulfilled the export obligation. *Id*. Commerce's methodology now accords with *Uttam Galva Steels* by calculating a duty drawback adjustment based on the entire duty drawback. Because the statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports and because the Turkish duty drawback program does not trace the actual use of the imported input to the actual finished product that is exported for a respondent to benefit from the program, Commerce's duty drawback methodology is supported by substantial evidence and is in accordance with law.

### III. Commerce Properly Applied Adverse Facts Available To Assan's Home Market Quality Billing Adjustments

On remand, the Court instructed Commerce to explain why it reversed its approach and decided not to apply an adverse adjustment to Assan's reported quality errors reported (*i.e.*, BILLADJ2U), when Commerce had enumerated evidence on the record that seemingly detracted from its decision not to apply adverse facts available. *See Assan Aluminyum*, 624 F. Supp. 3d at 1376. Specifically, the Court referenced Commerce's concern with the lack of customer-specific documentation for BILLADJ2U, such as copies of credit notes, such that Commerce could not confirm the validity of the adjustment. *Id*. at 1377. Instead of continuing to affect Assan adversely by using the lowest reported value (*i.e.*, reducing the U.S. price and increasing the dumping margin), Commerce changed course and relied on all of Assan's reported values at the final determination (*i.e.*, increasing the U.S. price and reducing Assan's dumping margin). *See* Remand Redetermination 12-13. On remand, Commerce redetermined that an adverse interference was, in fact, warranted and returned to using the lowest reported value with respect to Assan's quality errors. *Id*.

Although Assan supports the final Remand Redetermination and does not request a second remand to Commerce with respect to this issue, it maintains that Commerce's application of adverse facts available is contrary to the record evidence. Assan Cmts at 8-9. Assan argues that the appropriate response was to deny the adjustment claimed and that Commerce should have used its discretion not to apply an adverse inference to Assan. *Id*. However, Commerce's decision to apply an adverse inference to Assan's quality errors is supported by substantial evidence and is in accordance with law. *Tianjin Magnesium Int'l Co. v. United States,* 844 F. Supp. 2d 1342, 1346 (2012) (explaining that Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings); *see also Nan*

12

*Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1346 (Fed. Cir. 2016) ("Commerce has broad discretion to choose among the available record information" (citation omitted)).

Commerce requested that Assan provide supporting documentation (*e.g.*, customer specific documentation) for each billing adjustment reflected in its U.S. price. *See* Remand Redetermination at 14-15. Instead, Assan withheld information and provided incomplete supporting documentation needed to corroborate and to verify the proper adjustment for BILLADJ2U. *Id*. Therefore, Commerce relied on 19 U.S.C. §§ 1677e(a)(2)(A),(B), and (D) to determine that the application of facts available was warranted. *Id*. Under those sections, Commerce may apply facts otherwise available if "an interested party or any other person—(A) withholds information that has been requested by the administering authority . . . , (B) fails to provide such information by the deadline for submission of the information in the form or manner requested . . . , or (D) provides such information but the information cannot be verified." 19 U.S.C. §§ 1677e(a)(2)(A)-(B), (D). As the Court explained, Commerce found in the final determination that Assan provided inadequate information to allow the agency to confirm the validity of the adjustment. *Assan Aluminyum*, 624 F. Supp. 3d at 1377. However, Commerce did not invoke facts available in the final determination, as it does now. Remand Redetermination at 7.

Commerce reasonably determined that an adverse inference was warranted because Assan failed to cooperate by not acting to the best of its ability. Specifically, Commerce observed that it requested that Assan provide customer-specific documentation, such as credit notes detailing the billing adjustments for quality errors, in both its initial and supplemental questionnaires. *Id*. However, Assan failed to provide that information in response to either questionnaire. *Id*. Accordingly, on remand, Commerce determined that an adverse inference

13

should be applied because Assan failed to act to the best of its ability when it did not provide specific information that Commerce twice requested. *Id.* Based on that adverse inference, Commerce determined that the correct billing adjustment was the lowest value Assan reported as a billing adjustment for quality errors. *Id*. That determination falls well within the broad discretion afforded to Commerce in making adverse inference determinations. *Nan Ya Plastics*, 810 F.3d at 1346. Because the lowest value that Assan reported is a negative number, and because the variable BILLADJ2U is added to U.S. price, this adjustment resulted in the largest deduction from U.S. price that could be made based on the various values that Assan reported under this variable and, thus, results in a higher dumping margin than if Commerce had relied on the variable as reported by Assan. Remand Redetermination at 7.

In sum, Commerce acted within its statutory discretion to apply adverse facts available to Assan and using the lowest billing adjustment reported for quality errors is supported by substantial evidence and is in accordance with law. And as explained above, Assan does not request that the Court find against Commerce on this point, and the Court should therefore sustain Commerce's Remand Redetermination.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's Remand Redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

|  |  |
|---|---|
|  | /s/Reginald T. Blades, Jr.<br>REGINALD T. BLADES, JR.<br>Assistant Director |
|  | /s/Kyle S. Beckrich |
| OF COUNSEL:<br>ASHLANDE GELIN<br>Attorney<br>Office of the Chief Counsel<br>    for Trade Enforcement and Compliance<br>U.S. Department of Commerce<br>Washington, D.C. | KYLE S. BECKRICH<br>Trial Attorney<br>U.S. Dept. of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Telephone: (202) 616-9322<br>E-mail: kyle.beckrich@usdoj.gov |
| July 31, 2023 | *Attorneys for Defendant* |

15

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's word limitation requirement in that it contains 3,978 words, including text, footnotes, and headings.

/s/Kyle S. Beckrich
Kyle S. Beckrich