Slip Op. 24-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S.,<br><br>   **Plaintiff and Consolidated Defendant-Intervenor,**<br><br>   v.<br><br>UNITED STATES,<br><br>   **Defendant,**<br><br>   **and**<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ALERIS ROLLED PRODUCTS, INC.; ARCONIC CORPORATION; COMMONWEALTH ROLLED PRODUCTS INC.; CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC; JW ALUMINUM COMPANY; NOVELIS CORPORATION; AND TEXARKANA ALUMINUM, INC.,<br><br>   **Defendant-Intervenors and Consolidated Plaintiffs.** | Before: Gary S. Katzmann, Judge<br>Consol. Court No. 21-00246 |

## <u>OPINION</u>

[ The court remands Commerce's <u>Remand Results</u>. ]

Dated: <u>April 11, 2024</u>

<u>Leah Scarpelli</u>, Arent Fox LLP, of Washington, D.C., argued for Plaintiff and Consolidated Defendant-Intervenor Assan Aluminyum Sanayi ve Ticaret A.S.  With her on the briefs were <u>Matthew M. Nolan</u> and <u>Jessica R. DiPietro</u>.

<u>Kyle S. Beckrich</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department

of Justice, of Washington, D.C., argued for Defendant the United States.  With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, Kelley Drye & Warren LLP, of Washington, D.C., argued for Defendant-Intervenors and Consolidated Plaintiffs Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, JW Aluminum Company, Novelis Corporation, and Texarkana Aluminum, Inc.  With him on the brief were Paul C. Rosenthal and Joshua R. Morey.

Katzmann, Judge:  Last year, the court granted a voluntary remand request by Defendant the United States ("the Government") to allow the U.S. Department of Commerce ("Commerce") to recalculate a duty drawback adjustment.  See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States, 47 CIT __, 624 F. Supp. 3d 1343 (2023) ("Assan I").[1]  The original calculation, the Government acknowledged, was incompatible with a recent holding by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") that disfavored "duty neutral" adjustment methodologies.  Id. at 1362–63; see also Uttam Galva Steels Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1345, 1355 (2018), aff'd, 997 F.3d 1192 (Fed Cir. 2021).

On remand, Commerce's recalculation resulted in a larger drawback adjustment—and accordingly a higher calculated export price—for Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan"), a Turkish producer of subject merchandise.  Redetermination Pursuant to Court Remand Order at 16 (Dep't Com. May 31, 2023), ECF No. 94 ("Remand Results").  This in turn

---

[1] To ensure internal consistency and compatibility with future publication formats, the court represents Turkish-language proper names without diacritics.  For example, the name "Assan Alüminyum ve Ticaret A.Ş." becomes "Assan Aluminyum Sanayi ve Ticaret A.S."  See, e.g., Civility Experts Worldwide v. Molly Manners, LLC, 167 F. Supp. 3d 1179, 1191 n.5 (D. Colo. 2016) (omitting French diacritics); Akina v. Hawaii, 141 F. Supp. 3d 1106, 1111 n.1 (D. Haw. 2015) (Hawaiian).

brought Assan's overall dumping margin below the de minimis level.  See id.  If upheld, Commerce's redetermination would thus extinguish Assan's entire antidumping duty liability for the period of investigation.  See 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4).

A consortium of U.S. aluminum producers, the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members ("Association"), challenges this redetermination.  See Consol. Pls.' Cmts. on Remand Redetermination, June 30, 2023, ECF No. 100 ("Ass'n's Br.").  That challenge is now before the court.  To resolve it, the court must examine the interaction between Commerce's new adjustment methodology and the Turkish government's system for exempting import duties.

The court concludes that Commerce's new methodology, as currently explained, does not take proper account of the Turkish exemption system.  The court accordingly remands Commerce's redetermination for further explanation or reconsideration.

## BACKGROUND

### I.    *Legal and Regulatory Framework*

The court set forth the legal framework of Commerce's application of duty drawback adjustments in Assan I, 624 F. Supp. 3d at 1356.  The key provision is as follows:

> The price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States . . . .

19 U.S.C. § 1677a(c)(1)(B).  In other words, "a duty drawback adjustment shall be granted when, but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty."  Saha Thai Steel Pipe (Pub.) Co. v. United States, 635 F.3d 1335, 1341 (Fed. Cir. 2011).

The court in <u>Assan I</u> also discussed the Turkish government's system—known as an Inward Processing Regime ("IPR")—for exempting duty liability on imports of input materials "if the exporter satisfies certain requirements":

> Specifically, interested firms in Turkey secure Inward Processing Certificates ("IPC"), which represent that inputs used for the production of relevant exports fall within the same 8-digit HTS classification as those inputs for which an exemption has been sought. Duty liability is extinguished when an IPC is "closed," meaning that an exporter has demonstrated sufficient amounts of corresponding imports and exports to Turkish authorities.

624 F. Supp. 3d at 1357 (footnote and citation omitted). An IPC holder has two options: it can either pay import duties as usual and then obtain a refund of those duties upon the closure of an IPC, or it can pay no import duties at the time of importation and instead submit a guarantee (effectively an IOU) for the amount that would otherwise be owed. <u>See</u> Letter from Mayer Brown, LLP to W. Ross, Sec'y of Com., re: Section C Questionnaire Response at 42 (June 29, 2020), P.R. 142–43, C.R. 52 ("Assan Questionnaire Resp.").[2] Either way, an IPC holder remains liable for any import duties incurred until it exports a sufficient quantity of qualifying merchandise to close the IPC. <u>See id.</u> at 42. If an IPC does not close, the result is "retroactive collection" by the Turkish government "of all the customs duties, charges and VAT, as applicable, plus penalties." <u>Id.</u> at 43.

Commerce's practice is to decline to apply a duty drawback adjustment on the basis of an IPC until that IPC is closed. <u>See, e.g.</u>, <u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States</u>, 44 CIT __, __, 439 F. Supp. 3d 1342, 1349 (2020) ("Commerce reasonably predicates its inclusion of IPCs on evidence of closure as demonstrating final duty exemption . . .

---

[2] "P.R." and "C.R." respectively refer to the (pre-remand) Public Record and Confidential Record in this case. <u>See</u> Pub. Joint App'x, Apr. 7, 2022, ECF No. 48; Conf. Joint App'x, Apr. 7, 2022, ECF No. 47. "P.R.R." and "C.R.R." respectively refer to the Public Remand Record and Confidential Remand Record. <u>See</u> Pub. Remand Joint App'x, Aug. 14, 2023, ECF No. 108; Conf. Remand Joint App'x, Aug. 14, 2023, ECF No. 107.

.”); Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States, 47 CIT __, __, 654 F. Supp. 3d 1311, 1319 (2023) (“Commerce declined to provide Icdas any adjustment because Icdas did not provide evidence that demonstrated that any of the IPCs were closed.”); see also Def.’s Resp. to Cmts. on Remand Redetermination at 5–6, July 31, 2023, ECF No. 103 (“Gov’t Resp.”).  Over the past decade, however, Commerce has applied an increasingly strict definition of IPC closure for the purpose of determining entitlement to a duty drawback adjustment.  See Icdas, 654 F. Supp. 3d at 1320–21.  Whereas Commerce used to require a mere demonstration that “the exporting company has applied to the Turkish government for closure,” Commerce now requires “some indication from the [Turkish government] that the IPC was approved.”  Id. (internal quotation marks and citations omitted).

## II.    *Procedural History*

The court presumes familiarity with the background of this case as of the court’s decision in Assan I.  In Assan I, the court sustained “Commerce’s general grant of a duty drawback adjustment to Assan.”  624 F. Supp. 3d at 1362.[3]  As to Commerce’s specific calculation of that adjustment, however, the court granted the Government’s request for a voluntary remand on the ground that “[a] remand is generally required when an intervening event affects the validity of the

---

[3] Assan I also involved four unrelated issues.  The court (1) sustained Commerce’s denial to Assan of a home market rebate adjustment, (2) sustained Commerce’s deduction of Assan’s affiliated freight costs from its calculation of Assan’s constructed export price, (3) remanded for further explanation Commerce’s determination not to apply an adverse inference as to Assan’s reporting of certain billing adjustments, and (4) stayed consideration of Assan’s challenge to Commerce’s deduction of certain tariffs until the Federal Circuit’s then-pending decision in Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25 (Fed. Cir. 2023).  Because the Remand Results announce a de minimis dumping margin for Assan, these issues are not now live.  See Assan’s Cmts. on Remand Redetermination at 9, June 30, 2023, ECF No. 99 (“Assan’s Br.”) (“Assan supports the Final Remand Redetermination and will not request a second remand to the agency on . . . [the adverse inference] issue solely in the interest of expediency.”).

agency action." Assan I, 624 F. Supp. 3d at 1363 (citing SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).  The intervening event in question was the Federal Circuit's May 2021 decision in Uttam Galva, 997 F.3d 1192.  The decision affected the validity of Commerce's determination because Commerce had "allocated the exempted duties over Assan's total production rather than over only Assan's total exports of the subject merchandise, thereby utilizing a so-called 'duty neutral methodology.'" Assan I, 624 F. Supp. 3d at 1362; see also Common Alloy Aluminum Sheet from Turkey: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 13326 (Dep't Com. Mar. 8, 2021), P.R. 358.  In Uttam Galva, however, the Federal Circuit held that "[t]here is no basis" in 19 U.S.C. § 1677a(c)(1)(B) for dividing exempted duties by both exports and home-market sales of subject merchandise.  997 F.3d at 1197.

Commerce issued a draft redetermination and a revised dumping margin calculation on May 10, 2023.  See Draft Results of Redetermination & Revised Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S. (Dep't Com. May 10, 2023), C.R.R. 1, P.R.R. 2 ("Draft Remand Results").  Referring (seemingly) to the Federal Circuit, Commerce stated that it "revised its calculation of duty drawback consistent with the Court's opinion that the statute requires an upward adjustment to [Constructed Export Price] based on the entire drawback."  Id. at 2. Commerce stated that it accomplished this "by dividing the amount of duties exempted on the Inward Processing Certificate (IPC) closed during the [period of investigation] over the total quantity of exports made under that closed IPC."  Id.  This calculation yielded a "a per-unit duty drawback" figure that Commerce added to the adjusted gross unit price of each of Assan's U.S. sales of subject merchandise.  Id. at 3.

Before Commerce's revised drawback adjustment, the dumping margin[4] Commerce calculated for Assan hovered barely above the 2 percent <u>de minimis</u> level.  <u>Assan I</u>, 624 F. Supp. at 1380.  Following the revised adjustment, which increased Assan's calculated export price, the margin dropped below the <u>de minimis</u> level.  <u>Draft Remand Results</u> at 16.

The Association submitted comments on the <u>Draft Remand Results</u>, arguing that Commerce's revised methodology was flawed and proposing an alternate methodology that it suggested Commerce adopt instead.  <u>See</u> Letter from Association to G. Raimondo, Sec'y of Com., re: Comments on Draft Redetermination (May 17, 2023), C.R.R. 11, P.R.R. 8 ("Ass'n's Cmts. on <u>Draft Remand Results</u>").  Assan objected to the Association's comments on the ground that they contained "new arguments . . . which were not previously raised before this agency or the reviewing court."  Letter from Assan to G. Raimondo, Sec'y of Com., re: Objection to Petitioner's Comments on Draft Redetermination and Request to Strike New Factual Information at 1–2 (May 23, 2023), C.R.R. 12, P.R.R. 9.  Assan stated that the Association's proposed alternate methodology constituted "untimely filed new factual information" and should therefore "be stricken from the record of this proceeding."  <u>Id.</u> at 2 (citing 28 U.S.C. § 2637(d)).  Assan also filed comments of its own.  <u>See</u> Letter from Assan to G. Raimondo, Sec'y of Com., re: Assan's Comments on Draft Remand Redetermination Pursuant to Court Remand (May 17, 2023), Bar Code 4377730-01.

Commerce made no changes to the <u>Draft Remand Results</u> and issued a final remand redetermination on May 31, 2023.  <u>See</u> <u>Remand Results</u> at 16.  The Association and Assan each

---

[4] A dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  An adjustment that increases (constructed) export price thus decreases the ultimate dumping margin.

filed comments before the court.  See Assan's Br.; Ass'n's Br.  The Government responded to both comments, see Gov't Resp., and the Association and Assan each filed responses to the other's comments.  See Assan's Resp. to Cmts. on Remand Redetermination, July 31, 2023, ECF No. 104 ("Assan's Resp."); Ass'n's Resp. to Assan's Cmts. on Remand Redetermination, July 31, 2023, ECF No. 106 ("Ass'n's Resp.").

On August 14, 2023, the Association moved for oral argument.  See Ass'n's Request for Leave to File and Mot. for Oral Arg., Aug. 14, 2023, ECF No. 109.  The court granted this motion and issued questions to the parties.  See Ct.'s Qs. for Oral Arg., Jan. 18, 2024, ECF No. 111.  Oral argument took place on January 25, 2024.  See Oral Arg. Tr., Jan. 26, 2024, ECF No. 114 ("Oral Arg. Tr.").  At that argument and in a subsequent letter, the court ordered the parties to file additional briefs in response to the court's supplemental questions.  See Ct.'s Supp. Qs., Jan. 26, 2024, ECF No. 113.  The parties did so.  See Assan's Resp. to Supp. Qs., Jan. 31, 2024, ECF No. 115; Ass'n's Resp. to Supp. Qs., Jan. 31, 2024, ECF No. 116; Gov't Resp. to Supp. Qs., Jan. 31, 2024, ECF No. 118.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(2)(B)(ii).  19 U.S.C. § 1516a(b)(l)(B)(i) provides the standard of review: "The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law," id.; see also Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003), "which includes compliance with the court's remand order," SMA Surfaces, Inc. v. United States, 47 CIT __, __, 658 F. Supp. 3d 1325, 1328 (2023).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022). To be supported by substantial evidence, a determination must account for evidence in the record that fairly detracts from its weight, CS Wind Viet. Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016), including "contradictory evidence or evidence from which conflicting inferences could be drawn," Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487 (1951)).

An agency acts contrary to law if its decisionmaking is arbitrary or unreasoned. Burlington Truck Lines v. United States, 371 U.S. 156, 167–68 (1962). Commerce must establish and articulate a "rational connection between the facts found and the choice[s] made." Id. at 168; see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

## DISCUSSION

During the period of investigation, Assan exported subject merchandise to the United States under four distinct Turkish IPCs. See Assan Questionnaire Resp. at Ex. C-10. One of these IPCs closed during the period of investigation; the other three remained open. See id.; Oral Arg. Tr. at 7. Sales of subject merchandise exported under the closed IPC contributed to Assan's receipt of duty exemptions from the Turkish government. See Remand Results at 10. But Assan's sales under the three IPCs that remained open did not have this consequence. Under Turkey's Inward Processing Regime, the Turkish government does not grant drawbacks or exemptions "earned" under an IPC until the entire import balance of the IPC is matched by an equivalent value of exports. Assan I, 624 F. Supp at 1357. This means that an export under an open IPC does not result in a duty exemption (or drawback) until additional exports reach the amount required to

close the IPC.  Id.  As the Government puts it, "a duty liability remains contingent until an IPC is closed by the Turkish government."  Gov't Resp. at 7.

In this case, Commerce applied a duty drawback adjustment to all of Assan's U.S. sales of subject merchandise even though only some of those sales contributed directly to Assan's receipt of exemptions during the period of investigation.  Commerce did this by (1) deriving a uniform per-unit duty drawback rate from the exports attributable to the closed IPC—dividing "the amount of total duties exempted on the IPC closed during the [period of investigation] over the total quantity of exports made under that closed IPC to calculate a per-unit duty drawback adjustment"—and (2) applying that adjustment to all of Assan's sales of subject merchandise. Remand Results at 12.  As a result, Commerce applied a duty drawback adjustment to certain U.S. sales of merchandise whose export did not contribute to Assan's receipt of the Turkish duty exemptions used to calculate the adjustment.  Commerce stated that this methodology nevertheless "reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the [period of investigation]."  Id.

The Association disagrees, arguing that Commerce's methodology is not in accordance with 19 U.S.C. § 1677a(c)(1)(B)'s limitation of upward export price adjustments to "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  See Ass'n's Br. at 4.  The Association argues that Commerce ignored "a temporal aspect of the statute" by applying a per-unit drawback adjustment to increase the calculated price of sales of merchandise whose exportation from Turkey did not yet earn a duty exemption (because their associated IPCs remained open during the period of investigation).  Id. at 6.

The Government responds that Commerce's application of a duty drawback adjustment to sales under open IPCs was lawful because "the record demonstrates" that with respect to all of Assan's U.S. sales, "a connection exists between the non-payment of import duties and the exportation of subject merchandise to the United States."  Gov't Resp. at 7.  According to the Government, Commerce's application of a closed IPC–derived duty drawback adjustment to open-IPC U.S. sales is consistent with the Federal Circuit's holding in Uttam Galva that § 1677a(c)(1)(B) "requires an adjustment to 'export price' based on the full extent of the duty drawback" and that "[i]t does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports."  Id. (quoting 997 F.3d at 1197–98).

## I.    *Commerce's Revised Duty Drawback Adjustment Is Not in Accordance with Law*

It appears that Commerce's revised methodology impermissibly increased Assan's export price by more than "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B).  This is because Commerce calculated a per-unit duty drawback adjustment on the basis of a single closed IPC and applied that adjustment to all of Assan's U.S. sales of subject merchandise, including to sales of merchandise exported under open IPCs.  See Draft Remand Results at 3.  Even though certain open-IPC sales did not earn "benefits of the exempted duties," Gov't Resp. at 3, Commerce adjusted its calculation of their U.S. prices as though they did.  There was no clear statutory basis for doing so.  Under what the Government acknowledges is Commerce's practice, the amount of exempted duties under an open IPC is zero.  See Gov't Resp. at 3, 7 ("[A] duty liability remains contingent until an IPC is closed by the Turkish government.").  The adjustments to open-IPC sales thus exceed, in their

entirety, "the amount" of duties exempted by the Turkish government "by reason of" the open-IPC exports of subject merchandise to the United States. 19 U.S.C. § 1677a(c)(1)(B).

The Government argues that applying the closed-IPC–derived drawback adjustment to open-IPC sales nevertheless "reasonably reflects the duties exempted for the exports of subject merchandise made to the U.S. during the period of investigation." Gov't Resp. at 10. Assan develops this argument further, stating that "Commerce has endorsed a general principle whereby one closed [IPC] is used as a proxy for other IPCs in its drawback calculation," Assan's Resp. to Supp. Qs. at 1, and that "[b]ecause all of Assan's U.S. sales are made pursuant to an IPC, and are thus eligible for a drawback adjustment, application of the calculated per-unit adjustment to all U.S. sales is appropriate and does not involve any 'unrelated' duty liability," Assan's Resp. at 3 (internal quotation marks and citation omitted).

These arguments assert reasonableness but do not demonstrate it: neither the Government nor Assan explains <u>why</u> it was reasonable for Commerce to adjust the calculated price of open-IPC sales using a per-unit adjustment derived from duties exempted under a closed IPC. The Government's reference to "duties exempted for the exports of subject merchandise," Gov't Resp. at 10, appears to refer only to duties exempted pursuant to the closure of the closed IPC. This leaves unanswered the question of why Commerce extended an adjustment based on these closed-IPC exempted duties to increase anything more than the calculated price of closed-IPC U.S. sales.

Assan's suggestion that it was reasonable for Commerce to adjust the price of all of Assan's U.S. sales of subject merchandise because all were made pursuant to "an IPC," Assan's Resp. at 3, is similarly unpersuasive. It appears to rest on a tacit assumption that an IPC that is open during the period of investigation will close at some point in the future—such that it is reasonable to treat

all IPCs, open or closed, as closed for the purpose of calculating drawback adjustments.[5]  But

Commerce itself appears to have rejected the validity of this assumption, meaning that "the

grounds upon which [Commerce] acted in exercising its powers" are not those upon which Assan

suggests that Commerce's "action can be sustained."  SEC v. Chenery Corp., 318 U.S. 80, 95

(1943).  "Commerce's practice," the Government explains, "is to consider the benefits of the

exempted duties once an [IPC] is closed."  Gov't Resp. at 3; see also Icdas, 654 F. Supp. 3d at

1320–21 (collecting Commerce determinations); see also Assan's Resp. to Supp. Qs. at 2

(describing Commerce's "requirement that IPCs be 'closed' to be included in the numerator of the

per-unit calculation" (internal quotation marks and citation omitted)).  An open IPC yields no duty

exemptions during the period of investigation—and indeed may never close at all.  See Assan

Questionnaire Resp. at 43.

        The court does not read 19 U.S.C. § 1677a(c)(1)(B) to allow deeming the background

operation of an IPC scheme to confer exempt status on certain unexempted duties under open IPCs

for the narrow purpose of calculating drawbacks.  "[T]he statute," the court has explained,

"references only import duties, not import duty programs."  Saha Thai Steel Pipe (Public) Co. v.

United States, 33 CIT 1541, 1543 (2009).  In other words, Commerce's directive is to predicate

drawback adjustments on the exemption of duties—not a likelihood of future exemption through

---

[5] The Government raised a similar point at oral argument, stating that although Commerce's
methodology in this case "could result, in some cases, in a slightly higher duty drawback
adjustment, or a slightly lower duty drawback  adjustment," applying a uniform adjustment derived
from one closed IPC is "probably going to work out right, because Commerce is using the
consumption ratios under the closed IPC, which are unlikely to vary much from IPC to IPC."  Oral
Arg. Tr. at 45.  As with Assan's argument, however, this argument rests on an unstated and
unsupported assumption that the open IPCs (for which the closed IPC serves as a proxy) will close
in the future.

the contingent operation of a foreign government's duty exemption scheme.

Assan further argues that "Commerce properly granted Assan a full adjustment to U.S. price in accordance with its usual practice, i.e.[,] by dividing the amount of the uncollected duty under the closed IPC by Assan's total exports covered by that closed IPC and applying that per-unit adjustment to Assan's U.S. sales." Assan's Br. at 11. But Assan does not substantiate this description of Commerce's "practice" with an example of a past determination or case in which Commerce has applied a uniform per-unit adjustment to increase the calculated price of both closed- and open-IPC sales. As Assan acknowledged at oral argument, this aspect of Commerce's methodology has never been litigated before. See Oral Arg. Tr. at 35.

By focusing narrowly on Commerce's initial calculation of the per-unit adjustment, Assan loses sight of the equally important consideration of that adjustment's application. Recall that the per-unit adjustment is intended to reflect, as a practical matter, "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). Even if this adjustment is based on an internally correct numerator and denominator as to one IPC, it may cease to reflect "the amount" of exempted duties if it is subsequently applied to sales of merchandise whose exportation did not earn any duty exemptions at all during the period of investigation. It would be analogously incongruous to apply one taxpayer's properly-calculated deductions to another taxpayer's income. See 26 U.S.C. § 161.

The Government, meanwhile, transplants Uttam Galva to an inapplicable context. Uttam Galva involved an Indian steel producer that imported input materials into India and used those materials together with Indian-origin inputs to produce outputs that were exported to the United

States as subject merchandise, resulting in the producer's receipt of duty drawbacks from the Indian government.  997 F.3d at 1195–96.  Commerce's drawback adjustment methodology reduced[6] the amount of the export price adjustment based on the estimated proportion of drawback-earning U.S.-bound exports of subject merchandise that incorporated non-dutiable Indian-origin input materials.  Uttam Galva, 997 F.3d at 1195–96; see also Uttam Galva, 42 CIT at __, 311 F. Supp. 3d at 1352–53.  The Federal Circuit held that this was unlawful, explaining that "[i]t does not make a difference whether the imported inputs that qualified for a drawback were actually incorporated into goods sold in the exporter's domestic market."  Uttam Galva, 997 F.3d at 1198. In other words, Commerce failed to implement 19 U.S.C. § 1677a(c)(1)(B) when it reduced an export price adjustment to account for a foreign manufacturing process that incorporated non-dutiable, non-imported inputs into subject merchandise.  See id. at 1198.  Where an importer's country's government exempts duties "by reason of the exportation of the subject merchandise to the United States," 19 U.S.C. § 1677a(c)(1)(B), Commerce is to adjust export price by the full amount of the exemption—regardless of the destination of the imports that incurred the exempted duties.  See Uttam Galva, 997 F.3d at 1198.

---

[6] Commerce did this by "allocat[ing] the import duties exempted or rebated based on the import duty absorbed into, or imbedded in, the overall cost of producing the merchandise under consideration."  Id. at 1196 (internal quotation marks and citation omitted).  Commerce calculated the duty adjustment by dividing the amount of exempted duties by the cost of all production of merchandise, not just the production of U.S.-bound exports.  Uttam Galva Steels Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1345, 1352–53 (2018).  This, in turn, was based on Commerce's assumption that "imported raw material and the domestically sourced raw material are proportionally consumed in producing the merchandise, whether sold domestically or exported."  Id. at 1352 (citation omitted).  In other words, Commerce diluted the duty drawback adjustment to export price to account for the estimated proportional use of Indian-origin inputs in producing U.S.-bound subject merchandise.  See id.

All parties agree that Commerce avoided the <u>Uttam Galva</u> pitfall in this case.  <u>See</u> <u>Remand</u> <u>Results</u> at 16; Assan's Resp. at 10–11.  But § 1677a(c)(1)(B) is not a single-pitfall provision. There are other ways to increase export price by an amount other than "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B).  One of them is to increase export price by an amount that includes duties which have been collected and <u>not</u> rebated as of the end of the period of investigation—which is precisely what Commerce appears to have done in this remand proceeding.  The court accordingly remands the <u>Remand Results</u> for Commerce's reconsideration or further explanation of its adjustment calculation methodology.

## II.    *Commerce Did Not Adequately Explain Its Determination*

Remand is also warranted for the separate reason that Commerce failed to adequately explain its redetermination.  <u>See</u> <u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United</u> <u>States</u>, 41 CIT __, __, 222 F. Supp. 3d 1255, 1269 (2017).  Commerce is required to provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review."  19 U.S.C. § 1677f(i)(3)(A); <u>see also</u> <u>Motor</u> <u>Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983); <u>Timken U.S. Corp. v. United States</u>, 421 F.3d 1350, 1357 (Fed. Cir. 2005) (holding that § 1677f(i) codifies the <u>State Farm</u> standard).  And while the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," <u>State Farm</u>, 463 U.S. at 43 (quoting <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)), Commerce's explanation "must reasonably tie the determination under review to the governing statutory

standard and to the record evidence by indicating . . . what facts the agency is finding," CS Wind

Viet. Co, 832 F.3d at 1376.

The Remand Results do not meet this standard because Commerce did not substantively

address two of the Association's relevant arguments.    First, the Association argued that

Commerce's drawback methodology improperly applied a closed IPC–derived adjustment to

open-IPC sales:

> By assigning to each U.S. sale a per-unit drawback amount that applies only to
> exports made pursuant to [the closed IPC], regardless of whether Assan exported
> that U.S. sale pursuant to [the closed IPC], the Department . . . exaggerates the duty
> drawback applicable to Assan's U.S. sales.  Because the Department has identified
> no record evidence that Assan exported all its U.S. sales pursuant to [the closed
> IPC], the Department's methodology for Assan's reported per-unit drawback is
> unsupported by substantial evidence.

Ass'n's Cmts. on Draft Remand Results at 4.   Commerce acknowledged this argument in its

"Petitioner's Comments" summary and restated it as follows: "By assigning to each U.S. sale a

per-unit drawback amount that applies only to exports made pursuant to the closed IPC, regardless

of whether Assan exported that U.S. sale pursuant to that closed IPC, Commerce exaggerates the

duty drawback applicable to Assan's U.S. sales." Remand Results at 10.

But instead of addressing the Association's argument directly, Commerce devoted its

response to a discussion of how the record "demonstrate[s] that a reasonable link exists between

the duties imposed and those rebated or exempted."  Id. at 11 (citing Maverick Tube Corp. v.

Toscelik Profil ve Sac Endustrisi A.S., 861 F.3d 1269, 1274 (Fed. Cir. 2017)).   Referring

repeatedly to Uttam Galva (which, as explained above, does not apply to the Association's

challenge here), Commerce stated (twice, verbatim) that its methodology "reasonably reflects the

duties actually exempted for the exports of subject merchandise made to the United States during

the [period of investigation]."  Id. at 12–14.  Commerce thus misconstrued the Association's

argument as applying to a link between duties imposed and duties exempted. In fact, the Association's argument did not concern the nature of Turkish import duties or their links to exported merchandise. What the Association did challenge was the link between duties exempted and adjustments applied. Perhaps because of this misreading, Commerce did not acknowledge the Association's argument regarding the permissibility of applying a closed-IPC–derived duty drawback adjustment to open-IPC U.S. sales.

Commerce instead raised the specter of "tracing"—whereby a methodology runs afoul of Uttam Galva by attempting to match imported inputs to exported outputs—and claimed that the Association's proposed alternative methodology invokes that concern. See Remand Results at 12. But this kind of "tracing" is not relevant here. The Association has not advanced an alternative methodology whereby the amount of Commerce's duty drawback adjustment would depend on the nature of the pre-production sources of Assan's inputs. See Ass'n's Cmts. on Draft Remand Results at 7. What the Association recommends "tracing" is the link between the exemption of a duty and the U.S. sale that earns a corresponding drawback adjustment. Id. That kind of tracing was not at issue in Uttam Galva, and the Federal Circuit accordingly did not address it.

Avoidance of the type of "tracing" referenced by the Federal Circuit in Uttam Galva has a decades-long history in Commerce's determinations. It stems from Commerce's reasonable need to relieve itself "of the difficult, if not impossible, task of determining whether the raw materials used in producing the exported merchandise actually came from imported or domestic sources." Far E. Mach. Co. v. United States, 12 CIT 428, 431, 688 F. Supp. 610, 612 (1988). Based on Commerce's explanation here, however, the court cannot discern how the task the Association suggests that Commerce undertake—attributing specific adjustments to specific duty

exemptions—would implicate this concern.  Commerce has not established that linking U.S. sales to corresponding IPCs is as Herculean a task as linking, for example, specific imported physical steel coils to specific exported physical steel pipes (by analyzing a production process in a foreign country).  See Avesta Sheffield, Inc. v. United States, 17 CIT 1212, 1216, 838 F. Supp. 608, 610 (1993).  It is indeed a task that Commerce has suggested that it is capable of completing in this case, dividing as it did "the amount of total duties exempted on the IPC closed during the POI over the total quantity of exports made under that closed IPC to calculate a per-unit duty drawback adjustment."  Remand Results at 12; see also Assan's Questionnaire Resp. at 61 ("As noted above, all duties are tracked on a sales specific basis in . . . Assan's accounting systems.").

Second, Commerce did not address the Association's relevant argument that duty exemptions pursuant to the closed IPC do not all constitute exemptions "by reason of the exportation of the subject merchandise to the United States," 19 U.S.C. § 1677a(c)(1)(B), because, as summarized by Commerce, "the closed IPC . . . includes export destinations other than the United States as well as exports made outside of the [period of investigation]."  Remand Results at 10; Ass'n's Cmts. on Draft Remand Results at 4–5.  Commerce made no mention[7] of this specific statutory argument beyond this summary—this omission contravenes the text of 19 U.S.C. § 1677f(i)(3)(A).

---

[7] Commerce's statement that "[t]he statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports," Remand Results at 13, is not a response to the Association's argument.  Whether a particular imported good was exported to the United States is one question; whether goods exported under an IPC were exported to countries other than the United States is another.  19 U.S.C. § 1677a(c)(1)(B) (emphasis added).

**CONCLUSION**

For the reasons described above, the court remands the <u>Remand Results</u> for Commerce to (1) reconsider or further explain its duty drawback calculation methodology in light of the statutory constraints imposed by 19 U.S.C. § 1677a(c)(1)(B), and (2) respond to the arguments raised by the Association in its comments on the <u>Draft Remand Results</u>.

The court does not direct a result on remand. Commerce need not adopt, for instance, the Association's proposed drawback methodology. Commerce could adopt an altogether different methodology. Commerce could also leave its methodology unchanged and attempt to explain the reasonableness of its determination. If Commerce chooses this latter path, it must explain why 19 U.S.C. § 1677a does not prohibit adjustments to the price of open-IPC sales using a per-unit adjustment derived from closed-IPC sales—why, in other words, the universal application of that adjustment to all sales of subject merchandise does not increase "the price used to establish export price" by more than "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B).

The court does not reach the merits of any other unresolved issue in this litigation. Nor does the court opine on any questions of waiver or exhaustion pertaining to those issues. <u>See, e.g.</u>, Gov't Resp. at 12; Ass'n's Resp. at 8. If Commerce's second redetermination results in a dumping margin for Assan that is above the <u>de minimis</u> level, the court will consider those issues (and related questions) as necessary. It is hereby:

Consol. Court No. 21-00246                                                    Page 21

**ORDERED** that Commerce shall file its second remand redetermination with the court

within ninety days of the date of this opinion.  The timeline for filings and comments regarding

the second remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED.**

/s/  *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: April 11, 2024
        New York, New York